# Exhibit 5

**ADDLESHAW GODDARD**

Our reference   375839-1

28 October 2022

<u>By post:</u>

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)
5, rue Guillaume Kroll
L-1882 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg: B185604

Wolfgang Biedermann
H.I.G. European Capital Partners GmbH
Warburgstrasse 50
20354 Hamburg
Germany

Christian Kraul-von Renner
H.I.G. European Capital Partners GmbH
Warburgstrasse 50
20354 Hamburg
Germany

Maillis International S.A.
2, rue de Bitbourg
L-1273 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg: B212166

<u>Copy to:</u>

Alter Domus Liquidation Services S.à r.l.
15, boulevard R.W. Raiffeisen
L-2411 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg: B142389

Sébastien Binard
Arendt & Medernach S.A.
41 avenue JF Kennedy
L-2082 Luxembourg
Grand Duchy of Luxembourg

By email: WBiedermann@higcapital.com, ckraulvonrenner@higcapital.com, Sebastien.binard@arendt.com

**THIS LETTER REQUIRES URGENT ATTENTION.  FAILURE TO RESPOND IS LIKELY TO LEAD TO LEGAL PROCEEDINGS**

**Letter Before Action**

Addleshaw Goddard LLP, Milton Gate, 60 Chiswell Street, London EC1Y 4AG
Tel +44 (0)20 7606 8855  Fax +44 (0)20 7606 4390  DX 47 London
www.addleshawgoddard.com

Addleshaw Goddard LLP is a limited liability partnership registered in England and Wales (with registered number OC318149) and is authorised and regulated by the Solicitors Regulation Authority (with authorisation number 440721) and the Law Society of Scotland.  A list of members is open to inspection at our registered office, Milton Gate, 60 Chiswell Street, London EC1Y 4AG.  The term partner refers to any individual who is a member of any Addleshaw Goddard entity or association or an employee or consultant with equivalent standing based on their experience and/or qualifications.

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                                    28 October 2022

Dear Sirs

**Our Clients: Michael Maillis and Dailane Investments Limited**
**Claims relating to the sale of entities within the Maillis Group at an undervalue**

1.  We act on behalf of Dailane Investments Limited (**Dailane**), formerly Dailane Limited, and Michael Maillis.  In 1968, Mr Maillis founded M.J. Maillis S.A. Industrial Packaging Systems & Technologies, a company incorporated under the laws of Greece.

2.  Enclosed with this letter are supporting documents that are listed in the index contained in schedule 1.  All references to documents contained in the index herein are made using the format S1/document number(s).

3.  On 3 November 2011, H.I.G. Capital LLC, a company incorporated under the law of the USA, entered into a memorandum of understanding with Mr Maillis (**Memorandum of Understanding**) in relation to the investment and financial restructuring of the Maillis Group, which at the time comprised of Maillis International S.A (**Maillis SA**), a public limited liability company (*société anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg, together with its subsidiaries.  The Memorandum of Understanding was amended on 12 December 2011, replaced by a further Memorandum of Understanding on 25 May 2012 (S1/1), and a further addendum was agreed on 27 March 2014 (S1/2).

4.  In 2014, Europe Capital Partners I (**HIG Fund I**) invested in Maillis SA, together with its subsidiaries comprising the Maillis Group. Until the disposal of each Maillis Group subsidiary, H.I.G. European Capital Partners L.P., a limited partnership incorporated in the Cayman Islands, and H.I.G. Bayside Debt & LBO Fund II, L.P., a limited partnership incorporated in Delaware (together referred to as **HIG**) held the investment in the Maillis Group though H.I.G. Luxembourg Holdings 46 S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg (**HIG 46**).

5.  On 11 April 2016, Dailane and H.I.G. Luxembourg Holdings 47 S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg (**HIG 47**), entered into a fiduciary agreement (as amended and restated in February 2022, the **Fiduciary Agreement**) (S1/3-4).  Pursuant to the Fiduciary Agreement, HIG 47 held 14.925% of the total share capital of HIG 46 as fiduciary – and accordingly, an equivalent indirect participation in Maillis SA and the Maillis Group – for and on behalf of Dailane as settlor.

6.  We write further to the sale of the Contentious Assets, as defined in paragraph 12 below.  Following the sales, Dailane and Mr Maillis have undertaken investigations into the valuation methodology applied by HIG during the course of the disposals.  As a result of those investigations, Dailane and Mr Maillis have established that HIG sold the Contentious Assets at a significant undervalue in breach of HIG 47's obligations under the Fiduciary Agreement (see paragraphs 41 to 45 below).

7.  Dailane has suffered substantial losses as a result of the conduct of HIG 47, Wolfgang Biedermann, and Christian Kraul-von Renner and will principally seek to recover those losses from HIG 47, Mr Biedermann and Mr Kraul-von Renner as set out at paragraphs 54 to 65 below.

8.  Please note that failure to respond to this letter is likely to lead to legal proceedings being commenced against you without further notice (and increase your liability to our clients for costs).

**Background**

9.  Following the acquisition of the Maillis Group by HIG 46 and the entry into the Fiduciary Agreement, Mr Maillis was appointed non-executive chairman of Maillis SA pursuant to an appointment agreement dated 1 May 2017 (the **Appointment Agreement**) (S1/5).

10. In December 2018, HIG commenced the process of exiting its investment in the Maillis Group by selling Wulftec International, Inc. (**Wulftec**), a machine production company based in the US, to Duravant L.L.C.  In August 2020, HIG sold another Maillis Group company, Maillis Strapping Systems USA, Inc. (**MSS**), to Polychem Corporation, a portfolio company of the Sterling Group LP (**Sterling**).

2

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                     28 October 2022

11. During early 2020, HIG attempted to commence the exit process for the remaining entities of the Maillis Group. At the time, the Maillis Group did not have one year's worth of audited financial results following a restructuring in 2019.  That process was, unsurprisingly, aborted but did represent an early sign that HIG may not have had a genuine interest in achieving fair value at an arms' length for the remaining entities of the Maillis Group.

12. At the start of 2021, HIG began the exit process for the remaining entities of the Maillis Group, which at the time comprised of:

   a. Società Internazionale Applicazioni Tecniche S.p.A., a stock corporation (*società per azioni*) organised under the laws of Italy (**SIAT**);

   b. M.J. Maillis Single Member S.A. Industrial Packaging Systems & Technologies, a Greek stock corporation organised under the law of Greece (**MMS**);

   c. Marflex M.J. Maillis Poland sp. z o.o., a limited liability company organised under the laws of Poland (**MPS**); and

   d. Maillis SA and its remaining subsidiaries following the sales of SIAT, MMS, and MPS (the **Remaining Structure**).

   (together the **Contentious Assets**)

13. HIG appointed Harris Williams (**HW**), a global investment bank that specialises in mergers and acquisitions advisory services, to manage the exit process for the Contentious Assets by way of auction (the **Auction Process**).  Potential bidders were provided with Locked Box accounts from 2020 along with confidential information memorandums containing projections for each company. The Auction Process largely failed to generate satisfactory levels of interest in the Contentious Assets.  The Auction Process is further detailed in paragraphs 21 to 29.

14. Whilst reporting the results of the Auction Process to the board of Maillis SA on 21 October 2021 (S1/6), HIG presented the option of selling SIAT, MMS and the Remaining Structure to another HIG fund (the **Flip Transaction**) and selling MPS to a third party bidder.

15. Following the failure of the Auction Process, HIG made it clear that the Flip Transaction was its preferred option.  Thereafter and as a consequence, HIG rejected one third party offer for SIAT, rejected one third party offer for MMS, and rejected one third party offer for MPS but entered into further negotiations with another third party for MPS.  Instead of independently valuing the Contentious Assets subject to the Flip Transaction, HIG based their valuation of the companies on the offers that it had rejected.

16. On 20 December 2021, the share purchase agreements pursuant to the Flip Transaction were executed (S1/7-9).  On or around 29 March 2022, the Flip Transaction completed and shortly thereafter the proceeds were distributed to the shareholders of HIG 46.  The Flip Transaction is further detailed in paragraphs 30 to 40.

**Key provisions of the Fiduciary Agreement and Luxembourg law**

*Fiduciary Agreement*

17. The Fiduciary Agreement contains the following articles:

   Article 1.1: "*Fiduciary Assets means collectively (i) the <u>Shareholding</u>, (ii) the Investor Loan, (iii) the Senior Bonds, (iv) the Working Capital Facility Bonds and (v) the Transaction Bonus*"

   Article 1.1: "*Shareholding means 186,562 Shares (or as such number may be adapted in accordance with article 4.2.4 from time to time) representing <u>14,925% of the total share capital of HIG 46</u> and accordingly, <u>an indirect participation of 14,925%, in the share capital of Maillis S.A.</u> as of the date of this Agreement.*"

   Article 6(b): "*The Fiduciary Covenants that it will not dispose of, including by way of transfer, sale, redemption or otherwise, of the <u>Fiduciary Assets</u> and HIG 46's participation in Maillis*

3

*S.A., <u>other than on arms' length terms</u>.  Notwithstanding the foregoing, the Fiduciary may proceed to a restructuring of the Maillis group which would result in the replacement of the current parent company Maillis S.A., it being understood however that the Settlor's rights in respect of such new parent company shall be equivalent to the Settlor's rights in respect of Maillis S.A. under this Fiduciary Agreement."*

Article 12.1: *"This Fiduciary Agreement shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg."*

Article 12.2: *"The Parties agree that all disputes arising from the present Fiduciary Agreement which cannot be resolved by agreement of the Parties shall be submitted to the exclusive jurisdiction of the courts of the Grand Duchy of Luxembourg."* (Emphasis added) (S1/4)

18. Accordingly, Article 6(b) only permits HIG 47 to dispose of Dailane's shareholding in HIG 46 (and its indirect participation in Maillis SA) on arms' length terms.

*Luxembourg law*

19. Under Luxembourg law, directors (*administrateurs*) of public limited liability companies (*sociétés anonyme*) and private limited liability companies (*société à responsabilité limitée*) must perform their fiduciary duties in the corporate best interest (*intérêt social*) of the company they are representing and are expected to act wisely and carefully (*gestion en bon père de famille*) at all times during their tenure.

20. In addition, the concept of loss of chance (*perte de chance*) provides that where a fault of one or more parties directly causes an event, which results in a definitive loss of advantage that would have likely occurred, the offending parties will be liable to the affected party in damages for the financial prejudice suffered.

**Auction Process**

21. HW began the Auction Process in or around April 2021 by targeting 126 potential strategic and private equity buyers.  Of those potential buyers, 50 expressed an interest in purchasing at least one of the Contentious Assets and entered into negotiations for non-disclosure agreements.

22. On the instruction of HIG, HW provided prospective buyers of the Contentious Assets with locked box accounts for the year ended 31 December 2020 (**2020 Locked Box**), as well as confidential information memorandums for SIAT, MMS, and MPS (together the **CIMs**) containing forecasts for 2021 and projections thereafter up until 2025 (S1/10-12).  The potential bidders considered the information, and submitted their bids accordingly.

23. The CIMs were prepared by HW and were the main source of financial information provided to prospective buyers.  The financial figures in the CIMs were based on the financial factbook prepared by Ernst & Young (**EY**) (the **Financial Factbook**).  The Financial Factbook was provided with *no reliance* and therefore prospective bidders could not rely upon the reported figures, which was a further indication that HIG were not genuinely interested in selling the Contentious Assets at fair value and at arms' length.  Please also see paragraph 38 in this regard, where, in seeking debt finance for the Flip Transaction, HIG did procure reliance from EY, in stark contrast with its reluctance to do the same for the Auction Process.  One could not reasonably expect any bidder or debt fund to seriously consider investing in any of the Contentious Assets at a fair price without reliance on the financial figures produced.

24. Moreover, as a consequence of the restructuring of the Maillis Group in 2019, there was a lack of audited financial history of the Contentious Assets.  The lack of audited financial history could have easily been remedied by EY (or HW) at the request of HIG. No such request was made and the accounts for those years were not normalised, which amounted to a further indicator that HIG were not luxterested in selling the Contentious Assets at a fair value or at arms' length.

25. As a result, the Auction Process only resulted in one bid for SIAT, two bids for MPS, and one bid for MSS as follows:

4

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                                28 October 2022

a.   SIAT – offer from Sterling at an enterprise value of €157 million;

b.   MPS – offers from:

   i.   Sterling (which had previously acquired MSS from HIG in 2020 and sold Time Manufacturing Holdings LLC to HIG in December 2021 at a value of approximately $1 billion according to Bloomberg) at an enterprise value of €42.5 million; and

   ii.  Teufelberger Gesellschaft m.b.H., a limited liability company organised under the laws of Austria and registered with the Austrian Commercial Register (**Teufelberger**), at an enterprise value of €46 million.

c.   MMS – offer from Specta Group (**Specta**), a company incorporated in Germany, at an enterprise value of €6.4 million.

   (together the **Auction Offers**) (S1/6)

26. The standard minimum financial history for an auction sale of this nature is three years.  If HIG was genuinely motivated to achieve the best price for the Contentious Assets, it should have normalised the accounts for the missing years.  However, normalised accounts were not prepared by HIG or Maillis SA, and therefore could not be made available to prospective buyers for the purposes of the Auction Process.

27. In its summary of the bids, the Maillis SA board paper applied a series of adjustments (cash and cash equivalents, financial debt, other cash and debt-like items, working capital etc.) to the enterprise values to arrive at the base purchase price for each entity, before applying further adjustments (leakage deduction amount, and cash flow for 2021) to arrive at an indicative final purchase price.  All of the Auction Offers detailed above, with the exception of Teufelberger's offer for MPS, were eventually rejected by HIG.

28. Despite owning a material interest in the Maillis Group through Dailane, throughout the Auction Process Mr Maillis was only provided with limited information on the sale of the Contentious Assets and even then only following repeated requests.  When limited information was forthcoming from Mr Biedermann or Mr Kraul-von Renner it was often vague and lacking in evidence.  As a result, it was impossible for Mr Maillis to reach an informed view of the effectiveness of the Auction Process at the time.

29. Taken together: (a) the decision not to provide reliance on the financial figures to bidders, (b) the failure to normalise the accounts of the Contentious Assets, and (c) the consistent lack of information provided to Mr Maillis throughout the Auction Process, all support the assertion that HIG did not have a genuine interest in achieving fair value for the Contentious Assets at an arms' length pursuant to the Auction Process.

**Flip Transaction**

30. On 21 October 2021, HIG proposed an alternative of selling SIAT, MMS, and the Remaining Structure to another HIG fund – H.I.G. Europe Lower Middle LBO III (formerly H.I.G. Europe Capital Partners III) (**HIG Fund III**) (S1/6).  Under this option, the Flip Transaction, MPS would still be sold to a third party.  To the best of our knowledge, HIG Fund III also currently hold shares in Aspire Pharma Ltd and Infratech Bau GmbH in addition to SIAT, and the limited partners are pension funds and an endowment fund.

31. For the purposes of valuing the entities included in the Flip Transaction, HIG based the enterprise valuations on the Auction Offers, which had since been rejected by HIG.  The rejected Auction Offers had been submitted by third parties based on the 2020 Locked Box accounts, which was the year that Covid-19 negatively affected the financial results of many companies.  Unsurprisingly, the financial results of the Contentious Assets for 2021 were considerably stronger.

32. HIG proceeded to use the Auction Offers (themselves based on the 2020 Locked Box accounts) as a basis for valuing the Contentious Assets in spite of the following factors:

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                    28 October 2022

   a.   it was selling to another HIG entity, and thus there was an increased risk of a conflict of interest;

   b.   the share purchase agreements for the entities subject to the Flip Transaction were executed a full year later than the 2020 Locked Box accounts, on 20 December 2021 (S1/7-9);

   c.   the marked improvements in financial performance of the Contentious Assets throughout 2021;

   d.   it had the 2021 Budget for the Maillis Group at its disposal (S1/13);

   e.   it had interim financial figures up to and including October (at the time of the 21 October 2021 Maillis SA board meeting) and up to including December (at the time the share purchase agreements were executed pursuant to the Flip Transaction) (S1/22); and

   f.   Luc Van Damme (CEO of the Maillis Group at the time) had provided an updated 5-year projection for SIAT which clearly showed that SIAT's actual results substantially exceeded budget and its forecasts were accordingly adjusted upwards (S1/14).

33. Having based its enterprise valuations on the Auction Offers, HIG proceeded to make a series of adjustments to account for cash flow in 2021 whilst simultaneously making a series of deductions to account for purported net debt (see paragraphs 62 and 63 for further details on the net debt).

34. Throughout the Flip Transaction, various individuals criticised the valuation methodology applied by HIG to the Contentious Assets.  By way of example:

   a.   on 2 November 2021, Mr Maillis emailed Mr Kraul-von Renner (HIG representative on the board of Maillis SA), stating:

        *"I believe now, with the <u>help of an external expert</u>, I will understand your option 3 and comment as the Seller.*

        *My intention is to come to a fair agreement, both for the "Sellers" and the "Buyer", avoiding negotiations between partners."* (Emphasis added) (S1/15)

   b.   on 14 November 2021, Doretheos Samoladas (representing Adorma Limited on the board of Maillis SA) emailed Mr Kraul-von Renner, stating:

        "*Financial Performance Figures used to calculate the EV. Although I see the latter point, what really strikes me, at this point in time, is the fact that <u>the proposal follows the Locked Box structure of the failed</u> (regarding SIAT and Inofyta) <u>bidding process of the 1st half of 202</u>1 (<u>which of course, was taking into account 2020 year-end figures</u>). Using the Locked Box figures at this point in time, where we are very close to 2021-year end, does not look right. Moreover, a transaction of the nature of the pertained flip deal (a deal between HIG funds, where everything should be at arm's length) makes this look even stranger. The new fund was not part of the bidding process and so, nobody is committed to apply the now obsolete 2020 figures. I understand that the 2020 Locked Box concept would now work (again) in favor of the Buyer but, [a] I think we are losing the balance of how much additional value should be left for the Buyer, while [b] net debt calculation becomes questionable, when we now have actual 2021 figures, which we should apply [c] we also have to see what the "Leakages" are (to beneficiaries outside the scope of the flip), which will not be an issue with 2021 figures. So, since closing of the flip transaction will take place at the end of 2021 or beginning of 2022, <u>the 2020 Locked Box concept should not apply.</u>*" (Emphasis added) (S1/16)

   c.   on 6 December 2021, Luc van Damme (CEO of the Maillis Group at the time) emailed Mr Kraul-von Renner stating:

        *"I completely disagree with the numbers. <u>They are diminishing what we have achieved with Maillis.</u>"* (Emphasis added) (S1/17)

d.  on 9 December 2021, Mr Maillis emailed Mr Kraul-von Renner stating:

> *"I really don't understand being at the end of 2021 and having clear and reliable Company figures you still insist in the <u>creative locked box logic</u> and for explanation you elaborate not understandable <u>intransparent and confusing bridges</u>. <u>Sorry but to me the only reason I see, is an attempt to transfer disproportional value to the new Fund</u>. As I mentioned yesterday to Wolfgang and in order to facilitate the preferred to you Flip Option, I am prepared to accept the very aggressive EV valuation you proposed in October, although I know that this already transfers €20M-€30M to the new Fund because of the low multiplier. I explained further that in that case I will not accept (and this is not negotiable) any creative calculation of the Equity valuation other than the one based on the Net Debt calculation forecasted by Luc (not by you or by me) and adjusted with the IFRS Siat's Net Debt. This is my position."* (Emphasis added) (S1/18)

35. Despite all of the protestations detailed in paragraph 34 (amongst others), HIG decided to proceed with the Flip Transaction at the same value, save for a transaction bonus of €500,000 payable to Dailane which was designed solely to account for the cash adjustments made to SIAT (S1/20).

36. Mr Maillis did not have any legal right to prevent the sale of the Contentious Assets through the Appointment Agreement, the articles of association of HIG 46, the articles of association of Maillis SA, or through his singular vote on the board of directors of Maillis SA.  Accordingly, on 16 December 2021, Mr Maillis confirmed that he would approve the Flip Transaction by email to Mr Biedermann (HIG representative on the board of Maillis SA) and emailed the following day stating:

> "*at this point <u>I cannot do much but submit to the terms of H.I.G.</u>  I will therefore vote in favor of the flip, accepting the additional €500K you offered*." (Emphasis added) (S1/20)

37. In addition, on the 16 December 2021 Mr Maillis approved the sale of the Contentious Assets in his capacity as a director of Maillis SA and chairman of the board by signing the board minutes approving the sale (S1/21).

38. HIG ensured that EY placed reliance on a new version of the Financial Factbook (not seen by Mr Maillis or Dailane) when seeking debt finance for the Flip Transaction.  The fact that HIG did not ensure that the same reliance was in place for prospective bidders in the Auction Process is telling.

39. Despite owning a material interest in the Maillis Group through Dailane, throughout the Flip Transaction Mr Maillis was only provided with limited information following repeated requests.  When limited information was forthcoming from Mr Biedermann or Mr Klaus-von Renner it was often vague and lacking in evidence.  As a result, it was impossible for Mr Maillis to reach an informed view at the time of whether the Flip Transaction was carried out at a fair value.  In addition, neither Mr Maillis nor Dailane received any opportunity to roll over their investment in to HIG Fund III, as is often required with continuation funds.

40. HIG proceeded with the Flip Transaction in spite of the significant opposition it received throughout the process.  Fundamentally, opposition to the Flip Transaction was premised on the fact that the inputs into the calculations to value the Contentious Assets did not represent fair value at the time. The share purchase agreements for the Contentious Assets were executed on 21 December 2021, but the valuations were based on rejected Auction Offers, which in turn were based on the 2020 Locked Box accounts.  A calculation on this basis cannot be said to achieve fair value at the time of sale.  The Flip Transaction was also clearly not done at arm's length, particularly given that the Contentious Assets were sold to another HIG fund.

**Claim for breach of Fiduciary Agreement against HIG 47**

41. As detailed in paragraph 18, the Fiduciary Agreement prevented HIG 47 from disposing of the Fiduciary Assets (as defined therein) other than on *arms' length* terms.

42. Following the failure of the Auction Process, there was always a risk that the Flip Transaction would not be carried out on arms' length terms given that HIG Fund I was selling to HIG Fund III.  One way of mitigating that risk would have been to commission a fair and impartial independent valuation report or fairness opinion as at the time of the disposal.  We have seen no evidence to suggest either were sought.

7

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                                    28 October 2022

43. Instead, HIG purported to rely on the Auction Offers (which it either eventually rejected or reduced) and made adjustments to account for cash flow in 2021 and the net debt position of the remaining entities. Using the Auction Offers as a basis for valuation was clearly inappropriate for the reasons outlined in paragraph 40. By pursuing the Flip Transaction in the way that it did, HIG acted in an obvious and flagrant conflict of interest without seeking to properly mitigate that (or any) risk.

44. As a result, HIG 47 breached article 6(b) of the Fiduciary Agreement and is liable to Dailane for the financial prejudice suffered as a result of the Flip Transaction.

45. In addition, the eventual sale of MPS to Teufelberger resulted in a material reduction in proceeds payable to Dailane. The reduction in price was not justified by Mr Kraul-von Renner until 26 April 2022, after the transaction had completed (S1/19). Furthermore, the mismanagement of the Auction Process (detailed in paragraph 29) also made it challenging to ensure that MPS was sold at arms' length and at fair value. In the absence of any evidence to the contrary, HIG breached article 6(b) of the Fiduciary Agreement and is liable to Dailane for the financial prejudice suffered that resulted from the sale of MPS.

**Claims for breach of fiduciary duties against Mr Biedermann and Mr Kraul-von Renner**

46. In addition, in Mr Biedermann and Mr Kraul-von Renner's respective capacities as HIG appointed directors of Maillis SA, both failed to act in the best corporate interest of Maillis SA by not implementing the Flip Transaction at arms' length or fair value. As detailed in paragraph 17, Dailane held a minority shareholding in HIG 46 that specifically included an indirect shareholding in Maillis SA. At the time of the Flip Transaction, Maillis SA was a pure holding company for the Maillis Group and was wholly owned by HIG 46. Therefore, Mr Biedermann and Mr Kraul-von Renner are liable to Dailane for breaching their fiduciary duties owed to Maillis SA.

47. Patently, Mr Biedermann and Mr Kraul-von Renner were orchestrating the Flip Transaction for and on behalf of HIG as a whole. Their roles at HIG led to an inherent conflict of interest, by simultaneously representing the buyer and seller within the Flip Transaction. Neither Mr Biedermann nor Mr Kraul-von Renner did anything to mitigate this conflict. Mr Biedermann and Mr Kraul von-Renner did not act in the best corporate interest of Maillis SA, rather, they acted in the best corporate interest of HIG.

48. Instead of acting in the best interests of the direct and indirect shareholders of Maillis SA during the Flip Transaction, Mr Biedermann and Mr Kraul-von Renner engaged in mismanagement (*faute de gestion*) by failing to transfer the entities at arms' length or for fair value. As such, both Mr Biedermann and Mr Kraul von-Renner failed to perform their mandate as directors by failing to meet the standard reasonably expected of a wise and careful director placed in the exact same situation.

49. Accordingly, Mr Biedermann and Mr Kraul-von Renner are also liable to Dailane for the financial prejudice suffered as a result of breaches of their fiduciary duties.

50. The claims in paragraphs 46 to 49 are repeated in respect of the sale of MPS. As such, Mr Biedermann and Mr Kraul-von Renner are also liable to Dailane for the financial prejudice caused as a result of breaches of the fiduciary duties owed by them to Maillis SA in respect of the sale of the MPS.

**Claim for loss of chance (*perte de chance*) against Maillis SA**

51. Alternatively, Dailane, as an indirect shareholder and as such an affected third party (*action individuelle*), suffered a financial prejudice resulting from the fault of Maillis SA's board of directors' approval of the Flip Transaction, which neither occurred at arms' length nor at fair value.

52. Maillis SA's board of directors' approval of the Flip Transaction resulted in a loss of advantage for Maillis SA – namely, to sell the Contentious Assets at arms' length and for a fair value to any other future bidder. If HIG had conducted the Auction Process and the Flip Transaction correctly, at arms' length, the Contentious Assets would have been sold at a fair value, which would have generated significantly higher value for Dailane as an indirect shareholder. The board of Maillis SA were, or should have been, aware of this at the time but chose to approve the Flip Transaction. As a result, in approving the Flip Transaction on the terms offered by HIG, Maillis SA is liable to Dailane for loss of chance.

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                                    28 October 2022

53. The claims in paragraphs 51 and 52 are repeated in respect of MPS.  As such, Maillis SA is also liable to Dailane for the financial prejudice suffered caused by the loss of chance in respect of the sale of the MPS.

**Loss**

Timing of the valuation

54. The Auction Process, commissioned by HIG, took place in the middle of 2021 and provided prospective bidders with 2020 Locked Box accounts.  As is well known, 2020 was the year that Covid-19 struck and many companies suffered economically as a result.  The Maillis Group was no exception to this.

55. Having received limited offers from third parties, HIG proposed the Flip Transaction in October 2021.  However, rather than ensure that entities subject to the Flip Transaction were independently valued at that time (as any prudent vendor would have done), HIG based the enterprise valuations on the very same third party offers that it rejected.  HIG tacitly accepted the unfairness of this approach by purporting to make certain adjustments to the overall equity value throughout the Flip Transaction, including by way of cash and net debt calculations.

56. At the time that the share purchase agreements for the Flip Transaction were executed on 20 December 2021, HIG had access to an array of financial information, which is set out more fully at paragraph 32.  Fundamentally, however, in December 2021 HIG should not have been basing its valuations for the Flip Transaction on the Auction Offers that it rejected, which themselves were largely based upon the 2020 Locked Box accounts – particularly following the much improved financial performance of the Maillis Group in 2021.  Given the time that had elapsed, HIG should have either used locked box accounts from 2021 or completion accounts.  Regrettably, HIG did neither.

57. In the absence of 2021 locked box accounts or completion accounts, the most appropriate date to fairly and reasonably value the entities sold pursuant to the Flip Transaction is 20 December 2021, being the date on which the share purchase agreements were executed.

Enterprise value of the Contentious Assets as at 20 December 2021

58. Without waiving privilege in any form, Dailane and Mr Maillis have obtained independent expert valuations of SIAT and MMS.

59. As at 20 December 2021:

   a. on a market approach SIAT had an estimated enterprise value of €280 million; and

   b. on an income approach (due to lack of comparable companies) MMS had an estimated enterprise value of €12 million.

MPS discount

60. In an email sent by Mr Kraul-von Renner to Mr Maillis on 19 April 2022, he stated that the distribution for MPS had been reduced from €41.7 million to €38.6 million without providing any sufficient reasoning or supporting evidence (S1/19).  The sale of MPS is further detailed in paragraph 45.

61. Dailane also seeks the value of this reduction, pro-rated, as its loss.

Net debt as at 20 December 2021

62. Without waiving privilege in any form, schedule 2 contains calculations by a forensic accounting expert on the net debt position of the entities sold pursuant to the Flip Transaction as at 20 December 2021.  In order to accurately assess the net debt of those entities in December 2021, the forensic accountant has used the net debt schedule of the same date and made various adjustments where there is sufficient evidence to do so.

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                                     28 October 2022

63.  In summary, the net debt position of -€9.5 million suggested by HIG at the time of the Flip Transaction was markedly different from the actual net cash position in December 2021 of €20.6 million.

Total loss

64.  The total loss to the shareholders of HIG 46 caused by the breaches particularised in paragraphs 41 to 53 is as follows:

| Item | HIG valuation (EUR millions) | Correct valuation (EUR millions) | Delta (EUR millions) |
| --- | --- | --- | --- |
| Enterprise value of SIAT | 157.5 | 280 | 122.5 |
| Enterprise value of MMS | 6.4 | 12 | 5.6 |
| MPS discount | 38.6 | 41.7 | 3.1 |
| Net debt | (9.5) | 20.6 | 30.1 |
| | | **Total** | 161.3 |

65.  Applying the total loss of €161.3 million to Dailane's shareholding in HIG 46 of 14.925% provides the total financial prejudice suffered by Dailane, being **€24,074,025**.

**Next steps**

66.  If proceedings are to be avoided, we require that HIG 47, Mr Biedermann and Mr Kraul-von Renner admit liability for breaches particularised in paragraphs 41 to 53 in respect of the sale of the Contentious Assets and provide proposals for repayment of our clients' losses.

67.  At this stage, we also request you provide:

   a.  Any commentary or documentary evidence in the possession of HIG 46, HIG 47, Mr Biedermann, Mr Kraul-von Renner, HIG or any other HIG entity regarding the Flip Transaction and the sale of the Contentious Assets more generally;

   b.  Any independent valuation report prepared or commissioned by HIG 46, HIG 47, Mr Biedermann, Mr Kraul-von Renner, HIG or any other HIG entity for the purposes of the Flip Transaction or the sale of the Contentious Assets;

   c.  Any correspondence or documents from the advisory board or investment committee of HIG, which purportedly considered and approved the Flip Transaction;

   d.  Any fairness opinion obtained by HIG 46, HIG 47, Mr Biedermann, Mr Kraul-von Renner, HIG or any other HIG entity pursuant to the Flip Transaction;

   e.  All communications between HIG 46, HIG 47, Mr Biedermann, Mr Kraul-von Renner, HIG or any other HIG entity and Sterling, Teufelberger, and Specta in relation to the Auction Process and the Auction Offers; and

   f.  All other internal and external communications of HIG 46, HIG 47, Mr Biedermann, Mr Kraul-von Renner, HIG or any other HIG entity relating to the Flip Transaction and the sale of the Contentious Assets more generally, including communications with EY and HW.

68.  For the avoidance of doubt, if you refuse to provide the information requested at paragraph 67, Dailane and Mr Maillis reserve the right to apply to court for an order compelling you and/or relevant third parties such as professional advisors, liquidators, corporate service providers, and suppliers of other goods and services to provide these.  We will seek to recover the costs of obtaining any such orders from HIG 47, Mr Biedermann and/or Mr Kraul von-Renner.

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                    28 October 2022

69. Please also note that as there is now a dispute between HIG 47 and Dailane, you are required to preserve documents that may be relevant to the dispute.  Failure to do so may amount to contempt of court.

**Conclusion**

70. Dailane and Mr Maillis reserve the right to amend or add to the facts and matters upon which these claims are based, the causes of action, heads of loss and amounts claimed in due course.  Dailane and Mr Maillis also reserve the rights to any interest that may accrue on the losses set out at paragraph 65.

71. We require a response to this Letter Before Action including an admission of liability, proposals for repayment, and receipt of the materials and information set out at paragraph 67, as soon as possible, and in any event no later than **11 November 2022**.  In the absence of the same, we are instructed to commence civil proceedings against HIG 47, Mr Biedermann and Mr Kraul von-Renner without further notice to you and will seek to recover our costs from each of you as appropriate.  In addition, we strictly reserve our clients' rights to make any appropriate ancillary applications, notify any affected third parties and/or any regulators.

72. If you are in any doubt over your rights and obligations in relation to this letter, we strongly suggest that you seek independent legal advice.

Yours faithfully

**Addleshaw Goddard LLP**

Direct line      +44 (0)20 7788 5161
Email           Paul.Ferguson@addleshawgoddard.com

11

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                               28 October 2022

**Schedule 1 – Supporting Documents**

| Document number | Description | Date |
|---|---|---|
| 1. | Memorandum of Understanding | 25 May 2012 |
| 2. | Addendum to Memorandum of Understanding | 27 March 2014 |
| 3. | Fiduciary Agreement | 11 April 2016 |
| 4. | Amended and Restated Fiduciary Agreement | February 2022 |
| 5. | Appointment Agreement | 1 May 2017 |
| 6. | HIG paper (prepared for the Maillis SA board meeting) | 21 October 2021 |
| 7. | SIAT share purchase agreement | 20 December 2021 |
| 8. | MMS Flip share purchase agreement | 20 December 2021 |
| 9. | Remaining Structure share purchase agreement | 20 December 2021 |
| 10. | SIAT CIM | May 2021 |
| 11. | MMS CIM | May 2021 |
| 12. | MPS CIM | May 2021 |
| 13. | Budget | 2021 |
| 14. | Maillis SA board of directors paper | 20 October 2021 |
| 15. | Mr Maillis email to Mr Kraul-von Renner | 2 November 2021 |
| 16. | Mr Samoladas email to Mr Kraul-von Renner | 14 November 2021 |
| 17. | Mr van Damme email to Mr Kraul-von Renner | 6 December 2021 |
| 18. | Mr Maillis email to Mr Kraul-von Renner | 9 December 2021 |
| 19. | Mr Kraul-von Renner email to Mr Samoladas | 9 December 2021 |
| 20. | Mr Maillis email to Mr Biedermann | 16 December 2021 |
| 21. | Maillis SA board minutes | 16 December 2021 |
| 22. | Management reporting package | December 2021 |

H.I.G. Luxembourg Holdings 47 S.à r.l. (in Liquidation)                     28 October 2022

**Schedule 2 – Net Debt**

| Item | Value as at 20 December 2021 (EUR millions) |
|---|---|
| **Overall net debt** | |
| 1.   Net debt schedule | 8.8 |
| **Adjustments** | |
| 2.   Exit fees | (1.2) |
| 3.   Removal of Marflex net debt | 7.2 |
| 4.   Removal of IFRS debt | 5.8 |
| **Total** | **20.6** |

# Supporting Documents

1

## MEMORANDUM OF UNDERSTANDING

**THIS AGREEMENT** (this "Agreement") is made on May 25th, 2012

**BETWEEN:**

(1)     **Michael J. Maillis** ("Maillis"), founding shareholder of M.J. MAILLIS S.A.- INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES, a company duly established under the laws of Greece and having its registered seat at 5 Xenias street, Kifissia Attikis GR 145 62

And

(2)     **H.I.G. Capital LLC,** a company duly established under the laws of USA and having its registered seat at 1450 Brickell Avenue, 30th floor Miami, FL 33131 USA ("HIG")

Each of HIG and Maillis being "a Party" and together known as "the Parties"

**WHEREAS:**

(1) MJ Maillis S.A. (the "Company") and its Group (the "Mailis Group") have completed, on 6.10.2011, the financial restructuring of €279mio (out of approx.€294.6mio total) Group debt, which has decreased the Group's total debt to €219.6mio (as of 31.3.2012), including non-participating debt of approx. €13.7m (the "Company's current debt"). Given that the Company is still overleveraged, the founding shareholder (and Chairman of the BoD of the Company), has extended (through Mesirow Financial and with the assistance of DPK Solutions) an invitation for an investment proposal to potential investors for a transaction (the "Transaction") that could lead to a significant further decrease of the debt, the funding of the Company with new working capital and the consequent growth and increase of value of the Maillis Group. Maillis also seeks that any such investor accepts certain terms in respect of his post-Transaction participation and his contribution to the Group's future growth.

(2) HIG is an internationally active equity investor, having responded to Maillis' invitation and intending to pursue the conclusion of a Transaction with the elements and upon the conditions referred below. The term HIG herein below includes all HIG affiliates involved in the contemplated Transaction.

(3) The Parties have already entered into a Memorandum of Understanding, dated 3.11.2011, as modified by an Amendment, dated 12.12.2011, which they now wish to terminate and replace with this revised agreement.

1. **Transaction Structure**

   A. **The Company**

   (i)  Funds advised by HIG intend and will attempt to purchase up to 100% of all outstanding post-participating debt with a face value of approx. €206m (as of 31.3.2012) and up to approx. 77.4% of the shares in Maillis Group owned by Company's lenders (lenders' equity with par value €74.9mio), except non participating debt and local bank debt in the amount of approx. €13.7m, through two special purpose vehicles (SPV1 and SPV2, respectively). More specifically:

   (ii)  Funds advised by HIG are expected to leverage an amount of loan, in order to finance the purchase of Company's current post-participating debt, from its present creditors (the "Lenders"), at a discount. Such loan of HIG and/or SPV1 will bear interest with a rate up to EURIBOR + 500 bps pick, for 12 months and up to EURIBOR + 350 bps, thereafter. HIG expects that Lenders will be willing to sell their debt (and their shares) at prices significantly below face value or allow HIG to use debt purchase methods (e.g. bond exchange transactions) that will result in a substantially lower purchase cost than the debt face value. In any case, Parties are interested to buy this debt at a cost, as low as possible

   (iii)  SPV1 shall then offer to purchase all of the Company debt and SPV2 shall offer to purchase all of the Lenders' equity (debt purchase transaction is expected to be fast and relatively simple, since all Company debt is currently held under three bond loan facilities). Alternatively to the previous, HIG may use other affiliates to initially acquire Company's debt and equity, which will be subsequently transferred to SPV1 and SPV2, respectively, as soon as technically possible after their formation is completed

   (iv)  After having bought the debt or in case only a portion of the debt can be acquired, after having reached agreement with the remaining debt holders on a substantial restructuring of the total port-partcipating debt (or at an earlier stage, if HIG considers it necessary), SPV1 will provide Maillis Group with a €10m (or less, if at an earlier stage) bridge loan, to fund the Company's immediate working capital needs for its growth, based on the agreed assumptions and projections, in the CIM received by HIG on Friday, September 23, 2011. This bridge loan will have a twelve months term and would be expected to be paid back by Maillis Group from the proceeds realized from the sale of non-operating assets of the Maillis Group and the Company's operating cash-flows.

   (v)  If HIG/SPV2 acquires less than 1/3 of the Company's equity, Maillis will sell to SPV2 and SPV2 shall purchase the proportionate portion of Maillis' current stake (total 10.2%, directly and indirectly held, through the company Horqueta Holdings Ltd). For example, in case of HIG acquiring 27% of Company's equity, Maillis will sell to SPV2 27% of his current 10.2% stake and will be paid 27% of the total stake's value, specified below. If HIG/SPV2 acquires 1/3, or more of

the Company's equity and immediately after the purchase of 1/3, or more, of the Company's equity, by SPV2, SPV2 will launch a compulsory takeover bid aiming at the free float shareholders, at any legal minimum, which needs to be offered under the compulsory bid, currently assumed to be €0.13 approx. per share, or a total of €9.5m. Maillis will sell all the shares, directly or indirectly (through the company Horqueta) held by him (10.2% of Company's total share capital), under the public offer and in exchange, will receive an assumed € 4.5 m in cash. HIG will balance out (in whatever form it deems expedient) the expected €4.5m, from the takeover bid process, in case the actual takeover bid price that Maillis will receive is, for any reason, lower than €4.5m. In no case however shall Maillis receive more than € 4.5m in cash for all the shares directly or indirectly held by him. The usual time frame, which includes the preparation and filing of a prospectus (without extraordinary events, like competitive offers or price readjustment) for this process, is expected to be 7-11 weeks.

(vi)   Subsequently, upon the condition that SPV1 has acquired at least 75% of the debt and SPV2, at least 66.67% of Company's voting rights, HIG and SPV2 will proceed, prior to the merger in (vii) below, to all required actions to cause that the Company shall be delisted from the Athens Stock Exchange, as soon as possible. In order to acquire the necessary majority stake for delisting, if needed, HIG and SPV1 and SPV2 will proceed (to the extent possible and permitted) with an increase of capital in the Company, through a debt-to-equity conversion, using part of the purchased debt.

(vii)  To the extent possible and tax-efficient, HIG/SPV1 will waive with Maillis Group the acquired debt in excess of the actual purchase price paid by SPV1, either through a debt-to-equity conversion and/or through a merger. Parties envisage that the most efficient way of achieving this result will be HIG's SPV1 absorption by the (delisted) Company, by effect of a merger, bringing 100% of its debt into the Company, which (a) will become debtor of SPV1's Lenders and (b) all of Company's debt to SPV1 shall be eliminated, due to the merger, without any tax implications [merger timeframe 8-12 weeks]. Parties accept that, notwithstanding the previous, HIG may decide to defer the time of waiving the Super Senior Facility debt it will hold, by transferring the SSF bonds to SPV2 and leaving their conversion-to-equity for a later stage.

(viii) The remaining debt shall be refinanced by Maillis Group with third party Lenders, as soon as practically possible.

(ix)   Notwithstanding the previous, if SPV1 acquires less than 75% of the debt and/or SPV2, acquires less than 66.67% of Company's voting rights, then, in order to achieve the reduction of Company's debt, HIG, SPV1 and SPV2 will seek to conclude, with the remaining Lenders, a (new) restructuring, or other agreement, that will secure the required majorities, in favor of the delisting and/or the mutual conversion of the debt held by SPV1 and such Lenders, into Company's equity and/or the merging of SPV1 into the Company, seeking to

achieve as much as possible of the originally contemplated economic and structural Transaction results, for the Company and the Parties.

B. Maillis

(i) SPV1, or any other HIG entity holding the debt, prior to SPV1 merging into the Company, shall transfer to Maillis for "1Euro and other valuable consideration" loans purchased from the Lenders, in the amount of up to €4m proportionately to the percentage of post-participating Company's debt that HIG will progressively acquire (taking also into account, any debt haircuts accepted/offered by the Lenders, in whatever form). These loans shall be transferred to Maillis, prior to the merger of SPV1 with the Company (for example, if HIG/SPV1 had bought the total post-participating debt for an amount of €80m, total debt at Maillis Group level, including Maillis's portion would be €80m + 4m = €84m). In exchange of this transfer and the transfer to Maillis of the respective SPV1, SPV2 and Company's stakes, according to (ii) below, Maillis will waive any pre-emption and share repurchase rights, or any other special rights he currently holds with Maillis Group or any of its subsidiaries. This reinstated debt will bear interest with a rate up to EURIBOR + 500 bps pick, for 12 months and up to EURIBOR + 350 bps, thereafter and would be repaid, as soon as practically possible by the Maillis Group, through one or more (if required) refinance transactions, up to the total Company post-participating debt, or of the debt replacing it. after a merger of SPV1 into the Company and upon the Company becoming bankable, pursuant to the actions contemplated herein. Any proceeds from the refinancing would be returned to Maillis pro rata with the percentage of Company's total debt that will be refinanced.

(ii) Maillis shall participate, as a founder, or prior to any transaction related with this agreement, in SPV1 and SPV2, with a 15% stake (in order to have a 85% 15% participation of the Parties, in the total acquired debt and equity position in the Company). It is clarified that, in case SPV1 and SPV2 acquire Company's debt and equity, through a structure that will create an SPV1 and SPV2 liability towards HIG, higher than HIG's initial actual acquisition cost of the SPV holdings, plus the amount of Company's debt transferred to Maillis, according to (i) above, then, HIG shall compensate Maillis in cash, upon refinancing, for any amount of value that he would have, if he participated by 15% in the liability of SPV1 and SPV2, towards HIG, for the amount above HIG's initial actual acquisition cost of the SPVs' holdings, plus the amount of Company's debt transferred to Maillis, according to (i) above [an example of the operation of this term in contained in Annex II hereto - Any alternative transaction structures should lead to equal financial results for the parties] Maillis undertakes to waive the call options, directly or indirectly (through the company Horqueta), held by him, upon SPV2 acquiring each of the blocks of Company's shares that are currently charged with the call option (e g when NBG's shares are acquired and SPV2 becomes the option provider, in respect of NBG's shares, Maillis shall waive the call option provided by NBG and undertaken by SPV2 and so on, as to each of the other current option

providers). Such waiver shall be made in consideration for Maillis acquiring from HIG, the 15% participation in SPV1 and in SPV2 - not in the Company - and for a stake in the Company that will give to Maillis, an up to 3% direct participation in the Company proportionately to the percentage of post-participating Company's debt that HIG will progressively acquire (taking also into account, any debt haircuts accepted/offered by the Lenders, in whatever form), post-Transaction (to enable Maillis to sell up to 3%, to the existing and future management team of Maillis Group, as an incentive), as well as, in exchange of the transfer of up to €4m Company debt, according to (i) above. The structure described above is illustrated in Annex I hereto. Maillis will be entitled to decide at his discretion to sell up to 3% to the management and will be entitled to the proceeds of any sale of this portion of Company's shares. Parties consider that € 150k to € 300k would be a fair and favorable price per percentage point sold to management. Within 3 years, from the closing of the Transaction, SPV2 will sell up to 2% of Company's shares, to members of the management, as an incentive. Allocation of the 2% shares, to members of the management, will be determined according to HIG/SPV2's discretion. HIG will also have the option to acquire all or part of the 2% stake directly, or through a nominee. Maillis will be entitled to the proceeds of any sale of this 2% portion of Company's shares, as well, and SPV2 shall transfer their proceeds to Maillis. The previous arrangements would give to Maillis an amount of approx. 750K (at least), if Maillis decided to sell his whole additional 3% stake to the management.

(iii)   Parties aim that Company's debt transferred to Maillis (up to € 4 m) will be repaid to Maillis, by the Company, as soon as possible, and upon the third-party refinancing of the post-participating debt of the Company, or of the debt replacing it, after an SPV1 merger into the Company, and proportionately to any such refinancing taking place progressively (i.e. if 30% is refinanced, then 30% of Company's debt transferred to Maillis, shall be repaid to Maillis and so on), within three (3) years from closing of the Transaction. These cash proceeds would stay with Maillis without him having to reinvest any of this money received to purchase either debt, or his stake in the Maillis Group.

(iv)   In any post-Transaction increase of capital, merger, spin off, or other transformation of SPV1 and SPV2 or after a potential merger of the Company or its subsidiaries, Maillis will be allowed to participate in any capital increase of the Company or a subsidiary, with the same terms as any third party. Furthermore, in any case that a person or entity participating in an increase of capital or a merger, with any of the Group's entities is *affiliated* to HIG, HIG and SPV2 will safeguard the fairness and arm's length principle of the applicable share offer price, or exchange ratios.

(v)   Maillis will continue running the Maillis Group, as Chairman of the Board, with a remuneration package that will be reasonable, by international standards and in any case, not less than €350k gross, plus a bonus, on an annual basis and paid according to the most tax efficient structure, for Maillis. Maillis' yearly bonus will be equal to 1% of Company's Ebitda conso of the last audited fiscal

5   SM

year, or 0.75%, or 0.5%, or 0.25%, if 100%, or 95%, or 90%, or 85% respectively of the Ebitda projections, in the CIM received by HIG on Friday, September 23 2011, have been achieved, in each relative fiscal year.

(vi)   Maillis' post-Transaction stake in SPV1, SPV2 and the Company will avail of the usual tag-along provisions and be subject to the usual drag-along provisions in respect of HIG, which will be further detailed in writing, at the closing of the Transaction.

(vii)   Parties will execute a Shareholders' Agreement for the Company, as well as for SPV1 and SPV2, to agree all other details on the implementation of their relationship, according to this agreement.

## 2   Conditions to Closing of the Transaction

Closing of the Transaction, pursuant to this agreement is subject to the following general terms and conditions.

Following this agreement with the founding shareholder of the Company, HIG will seek to conclude an agreement with the Lenders and the Company, enabling the transactions listed above. Execution of a definitive agreement, or agreements, with the Lenders allowing, or pertaining to, the transactions listed above, shall be a condition to closing the transaction

In addition to the execution of a definitive agreement with the Lenders and the Company, conditions to closing the Transaction will be:

The obtaining of any governmental approvals, certificates etc. as far as applicable

Between the date of this Memorandum of Understanding and the closing of the transaction, Maillis and the Company should operate its business in the normal and customary manner and no material adverse change in Company's business and financial position should occur

Subsequent to the date of this Memorandum of Understanding, neither Party will make any public announcement with regard to this agreement, or the Transaction, prior to the execution of a definitive agreement for the Transaction, without the prior written consent of the other unless, in the opinion of a Party's counsel, it is required by law to do so in which event, reasonable prior notice of the intended disclosure will be given to the other Party

All transaction costs of the Parties should, within reasonable limits, be borne by the Maillis Group, in view of the substantial benefits deriving for the Group, from the contemplated Transaction. Upon the submission by HIG of a proposal, within the above terms, to the Company's Board of Directors, for approval to proceed further with the Transaction, Parties will use best endeavors, for the conclusion of a subsequent engagement letter, in this respect, between Mesirow and the Company and HIG Solutions and the Company, confirming their fees, as finally agreed with Maillis. Accordingly, an engagement letter with Company's counsel, with the estimated legal fees





for preparing and consummating the Transaction, should be concluded with the Company.

f. The Company should not, nor permit any of their agents or any other person acting for them, to enter into or conduct any discussions or negotiations with any other corporation, partnership, person or other entity or solicit or entertain any inquiries or proposals relating to a possible transaction in respect of the Company, its capital stock, its debt or any substantial part of its assets or businesses. It is expressly stipulated that, the ongoing processes and negotiations for the North America, the German, the Indian business and the Romanian building, will not be affected by this clause 2(e).

3. Term

The Term of this agreement shall remain into effect, until seven (7) months, after its signing. In case a definitive debt and equity purchase agreement, with any of the Lenders, is concluded within this term, this agreement shall remain in effect until the respective full performance of the obligations of the Parties.

4. "No-Shop" Clause

In consideration of the substantial expenditure of time, effort and expense to be undertaken by HIG in connection with the proposed transaction, while this agreement is in effect (i.e. while the definitive agreement for the Transaction may be negotiated) Maillis should not, nor propose to, or direct, or cause that the BoD, or other Company officer, nor permit any of his agents or any other person acting for him, to enter into or conduct any discussions or negotiations with any other corporation, partnership, person or other entity or solicit or entertain any inquiries or proposals relating to a possible transaction in respect of the Company, its capital stock, its debt or any substantial part of its assets or businesses.It is expressly stipulated that, the ongoing processes and negotiations for the North America, the German, the Indian business and the Romanian building, will not be affected by this clause (4).

5. Binding Effect

Except as otherwise specifically provided in this paragraph, it is understood that this Memorandum of Understanding is intended to be, and shall be construed and remain non-binding, with respect to the transactions referred herein, until the conclusion, by HIG (or SPVs) of a definitive agreement with all or some of the Lenders. Accordingly, this Memorandum of Understanding, until the conclusion, by HIG (or SPVs) of a definitive agreement with all or some of the Lenders, does not impose or create any legal obligations on HIG or Maillis, except for the specific agreements and obligations described in articles 2 (a)(c)(d)(e), 4, 5, 6, 7, 8 and 9 hereof, which shall be binding from the date hereof. Enforceability of the agreements and obligations described in articles 2 (a)(c)(d)(e) 5, 6, 7, 8 and 9 hereof shall survive the termination or cancellation of this Memorandum of Understanding. Any other legal obligation of HIG or Maillis, with respect to the proposed transaction, shall exist only upon the execution and delivery of a definitive agreement for the Transaction, within the above terms.

6. Notices

Communications can be addressed to:

SM

7

For HIG:
Wolfgang Biedermann
H I G  European Capital Partners GmbH
Warburgstr. 50
D  20354 Hamburg
Germany
Tel.   ꞏꞏ  ꞏꞏ  ꞏꞏ  ꞏꞏ  ꞏꞏ  ꞏꞏ
Fax:   ꞏꞏ  ꞏꞏ  ꞏꞏ  ꞏꞏ  ꞏꞏ  ꞏꞏ
Email: W.Biedermann@higcapital.com

For Maillis:
Michael J. Maillis
5 Xenias & Harilaou Trikoupi Street
14562 Kifissia
Athens, Greece
Tel  0030 210 6285102
Fax  0030 210 6285101,
Email: michael@gmail.gr

## 7.  Confidentiality

The existence and the contents of this agreement shall remain confidential between the Parties and their representatives. HIG is entering into this Agreement in its capacity as an advisor to funds managed by H.I.G. (the "Funds") and, in connection therewith  may share information provided under this Agreement with representatives of the Funds  who in such event shall be considered as representatives for the purposes of this agreement.

## 8. Governing law and Jurisdiction

This agreement will be governed and construed according to Greek law. Any dispute arising out of, or in respect of its terms or its validity, will be exclusively referred to a three member arbitration tribunal of the International Chamber of Commerce (ICC)  in Athens Greece, appointed and constituted according to the applicable ICC rules. The proceedings language will be English.

## 9.  Miscellaneous

This agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior agreements and understandings between the parties with respect to such subject matter. This agreement may not be amended or modified except in a writing executed by the parties hereto.

Calculating the acquired Company's debt, takes also into account, any debt haircuts accepted/offered by the Lenders, in whatever form

All amounts and transactions stipulated herein, are being denominated in Euro

HIG recognizes and acknowledges that, the conclusion of any subsequent definitive agreement, with the Company, for the Transaction, is entirely dependent upon Company's internal approvals and commitments, without any liability connected to



Maillis, for the outcome in this respect, unless the terms of the present agreement stipulate otherwise.

This agreement shall inure to the benefit of the Company and shall be enforceable by it without limitation, according to its terms.

This agreement is not intended to affect, in any respect, the relationship and undertakings of the Maillis Group towards its Lenders.

This agreement shall be binding according to its terms, upon the Parties and their successors. Parties shall not be entitled to assign any rights or obligations under this Agreement.

You represent that the person signing this agreement is authorized to execute it on behalf of each respective Party.

**IN WITNESS WHEREOF** this Agreement has been duly executed by the Parties hereto, in two copies (one for each Party), the day and year before written.

Signed by: Michael Maillis

Name:

Signed by: Sami Mnaymneh
For and on behalf of: **H.I.G. Capital LLC**

Name:

9

ANNEX I



SPV2 could be, instead of a Greek, a Lux, or Cyprus entity, according to the most tax efficient structure

## ANNEX II

Due to tax reasons it makes sense to have the acquired debt not at acquisition costs (e.g. €80m) but at face value (e.g. €200m) on the balance sheet of respective SPVs. However, the first MoU and the pro-rata agreement between you and H.I.G. was based on the assumption that acquired debt is shown at acquisition costs in the SPVs (e.g. €80m). Thus, we need to insert a clause to reflect our pro-rata agreement. A simple numeric example is as follows:

Old:

    i. Purchase price for 100% debt = 80€m

    ii. Debt on balance sheet = Acquisition costs + MM Debt = 80 H.I.G. + 4 MM = 84€m

    iii. Equity: 85% H.I.G. +15% MM

Example. Distribution of €200m from re-financing with €84m debt on balance sheet

1. €84m to debt holders, pro rata
   a. 80€m H.I.G.
   b. 4€ MM
2. €116m to shareholders
   a. 85% H.I.G. = ~€99m
   b. 15% MM = ~€17m

New:

    i. Purchase price for 100% debt = 80€m

    ii. Debt on balance sheet = Face Value = 200€

    iii. Equity: 85% H.I.G. +15% MM

Example: Distribution of €200m from re-financing with €200m debt on balance sheet

1. €84m to debt holders, pro rata
   a. 80€m H.I.G.
   b. 4€ MM
2. €116m distributed according to shareholdings
   a. 85% H.I.G. = ~€99m
   b. 15% MM = ~€17m

*Technically, as H.I.G. is the debt holder, H.I.G. will initially receive €116m and then, according to the new MoU, forwards 15% x €116m = ~€17m to MM*

11

2

**Addendum**
**To a Memorandum of Understanding between the Parties, dated 25.5.2012 (the "MoU")**

**THIS ADDENDUM** (the "Addendum") is made on March 27, 2014

**BETWEEN:**

(1)    **Michael J. Maillis** ("Maillis"), founding shareholder of M.J. MAILLIS S.A.-INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES, a company duly established under the law of Greece and having its registered seat at 5 Xenias street, Kifissia Attikis GR 145 62

And

(2)    **H.I.G. Capital LLC**, a company duly established under the laws of USA and having its registered seat at 1450 Brickell Avenue, 30th floor Miami, FL 33131 USA ("HIG")

Each of HIG and Maillis being "a Party" and together known as "the Parties"

**WHEREAS:**

**Grace Bay II Holdings S.a.r.l.**, a company duly established under the laws of Luxembourg, ("Grace Bay") and **H.I.G. Europe Capital Partners L.P.,** have now concluded a Letter of Intent, dated 12.2.2014 (the **"LoI"**), with the Original Lenders of the Company, containing the main terms of a financial restructuring transaction (the "Transaction"), in respect of MJ Maillis S.A. (the "Company") and its Group (the "Mailis Group").

THEREFORE, in performance of cl. 1.A. (ix) of the MoU, Parties now wish to specify further and adjust their agreement, to the terms of the actual Transaction achieved, as per the LoI terms, as follows:

1.  For the purpose of interpreting and performing the MoU, SPV1 and SPV2 will, separately or collectively, mean HIG's "HoldCo" (item 5 of the LoI preamble).

2.  Given that the actual takeover bid price that Maillis will receive from the takeover bid process, will be lower than €4.5m, pursuant to cl. 1.A(v), HIG agrees to balance out the initially expected €4.5m, in cash, as additional consideration for Maillis performing his other obligations, as follows: (i) Following the completion

1

of the takeover bid process, HIG will acknowledge the balance amount owed to Maillis and (ii) HIG shall subsequently pay the balance amount [a] by forwarding to Maillis, as soon as, practically possible, proceeds received from the redemption of the WC facility, in the total aggregate amount of €1.5m or any smaller amount, due to a smaller balance amount ("Proceeds from WC redemption") and  [b] by paying the remainder (if there is such remainder) of the balance amount, at its exit/divestment from the HoldCo.  In no case however, Maillis shall receive more than € 4.5m in cash for all the shares directly or indirectly held by him. To avoid misunderstandings of the clause above, following example reflects the common understanding:

Example A
    a. Total proceeds of Maillis: €4.5m
    b. Proceeds of Maillis in the course of the takeover bid: €2.8m
    c. Balance amount: €1.7m
    d. Proceeds from WC redemption: €1.5m
    e. Payment at exit from HoldCo: €0.2m

Example B
    a. Total proceeds of Maillis: €4.5m
    b. Proceeds of Maillis in the course of the takeover bid: €3.1m
    c. Balance amount: €1.4m
    d. Proceeds from WC redemption: €1.4m
    e. Payment at exit from HoldCo: €0m

3. Pursuant to cl. 1.B (i) of the MoU, HoldCo shall transfer to Maillis, *for 1Euro and other consideration*, Company Senior Bonds, purchased from the Lenders, and Loan Note in the total amount of €3,080,000, calculated as follows, according to the said MoU term:

LoI transaction, is financially, 23% less than the MoU transaction  →
→ 77% x €4,000,000 = **€3,080,000** Debt participation of which,
- €2,202,200  or 71,5%  in Senior Bonds at Company (~€23.3m H.I.G. Senior bond Company / ~€32.6m H.I.G. Debt at Company & Holdo)
- €877,800   or 28,5% in Loan Note at HoldCo (~€9.3m H.I.G. Loan note Holdo/ ~€32.6m H.I.G. Debt at Company & Holdo)

These loans shall be transferred to Maillis, upon closing the financial restructuring, with Company's Original Lenders. The terms of this reinstated debt will be according to the LoI and/or the definitive agreements implementing the LoI.

2

4. Pursuant to cl. 1.B (ii) of the MoU, HIG will enable the acquisition, by Maillis, of his 15% stake, in HoldCo, as a founder, or upon closing the financial restructuring, with Company's Original Lenders.

5. Pursuant to cl. 1.B (ii) of the MoU, HIG/HoldCo shall transfer a stake in HoldCo that will give to Maillis, an additional indirect participation of 2.31%, in the Company, calculated as follows, according to the said MoU term:
   Lol transaction, is financially, 23% less than the MoU transaction →
   → 77% x 3% = **2.31%**
   Thus, the total participation of Maillis in HoldCo will be **17.31%** (15% + 2.31%).

   Parties agree that a total of 4.31% of HoldCo shares (2.31% from Maillis and 2.0% from HIG) should be sold on a pro rata basis to management and co-investors as an incentive according to following schedule:
   - CEO:                           1.0-1.51%
   - Other C-level managers:   1.5-2.0% (e.g., COO: 0.5-0.67%;
                                   CFO: 0.5-0.67%; CMO/CSO: 0.5-0.67%)
   - Dorotheos Samoladas:     1.3%

   Based on the transaction of the Lol, parties agree that €100k per percentage point of equity in HoldCo would be a fair and favourable price sold to management and co-investors. Notwithstanding the previous, Dorotheos Samoladas, will acquire his 1.3% for €345.5K (€265.77K, per pp). Accordingly, the amount of €750K, in the last paragraph of cl. B (ii), will be adjusted to **€646.5K** (3.01pp x €100K=301K + 345.5K [for1.3pp] = 646.5K).

6. Maillis' yearly bonus, pursuant to cl. 1.B (v) of the MoU, will be calculated in respect of the Ebitda projections, in the relevant approved annual budgets. Post-closing, Maillis' office and PA, will become "Board Room" and "Board PA", respectively and consequently, HIG's non-executive BoD members, will also have access and right of use, at Company's location in Athens. Along with the minimum remuneration package agreed in the MoU, Maillis will retain his current benefits, only, which are: Company car and all car expenses, including fuel and driver, iPhone and health insurance policy no.2657 of European Trust.

7. Parties understand that Maillis' Letters of Engagement, with Mesirow and DPK Solutions, are expired/terminated, without any pending or probable claim against Maillis, or ensuing cost for the Company. It is however agreed that (i) Maillis will be indemnified by the Company, in case of any claim brought forward against him in relation to the said engagements and (ii) after closing the Transaction,

3

Maillis will be reimbursed the €30K fee paid to Mesirow, as an initial retainer for their services.

8. Parties will use best endeavours to ensure that Maillis will receive/acquire the agreed payments and assets, from HIG, according to a tax efficient structure.

9. **Corporate Governance**

A. BoD

The new BoD will have 7 members. John Lentzos will remain a BoD member, for continuity purposes, due to his deep knowledge and longstanding experience, in the Group's operation and business activities.

BoD meetings will take place at least once every month. Articles of Incorporation of the Company shall be amended to reflect and allow the new BoD composition in which HIG controls the majority, along with the adoption of any other preferred terms, in respect of the BoD.

B. Maillis' position and role post- Closing

(i) Michael Maillis will be the non-executive BoD Chairman of the Company in order to help to successfully manage the transition of a founder-run business to an independent multinational organization. Maillis will retain an important consulting role, on business development matters. Such terms are based on the clear understanding that Maillis is a leading industry expert, whose know-how and input, in the post-restructuring period, should be essential for achieving the projected growth and value increase of the Group.

(ii) Employment. Maillis will continue working similarly as described in his existing employment contract, which prescribes a non-executive, advisory role:

*"...M. Maillis, founder, shareholder and Chairman of the Board of Directors of the Company, is engaged by the Company, with a fixed term contract, in order to study, plan and recommend to the Board [actions], in respect of Business Development issues of the Company (indicatively, commercial partnerships, joint ventures, as well as M&As, in order to promote the development of the Group's business activities). These consulting responsibilities to the Board of the Company shall be exercised on a fixed basis, in parallel to any other proposals and recommendations of the executive members of the Board.*

*Due to the nature of his position, but also the structure of the Company's group, composed of the Company itself and a significant number of subsidiaries, mainly abroad, Mr. Maillis will provide his services within hours to be determined by him, according to the needs of his office.*

4

*M. Maillis, in the exercise of his duties and powers, must always act in accordance with the provisions of the law and the statutes and regulations of the Company and has the duty to report to the Board of Directors, on the above responsibilities..."*

A new Employment Contract, in the English language, will be executed incorporating the current terms, as amended with this Addendum. Maillis's Employment Contract shall provide a remuneration according to the MoU, i.e. *"a package that will be reasonable, by international standards and in any case, not less than €350k gross, annually, plus a bonus"*, as per (6) above.

C. Selection of the new CEO, CFO and CSO, by HIG. Timing and Maillis' input/participation, in the new management selection process

- New Management should strictly implement the Business plan that will be finally approved, by the BoD.

- New management will be selected by HIG and appointed immediately after Closing. In advance of the selection, HIG will diligently consult on respective management candidates with Michael Maillis.

- Based on the recommendation of Michael Maillis, HIG aims to enter into further discussions with Michael Panagis as potential CEO for the Group post-Closing. In addition, HIG confirms that the COO post-Closing will be John Lentzos.

- The CRO will report to the BoD.

- Management Incentives: To be determined by HIG, with the input of Maillis.

**D. Communication with the Management**
In order to help to successfully manage the transition of a founder-run business to an independent multinational organization, Maillis, as the founder of the business, will communicate his views and directions, through the monthly BoD meetings, safeguarding management's reporting lines.

This Addendum constitutes an integral part of the MoU, while all other terms of the MoU remain unaltered.

The person signing this Addendum is authorized to execute it on behalf of each respective Party.

5

This Addendum is executed in two original copies. Each Party receives one executed copies.

**IN WITNESS WHEREOF** this Addendum has been duly executed by the Parties hereto the day and year before written.

Signed by: Sami Mnaymneh

For and on behalf of: **H.I.G. Capital LLC**

Name: SAMI MNAYMNEH

Signed by: Michael Maillis

Name: Michael Mailli

6

3

**Dailane Limited**

**as Settlor**

**and**

**H.I.G. Luxembourg Holdings 47 S.à r.l.**

**as Fiduciary**

---

**AMENDED AND RESTATED**
**FIDUCIARY AGREEMENT**

---

*Arendt – 50087.14898317vEXEC*



**THIS FIDUCIARY AGREEMENT** (the "**Fiduciary Agreement**") is made on 11th April 2016.

**BETWEEN**

(1)     **H.I.G. Luxembourg Holdings 47 S.à r.l.**, a *société à responsabilité limitée* incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 5, rue Guillaume Kroll, L-1882 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies' Register under number B 185 604 (the "**Fiduciary**");

and

(2)     **Dailane Limited**, a limited liability company incorporated in Cyprus, having its registered office in 17 Ifigeneias, 2007 Strovolos, Nicosia, Cyprus, registered with the register of companies of Cyprus, under number 343251, and legally represented in the present by Mr Philippos Philippou Sole Director  (the "**Settlor**").

The Fiduciary and the Settlor are collectively referred to as the "**Parties**" and individually as a "**Party**".

**PREAMBLE:**

The Fiduciary holds the Fiduciary Assets (as defined below) as fiduciary (*fiduciaire*) on the Settlor's behalf, subject to the Fiduciary and the Settlor complying with certain fiduciary obligations in accordance with this Fiduciary Agreement.

**NOW THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:**

**ARTICLE 1 – DEFINITIONS**

1.1.     In this Fiduciary Agreement, unless the context otherwise requires the following expressions shall have the following meanings:

"**Affiliate**" of any Person means any other Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person. For the purpose of this definition, "control" and the correlative meanings of the terms "controlled by" and "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the holding of more than 50% of the voting stock of a Person or having the legal or de facto right to appoint a majority of the members of the board of directors or a similar corporate body of a Person.

"**Bank Account**" means the bank account of the Settlor;

*Arendt – 50087.14898317vEXEC*

"**Business Day**" means any day other than a Saturday, Sunday, legal holiday or other day on which commercial banks in Luxembourg are closed for business;

"**Fiduciary Agreement**" means this fiduciary agreement;

"**Fiduciary Assets**" means collectively (i) the Shareholding, (ii) the Investor Loan, (iii) the Senior Bonds and (iv) the Working Capital Facility Bonds;

"**HIG 46**" means H.I.G. Luxembourg Holdings 46 S.à r.l., a *société à responsabilité limitée* incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 5, rue Guillaume Kroll, L-1882 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies' Register under number B 185 603;

"**Income**" means any cash income, including interest payments, sale proceeds, redemption proceeds and/or transfer proceeds, in each case net of transaction costs, derived by the Fiduciary from the Fiduciary Assets through, as the case may be, the holding, sale, redemption and/or transfer thereof;

"**Investor Loan**" means a claim representing a portion corresponding to EUR 877,800 of EUR 9,900,000 principal in a EUR 25,000,000 investor loan dated 26 June 2014 between, among others, Fiduciary as lender and HIG 46 as borrower plus interest thereon and all related rights;

"**Maillis S.A.**" means M.J. Maillis S.A. - Industrial Packaging Systems and Technologies;

"**Materially Adverse Effect**" means an adverse effect on the economic interests of the Settlor in respect of the Shareholding of a minimum amount of EUR 100,000;

"**Person**" means an individual, a corporation, association, limited liability company, limited liability partnership, partnership, estate, trust, unincorporated organization or a government or any agency or political subdivision thereof;

"**Sale**" has the meaning ascribed to such term in article 4.2.4;

"**Senior Bonds**" means 2,202,200 senior bonds having a nominal value of EUR 1.00 each and an aggregate nominal value of EUR 2,202,200, issued by Maillis S.A. pursuant to the Senior Bond Programme dated 30 September 2011 as amended on 21 July 2014;

"**Shareholding**" means 186,562 Shares (or as such number may be adapted in accordance with article 4.2.4 from time to time) representing 14,925% of the total share capital of HIG 46 and accordingly, an indirect participation of 14,925%, in the share capital of Maillis S.A. as of the date of this Agreement;

*Arendt – 50087.14898317vEXEC*

"**Shares**" means collectively the shares issued by HIG 46, currently being 1,250,000 shares with a nominal value of EUR 0.01 each with each such share being referred to as a "**Share**";

"**WCF Payment Event**" has the meaning ascribed to such term in article 4.2.3;

"**Working Capital Facility Bonds**" means 1,355,860 working capital facility bonds having a nominal value of EUR 1.00 each and an aggregate nominal value of EUR 1,355,860, issued by Maillis S.A. pursuant to the EUR 10,000,000 Working Capital Programme dated 21 July 2014.

1.2.   In this Fiduciary Agreement:

(a)   articles headings are inserted for convenience only and shall not affect the construction of this Fiduciary Agreement and unless otherwise specified, all references to Articles are to Articles of this Fiduciary Agreement;

(b)   unless the context otherwise requires, words denoting the singular number shall include the plural and vice versa;

(c)   references to any document or agreement are to be construed as references to such document or agreement as amended or supplemented from time to time; and

(d)   references to any enactment include re-enactments, amendments and extensions thereof.

## ARTICLE 2 – FIDUCIARY SETTING-UP

2.1   The Settlor hereby acknowledges that the Fiduciary Assets are held by the Fiduciary subject to the provisions of this Fiduciary Agreement.

2.2   The Fiduciary hereby acknowledges that it holds the Fiduciary Assets on behalf of the Settlor.

2.3   In the event that the Fiduciary is instructed by the Settlor to purchase some additional shares or debt instruments in the HIG 46 or to subscribe to an increase of share capital in the HIG 46, the Settlor shall transfer to the Fiduciary the necessary amount to make such acquisition or subscription.

## ARTICLE 3 – OWNERSHIP AND SALE OF THE FIDUCIARY ASSETS

3.1   The Fiduciary shall acquire, subscribe, or hold the Fiduciary Assets in its own name, but for the account, on behalf and at the risk of the Settlor.

*Arendt – 50087.14898317vEXEC*



3.2 The Fiduciary shall be, for the third parties, the exclusive owner of the Fiduciary Assets.

3.3 The Fiduciary shall retain the Fiduciary Assets until (i) liquidation of the Fiduciary Assets, under the terms of this Agreement or (ii) termination of the Fiduciary Agreement in accordance with Article 7 below, it being understood that the Fiduciary may dispose of the Shareholding in accordance with, and subject to, the provisions of articles 6(b) and 6(c), as applicable.

3.4 Notwithstanding article 3.3. above, the Settlor may at any time instruct the Fiduciary to sell or otherwise dispose all, or part of the Senior Bonds and the Investor Loan.

## ARTICLE 4 – FIDUCIARY DUTIES

4.1.    <u>Voting Rights</u>

4.1.1.   The Fiduciary shall act with regard to the voting rights in respect of the Shareholding in accordance with the written instructions of the Settlor. Notice of decisions to be taken by the general meeting of shareholders of HIG 46 requiring the approval by shareholders holding more than 85.075% of the share capital of HIG 46 (the "**Eligible Decisions**") shall be notified to the Settlor in accordance with the notification requirements under this Agreement at least 5 Business Days prior to the date of the adoption of such Eligible Decisions. All instructions are, once received, to be considered as irrevocable and unconditional and the Settlor represents and guarantees that the Fiduciary may rely on the validity of any instruction received in accordance with this Agreement. The Fiduciary shall incur no liability for or in respect of any action taken in compliance with the instructions transmitted by the Settlor in accordance with this article.

4.1.2.   For the avoidance of doubt, the Fiduciary shall exercise the voting rights in respect of the Shareholding in its sole discretion to the extent that such exercise of the voting rights in respect of the Shareholding would not have any Materially Adverse Effect (i) in respect of decisions of the general meeting of shareholders of HIG 46 which are not Eligible Decisions or (ii) if written instructions have not been received from the Settlor in respect of Eligible Decisions at least 24 hours prior to the date of adoption of the Eligible Decisions accordance with the notification requirements under this Agreement or (iii) in such cases as may be required to give effect to the provisions of this Agreement (including, without limitation, the transfer of Shares to third parties).

4.2.    <u>Payments of Income</u>

4.2.1.   Any Income received by the Fiduciary in respect of the Fiduciary Assets shall be held in escrow by the Fiduciary on behalf and for account of the Settlor and shall be transferred to the Bank Account within 10 Business Days of receipt.

*Arendt – 50087.14898317vEXEC*



4.2.2.   The Fiduciary shall ensure that any Income from the Fiduciary Assets are duly and punctually paid, received or collected as and when the same become due and payable or to secure that the correct amounts (if any) are paid or received.

4.2.3.   Notwithstanding article 4.2.2. above, the Settlor acknowledges and agrees that, after the WCF Prepayment (as defined below) the Fiduciary shall hold on to any Income derived by the Fiduciary from the Working Capital Facility until such Income has attained an aggregate amount of EUR 709,360 (the "**WCF Payment Event**").

Upon occurrence of the WCF Payment Event, the Fiduciary shall pay an amount equal to EUR 709,360 to the Settlor by wire transfer to the Bank Account within 10 Business Days.

An amount of EUR 646,500 will be paid to the Settlor prior to the occurrence of the WCF Payment Event, at the latest within 10 (ten) Business Days from execution of this Agreement (the "**WCF Prepayment**").

4.2.4   In the event of a sale of all or part of the Shareholding by the Fiduciary (a "**Sale**") or in the event of disposal/liquidation of the Fiduciary Assets, in any other way whatsoever, the Settlor shall be entitled to receive the purchase price/proceeds from the Fiduciary within a period of 10 (ten) Business Days from the closing of the Sale. For the avoidance of doubt, in such event the definition of "**Shareholding**" shall be adapted accordingly and reduced by the number of Shares sold under the relevant Sale.

4.2.5   The Fiduciary shall promptly inform Settlor of any delays or irregularities in the performance of the above mentioned Fiduciary's duties.

## ARTICLE 5 – REPRESENTATIONS AND WARRANTIES

5.1.   The Settlor represents and warrants to, and for the benefit of the Fiduciary that:

(a)   it has the corporate power under the laws of Cyprus and under its constitutional documents to enter into the Fiduciary Agreement;

(b)   the execution of the Fiduciary Agreement and the performance by the Settlor of its obligations thereunder have been duly authorized by the Settlor and upon due execution, the Fiduciary Agreement will constitute and create valid and binding obligations of the Settlor enforceable in accordance with its terms;

(c)   it is not subject to any bankruptcy proceedings or proceedings for voluntary arrangement with its creditors, controlled management or suspension of payments or any similar foreign law proceedings having similar effects; and

*Arendt – 50087.14898317vEXEC*

(d)      as far as the Settlor is aware, no demand, order or resolution for the winding-up or liquidation of the Settlor or for the protection of the Settlor from its creditors has been filed or is currently pending before a court of competent jurisdiction.

5.2.     The Fiduciary represents and warrants to, and for the benefit of the Settlor that:

(a)      it has the corporate power under the laws of the Grand Duchy of Luxembourg and under its constitutional documents to enter into the Fiduciary Agreement;

(b)      the execution of the Fiduciary Agreement and the performance by the Fiduciary of its obligations thereunder have been duly authorized by the Fiduciary and upon due execution, the Fiduciary Agreement will constitute and create valid and binding obligations of the Fiduciary enforceable in accordance with its terms;

(c)      it is not subject to any bankruptcy proceedings or proceedings for voluntary arrangement with its creditors (*concordat préventif de faillite*), controlled management (*gestion contrôlée*) or suspension of payments (*sursis de paiement*) or any similar foreign law proceedings having similar effects; and

(d)      as far as the Fiduciary is aware, no demand, order or resolution for the winding-up or liquidation of the Fiduciary or for the protection of the Fiduciary from its creditors has been filed or is currently pending before a court of competent jurisdiction.

## ARTICLE 6 – COVENANTS

The Fiduciary covenants that:

(a)      it will not (x) create any lien, security interest, claim, option, pledge, charge, assignment, transfer or other encumbrances of any kind, nor grant any mandate with a view to the creation thereof in respect of, or (y) permit the existence of any lien, security interest, claim, option, pledge, charge, assignment, transfer or other encumbrance over the Senior Bonds, the Shareholding and the Investor Loan, without the prior consent of the Settlor;

(b)      it will not dispose of, including by way of transfer, sale, redemption or otherwise, of the Fiduciary Assets and HIG 46's participation in Maillis S.A., other than on arms' length terms. Notwithstanding the foregoing, the Fiduciary may proceed to a restructuring of the Maillis group which would result in the replacement of the current parent company Maillis S.A., it being understood however that the Settlor's rights in respect of such new parent company shall be equivalent to the Settlor's rights in respect of Maillis S.A. under this Fiduciary Agreement.

*Arendt – 50087.14898317vEXEC*

(c)     it will not cause the disposal of the Shareholding, without transferring a pro-rata portion of its Shares and/or any Shares held by the Fiduciary's Affiliates (as the case may be) and will not cause the disposal of any of its Shares and/or any Shares held by its Affiliates (as the case may be), without transferring a pro-rata portion of the Shareholding;

(d)     it or any of its Affiliates (as the case may be) will not cause the issuance of new shares or debt instruments in HIG 46,  Maillis S.A. or any of its Affiliates (including but not limited to the context of a capital increase, merger, demerger or spin off) to the Fiduciary, or to any entity which is an Affiliate of H.I.G. Capital, LLC, other than on arms' length terms and not without offering the Settlor a right to purchase or subscribe for 15% of such instruments under the same terms as the Fiduciary;

(e)     it will not cause any amendments of the articles of association of the Fiduciary or HIG 46 which would have a Materially Adverse Effect on the economic interests of the Settlor under this Agreement without prior consent of the Settlor; and

(f)     unless required by applicable law, it will not cause (x) applications to be made by the Fiduciary, HIG 46 or Maillis S.A. or by any other entitled person for the appointment of a *commissaire, juge-commissaire, liquidateur, curateur* or similar officer pursuant to any insolvency or similar proceedings in respect of the Fiduciary, HIG 46 or Maillis S.A. and/or (y) applications to be made by the Fiduciary, HIG 46 or Maillis S.A. for a voluntary or judicial winding-up or liquidation of the Fiduciary, HIG 46 or Maillis S.A., without the prior consent of the Settlor.

## ARTICLE 7 – DURATION

7.1     The Fiduciary Agreement shall remain in effect until 30 September 2030 (the "**Termination Date**"). It shall come into force on the date of the signature of the Fiduciary Agreement by both Parties.

7.2     The Fiduciary Agreement may be terminated prior to the Termination Date by the joint written consent of both Parties, or in case of disposal of all Fiduciary Assets.

7.3     The Fiduciary Agreement shall automatically terminate (i) in case the Fiduciary has become or shall become subject to bankruptcy (*faillite*), insolvency, moratorium, controlled management (*gestion contrôlée*), suspension of payments (*sursis de paiement*), court ordered liquidation or reorganization or any similar Luxembourg or foreign laws insolvency procedures affecting the enforcement of creditor's rights generally, or/and (ii) in the event the Fiduciary goes into liquidation.

7.4     Notwithstanding the foregoing, the Settlor may terminate the Fiduciary Agreement immediately upon fifteen (15) days notice upon the occurrence of the following events (i) if the Fiduciary fails to perform any of its obligations hereunder and such material breach

*Arendt – 50087.14898317vEXEC*



is not remedied within fifteen (15) days after receipt by the Fiduciary of a written notice to remedy from the Settlor specifying the particular material breach or/and (ii) if the Fiduciary has negative net assets (considering any debt instruments issued to, or loans made by, the Fiduciary's shareholder as equity (*fonds propres*) for a period exceeding more than ten (10) consecutive months, after the close of each financial year. For the purpose of this clause, the Fiduciary shall provide to the Settlor, copy of the pro forma balance sheet of each financial year, upon the annual general meeting of shareholders approving the annual accounts of the Fiduciary or in any case no later than 6 (six) months of the close of the respective financial year.

7.5     In the event of termination of the Fiduciary Agreement pursuant to article 7.3 and/or article 7.4, the Fiduciary will not cause the disposal of any of its Shares and/or any Shares held by its Affiliates (as the case may be), without inviting the Settlor to transfer a pro-rata portion of the Shareholding. This provision will survive to the termination of the Fiduciary Agreement for a period of five (5) years after such termination.

7.6     Termination of this Fiduciary Agreement by one Party shall be without prejudice of the performance of any Party's obligations under this Fiduciary Agreement and in particular to the obligations of the other Party to pay any sum due to the date of the termination.

7.7     Upon termination of the Fiduciary Agreement, all the documents relating to this Fiduciary Agreement belonging to the Settlor and kept by the Fiduciary shall be delivered to the Settlor, at the expenses of the Settlor.

7.8     In case of termination of this Fiduciary Agreement, the Fiduciary shall immediately, without any consideration, restore the Fiduciary Assets to the Settlor, its legal successor or any person designated by him.

7.9     The Fiduciary agrees to sign, upon instructions of the Settlor, any agreement necessary for the transfer to the Settlor of the Fiduciary Assets or related income held by the Fiduciary for the account of the Settlor, at the costs of the Settlor, provided that (i) the transfer takes place on or after the Termination Date and (ii) these agreements shall not be contrary to any regulation enforceable in Luxembourg.

## ARTICLE 8 – ASSIGNMENT

No Party may transfer his rights and obligations hereunder without the prior written consent of the other Party.

## ARTICLE 9 – CONFIDENTIALITY - DISCLOSURE

Each Party shall at all times keep confidential (and ensure that its employees, directors and officers, as the case may be, shall keep confidential) the Agreement and any confidential information which it may acquire in relation to the Agreement save where the disclosure of such

*Arendt – 50087.14898317vEXEC*

information is required by operation of law or by the request of any regulatory authority. The provisions of this article shall survive termination of the Agreement for a duration of 25 years.

## ARTICLE 10 – NOTICES

All notices and communications hereunder shall be made in writing by mail or e-mail and shall be sent as follows:

(a)      if to the Settlor:

**Dailane Limited**
Attn: the Sole Director
17 Ifigeneias, 2007 Strovolos
Nicosia, Cyprus
Tel: +357 22271000
Fax: +357 22271004

(b)      if to the Fiduciary:

**H.I.G. Luxembourg Holdings 47 S.à r.l.**
Attn: the board of managers
5, rue Guillaume Kroll
L-1882 Luxembourg
Grand Duchy of Luxembourg
Tel: +352 48 18 28 1
Fax: +352 48 18 28 3461

Any notice or communication sent in accordance with Article 10 shall be effective on electronic confirmation of receipt when sent by electronic mail or, if sent by mail or overnight courier, on the date actually received.

## ARTICLE 11 – TAX EXPENSES

All taxes incurred by the Settlor as a result of the payment of any sums by the Fiduciary to the Settlor under this Agreement shall be borne by the Settlor.

## ARTICLE 12 – APPLICABLE LAW AND JURISDICTION

12.1.   This Fiduciary Agreement shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg.

*Arendt – 50087.14898317vEXEC*

12.2.  The Parties agree that all disputes arising from the present Fiduciary Agreement which cannot be resolved by agreement of the Parties shall be submitted to the exclusive jurisdiction of the courts of the Grand Duchy of Luxembourg.

*[remainder of the page intentionally left in blank; signature page follows]*



*Arendt – 50087.14898317vEXEC*

Signed on 11th April 2016.

**Dailane Limited
as Settlor**



**H.I.G. Luxembourg Holdings 47 S.à r.l.
as Fiduciary**

| By: | By: |
|---|---|
| Title: A Manager | Title: B Manager |

*Arendt – 50087.14898317vEXEC*

Signed on 11th April 2016.

**Dailane Limited**
**as Settlor**

_____

**H.I.G. Luxembourg Holdings 47 S.à r.l.**
**as Fiduciary**

_____          _____
By: Daphné Chanteloup                      By: Laurence Goblet
Title: A Manager                           Title: B Manager

*Arendt – 50087.14898317vEXEC*

Case 1:22-cv-23619-RKA   Document 5-5   Entered on FLSD Docket 11/04/2022   Page 50 of 298

4

**Dailane Limited**

**as Settlor**

**and**

**H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)**

**as Fiduciary**

---

**AMENDMENT AND RESTATEMENT AGREEMENT
TO THE FIDUCIARY AGREEMENT ORIGINALLY DATED 29
SEPTEMBER 2015 AS FIRST AMENDED AND RESTATED ON 11 APRIL
2016**

---

*Arendt – 007967-70115.36354152vEXEC*

**THIS AMENDMENT AND RESTATEMENT AGREEMENT** (the "**Amendment Agreement**") is made on _____ 2022 (the "**Effective Date**").


**BETWEEN**

(1)     **H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)**, a *société à responsabilité limitée* incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 15, Boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies' Register under number B 185 604 (the "**Fiduciary**");

and

(2)     **Dailane Limited**, a limited liability company incorporated in Cyprus, having its registered office in 17 Ifigeneias, 2007 Strovolos, Nicosia, Cyprus, registered with the register of companies of Cyprus, under number 343251, and legally represented in the present by Mr Philippos Philippou Sole Director  (the "**Settlor**").

The Fiduciary and the Settlor are collectively referred to as the "**Parties**" and individually as a "**Party**".

**PREAMBLE:**

The Parties are parties to the fiduciary agreement originally dated 29 September 2015 as first amended and restated on 11 April 2016 (the "**2016 Amended and Restated Agreement**").

As detailed hereinafter, the Parties intend to amend the terms of the 2016 Amended and Restated Agreement as contained in the amended and restated fiduciary agreement attached hereto as Schedule 1 (the "**2022 Amended and Restated Agreement**").

**NOW THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:**

**ARTICLE 1 – AMENDMENT TO THE 2016 AMENDED AND RESTATED AGREEMENT**

The Parties hereby agree to amend the 2016 Amended and Restated Agreement by (i) amending the definition of "Fiduciary Assets" in order to include a one-time payment to the Settlor of EUR 500,000 if and when the proceeds generated from the sale of Società Internazionale Applicazioni Tecniche S.p.A. in 2022 are distributed to the shareholders of H.I.G. Holdings Luxembourg 46 S.à r.l., as set forth in the 2022 Amended and Restated Agreement and by (ii) making certain adjustments in order to take into account the voluntary liquidation of the Fiduciary, which was resolved upon by the general meeting of shareholders of the Fiduciary on 27 December 2018.

*Arendt – 007967-70115.36354152vEXEC*

## ARTICLE 2 – EFFECTIVE DATE

This Amendment Agreement shall take effect as of the Effective Date and the 2022 Amended and Restated Agreement shall enter into full force and effect as amended by this Amendment Agreement from thereon.

## ARTICLE 3 – APPLICABLE LAW AND JURISDICTION

3.1.    This Amendment Agreement shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg.

3.2.    The Parties agree that all disputes arising from the present Amendment Agreement which cannot be resolved by agreement of the Parties shall be submitted to the exclusive jurisdiction of the courts of the Grand Duchy of Luxembourg.

## ARTICLE 4 – COUNTERPARTS

This Amendment Agreement may be executed in as many counterparts as there are parties with a distinct interest, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

*Arendt – 007967-70115.36354152vEXEC*

**IN WITNESS THEREOF**, the Parties have agreed this Amendment Agreement to be duly executed in counterparts as of the date first above written.

**Dailane Limited
as Settlor**



Philippos Philippou

**H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)
as Fiduciary**

represented by its liquidator, **Alter Domus Liquidation Services S.à r.l.**,
represented itself by its permanent representative **Laurence Goblet**

*Goblet*

_____

*Arendt – 007967-70115.36354152vEXEC*

## SCHEDULE 1

## AMENDED AND RESTATED FIDUCIARY AGREEMENT

*Arendt – 007967-70115.36354152vEXEC*

**Dailane Limited**

**as Settlor**

**and**

**H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)**

**as Fiduciary**

---

**AMENDED AND RESTATED
FIDUCIARY AGREEMENT**

---

**THIS FIDUCIARY AGREEMENT** (the "**Fiduciary Agreement**") is made on _____ 2022.

**BETWEEN**

(1)　　**H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)**, a *société à responsabilité limitée* incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 15, Boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies' Register under number B 185 604 (the "**Fiduciary**");

and

(2)　　**Dailane Limited**, a limited liability company incorporated in Cyprus, having its registered office in 17 Ifigeneias, 2007 Strovolos, Nicosia, Cyprus, registered with the register of companies of Cyprus, under number 343251, and legally represented in the present by Mr Philippos Philippou Sole Director  (the "**Settlor**").

The Fiduciary and the Settlor are collectively referred to as the "**Parties**" and individually as a "**Party**".

**PREAMBLE:**

The Fiduciary holds the Fiduciary Assets (as defined below) as fiduciary (*fiduciaire*) on the Settlor's behalf, subject to the Fiduciary and the Settlor complying with certain fiduciary obligations in accordance with this Fiduciary Agreement.

**NOW THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:**

**ARTICLE 1 – DEFINITIONS**

1.1.　　In this Fiduciary Agreement, unless the context otherwise requires the following expressions shall have the following meanings:

"**Affiliate**" of any Person means any other Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person. For the purpose of this definition, "control" and the correlative meanings of the terms "controlled by" and "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the holding of more than 50% of the voting stock of a Person or having the legal or de facto right to appoint a majority of the members of the board of directors or a similar corporate body of a Person.

*Arendt – 007967-70115.36354559vEXEC*

"**Bank Account**" means the bank account of the Settlor;

"**Business Day**" means any day other than a Saturday, Sunday, legal holiday or other day on which commercial banks in Luxembourg are closed for business;

"**Fiduciary Agreement**" means this fiduciary agreement;

"**Fiduciary Assets**" means collectively (i) the Shareholding, (ii) the Investor Loan, (iii) the Senior Bonds, (iv) the Working Capital Facility Bonds and (v) the Transaction Bonus;

"**HIG 46**" means H.I.G. Luxembourg Holdings 46 S.à r.l., a *société à responsabilité limitée* incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 15, Boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies' Register under number B 185 603;

"**Income**" means any cash income, including interest payments, sale proceeds, redemption proceeds and/or transfer proceeds, in each case net of transaction costs, derived by the Fiduciary from the Fiduciary Assets through, as the case may be, the holding, sale, redemption and/or transfer thereof;

"**Investor Loan**" means a claim representing a portion corresponding to EUR 877,800 of EUR 9,900,000 principal in a EUR 25,000,000 investor loan dated 26 June 2014 between, among others, Fiduciary as lender and HIG 46 as borrower plus interest thereon and all related rights;

"**Maillis S.A.**" means M.J. Maillis S.A. - Industrial Packaging Systems and Technologies;

"**Materially Adverse Effect**" means an adverse effect on the economic interests of the Settlor in respect of the Shareholding of a minimum amount of EUR 100,000;

"**Person**" means an individual, a corporation, association, limited liability company, limited liability partnership, partnership, estate, trust, unincorporated organization or a government or any agency or political subdivision thereof;

"**Sale**" has the meaning ascribed to such term in article 4.2.4;

"**Senior Bonds**" means 2,202,200 senior bonds having a nominal value of EUR 1.00 each and an aggregate nominal value of EUR 2,202,200, issued by Maillis S.A. pursuant to the Senior Bond Programme dated 30 September 2011 as amended on 21 July 2014;

"**Shareholding**" means 186,562 Shares (or as such number may be adapted in accordance with article 4.2.4 from time to time) representing 14,925% of the total share

*Arendt – 007967-70115.36354559vEXEC*

capital of HIG 46 and accordingly, an indirect participation of 14,925%, in the share capital of Maillis S.A. as of the date of this Agreement;

"**Shares**" means collectively the shares issued by HIG 46, currently being 1,250,000 shares with a nominal value of EUR 0.01 each with each such share being referred to as a "**Share**";

"**SIAT**" means Società Internazionale Applicazioni Tecniche S.p.A., a stock corporation (*Società per azioni*) organized under the laws of Italy with its registered office at Milan, via Gabriele Rossetti no. 9, Italy, registered with the Companies' Register of Milano Monza Brianza Lodi under no. 12635750156, VAT and Tax Code 12635750156;

"**Transaction Bonus**" means a one-time payment to the Settlor of EUR 500,000 if and when the proceeds generated from the sale of SIAT in 2022 are distributed to the shareholders of HIG 46;

"**WCF Payment Event**" has the meaning ascribed to such term in article 4.2.3;

"**Working Capital Facility Bonds**" means 1,355,860 working capital facility bonds having a nominal value of EUR 1.00 each and an aggregate nominal value of EUR 1,355,860, issued by Maillis S.A. pursuant to the EUR 10,000,000 Working Capital Programme dated 21 July 2014.

1.2.    In this Fiduciary Agreement:

(a)    articles headings are inserted for convenience only and shall not affect the construction of this Fiduciary Agreement and unless otherwise specified, all references to Articles are to Articles of this Fiduciary Agreement;

(b)    unless the context otherwise requires, words denoting the singular number shall include the plural and vice versa;

(c)    references to any document or agreement are to be construed as references to such document or agreement as amended or supplemented from time to time; and

(d)    references to any enactment include re-enactments, amendments and extensions thereof.

## ARTICLE 2 – FIDUCIARY SETTING-UP

2.1    The Settlor hereby acknowledges that the Fiduciary Assets are held by the Fiduciary subject to the provisions of this Fiduciary Agreement.

2.2    The Fiduciary hereby acknowledges that it holds the Fiduciary Assets on behalf of the Settlor.

*Arendt – 007967-70115.36354559vEXEC*

2.3     In the event that the Fiduciary is instructed by the Settlor to purchase some additional shares or debt instruments in the HIG 46 or to subscribe to an increase of share capital in the HIG 46, the Settlor shall transfer to the Fiduciary the necessary amount to make such acquisition or subscription.

## ARTICLE 3 – OWNERSHIP AND SALE OF THE FIDUCIARY ASSETS

3.1     The Fiduciary shall acquire, subscribe, or hold the Fiduciary Assets in its own name, but for the account, on behalf and at the risk of the Settlor.

3.2     The Fiduciary shall be, for the third parties, the exclusive owner of the Fiduciary Assets.

3.3     The Fiduciary shall retain the Fiduciary Assets until (i) liquidation of the Fiduciary Assets, under the terms of this Agreement or (ii) termination of the Fiduciary Agreement in accordance with Article 7 below, it being understood that the Fiduciary may dispose of the Shareholding in accordance with, and subject to, the provisions of articles 6(b) and 6(c), as applicable.

3.4     Notwithstanding article 3.3. above, the Settlor may at any time instruct the Fiduciary to sell or otherwise dispose all, or part of the Senior Bonds and the Investor Loan.

## ARTICLE 4 – FIDUCIARY DUTIES

4.1.    <u>Voting Rights</u>

4.1.1.     The Fiduciary shall act with regard to the voting rights in respect of the Shareholding in accordance with the written instructions of the Settlor. Notice of decisions to be taken by the general meeting of shareholders of HIG 46 requiring the approval by shareholders holding more than 85.075% of the share capital of HIG 46 (the "**Eligible Decisions**") shall be notified to the Settlor in accordance with the notification requirements under this Agreement at least 5 Business Days prior to the date of the adoption of such Eligible Decisions. All instructions are, once received, to be considered as irrevocable and unconditional and the Settlor represents and guarantees that the Fiduciary may rely on the validity of any instruction received in accordance with this Agreement. The Fiduciary shall incur no liability for or in respect of any action taken in compliance with the instructions transmitted by the Settlor in accordance with this article.

4.1.2.     For the avoidance of doubt, the Fiduciary shall exercise the voting rights in respect of the Shareholding in its sole discretion to the extent that such exercise of the voting rights in respect of the Shareholding would not have any Materially Adverse Effect (i) in respect of decisions of the general meeting of shareholders of HIG 46 which are not Eligible Decisions or (ii) if written instructions have not been received from the Settlor

in respect of Eligible Decisions at least 24 hours prior to the date of adoption of the Eligible Decisions accordance with the notification requirements under this Agreement or (iii) in such cases as may be required to give effect to the provisions of this Agreement (including, without limitation, the transfer of Shares to third parties).

4.2.     Payments of Income

4.2.1.   Any Income received by the Fiduciary in respect of the Fiduciary Assets shall be held in escrow by the Fiduciary on behalf and for account of the Settlor and shall be transferred to the Bank Account within 10 Business Days of receipt.

4.2.2.   The Fiduciary shall ensure that any Income from the Fiduciary Assets are duly and punctually paid, received or collected as and when the same become due and payable or to secure that the correct amounts (if any) are paid or received.

4.2.3.   Notwithstanding article 4.2.2. above, the Settlor acknowledges and agrees that, after the WCF Prepayment (as defined below) the Fiduciary shall hold on to any Income derived by the Fiduciary from the Working Capital Facility until such Income has attained an aggregate amount of EUR 709,360 (the "**WCF Payment Event**").

Upon occurrence of the WCF Payment Event, the Fiduciary shall pay an amount equal to EUR 709,360 to the Settlor by wire transfer to the Bank Account within 10 Business Days.

An amount of EUR 646,500 will be paid to the Settlor prior to the occurrence of the WCF Payment Event, at the latest within 10 (ten) Business Days from execution of this Agreement (the "**WCF Prepayment**").

4.2.4    In the event of a sale of all or part of the Shareholding by the Fiduciary (a "**Sale**") or in the event of disposal/liquidation of the Fiduciary Assets, in any other way whatsoever, the Settlor shall be entitled to receive the purchase price/proceeds from the Fiduciary within a period of 10 (ten) Business Days from the closing of the Sale. For the avoidance of doubt, in such event the definition of "**Shareholding**" shall be adapted accordingly and reduced by the number of Shares sold under the relevant Sale.

4.2.5    The Fiduciary shall promptly inform Settlor of any delays or irregularities in the performance of the above mentioned Fiduciary's duties.

## ARTICLE 5 – REPRESENTATIONS AND WARRANTIES

5.1.     The Settlor represents and warrants to, and for the benefit of the Fiduciary that:

(a)      it has the corporate power under the laws of Cyprus and under its constitutional documents to enter into the Fiduciary Agreement;

*Arendt – 007967-70115.36354559vEXEC*

(b)     the execution of the Fiduciary Agreement and the performance by the Settlor of its obligations thereunder have been duly authorized by the Settlor and upon due execution, the Fiduciary Agreement will constitute and create valid and binding obligations of the Settlor enforceable in accordance with its terms;

(c)     it is not subject to any bankruptcy proceedings or proceedings for voluntary arrangement with its creditors, controlled management or suspension of payments or any similar foreign law proceedings having similar effects; and

(d)     as far as the Settlor is aware, no demand, order or resolution for the winding-up or liquidation of the Settlor or for the protection of the Settlor from its creditors has been filed or is currently pending before a court of competent jurisdiction.

5.2.    The Fiduciary represents and warrants to, and for the benefit of the Settlor that:

(a)     it has the corporate power under the laws of the Grand Duchy of Luxembourg and under its constitutional documents to enter into the Fiduciary Agreement;

(b)     the execution of the Fiduciary Agreement and the performance by the Fiduciary of its obligations thereunder have been duly authorized by the Fiduciary and upon due execution, the Fiduciary Agreement will constitute and create valid and binding obligations of the Fiduciary enforceable in accordance with its terms;

(c)     it is not subject to any bankruptcy proceedings or proceedings for voluntary arrangement with its creditors (*concordat préventif de faillite*), controlled management (*gestion contrôlée*) or suspension of payments (*sursis de paiement*) or any similar foreign law proceedings having similar effects; and

(d)     with the exception of the resolution taken by the general meeting of shareholders of the Fiduciary on 27 December 2018 to voluntarily dissolve and liquidate the Fiduciary, as far as the Fiduciary is aware, no demand, order or resolution for the winding-up or liquidation of the Fiduciary or for the protection of the Fiduciary from its creditors has been filed or is currently pending before a court of competent jurisdiction.

## ARTICLE 6 – COVENANTS

The Fiduciary covenants that:

(a)     it will not (x) create any lien, security interest, claim, option, pledge, charge, assignment, transfer or other encumbrances of any kind, nor grant any mandate with a view to the creation thereof in respect of, or (y) permit the existence of any lien, security interest, claim, option, pledge, charge, assignment, transfer or other

encumbrance over the Senior Bonds, the Shareholding and the Investor Loan, without the prior consent of the Settlor;

(b)     it will not dispose of, including by way of transfer, sale, redemption or otherwise, of the Fiduciary Assets and HIG 46's participation in Maillis S.A., other than on arms' length terms. Notwithstanding the foregoing, the Fiduciary may proceed to a restructuring of the Maillis group which would result in the replacement of the current parent company Maillis S.A., it being understood however that the Settlor's rights in respect of such new parent company shall be equivalent to the Settlor's rights in respect of Maillis S.A. under this Fiduciary Agreement.

(c)     it will not cause the disposal of the Shareholding, without transferring a pro-rata portion of its Shares and/or any Shares held by the Fiduciary's Affiliates (as the case may be) and will not cause the disposal of any of its Shares and/or any Shares held by its Affiliates (as the case may be), without transferring a pro-rata portion of the Shareholding;

(d)     it or any of its Affiliates (as the case may be) will not cause the issuance of new shares or debt instruments in HIG 46,  Maillis S.A. or any of its Affiliates (including but not limited to the context of a capital increase, merger, demerger or spin off) to the Fiduciary, or to any entity which is an Affiliate of H.I.G. Capital, LLC, other than on arms' length terms and not without offering the Settlor a right to purchase or subscribe for 15% of such instruments under the same terms as the Fiduciary;

(e)     it will not cause any amendments of the articles of association of the Fiduciary or HIG 46 which would have a Materially Adverse Effect on the economic interests of the Settlor under this Agreement without prior consent of the Settlor; and

(f)     unless required by applicable law, it will not cause (x) applications to be made by the Fiduciary, HIG 46 or Maillis S.A. or by any other entitled person for the appointment of a *commissaire, juge-commissaire, liquidateur, curateur* or similar officer pursuant to any insolvency or similar proceedings in respect of the Fiduciary, HIG 46 or Maillis S.A. and/or (y) applications to be made by the Fiduciary, HIG 46 or Maillis S.A. for a voluntary or judicial winding-up or liquidation of the Fiduciary, HIG 46 or Maillis S.A., without the prior consent of the Settlor. For the avoidance of doubt, the Settlor provided its prior consent to the voluntary liquidation of the Fiduciary resolved upon by the general meeting of shareholders of the Fiduciary on 27 December 2018.

## ARTICLE 7 – DURATION

7.1     The Fiduciary Agreement shall remain in effect until 30 September 2030 (the "**Termination Date**"). It shall come into force on the date of the signature of the Fiduciary Agreement by both Parties.

*Arendt – 007967-70115.36354559vEXEC*

7.2     The Fiduciary Agreement may be terminated prior to the Termination Date by the joint written consent of both Parties, or in case of disposal of all Fiduciary Assets.

7.3     The Fiduciary Agreement shall automatically terminate (i) in case the Fiduciary has become or shall become subject to bankruptcy (*faillite*), insolvency, moratorium, controlled management (*gestion contrôlée*), suspension of payments (*sursis de paiement*), court ordered liquidation or reorganization or any similar Luxembourg or foreign laws insolvency procedures affecting the enforcement of creditor's rights generally, or/and (ii) in the event the Fiduciary goes into liquidation, unless the Settlor has given its prior consent to the liquidation of the Fiduciary in accordance with article 6(f) above.

7.4     Notwithstanding the foregoing, the Settlor may terminate the Fiduciary Agreement immediately upon fifteen (15) days notice upon the occurrence of the following events (i) if the Fiduciary fails to perform any of its obligations hereunder and such material breach is not remedied within fifteen (15) days after receipt by the Fiduciary of a written notice to remedy from the Settlor specifying the particular material breach or/and (ii) if the Fiduciary has negative net assets (considering any debt instruments issued to, or loans made by, the Fiduciary's shareholder as equity (*fonds propres*) for a period exceeding more than ten (10) consecutive months, after the close of each financial year. For the purpose of this clause, the Fiduciary shall provide to the Settlor, copy of the pro forma balance sheet of each financial year, upon the annual general meeting of shareholders approving the annual accounts of the Fiduciary or in any case no later than 6 (six) months of the close of the respective financial year.

7.5     In the event of termination of the Fiduciary Agreement pursuant to article 7.3 and/or article 7.4, the Fiduciary will not cause the disposal of any of its Shares and/or any Shares held by its Affiliates (as the case may be), without inviting the Settlor to transfer a pro-rata portion of the Shareholding. This provision will survive to the termination of the Fiduciary Agreement for a period of five (5) years after such termination.

7.6     Termination of this Fiduciary Agreement by one Party shall be without prejudice of the performance of any Party's obligations under this Fiduciary Agreement and in particular to the obligations of the other Party to pay any sum due to the date of the termination.

7.7     Upon termination of the Fiduciary Agreement, all the documents relating to this Fiduciary Agreement belonging to the Settlor and kept by the Fiduciary shall be delivered to the Settlor, at the expenses of the Settlor.

7.8     In case of termination of this Fiduciary Agreement, the Fiduciary shall immediately, without any consideration, restore the Fiduciary Assets to the Settlor, its legal successor or any person designated by him.

7.9     The Fiduciary agrees to sign, upon instructions of the Settlor, any agreement necessary for the transfer to the Settlor of the Fiduciary Assets or related income held by the Fiduciary

*Arendt – 007967-70115.36354559vEXEC*

for the account of the Settlor, at the costs of the Settlor, provided that (i) the transfer takes place on or after the Termination Date and (ii) these agreements shall not be contrary to any regulation enforceable in Luxembourg.

## ARTICLE 8 – ASSIGNMENT

No Party may transfer his rights and obligations hereunder without the prior written consent of the other Party.

## ARTICLE 9 – CONFIDENTIALITY - DISCLOSURE

Each Party shall at all times keep confidential (and ensure that its employees, directors and officers, as the case may be, shall keep confidential) the Agreement and any confidential information which it may acquire in relation to the Agreement save where the disclosure of such information is required by operation of law or by the request of any regulatory authority. The provisions of this article shall survive termination of the Agreement for a duration of 25 years.

## ARTICLE 10 – NOTICES

All notices and communications hereunder shall be made in writing by mail or e-mail and shall be sent as follows:

(a)      if to the Settlor:

**Dailane Limited**
Attn: the Sole Director
17 Ifigeneias, 2007 Strovolos
Nicosia, Cyprus
Tel: +357 22271000
Fax: +357 22271004

(b)      if to the Fiduciary:

**H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)**
Attn: the board of managers
15, Boulevard F.W. Raiffeisen
L-2411 Luxembourg
Grand Duchy of Luxembourg
Tel: +352 48 18 28 1
Fax: +352 48 18 28 3461

*Arendt – 007967-70115.36354559vEXEC*

Any notice or communication sent in accordance with Article 10 shall be effective on electronic confirmation of receipt when sent by electronic mail or, if sent by mail or overnight courier, on the date actually received.

## ARTICLE 11 – TAX EXPENSES

All taxes incurred by the Settlor as a result of the payment of any sums by the Fiduciary to the Settlor under this Agreement shall be borne by the Settlor.

## ARTICLE 12 – APPLICABLE LAW AND JURISDICTION

12.1.   This Fiduciary Agreement shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg.

12.2.   The Parties agree that all disputes arising from the present Fiduciary Agreement which cannot be resolved by agreement of the Parties shall be submitted to the exclusive jurisdiction of the courts of the Grand Duchy of Luxembourg.

*[remainder of the page intentionally left in blank; signature page follows]*

*Arendt – 007967-70115.36354559vEXEC*

Signed on _____ 2022.

**Dailane Limited
as Settlor**

Philippos  Philippou

**H.I.G. Luxembourg Holdings 47 S.à r.l. (in liquidation)
as Fiduciary**

represented by its liquidator, **Alter Domus Liquidation Services S.à r.l.**,
represented itself by its permanent representative **Laurence Goblet**

_LGoblet_

_____

5

# M. J. MAILLIS GROUP

## TERMS AND CONDITIONS OF APPOINTMENT

20/1/17

MAILLIS INTERNATIONAL S.A
2 rue de Bitbourg L-1273 Luxembourg LUXEMBOURG
Group web-site: www.maillis.gr
GENERAL TRADE REG. No. B 212166 - VAT: LU 291 31 518

---

### TERMS AND CONDITIONS OF APPOINTMENT

---

**THESE TERMS AND CONDITIONS OF APPOINTMENT** (the "**Terms and Conditions**") are concluded between:

**Maillis International S.A.**, a *société anonyme* incorporated and existing under the laws of Luxembourg, having its registered office at 2, rue de Bitbourg, L-1273, registered with the Luxembourg Trade and Companies' Register under number B.212.166, represented herein by Mr. Rudolf Estermann and Mr. Luc van Damme,

hereinafter referred to as the "**Company**";

and

**Mr. Michail Maillis**, residing at 17 Athanassiou Diakou, 2060 Strovolos Nicosia, Cyprus,

hereinafter referred to as the "**Director**".

The Company and the Director are collectively referred to as the "**Parties**".

**Preamble:**

- By resolution of the shareholders of the Company dated 20 January 2017, it has been decided to appoint Mr. Michail Maillis as member of the board of directors ("*membre du conseil d'administration*") of the Company (the "**Board of Directors**") bearing the title of "**Director**" for a definite period of time and with effect as from 20 January 2017 until the next shareholders general meeting to be held in 2018.

- By resolution of the Board of Directors of the Company dated 20 February 2017, the Director Maillis has been appointed as Chairman of the Board of Directors.

- The Director is the founder of the Maillis Group, hereinafter referred to as the "**Group**".

- The Director is also a leading industry expert, whose know-how and input, in the post-restructuring period, should be essential for achieving the projected growth and value increase of the Group, while his cooperation is also required, in order to help to successfully manage the transition of a founder-run business to an independent multinational organization.

- The purpose of the present agreement is solely to reflect the terms and conditions of the appointment of the Director as member of the board of directors of the Company.

**In consideration of the above, the Parties have agreed as follows:**

**Article 1: Terms of Appointment**

1.1. Notwithstanding the provisions of article 12 (Termination of Appointment) of these Terms and Conditions as well as the provisions of the Company's articles of association, these Terms and Conditions are concluded for the duration of the Director's appointment as member of the board of directors of the Company.

1.2. The Director's appointment is subject to the provisions of the articles of association of the Company as well as the provisions of the Luxembourg Companies' Act ("*Loi du 10 Août 1915 concernant les sociétés commerciales*").

1.3. The present Contract shall enter into force on the date of signature of the present and shall expire on 31.5.2020, with the right of the Director to unilaterally extend the term as provided in the cl. 1.4. below.

1.4. Without prejudice to cl. 13.1 of the present Terms and Conditions, if eighteen (18) months before the term expiry, the current shareholder of the Company (HIG Luxembourg Holdings 46 S.à r.l.) has not divested from the Company, by selling at least its majority participation, to a party not related to the HIG Group, in any way whatsoever, the Director may unilaterally cause the extension of the appointment term, for two more years, by sending to the Company's CEO, a written notice (by email, fax or registered mail) for effecting such extension. The receipt of such written notice by the Company will automatically conclude parties' agreement for the extension, the Company providing its acceptance (under the abovementioned terms), in the present -Appointment.

**Article 2: Compensation and Expenses**

2.1. In consideration for the services to be provided as described herein (the "**Services**"), the Company shall pay the Director an annual gross director's fee (the "**Director's Fee**") amounting to EUR 87,500.- gross per annum (including, if applicable, possible tax-witholdings, social security contributions payable by the Directors –not the Company- according to art. 2.3 below, and/or any VAT to be paid by the Company).

2.2. The Company shall cover any reasonable expenses such as traveling and hotel expenses incurred by the Director in the performance of his duties, per board meeting, upon bringing evidence of such expenses. The Director will follow travelling and hotel arrangements made by the Company for the BoD members.

2.3. The Director agrees that the Director's Fee may be subject to potential tax and/or social security withholdings as potentially required by applicable law.

2.4. Also, the Director shall be entitled to an annual gross bonus, equal to 1% of the 25% of the Operating EBITDA of the last audited fiscal year ("the Bonus basis"), used as a basis to determine the bonus of the Group C-Level Management, or 0.75%, or 0.50%, or 0.25% of the Bonus basis, if 100%, or 95%, or 90%, or ≥85%, respectively, of the Ebitda projections, in the relevant approved annual budgets, has been achieved, in each respective fiscal year. The annual bonus shall be paid according to the most tax efficient structure for the Company.

2.5. Furthermore, the Director shall be granted the use of an i-Phone.

2.6. In addition, the Company shall cause that the Director and the members of his family shall continue to be granted healthcare services, as included in the scope of coverage stipulated in the insurance policy No. GL60000886 of the insurance company "Generalli", which is valid and effective since the date of signing of his former employment contract with M.J. Maillis S.A. – Industrial Packaging Systems & Technologies. In this respect, the premium payable with respect to such insurance policy will be paid by the Company.

2.7.   The Company shall cause that the Chairman will also have access and right of use of the BoD office, as well as of the BoD office, in Athens, of its subsidiary M J Maillis S.A.

### Article 3: Powers and Duties

3.1.   The Director shall comply with the guidance of the Board of Directors.

3.2.   The Director shall exercise such powers and discharge such duties as appropriate to his functions of Director.

3.3.   Collectively with the Board of Directors, the Director shall – among other – regularly review the strategy, performance, resources, financial and risk control procedures and the Company's standards of conduct as well as handle any issue arising out in the course of the business of the Company. The Director shall advise and assist the Company in all aspects of its business.

3.4.   The Director may be authorized to represent the Company in its relation with third parties and to sign on its behalf any legally binding documents in accordance with the articles of incorporation of the Company as such may be amended from time to time; i.e. provided that the Board of Directors has delegated to him such authority and power of signature.".

3.5.   In collaboration with the Board of Directors, the Director shall make sure that the Company complies with all applicable legal requirements in Luxembourg and in any other relevant jurisdiction.

### Article 4: Attendance at Board meetings

4.1.   The Director shall prepare for and attend every regularly scheduled meeting of the Board of Directors of the Company and shall prepare for and use all reasonable endeavors to attend any other meeting of the Board of Directors which he will receive notice of.

4.2.   The Company shall give a reasonable notice of every meeting and of the business which is proposed to be transacted. Regular board meetings of the Company will usually be held at least once every three months; without prejudice to other meetings that may be convened as needed with sometimes only a short period of notice.

4.3.   The Director shall attend the annual general meeting of the Company every year and shall also attend extraordinary general meetings, if requested by the Company.

### Article 5: Fiduciary Duties

5.1.   The Director undertakes to act in the best interest of the Company and to duly take into account the reasonable directions and guidance of the Board of Directors.

5.2.   The Director shall not accept or continue any appointment which might involve a direct or indirect conflict of interest with the Group and shall immediately disclose any such potential conflict to the Board of Directors.

5.3.   The Director confirms that he does not and will not hold any interest in any competitor of the Group. The Director undertakes that he will not accept instructions nor do any act which may directly give rise to a conflict of interest with his duties, responsibilities and obligations arising out of his appointment with the Company and that he will inform the Board of Directors of any conflict thereof.

5.4. The Director must inform the Board of Directors of any potential conflict of interest and must refrain from discussing and voting on any matter related to such conflict.

5.5. The Director may not acquire or divert to himself property or opportunities that the Group needs or is seeking, or as to which it has a tangible expectancy or that he was otherwise under a duty to acquire for the Company.

5.6. If the Director considers or becomes aware that the Company is acting or intending to act in a way which is illegal, the Director must inform the other directors of the Company and must vote against any proposal in a board meeting that it is against the Company's interests.

5.7. By accepting his appointment, the Director confirms that he is able to allocate sufficient time and that he has the relevant experience to fully discharge his duties.

5.8. During his appointment, the Director shall devote his time, attention and business skills to the discharge of his duties as set out in these Terms and Conditions, such as the preparation for board meetings and availability for discussion of the matters to be treated by the Board of Directors.

5.9. During the term of these Terms and Conditions, the Director agrees to comply with any Company regulations, codes of conduct or policies in force. The Director will always comply with the modus operandi applicable to MJM Maillis management from time to time, current version of which is attached hereto as Annex I.

5.10 No later than on the date of his entry in service, the Director undertakes to provide the Company with an exhaustive list of any other companies or organizations in which he holds an office, an employment or a consultancy relationship.

### Article 6: Claims

6.1. If any third party makes a claim against, or notifies an intention to make a claim against the Director, which may reasonably be considered as likely to give rise to a liability, the Director shall as soon as reasonably practicable give written notice of that matter to the Company, specifying in reasonable detail the nature of the relevant claim.

### Article 7: Non-Compete and non-solicitation clause

7.1. The Director will be under the obligation to refrain from providing services and in general, from being employed, as well as from participating, in any way, whether directly or indirectly, in any business that is competitive in regard to the Company or its subsidiaries, for the term of the present appointment and for a time period of one year from the day on which, the expiry, or a termination of the present appointment, for any reason whatsoever, becomes effective. Any business activity in the sectors in which, the Company engages in, shall be regarded as a competitive business.

7.2 In the event that the Director breaches the above non-compete obligation, the Company shall be entitled to payment of a contractual penalty, equal to the half of the Director's Fee. In such a case the Director shall also be liable to indemnify the Company for any and all damages the Company suffered due to the Director's failure to comply with these Terms and Conditions to the extent that such damages exceed the amount of contractual penalty provided for above. The Director accepts and agrees that the contractual penalty provided for in this paragraph is fair and justifiable in view of Company's legitimate interests and hereby waives his right to challenge the validity or level of such a contractual penalty in a Court of Law or otherwise.

**Article 8: Independence**

8.1. The Director must inform the Board of Directors of any business, family or other kind of relationship with any shareholder of the Company who is entitled to exercise 5 % or more of the total voting rights at the general meeting of the Company.

8.2. The Director shall not enter into any business or relationship with another company, natural person or any other entity which could materially interfere with the exercise of his independent judgment.

8.3. The Director undertakes to refrain from taking any benefit which could negatively influence his independence.

**Article 9: Public Reports**

9.1. The Director is not authorized to publicly express the views of the Company.

**Article 10: Confidential Information**

10.1. The Director shall consider as confidential all data and information which becomes known to him regarding the activities of the Company, its subsidiaries and its Group in general, and he shall keep absolute confidentiality in regard to the aforementioned and all the issues of the Company and of the subsidiaries and Group thereof in general, such as, indicatively, their business plans, strategy perspectives, any new acquisitions under negotiations, co-operations, etc., contracts and all transactions in general, their general financial situation, know-how, suppliers, clients, etc.

10.2 This confidentiality obligation shall survive for a duration of [10] years subsequent to the termination of the appointment, for any reason whatsoever, of the present appointment.

**Article 11: Return of Documents**

11.1. Any documents, copies of documents, books or any other working materials of any kind that the Director may receive or use while discharging his duties remain the property of the Company, and shall be returned by the Director to the Company, at the Company's first request or at the latest at the term of the Director's office. The Director shall not keep copies or reproductions of any nature whatsoever of such documents.

**Article 12: Termination of Appointment**

12.1. The present Director's appointment may be terminated by either contracting party, by notice of termination for cause (including but not limited to cause foreseen in article 13 or the non-compliance with the modus operandi applicable to MJM Maillis management from time to time), only. Except in the case provided by clause 13.2 below, no indemnity shall be payable to the Director by reason of termination of his appointment under this clause 12.1.

**Article 13: Specifically Agreed Just Causes for Termination**

13.1. In case, the current shareholder of the Company, H.I.G. Luxembourg Holdings 46 S.à r.l. divests from the Company, by selling at least its majority participation, to a party not related to the HIG Group, in any way whatsoever, the Company will be entitled to terminate the present appointment, upon conclusion of the respective equity transfer, without the obligation to indemnify the Director, in respect of the remaining total amounts of the Director's Fee, for each remaining year of service.

13.2. Taking into account the Director's capacity as founder of the Group, the parties agree that, in the event that the Director is not elected as Chairman of the Company's Board of Directors, or of any other future parent company of the Maillis Group (in case such change occurs), at any time during the term of this appointment, that shall constitute just cause for its termination by the Director. In such case, severance payment owed to the Director, in an amount equal to the aggregate annual Director's Fee, for the remaining period of the term, will be paid in equal monthly installments, until 31.5.2020 (or other extended term, subsequently agreed by the Parties or as provided in the current Appointment)

## Article 14: Interaction with an Employment Relationship

14.1. The Parties acknowledge that these Terms and Conditions can under no circumstances give lieu to an employment relationship. Accordingly, these Terms and Conditions are not governed by the Labor Code ("*Code du travail*").

14.2. The Director's office is governed by Article 50 and following of the Luxembourg Companies' Act and Articles 1984 and following of the Luxembourg Civil Code.

14.3. The appointment of the Director as a member of the Board of Directors of the Company shall be without prejudice to the possibility of the conclusion of an employment contract between the Parties in case of performance of services other than those related to the management of the Company.

14.4. Any such employment contract shall remain without effect on the Director's office as a member of the Board of Directors of the Company.

## Article 15: Intellectual Property

15.1. The Company is the sole legal owner of its intellectual property and the registered proprietor thereof.

15.2. Intellectual property rights of whatever nature created during the discharge by Director of his duties under these Terms and Conditions shall vest to the exclusive benefit of the Company unless otherwise agreed. The Director agrees not to disclose any related confidential information about the Company and its business.

## Article 16: Notices

16.1. Notice that must be given in application of these Terms and Conditions shall be in writing in English and shall be either delivered directly to the other party personally or mail or registered mail to the addresses as set forth below (or such other address as a party may designate by written notice to the other party).

The address of the Company:

**Maillis International S.A.**
2, rue de Bitbourg
L-1273 Luxembourg
Attention: Mr. Luc van Damme, Chief Financial Officer

The address of the Director:

**Mr. Michail Maillis**
17, Athanassiou Diakou Str ,
2060 Strovolos Nicosia, Cyprus

**Article 17: Integration clause**

17.1  These Terms and Conditions encompass the entire agreement of the parties, and supersede all previous understandings and agreements between the parties, whether oral or written.

17.2.  The Parties hereby acknowledge and represent, by affixing their hands and seals hereto, that said parties have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in these Terms and Conditions, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of these Terms and Conditions.

17.3.  The Parties hereby waive all rights and remedies arising or which may arise as the result of one of the party's reliance on such representation, assertion, guarantee, warranty, collateral contract or other assurance, provided that nothing herein contained shall be construed as a restriction or limitation of said party's right to remedies associated with the gross negligence, willful misconduct or fraud of any person or party taking place prior to, or contemporaneously with, the execution of these Terms and Conditions.

17.4.  These Terms and Conditions may not be modified or amended except by an instrument in writing signed by both Parties.

**Article 18: Governing Law and Jurisdiction**

18.1.  These Terms and Conditions shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg.

18.2.  In case of litigation, the Courts of Luxembourg-City shall have exclusive jurisdiction.

**IN WITNESS WHEREOF** the Parties have agreed these Terms and Conditions to be duly executed in two copies

Signed in Luxembourg, on May 1st, 2017

Acting in the name and on behalf of the Company

Name:  R. Estermann

Name:  M. Maillis
Director

Name:  L. van Damme

## ANNEX I

### Maillis International SA
### INTERNAL REGULATION
### BoD - MANAGEMENT- HIG RELATION AND FUNCTIONS

I. The purpose of this Regulation is to establish internal rules of corporate governance, on the relation and function of the BoD, its non-executive Chairman, the sole shareholder and the MJM SA executive Management, which are aimed to ensure the efficient operation of the Company, in conformity with the sole shareholder's management practices and the "Modus Operandi" rules, established on 30.3.2015

### II. The roles of the Management/BoD

The MJM Chief Executives Team consisting at this moment in time of the CEO, the CFO, the COO and the CSO are responsible to develop the business plan, the budget and the strategy.

The Chief Executives Team is headed by the CEO. It is fully responsible to manage the business operationally on a day to day basis and to meet the set targets.

The BoD is a control and support body, acting according to the Company's bylaws and BoD Rules. In addition, the BoD recruits the Chief Executives Team and resolves on its remuneration and on management incentives policy.

Next to the Chief Executives Team, the BoD currently consists of 5 non-executive members.

Currently these are Michael Maillis, Dieter Baumann, Dorotheos Samoladas, Wolfgang Biedermann and Christian Kraul von Renner.

The Non-Executive Chairman of the BoD is Michael Maillis (M.Maillis).

All non-executive members of the BoD are, per definition, non-operational. They oversee the CEO and the Chief Executives Team and among others, evaluate and approve all operating plans, financial and operating results and monitor implementation of the business plan in ordinary BoD Meetings.

### III. Interface with H.I.G.

Christian Kraul-von Renner (representing H.I.G.) has the special function of being the lead interface between the owner H.I.G. and the operational management. In this function Christian Kraul-von Renner (CKvR) will have regular exchange with the CEO and the executive team, outside the BoD meetings as it is common for H.I.G. at their portfolio companies.

### IV. Functions and powers of the Non-Executive BoD Chairman / Interface with CEO/Management Team

The Chairman sets the BoD agenda including items proposed for discussion by the CEO or the other BoD members, invites and chairs the BoD meetings and participates in BoD committees.

In addition to his role as Non-Executive Chairman of the BoD, M.Maillis has a consulting role, recommending to the BoD upon business development issues and may take over specific tasks or projects with focus on Business Development, whenever assigned to him, by the BoD.

In order to manage the transition of the Maillis Group, from a founder-run business to an independent and integrated global organization, each of the Chief Executives Team and M.Maillis will act according to the following rules and procedures:

1. M.Maillis has stepped down as managing director at subsidiaries and has handed over any remaining operational tasks, to the CEO.

2. As the non-executive Chairman of the BoD, M.Maillis shall communicate views and directions only to the Chief Executives Team, through the BoD meetings and the "Chairman hour", safeguarding always management's reporting lines.

3. After consultation and instructions by the BoD, M Maillis shall, in close coordination with the CEO, use his extensive experience and business reputation, to act as ambassador for the business, to create business opportunities.

4. The BoD Chairman shall hand-over these Business Development tasks to the CEO, once the tasks are becoming operational. That point will be judged by the CEO and communicated, accordingly, to the Chairman of the BoD in writing. To secure a smooth hand-over, there will be appropriate communication and documentation at all times about the project progress by the BoD Chairman.

5. The CEO is the main and ordinary source of information and discussion for M.Maillis. To that extent, CEO shall meet with the Chairman of the BoD on a regular basis (at least twice a month) for a dedicated "Chairman hour" to (i) be informed on the progress of Group's activities, (ii) discuss business challenges & opportunities and (iii) share his extensive business experience with the CEO Such meetings can be joined, selectively, by other members of the Chief Executives Team, invited by the CEO, at his discretion or upon request from the Chairman of the BoD.

6. The Chairman of the BoD and all other BoD members may participate in management meetings, on CEO invitation

7. Any type of third party consultants, advisors, lawyers or any other service firm can only be appointed by the CEO or the Chief Executives Team.

8. The Chairman of the BoD may request information on any issue, from the Chief Executives Team only, while informing in parallel the CEO about such request. Chairman's access to information shall not include the preparation for him, of new or special reports, but only information readily available to the Chief Executives Team. In line with the previous, the Chairman of the BoD will not, directly, contact other MJM executives and employees for any kind of information, request or support.

9. The Chairman of the Board's reviews with selected employees on business topics, may only take place within the framework of the Chairman's hour, as described above. All project or task assignments to employees necessary for such reviews shall be made by the CEO and the Chief Executives Team.

10. The Chairman of the Board may ask from the CEO, to be assisted, in any business development task assigned to him by the BoD or the CEO, by an employee or other expert, reasonably required for the pertained project. For this purpose, task assignment to such employee or other expert, shall always be made by the CEO and on the basis of the latter's approval.

The above rules and processes are designed to assist and promote the efficient operation of the management. Accordingly, such rules and processes have to be applied and performed, in a manner that will respect this principle and shall not excessively burden the Chief Executives Team's normal operation. Non-observation of these rules would be considered as non-observation of official BoD rules.

**V. Transactions to be notified for approval to the BoD**

1. Transactions

The following transactions and management measures require the approval of the [BoD], unless they are already included in the approved annual budget:

(a) sale and / or transfer of the entire business operations or a substantial part of business operations, leasing the entire business operation;

(b) the establishment, acquisition or disposal of investments in other companies, whatever their legal form, or acquisition of other businesses, in whole or in substantial part, as well as the establishment, acquisition, closure and sale of businesses, business units or branches;

(c) the acquisition and disposal of land and land rights, with a value in excess of € 200,000.00 and any pertaining thereto security transactions;

(d) investments (including through acquisition of lease obligations) with a total value of more than € 200,000.00;

(e) conclusion of rental and lease agreements with a commitment amount of € 200,000.00 annually in individual cases or more;

(f) the conclusion, amendment or termination of contracts with any:

    (i) shareholders, members of the executive management or related persons of such persons;

    (ii) companies in which one of the persons under (i) above is directly or indirectly holding more than 5%;

    insofar as the Company hereby concludes commitments of more than € 10,000.00, in each case;

(g) the provision or absorption and utilization of any type of loans (excluding overdrafts) and the assumption of guarantees, warranties or other obligations for an amount in excess of € 200,000.00 in individual cases, or entering into guarantees, warranties or other obligations in excess of € 100,000.00 in individual cases where these are outside of the ordinary business operations;

(h) management of active processes, litigations and concluding settlements with a value of over € 200,000.00 in individual cases;

(i) the issue and revocation of powers of attorney and general powers of attorney and hiring employees with a fixed annual remuneration, per individual case, of more than € 100,000.00, or significant changes in the compensation system for employees;

(j) futures in foreign exchange and other similar exchange-traded goods and rights, provided that such transactions are not conducted for hedging purposes;

(k) the conclusion, amendment or termination of contracts for the procurement or the acquisition of licenses, patents, know-how, with the exception of these obtained in the ordinary course of business for software purposes (software licenses), provided that the contract amount exceeds € 100,000.00 in individual cases;

(i) decisions on management level, which materially affect the organizational structure of the Company;

(m) transactions and measures that go beyond the ordinary course of business operations and can lead, in individual cases, to charges of more than € 200,000.00;

(n) the conclusion of any contracts not already included under element (e) above, that bind the company for more than 1 year, or may, in individual cases result to charges of more than € 200,000.00;

(o) investments in revenues or results of the Company in any form - with the exception of industry-standard commissions, bonuses and bonuses of the employees and / or business partners.

2. BoD Notification and approval procedure for the above transactions

The Management has the obligation/duty to notify any item described in [1] above, to the BoD, in order to get the BoD's approval, as provided herein.

A formal BoD resolution is not required. The members of the BoD may alternatively apply the following procedure:

i. The CEO or any other member of the MJM Chief Executives Team, shall inform, by e-mail, or other written form, the BoD members, on the issue at hand and the required/proposed action of the Management.

ii. Such notification shall be accompanied by an executive summary or presentation on the matter, as well as by supportive documents (if any).

iii. The proposed transaction and related acts shall be deemed approved by the BoD, if one of the following occurs: (a) at least five (5) members of the Board reply in writing that they agree with the proposed action, or (b) no objection is raised, within five [5] business days from the respective notification of the Executive Management Team. iv. If (i) above does not occur and there is an objection (in writing) by any BoD member, the matter is referred to a formal BoD meeting.

6

# Maillis BoD

*21 October 2021*





# Summary of status quo and our options

- HW has approached ~126 buyers for the three Maillis businesses including 65 corporate and 61 PE buyers.

- **Market response** was limited due to various reasons, e.g., lack of financial history after a radical operational restructuring in 2019, carve-out character and serious questions around sustainability of very dynamic 2021 sales growth and EBITDA performance.

- The Sterling-backed Greenbridge Group was initially tactically bidding for all three businesses but ultimately submitted a bid for SIAT and MPS only and at a ~€40m lower valuation vs. NBO despite strong current trading of both businesses. → A **continuation** of the discussions **with Sterling** after such a steep reduction in initial valuation and no other bidder in the process would have put us "with the back to the wall" and thus, likely have led to **a further decrease in valuation** during negotiations in the final DD phase.

- For Maillis Metals Solutions ("MMS"), Sterling entirely withdrew their initial bid of €10-11m EV after DD and thus, we only remain with one bid of €6.4m EV from SPECTA, who we consider an unreliable buyer.

- Whilst we decided to **put the process on hold for SIAT and MMS**, we are still **entertaining discussions** with two bidders for Maillis Plastics Solutions ("**MPS**") at ~€46m EV.

- In summary, the process didn't produce a clean option to sell all three companies at the same time and subsequently manage down the remaining structure ("RS") including **legacy liabilities** such as the UK pensions and **winding-down costs**. Now, Maillis shareholders are faced with a **pluri-annual** manage & sale & run-down scenario.

- Maillis' shareholders now have the **following options on the table**:

  1. Sell MPS now **+** revive discussions with Sterling on SIAT based on their revised offer **+** find solution for MMS **+** manage down RS until ~2024

  2. Sell MPS now **+** park SIAT/MMS and retry a sale in Q1 2023 **+** manage down RS until ~2024

  3. Sell MPS now **+** explore a "clean-cut" package deal for SIAT/MMS/RS with H.I.G Europe III





# Overview of received offers

| Valuation overview (Locked Box 31 Dec 2020) | | | | | |
|---|---|---|---|---|---|
| | SIAT *Sterling* | MPS *Sterling* | MPS *Teufelberger* | MMS *Specta* | Remaining Structure |
| **EV - Total** | **157.5** | **42.5** | **46.0** | **6.4** | **-** |
| Cash and cash equivalents | 13.7 | 0.9 | 0.9 | 2.8 | 14.9 |
| Financial debt | (2.5) | (3.5) | (3.5) | (0.3) | - |
| Other cash and debt-like items | (3.4) | (4.7) | (4.7) | (1.9) | (18.2) |
| Working Capital Adjustment | (2.7) | 1.2 | 1.2 | (2.1) | - |
| Other items | (1.1) | - | - | (1.0) | (12-14) |
| **Base Purchase Price** | **161.5** | **36.4** | **39.9** | **3.8** | **(15-17)** |
| Leakage Deduction Amount | (3.3) | (1.0) | (1.0) | - | - |
| Cash Flow 2021 | 9.0 | 2.8 | 2.8 | tbd | - |
| **Final Purchase Price** | **167.1** | **38.2** | **41.7** | **3.8** | **(15-17)** |
| *Valuation adj. PF EBITDA (2021F)* | *18.5* | *6.9* | *6.9* | *1.8* | |
| *Multiple* | *8.5x* | *6.2x* | *6.7x* | *3.6x* | |

## Comments

▪ Net Debt figures reflect offer received where available <u>and</u> likely negotiation outcome based on EY factbook.

▪ The Remaining Structure contains significant rundown and pension obligations estimated, which will need to be managed over the next 3+ years until would down.





# Overview - Option 1

**Actions**

- Sell MPS now
- Restart discussions about SIAT with Sterling with 2021 figures
- Find solution for MMS, i.e., sell to SPECTA or other bidder in 2022
- Manage down RS until ~2024

**Potential Proceeds to H.I.G. Lux 46**

- Sell MPS now → €42m cash proceeds based on current offer levels
- Sell SIAT now → €167m cash proceeds - assuming Sterling stick to their current offer
- Sell MMS now → €3-4m cash proceeds – assuming SPECTA stick to their offer
- Manage down RS until ~2024 → Cash costs of ~€15-17m
- **Total net proceeds of €195-198m potentially now**

**Pros / cons**

- (+) **Potentially** realize an excellent deal after a 7 years holding period
- (+) Valuation based on best market offers derived from a very broad auction
- (−) **Execution risk** from low negotiation power restarting with Sterling and questionable reliability of SPECTA
- (−) Risk of keeping MMS and Remaining Structure with uncertainty around actual winding-down costs



# Overview - Option 2

**Actions**

- Sell MPS now
- Park SIAT/MMS and retry sale in Q1 2023
- Manage down RS until ~2024

**Potential Proceeds to H.I.G. Lux 46**

- Sell MPS now → €42m cash proceeds now based on current offers
- Park SIAT/MMS and retry sale in Q1 2023 → ~€175-185m consisting of €171-180m for SIAT and €4-5m for MMS - assuming an EV of 8.5x €18.7m 2022 EBITDA for SIAT and €10m EV for MMS
- Manage down RS until ~2024 → Winding-down costs of ~€15-17m
- **Total net proceeds of** ~ **€200-212m** of which ~ **€158-170m in 2 years time** subject to prevailing market conditions

**Pros / cons**

- (+) Potential to realize approx. 5-10% upside from cash flow generation assuming continued strong momentum of SIAT and MMS
- (−) Market, execution and valuation risk, if business plan does not materialize in 2 years time
- (−) Continued winding-down management for current shareholders with MMS and Remaining Structure
- (−) **Potential risk of frustrating and demotivating SIAT management** having no clear ownership perspective for an additional 2 years



# Overview - Option 3

**Actions**

- Sell MPS now
- Sell SIAT/MMS/RS in a package deal to H.I.G. Europe III now

**Potential Proceeds to H.I.G. Lux 46**

- Sell MPS now → Equity value of €42m now
- Sell SIAT, MMS and Remaining Structure in a package deal→ Equity value of €150m now
- **Total of €192m equity value now** based on €210m EV

**Pros / cons**

- ⊕ **Immediate "clean-cut" realization** of an excellent deal after a 7 years holding period **without any additional winding- down risk** from Remaining Structure
- ⊕ Valuation based on best market offers derived from a very broad auction
- ⊕ Management fully rewarded now and with a clear perspective for the next years
- ⊖ Potentially leaving an additional 5-11%  value in 2-3 years time on the table vs Option 2

7

Execution Version

# Share Purchase Agreement

relating to

# Project Thaleia



RENZENBRINK
& PARTNER

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| 1. | SALE AND TRANSFER OF THE SHARES | 6 |
| 1.1 | Status of the Company | 6 |
| 1.2 | Sale and Purchase of the Shares | 6 |
| 2. | PURCHASE PRICE | 6 |
| 2.1 | Purchase Price | 6 |
| 2.2 | Notification of Total Purchase Price | 7 |
| 2.3 | Mode of Payment; Seller's Account | 7 |
| 2.4 | Default Interest; Calculation of Interest | 8 |
| 2.5 | No Set-off/Retention; Treatment of Payments | 8 |
| 3. | CLOSING; CLOSING CONDITIONS; CLEARANCES | 8 |
| 3.1 | Closing; Scheduled Closing Date; Closing Date | 8 |
| 3.2 | Conditions to Closing | 9 |
| 3.3 | Closing Actions | 9 |
| 3.4 | Termination Right | 11 |
| 4. | TRANSFER OF EMPLOYEES | 11 |
| 5. | PROFIT PARTICIPATION AGREEMENTS | 12 |
| 5.1 | Definitions | 12 |
| 5.2 | Profit Participation Agreement | 12 |
| 6. | WARRANTIES OF THE SELLER | 13 |
| 6.1 | General Provisions on Seller's Warranties | 13 |
| 6.2 | Enforceability and Capacity | 13 |
| 6.3 | Status of the Group Companies | 14 |
| 6.4 | Financial Statements | 14 |
| 6.5 | Employees | 15 |
| 6.6 | Intellectual Property | 15 |
| 6.7 | Compliance | 15 |
| 6.8 | Real Estate | 15 |
| 6.9 | Litigation | 16 |
| 6.10 | No other Warranties | 16 |
| 7. | COVENANTS OF THE SELLER | 16 |
| 8. | LIABILITY OF THE SELLER | 17 |
| 8.1 | Relevant Breaches; Losses | 17 |
| 8.2 | Notice Obligation | 17 |
| 8.3 | Exclusions of Seller's Liability | 18 |
| 8.4 | No Double Dip | 19 |
| 8.5 | Third Party Claims | 19 |

8.6    De Minimis, Deductible ................................................................................................ 20

8.7    Caps ........................................................................................................................... 21

8.8    Time Limitations ........................................................................................................ 21

8.9    No other Remedies .................................................................................................... 21

8.10   Reimbursement and Excess Recoveries ..................................................................... 22

9.     TAXES ......................................................................................................................... 22

9.1    Tax Indemnity ............................................................................................................ 22

9.2    Exclusion of Tax Indemnity ........................................................................................ 23

9.3    Tax Refunds and Overstated Tax Provisions ............................................................... 24

9.4    Tax Matters after the Closing Date ............................................................................ 25

9.5    Cooperation on Tax Matters ...................................................................................... 26

9.6    Reverse Tax Indemnity .............................................................................................. 26

9.7    Purchase Price Adjustment ....................................................................................... 27

9.8    Limitation .................................................................................................................. 27

10.    WARRANTIES OF THE PURCHASER ............................................................................. 27

10.1   Authorization of the Purchaser .................................................................................. 27

10.2   Financial Capability .................................................................................................... 27

10.3   Purchaser's Intentions and Experiences ..................................................................... 28

11.    COVENANTS OF THE PURCHASER ............................................................................... 28

11.1   Access to Information ................................................................................................ 28

11.2   Cooperation ............................................................................................................... 29

11.3   Shareholder Resolution of TAM S.r.l. ......................................................................... 29

11.4   Indemnification of Beneficiaries ................................................................................ 29

12.    LIABILITY OF THE PURCHASER .................................................................................... 30

13.    MISCELLANEOUS ....................................................................................................... 30

13.1   Defined Terms ............................................................................................................ 30

13.2   Other Defined Terms .................................................................................................. 31

13.3   Notices ...................................................................................................................... 32

13.4   Public Disclosure, confidentiality ............................................................................... 33

13.5   Costs and Expenses .................................................................................................... 33

13.6   Entire Agreement; Amendments and Waivers ............................................................ 34

13.7   No Assignments; No Set-Off and No Third Party Rights ............................................... 34

13.8   Governing Law; Jurisdiction; Service of Process ......................................................... 34

13.9   Interpretation ............................................................................................................ 35

13.10  Severability ................................................................................................................ 35

LIST OF SCHEDULES

| | |
|---|---|
| Schedule (A) | Other Group Companies |
| Schedule 2.1(b) | Sample Calculation Purchase Price Adjustment Cash Generation |
| Schedule 2.1(c) | Sample Calculaton 2021 Bonus and BoD Fees |
| Schedule 3.3(a)(x) | Closing Protocol |
| Schedule 4(a) | Employees To Be Transferred |
| Schedule 5.1(a) | PPA and PPA Beneficiary |
| Schedule 6.4(b) | Management Reports |
| Schedule 6.5(b) | Collective Bargaining Agreements, Workers' Council and Pension Commitments |
| Schedule 6.5(c) | Pending Employment-related Litigation |

This SHARE PURCHASE AGREEMENT ("Agreement") is entered into on 20 December 2021 ("Signing Date") by and among

(1) EUROPACK S.A., a stock corporation (*société anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 2, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B 68393 ("Seller"), and

(2) Thaleia AcquiCo S.r.l., a limited liability company (*Società a responsabilità limitata*) organized under the laws of Italy and registered with the Registry of Enterprises of Milano Monza Brianza Lodi under no. 12134760961 ("Purchaser").

The Seller and the Purchaser are collectively referred to as the "Parties", and each individually a "Party".


RECITALS

(A)  The Seller is the sole shareholder of SIAT – Società Internazionale Applicazioni Tecniche S.p.A., a stock corporation (*Società per azioni*) organized under the laws of Italy with its registered office at Milan, via Gabriele Rossetti no. 9, Italy, registered with the Companies' Register of Milano Monza Brianza Lodi under no. 12635750156, VAT and Tax Code 12635750156 ("Company"). The Company holds, or will hold as of the Closing Date, controlling and non-controlling interests, respectively, in the companies listed in **Schedule (A)** (such companies the "Other Group Companies" and together with the Company the "Group Companies", each a "Group Company").

(B)  The Company is active in the manufacturing of transit packaging machinery ("Business").

(C)  The Seller intends to sell and transfer all shares in the Company to the Purchaser and the Purchaser intends to purchase and acquire such participations in the Company from the Seller, in each case in accordance with the terms and conditions of this Agreement ("Transaction"). The Transaction forms part of a combined effort under which it is planned to sell Maillis Group as a whole in various portions under separate purchase agreements to different purchasers. In such context, on or about hereof, (i) Maillis Holdings S.à r.l. will enter into a purchase agreement regarding the sale of its shares in Marflex M.I. Maillis Poland sp. Z o.o. ("Marflex SPA"), (ii) Maillis International S.A. will enter into a purchase agreement regarding the sale of its shares in M.J. MAILLIS SINGLE MEMBER S.A. INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES ("Inofyta SPA") and (iii) H.I.G. Lux 46 Holdings S.à r.l. will enter into a purchase agreement regarding the sale of its shares in Maillis International S.A. ("Maillis International SPA"). It is intended to consummate the transactions under the Marflex SPA, this Agreement, the Inofyta SPA and the Maillis International SPA in this specific order in a short sequence, if practically possible on the same day.

(D)  The Parties confirm that this Agreement is entered into following (i) completion of a comprehensive internal due diligence investigation of the Group Companies, their business operations and the Business by the Purchaser together with its representatives ("Due Diligence") and (ii) a discussion and negotiation of all provisions contained in this Agreement.

5

1.    SALE AND TRANSFER OF THE SHARES

1.1   Status of the Company

(a)   The Seller is the sole shareholder of the Company.

(b)   The Company's share capital amounts to EUR 9,560,000.00 and is divided into 9,560,000 shares with a nominal value of EUR 1.00 per share ("Shares").

1.2   Sale and Purchase of the Shares

(a)   The Seller hereby sells the Shares subject to the terms of this Agreement to the Purchaser. The Purchaser hereby accepts such sale.

(b)   The Shares are sold with all rights and obligations pertaining thereto, including the rights to any profits not yet distributed or resolved to be distributed on or prior to the Effective Date, except for Permitted Leakage.

2.    PURCHASE PRICE

2.1   Purchase Price

(a)   The aggregate purchase price for the Shares shall be

(i)    a fixed amount of EUR 150,000,000 (in words: Euro one hundred fifty million) ("Base Purchase Price"); plus/minus

(ii)   the Cash Flow Gross-Up Amount plus/minus

(iii)  the Additional 2021 Bonus and BoD Fees minus

(iv)   the Relevant Withholding Tax minus

(v)    the amount of the relevant withholding tax generated under the Inofyra SPA minus

(vi)   the amount of the cash distribution pursuant to Section 3.3(a)(i) (the Base Purchase Price plus/minus the Cash Flow Gross-Up Amount plus/minus the Additional 2021 Bonus and BoD Fees minus the Relevant Withholding Tax, the withholding tax under the Inofyra SPA and the amount of the cash distribution the "Total Purchase Price").

(b)   "Cash Flow Gross-Up Amount" shall mean the difference between the Normalized Cash Flow and the Included Cash Flow. "Included Cash Flow" shall mean an amount of EUR 9,000,000.00 already included as anticipated cash generation until Closing in the calculation of the Base Purchase Price. "Normalized Cash Flow" shall mean the cash generated by the Company between the Effective Date and the date of the latest management reporting as prepared in accordance with past practice available 10 (ten) Business Days prior to the anticipated Scheduled Closing Date normalized for the repayment of an external loan in the amount of EUR 2,619,045.45 and assuming no stretching of working capital that increases cash generation unsustainably and calculated in line with Schedule 2.1(b).

(c)   "Additional 2021 Bonus and BoD Fees" shall mean the difference between the Actual 2021 Bonus and BoD Fees and the Included 2021 Bonus and BoD Fees. "Included 2021 Bonus and BoD Fees" shall mean an amount of EUR 1,516,000.00 which is already included as anticipated cash-out until Closing in the calculation of the Base Purchase Price. "Actual 2021 Bonus and BoD Fees" shall mean the actual cash-out and/or obligation by Maillis International S.A. between the Effective Date and the Closing Date for the line items as defined in Schedule 2.1(c).

(d)   An amount of EUR 16,000,000.00 of the Total Purchase Price ("Vendor Loan Amount") shall not be paid at the Scheduled Closing Date but deferred (such deferred payment of the Total Purchase Price the "Vendor Loan") at the following conditions:

   (i)   The Vendor Loan shall be granted without any collateral or other security and bear a fixed non-cash (p.i.k.) interest rate of 8% p.a.

   (ii)   The Vendor Loan shall have an unlimited term and only be terminable by the Purchaser or other respective debtor.

   (iii)   The Parties hereby irrevocably declare their consent to the assumption of any obligations under the Vendor Loan by any Affiliate of the Purchaser (including Tribus Holdings 8 S.à r.l.), with debt-discharging effect (*schuldbefreiende Wirkung*).

   (iv)   For the avoidance of doubt, the Parties agree to the distribution of any rights and claims under the Vendor Loan (including any (re)payment and interest claims) by the Seller and its assignees.

   (v)   The Parties agree that the Vendor Loan shall be granted economically solely by Bayside Debt & LBO Fund II and LP and H.I.G Europe Capital Partners, LP and not by other indirect shareholders of the Maillis Group. The respective shareholders of the Seller will implement the distribution accordingly (i.e., as if the Total Purchase Price had been fully paid in cash).

(e)   At the Scheduled Closing Date, the Purchaser shall pay to the Seller in the Seller's Account in accordance with Sections 2.2 and 2.3 an amount equal to the Total Purchase Price minus the Vendor Loan Amount.

2.2   Notification of Total Purchase Price

No later than five (5) Business Days prior to the Scheduled Closing Date, the Seller shall deliver to the Purchaser a written notice (email sufficient) setting forth a calculation of the Total Purchase Price, taking into account the amount of the distribution pursuant to Section 3.3(a)(i), the estimate of any Relevant Withholding Tax (as set out in Section 5.2(b)), the withholding tax under the Inofyta SPA, the Cash Flow Gross-Up Amount and the Additional 2021 Bonus and BoD Fees).

2.3   Mode of Payment; Seller's Account

(a)   The relevant amounts payable to the Seller under this Agreement shall be paid by the Purchaser by irrevocable wire transfer to a bank account to be notified by the Seller to the Purchaser ("Seller's Account") free of charges.

7

(b)    The Total Purchase Price has been finally determined by the Parties and shall not be subject to any further adjustment.

(c)    Payments to be made under this Agreement by the Seller shall be made into an account held by the Purchaser to be notified by the Purchaser to the Seller in accordance with Section 13.3.

(d)    Any and all payments to the Seller under this Agreement shall be deemed to have been made upon the later of (i) the irrevocable and unconditional crediting of the amount payable (without deduction of any costs or charges, other than those of the recipient's bank) to the Seller's Account pursuant to Section 2.3(a) and (ii) the value date as of which such amount has been credited to such account.

2.4    Default Interest; Calculation of Interest

(a)    In the event of a delayed payment by any Party in respect of any payment under or in connection with this Agreement when due and regardless of whether or not the statutory requirements of default are met, such Party shall be liable for default interest of eight percent (8%) p.a. as from (and including) the respective due date until (but excluding) the day of actual receipt of the respective payment in the relevant account. The foregoing shall not affect the rights of the relevant other Party to claim additional damages.

(b)    Interest under this Agreement shall be calculated on the basis of the actual/360 method.

2.5    No Set-off/Retention; Treatment of Payments

(a)    The Purchaser shall not have any right of set-off or retention right with respect to its payment obligations pursuant to this Section 2.

(b)    The Parties agree that any indemnity, compensation, damage or similar payment made under this Agreement (other than the payment of the Total Purchase Price) shall be treated by the Parties as an adjustment of the Total Purchase Price, i.e., an increase or a reduction of the Total Purchase Price, respectively, and, to the extent permitted by applicable law, shall be treated by the Parties as such also for Tax purposes. For the avoidance of doubt the foregoing shall not affect the definition of Total Purchase Price nor, consequently, the overall cap pursuant to Section 8.7.

3.    CLOSING; CLOSING CONDITIONS; CLEARANCES

3.1    Closing; Scheduled Closing Date; Closing Date

The closing of the Transaction ("**Closing**") pursuant to Section 3.3(a) shall take place at 10 a.m. CET on the Scheduled Closing Date unless the Seller and the Purchaser agree on another time of Closing in text form. "**Scheduled Closing Date**" shall be the Business Day which is the day on which the last of the Closing Conditions has been fulfilled or waived, with the proviso that the failure to perform any Closing Actions (other than Closing Actions 3.3 (a) (i), (ii), (iii) and (iv) below) within three Business Days after the Scheduled Closing Date does not result in a default for purposes of this Agreement. "**Closing Date**" shall be the day on which all of the Closing Actions as set out in Section 3.3 below have been taken or duly waived (other than Closing Actions 3.3 (a) (i), (ii), (iii) and (iv) below).

3.2   Conditions to Closing

(a)   The Parties mutually agree that the consummation of the Closing does not require clearance by any antitrust or other regulatory authorities.

(b)   The obligations of the Purchaser and the Seller to consummate the Closing are subject to the following conditions precedent ("Closing Conditions"):

(i)   Transfer of all shares in M.J. MAILLIS ESPANA S.A., a stock corporation (*Sociedad Anónima*) duly incorporated under the laws of Spain, with registered office at C/ Palau de Plegamans, 21, 08213 Polinyà, Barcelona, Spain, duly registered with the Trade Registry of Barcelona (tome 42940, folio 150, sheet B-76457) from Maillis Holdings S.à r.L, a limited liability company (*société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 2, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B 212128 ("**Maillis Holdings**") to the Company (by way of a sale and transfer from Maillis Holdings to the Company at a purchase price of EUR 1,00);

(ii)   the Purchaser has confirmed (in its free discretion) to the Seller in writing that the Purchaser has obtained, directly or indirectly, sufficient funds or binding equity and debt financing commitments to pay the Total Purchase Price (minus the Vendor Loan Amount); and

(iii)   closing of the Marflex SPA has occurred.

(c)   The Seller and the Purchaser may waive one or more of the Closing Conditions by way of a joint agreement in text form. The Parties undertake to use their best efforts to achieve fulfillment of the Closing Conditions as soon as reasonably practicable following the Signing Date and shall reasonably cooperate with each other in connection with the closing of the transactions contemplated by this Agreement. The Parties shall notify each other in writing without undue delay of the fulfillment of any Closing Condition, enclosing sufficient evidence of the fulfillment of the respective Closing Condition.

(d)   To the extent within their control, the Parties shall take reasonable efforts in order to procure that the Closing Conditions are fulfilled as soon as reasonably practicable.

3.3   Closing Actions

(a)   On the Scheduled Closing Date, the Parties shall take, or cause to be taken the following actions (the "**Closing Actions**") by concurrent performance in the following sequence:

(i)   The Seller shall pass a resolution on and procure that the Company effects a cash distribution of the amount of the non-operating cash at hand of the Company to be reasonably assessed by the Seller and the Company to the extent legally permissible.

(ii)   The Purchaser shall pay the Total Purchase Price minus the Vendor Loan Amount to the Seller.

7

(iii)   The Seller shall transfer to Purchaser the Shares and, to this effect, deliver to Purchaser the share certificates of the Shares, duly endorsed for transfer to Purchaser with authentication of a notary public selected by the Parties pursuant to section 2355 paragraph 3 of the Italian Civil Code.

(iv)   The Seller shall cause the transfer of the Shares to be duly recorded in the share ledger of the Company.

(v)   If and to the extent requested by the Purchaser, the Seller shall cause Luc Modest Van Damme, Spyridon Gaitanos, Stefano Nanni Costa and/or Fabricio Redaelli to resign from their office as directors of the Company and, in the case of Luc Modest Van Damme, of TAM S.r.l. by delivering letters of resignation and whereby each of them acknowledges and agrees not to have any claim against the Company and, where applicable, TAM S.r.l., except the compensation accrued until the resignation date.

(vi)   If and to the extent requested by the Purchaser, the Seller shall cause Luc Modest Van Damme, Spyridon Gaitanos, Stefano Nanni Costa and/or Fabricio Redaelli to resign from their office as directors of the Company and, in the case of Luc Modest Van Damme, of TAM S.r.l. by delivering letters of resignation and whereby each of them acknowledges and agrees not to have any claim against the Company and, where applicable, TAM S.r.l., except the compensation accrued until the resignation date.

(vii)   If and to the extent requested by the Purchaser, the Seller shall cause Luc Modest Van Damme and/or Spyridon Gaitanos to resign from their office at M.J. Maillis España S.A. by delivering letters of resignation and whereby each of them acknowledges and agrees not to have any claim against the Company, except the compensation accrued until the resignation date.

(viii)   If requested by the Purchaser, the Seller shall use its best efforts to cause the external auditor of the Company to resign from its office by delivering a letter of resignation whereby he acknowledges and agrees not to have any claim against the Company, except the compensation accrued until the resignation date.

(ix)   The Purchaser shall hold a shareholders' meeting of the Company and resolve the acceptance of the resignations of the resigning officers as directors of the Company and approval of all the actions taken by such resigning directors in their capacity, and fully release them from any personal responsibility for the activity carried out in same capacity, waiving any responsibility action *vis-à-vis* such directors pursuant to Article 2393 of the Italian Civil Code and pursuant to applicable Laws.

(x)   the Parties shall execute a closing protocol confirming the due fulfilment or waiver of the Closing Conditions and the due performance or waiver, as the case may be, of the Closing Actions set forth under Section 3.3(a)(i) through Section 3.3(a)(ix) ("Closing Protocol"), essentially in the form of the draft attached hereto as **Schedule 3.3(a)(x)**.

(b)   The Seller and the Purchaser may waive one or more of the Closing Actions (other than Closing Actions 3.3 (a) (i), (ii), (iii) and (iv) above) by way of a joint agreement in text form. Such waiver shall solely have the effect that the Closing is performed despite non-performance of such Closing Action. Unless expressly agreed otherwise, the waiver shall leave the right of the waiving Party to demand performance of the relevant Closing Action as well as any rights to claim damages in connection with the facts or circumstances which resulted in the waiver remains unaffected.

(c)   The relevant Parties shall make any declarations (including towards any commercial register) and adopt any shareholders' resolution as may be necessary or appropriate such that the Closing Actions (including any changes in the offices set forth therein) are legally effected and registered with the respective commercial registers (as applicable) as soon as reasonably possible after the Closing Date.

3.4   Termination Right

(a)   The Seller shall be entitled to terminate this Agreement if

(i)   the Closing Conditions set forth in Section 3.2(b) have not been fulfilled within nine (9) months after the Signing Date ("Long Stop Date"), or

(ii)   any all the Closing Actions to be performed by the Purchaser have not been performed by the Purchaser or waived by the Seller within fifteen (15) Business Days following the Scheduled Closing Date.

(b)   The Purchaser shall be entitled to terminate this Agreement if

(i)   the Closing Conditions set forth in Section 3.2(b) have not been fulfilled by the Long Stop Date, or

(ii)   any of the Closing Actions to be performed by the Seller have not been performed by the Seller or waived by the Purchaser within fifteen (15) Business Days following the Scheduled Closing Date.

(c)   In the event of a termination in accordance with Section 3.4(a) or 3.4(b), none of the Parties shall have any obligation or incur a liability towards the other Party provided, however, that the provisions contained in Section 13 of this Agreement shall survive and remain unaffected by the termination of this Agreement and both the Seller and the Purchaser shall do and complete without undue delay any and all actions and formalities required for reverting the transfer of the Shares.

4.   TRANSFER OF EMPLOYEES

(a)   The Seller and the Purchaser agree and acknowledge that the employment relationships of the employees of Maillis Group entities listed in **Schedule 4(a)** (collectively the "Business Employees To Be Transferred") form part of the Business and shall be offered to transfer, at the Purchaser's election, either to the Company or to the Purchaser within six (6) months after the Closing Date. As soon as reasonable following the date hereof, the Seller and the respective Maillis Group entity shall approach the Business Employees To Be Transferred and inform each of them about the potential transfer of their employment relationships to the Company or the Purchaser, as the case may be.

(b)   No later than fifteen (15) Business Days after the date hereof, the Seller shall cause the Company (if applicable), the respective Maillis Group Company and the Purchaser (if applicable) to offer to each Business Employee To Be Transferred to enter into a tripartite agreement according to which the Company or the Purchaser, as the case may be, shall assume, subject to the occurrence of Closing, the employment relationship of the respective Business Employee To Be Transferred at essentially the same conditions as those which apply for his/her employment with the respective Maillis Group Company and crediting his/her length of service with the respective Maillis Group Company and its predecessors, if any.

(c)   The provisions of this Section 4 shall be for the sole benefit of the Parties and nothing herein, expressed or implied, is intended to or shall be construed to confer on or give to any person other than the Parties any legal or equitable or other rights or remedies with respect to the matters provided for in this Section 4.

## 5.   PROFIT PARTICIPATION AGREEMENTS

### 5.1   Definitions

(a)   "PPA" shall mean the respective profit participation agreement relating to the Seller entered into between the Seller, the shareholders of the Seller and the respective PPA Beneficiary as set-out in **Schedule 5.1(a)**.

(b)   "PPA Beneficiary" shall mean the respective individual as set-out in Schedule 5.1(a).

### 5.2   Profit Participation Agreement

(a)   Eight (8) Business Days prior to the Scheduled Closing Date, the Seller shall provide to the Purchaser and the Company a conservative good faith-estimate of the gross amount of the entitlement of each respective PPA Beneficiary pursuant to the respective PPA ("**PPA Gross Amount**").

(b)   After notification of the PPA Gross Amount pursuant to Section 5.2(a), the Seller shall procure that the payroll department of the relevant Group Company shall provide for each participant of the PPA without undue delay, but no later than five (5) Business Days prior to the Scheduled Closing Date, to the Seller and the Purchaser a conservative good-faith-estimate of the amount of relevant withholding Tax/social-security contributions (or of any other payment owed by any Group Company in connection or based upon any PPA payment) payable in connection with entitlement of each respective PPA Beneficiary pursuant to the respective PPA (such reported amount the "**Relevant Withholding Tax**").

(c)   The Purchaser undertakes to pay the Relevant Withholding Tax to the respective Group Companies without undue delay after Closing.

(d)   As soon as reasonably possible after the Closing, the Seller shall provide the final amount of the PPA Gross Amount to the Purchaser and the Company; as soon as possible thereafter but not later than ten (10) Business Days after the notification by the Seller, the Purchaser shall procure that the Group Companies provide final amounts of the Relevant Withholding Tax and the underlying calculation of the Relevant Withholding Tax. If and to the extent the final amount of the Relevant Withholding Tax is higher than

42

the estimated amount as notified pursuant to Section 5.2(b), the Seller shall pay the difference to the respective Group Company's bank account as notified by the Group Company to the Seller. If and to the extent the final amount of the Relevant Withholding Tax is lower than the estimated amount as notified pursuant to Section 5.2(b), the Purchaser shall procure that the Company shall pay the difference to the Seller' Account.

(e)   The Purchaser shall procure that the respective Group Company shall pay the respective Relevant Withholding Tax (as adjusted under lit above) to the respective competent Tax Authority in accordance with applicable Law.

## 6.   WARRANTIES OF THE SELLER

### 6.1   General Provisions on Seller's Warranties

(a)   The Seller hereby represents and warrants to the Purchaser in the form of an independent guarantee and exclusively in accordance with the limitations, exclusions and other conditions of this Agreement that the statements contained in Section 6.2 through 6.9 (collectively "Seller's Warranties") are true and correct as of the Signing Date and/or as of any other date explicitly referred to in the specific Seller's Warranty.

(b)   The Seller's Warranties are given on the basis that they should be regarded as a risk allocation between the Parties; the Purchaser acknowledges and agrees that the Seller, its advisors, the management and other employees of the Group Companies have not independently examined or verified the underlying facts, matters, circumstances and statements made in such Seller's Warranties and the schedules pertaining thereto and that this shall neither be construed or interpreted as fraud nor indirect intent due to insufficient or inadequate inquires by the Seller and that nothing in this Agreement shall imply a duty of the Seller (including its advisors and directors and employees of the Group Companies) to make specific or other enquiries or researches of whatever nature.

(c)   "Seller's Knowledge" shall mean the actual knowledge of the Seller as of the Signing Date. Any liability for negligent ignorance due to insufficient inquiries, deemed knowledge, knowledge 'on file' of which the Seller did not have positive knowledge or any other imputation of knowledge to the Seller shall be excluded and none of these circumstances results in Seller's Knowledge.

(d)   Any attribution of knowledge to the Seller and any responsibility of the Seller for a Third Party's fault or knowledge 'on file' shall be excluded.

(e)   If any disclosure of events or documents made in this Agreement (i) is below any materiality threshold provided for in relation to such disclosure requirement, or (ii) contains additional information, this shall neither be deemed to constitute a basis for a Relevant Breach nor otherwise affect the respective materiality thresholds (or their interpretation) or increase the scope of any indemnification.

### 6.2   Enforceability and Capacity

On the Signing Date and on the Closing Date, this Agreement constitutes the legal, valid and binding obligation of the Seller, enforceable under the laws of the Grand Duchy of Luxembourg against the Seller in accordance with its terms, except to the extent that the enforceability

17

thereof may be limited by bankruptcy or insolvency laws. The Seller has the absolute and unrestricted right, power, authority and capacity to execute this Agreement. Except for any Clearances, the Seller has the full power and authority to enter into this Agreement and to perform its obligations hereunder and to consummate this Agreement and the Transaction.

6.3   Status of the Group Companies

(a)   On the Signing Date and on the Closing Date, the Company is duly incorporated and validly existing under the laws of its country of incorporation, the Seller is the sole and unrestricted owner of the Shares as set forth in Section 1.1 and the Company is the owner of the participations in the other Group Companies as set forth in Schedule (A). On the Signing Date and the Closing Date, the Shares and the participations of the Company in the other Group Companies as set forth in Schedule (A) have been duly authorized and validly issued. On the Signing Date and on the Closing Date, such Shares and participations are fully paid up and all contributions have been made in compliance with applicable law and have not been repaid or returned, in whole or in part and are no obligations to make further contributions in respect of such Shares and participations of the Company in the other Group Companies as set forth in Schedule (A).

(b)   No insolvency or similar proceedings have been, or, to the Seller's Knowledge, have been threatened to be, opened or applied for regarding the assets of any Group Company and the assets of the Seller and there are, to the Seller's Knowledge, no circumstances which would require the opening of or application for such proceedings.

(c)   There is no lawsuit, investigation or proceeding pending or threatened in writing against the Seller before any court, arbitrator or Governmental Authority which in any manner challenges or seeks to prevent, alter or materially delay the transactions contemplated under this Agreement.

6.4   Financial Statements

(a)   The audited financial statement of the Company for the fiscal year 2020, consisting of a balance sheet as of 31 December 2020, a profit and loss statement for the period from 1 January 2020 through 31 December 2020 and notes (excluding the management report with respect to which the Seller does not make any representations) (collectively the "Financial Statements 2020"), to the Seller's Knowledge, have been prepared in accordance with applicable Laws and with the Accounting Principles and, to the Seller's Knowledge, give a true and fair view, on a stand-alone basis, of the assets and liabilities of the Company as at 31 December 2020, and of the revenues, expenses and results of its operations for the relevant period then ended.

(b)   To the Seller's Knowledge, taking into account their interim nature excluding, inter alia, typical year-end eliminations (accruals/deferrals), the unaudited management reporting as of 31 October 2021 as attached hereto as Schedule 6.4(b) does not materially misstate the assets position, financial condition and results of operation of the Company as of the cut-off date.

6.5 Employees

(a) Prior to the Signing Date, true and complete copies of the employment agreements with Mr. Konstantinos Marinakis, Mr. Giauantonio Bottarini and Mr. Gianluca Aichleri ("**Key Employees**") have been disclosed to the Purchaser in the Due Diligence Information. To Seller's Knowledge, none of the Key Employees has given written notice of termination of his or her service or employment.

(b) Except as disclosed in **Schedule 6.5(b)**, the Company (i) is not bound by any collective bargaining agreements, (ii) does not have a workers' council and (iii) is not bound by any pension commitments (other than the statutory severance payment obligations (*trattamento di fine rapporti*)).

(c) Except as disclosed in **Schedule 6.5(c)**, The Company is not involved in any pending litigation or arbitration (i) with present or former (A) members of their corporate bodies or (B) employees, (ii) with any labor union, group or organization representing employees or (iii) on the basis of a breach of the applicable labor legislation, in each case with a value in dispute exceeding EUR 50,000.

(d) To the Seller's Knowledge, no material workplace accidents have occurred and no serious health effects of any (former) employee have been plausibly related to such employee's work for the Company, in each case within the last five (5) years.

6.6 Intellectual Property

(a) To the Seller's Knowledge, the Company holds title to, or has a license to use all Intellectual Property Rights which are necessary for carrying out the Business in substantially the same manner as on the Signing Date ("**Material Intellectual Property Rights**").

(b) To the Seller's Knowledge, the Material Intellectual Property Rights are not subject to any proceedings initiated by competent courts or authorities or third parties in respect of the opposition, cancellation, revocation, rectification or de-registration of the Material Intellectual Property Rights.

6.7 Compliance

(a) The Company has all regulatory permits required for the conduct of the Business, as currently conducted. To the Seller's Knowledge, no such permit has been cancelled, revoked or otherwise terminated. To the Seller's Knowledge, the business of the Company is, and has been within two (2) years prior to the Signing Date, conducted in accordance with aforementioned permits.

(b) To Seller's Knowledge, in the twelve (12) months' period preceding the Signing Date none of the Company has received a notification by any Governmental Authority (other than related to Tax audits) with respect to a material violation of applicable laws or permits.

6.8 Real Estate

The Company does not own real property or land rights or has committed to acquire real property or land rights.

15

6.9   Litigation

The Company is not involved in any litigation (court or arbitration), either as plaintiff, defendant or otherwise, with a value (excluding interest, if any) in excess of EUR 100,000.00 in the individual case. To the Seller's Knowledge, no proceedings with a value (excluding interest, if any) in excess of EUR 100,000.00 in the individual case have been threatened in writing against the Company.

6.10   No other Warranties

(a)   The Seller makes no express or implied representations or warranties in addition to the Seller's Warranties contained in Sections 6.2 through Section 6.9 and assumes no disclosure obligations in respect of the Group Companies and their businesses. The Purchaser confirms that its decision to acquire the Shares is based on a comprehensive due diligence exercise in respect of the Group Companies and their businesses conducted by the Purchaser.

(b)   The Purchaser acknowledges specifically that the Seller does not make any representation or warranty with respect to:

(i)   any kind of budget, outlook, estimate or other forecast (including the underlying documentation) regarding future cash flows, financial condition and results of operation of the Group Companies and the future prospects of the business of the Group Companies;

(ii)   other information and documents with respect to the Shares, the Group Companies and their businesses and the Due Diligence Material which have not been made subject of the Seller's Warranties.

7.   COVENANTS OF THE SELLER

In the period commencing on the Signing Date and ending on (but excluding) the Closing Date, the Seller shall take all legally permissible and reasonable steps within its power in order to ensure that, during such period, the Company will continue to conduct the business in the ordinary course consistent with past practice and will take none of the following actions without the Purchaser's prior approval (not to be unreasonably conditioned, withheld or delayed and be deemed granted if and to the extent no objection from or on behalf of the Purchaser is received in written form (email sufficient) by the Seller within three (3) Business Days following receipt by the Purchaser of the request for consent)):

(a)   any dissolution or liquidation of the Company;

(b)   any acquisition or disposal of shares in other companies, businesses or other fixed assets outside the ordinary course of business (in each case unless included in the budget of the Company;

(c)   any change of the articles of association of the Company;

(d)   payments or other benefits or promises to managing directors or employees made with a view to the sale and transfer of the Shares.

38

8. LIABILITY OF THE SELLER

8.1 Relevant Breaches; Losses

(a)  In the event of any incorrectness of any of the Seller's Warranties ("**Relevant Breach**") and subject to this Section 8, the Seller shall put the Purchaser or, at the election of the Seller, the relevant Group Company, in the position the Purchaser had been in had the Relevant Breach not occurred ("**Restitution in Kind**"). If the Seller (i) has not provided Restitution in Kind within two (2) months following receipt of the Claim Notice, (ii) Restitution in Kind is impossible or (iii) the Seller has declared his definite unwillingness to provide Restitution in Kind in writing, the Purchaser may demand the Seller to pay the amount of the Losses incurred.

(b)  "**Losses**" shall mean all liabilities, reasonable costs and expenses and other damages, excluding, however, (i) any indirect damages to the extent not reasonably foreseeable, (ii) lost profits to the extent not reasonably foreseeable and any lost profits at the level of the Purchaser, (iii) any consequential damages to the extent not reasonably foreseeable, (iv) any potential or actual reductions in value of the Shares, any Group Company or the Business beyond the actual damages incurred, (v) any frustrated expenses, (vi) damages/losses of goodwill or due to lost opportunities, and (vii) any incidental or internal costs and expenses incurred by any Group Company or the Purchaser, and (viii) any damages based on the allegation that the Total Purchase Price or any portion thereof have been calculated or determined based on incorrect assumptions. In calculating any Losses, no valuation methodology using multiples of earnings or similar shall be applied. Any Losses shall be computed net of any present or future advantages and benefits (including avoided losses, Tax benefits and savings as well as increases in the value of any asset owned by the Company) related to the relevant matter. All Losses shall be calculated on a Euro-for-Euro basis.

(c)  Any Losses incurred at the level of a Group Company which is not (directly or indirectly) wholly owned by the Seller shall be taken into account only on a pro rata basis in proportion to the respective direct or indirect shareholding of the Seller in such Group Company as of the Closing Date.

(d)  Any payments made by the Seller with respect to Relevant Breaches pursuant to this Agreement shall be treated by the Parties as adjustments of the Total Purchase Price. In no event shall the Seller owe any gross-up for Taxes falling due in connection with any compensation for Losses.

8.2 Notice Obligation

(a)  In the event that the Purchaser or, after the Closing Date, any Group Company becomes aware of facts that could potentially constitute a Relevant Breach, the Purchaser shall without undue delay, however at but in no event later than within a period of 15 (fifteen) Business Days after the relevant person becoming aware of the relevant circumstances, notify the Seller thereof ("**Claim Notice**"). The Claim Notice shall set out in reasonable detail the potential Relevant Breach and, to the extent possible, the estimated amount of Losses (to be) incurred in connection therewith.

(b)     Following the Closing, the Purchaser shall procure that the Seller is provided with all required or requested information and assistance, including access to all records, documents, information and relevant management members and employees or other knowledgeable persons, which the Seller requires or reasonably requests in order to determine the extent, if any, to which the claim is justified.

8.3     Exclusions of Seller's Liability

In no event shall the Seller be liable for any Relevant Breach if and to the extent

(a)     the matters to which the Relevant Breach relates are reflected as a write off, value adjustment, liability or provision, including general adjustments or provisions made for the relevant risk category, in the Financial Statements 2020;

(b)     the Purchaser, any Affiliate of the Purchaser and/or, after the Closing, the Company have participated in causing such Loss, including a failure to mitigate damages;

(c)     the Purchaser had actual knowledge of the facts or circumstances underlying the Relevant Breach as of the Signing Date. The Purchaser shall be deemed to have actual knowledge of all facts and circumstances

        (i)     contained in this Agreement and all Schedules thereto;

        (ii)    any information disclosed to the Purchaser, its representatives and/or professional advisors by or on behalf of the Seller in writing or in written form (email sufficient)in connection with the transactions contemplated under this Agreement, including without limitation (i) any facts and circumstances identified in the Financial Fact Book prepared by Ernst & Young dated 24 June 2021 or in the Tax Fact Book prepared by Ernst & Young dated 25 June 2021, and (ii) answers in writing or in written form (email sufficient) given by or on behalf of the Seller or its professional advisors in connection with the question and answer process until and including 30 November 2021;

        (iii)   any information Fairly Disclosed in the documents contained in the virtual data room operated by Intralinks accessible to the Purchaser, its representatives and professional advisors until 30 November 2021, a complete set of which is contained on two (2) USB-sticks, one of which will be handed over to each Party for purposes of providing evidence . "**Fairly Disclosed**" shall mean disclosed in a manner that an experienced purchaser applying the customary duty of care of a prudent businessman and having received professional advice could reasonably detect the relevance of the matter.

(d)     the claim resulting from the Relevant Breach results from, or is increased by, the passing of, or any change in any law, statute, ordinance, rule, regulation, common law rule or administrative practice of any government, governmental department, agency or regulatory body after the Signing Date;

(e)     the Purchaser or any Group Company, or any successor to all or parts of their business has received or has a respective claim for repayment, reimbursement or indemnification against a third party (other than any of the Group Entities), including under any insurance

policy (but except for any W&I Insurance policy) in force until the Closing Date, or would have had such claim if the insurance coverage in force immediately prior to the Closing Date had been maintained after the Closing Date; or

(f)     the Purchaser failed to fully comply with the procedures set forth in Sections 8.2 and 8.5 with regard to a Relevant Breach, except to the extent that such failure does neither cause an increase of the claim resulting from the Relevant Breach nor otherwise prejudices the Seller.

8.4     No Double Dip

(a)     The Parties agree that where one and the same set of facts qualifies under more than one provision entitling the Purchaser to a claim or remedy under this Agreement, there shall be only one claim or remedy. In particular, the foregoing shall apply if one and the same set of facts or circumstances qualifies as a breach or non-fulfilment of more than one of the Seller's Warranties.

(b)     Furthermore, rights of the Purchaser resulting from the breach of breaches of Seller's Warranties shall be excluded if and to the extent this Agreement provides for a more specific Seller's Warranty relating to the relevant set of facts. In such cases, solely the more specific Seller's Warranty shall apply and any rights of the Purchaser shall exclusively be determined on basis of the more specific Seller's Warranty and the limitations and exclusions applicable to such specific Seller's Warranty.

8.5     Third Party Claims

In the event that (i) an order of any Governmental Authority is issued, announced to be issued, threatened to be issued or imminent to be issued against the Purchaser or any Group Company or (ii) the Purchaser or any of the Group Companies are sued, threatened to be sued or imminent to be sued by a third party, including any Governmental Authority, in each case in a manner which may, taking into account the liability limitations of the Seller under this Section 8, give rise to a Relevant Breach ("Third Party Claim"), the Purchaser shall give Seller notice of such Third Party Claim without undue delay but in any case no later than within ten (10) Business Days after the Purchaser or any relevant Group Company have learned of such Third Party Claim, and the following principles shall apply:

(a)     The Purchaser shall procure that the Seller is provided with all materials, information and assistance relevant in relation to the Third Party Claim and are given reasonable opportunity to comment or discuss with the Purchaser any measures which the Seller proposes to take or to omit in connection with such Third Party Claim. In particular, the Seller shall be given an opportunity to comment on, participate in, and review any reports, audits or other measures and shall receive copies of all relevant orders of any governmental authority without undue delay but in any event at least ten (10) Business Days prior to the expiry of any relevant objection period.

(b)     No admission of liability shall be made by or on behalf of the Purchaser or any relevant Group Company, and the Third Party Claim shall not be compromised, disposed of or settled, without the prior written consent of the Seller, such consent not to be unreasonably delayed or withheld.

(c)    The Seller shall further be entitled, at its own discretion, to take such action (or cause the Purchaser or any relevant Group Company to take such action) as the Seller deems reasonably necessary to avoid, dispute, deny, defend, appeal, resist, compromise or contest such Third Party Claim (including making counter claims or other claims against third parties) in the name and on behalf of the Purchaser or the Group Companies concerned, provided that the Third Party Claim shall not be compromised, disposed or settled without the prior written consent of the Purchaser, such consent not to be unreasonably delayed or withheld. The Purchaser shall give, and shall procure that the relevant Group Companies give, subject to them being reimbursed all reasonable and evidenced costs and out of pocket expenses, all such information and assistance as described above, including (i) reasonable access to premises and personnel during normal business hours and without causing substantial disruption of the business operations and (ii) the right to examine and copy or photograph any assets, accounts, documents and records for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any Third Party Claim or liability as the Seller or its professional advisors may reasonably request; the Purchaser shall fully cooperate, and cause each Group Company to fully cooperate with the Seller in the defense of any Third Party Claim.

(d)    The foregoing shall include, in particular, the Seller's right to select counsel to the Purchaser or the relevant Group Company, to direct any negotiations with the relevant Third Party and to take all decisions regarding the commencement, conduct or termination of any litigation or arbitration proceedings.

(e)    The Purchaser shall, for such purpose, promptly deliver to the Seller and its representatives copies of all correspondence relating to the Third Party Claim; in all other respects, Section 11.1 below shall apply. The costs incurred by the Purchaser or the Company in the defense of the Third Party Claim shall be borne by the Seller only to the extent that such costs are included in the damages recoverable by the Purchaser pursuant to this Section 8; the Seller shall bear its costs incurred in connection with the defense.

(f)    No action by the Seller or its representatives in connection with the defense of any Third Party Claim shall be construed as an acknowledgement (whether express or implied) of the Purchaser's claim under this Agreement or of any underlying facts related to such claim.

8.6    De Minimis, Deductible

(a)    Except for Excluded Claims, the Seller shall only be liable for Losses

   (i)    if the Losses resulting from an individual Relevant Breach exceed an amount of EUR 200,000.00 (in words: Euro two hundred thousand) in each case and

   (ii)    if the aggregate amount of Losses resulting from Relevant Breaches which are not excluded or deducted pursuant to Section 8.6(a)(i) exceeds an amount of EUR 2,000,000.00 (in words: Euro two million) ("**Deductible Amount**"), whereas only the amount exceeding the Deductible Amount shall be recoverable.

(b)    "Excluded Claims" shall mean the following claims of the Purchaser

20

(i) specific performance claims for transfer of title to the Shares or (ii) are claims for Breaches of the Seller's Warranties set forth in Sections 6.2 and 6.3 ((i) and (ii) the "Fundamental Warranties");

(ii) resulting from an intentional breach of a Seller's Warranty or fraud.

**8.7** Caps

(a) Except for Excluded Claims, the aggregate liability of the Seller for any breach of any covenant or any other claim of the Purchaser for a breach of this Agreement or in connection with this Agreement, shall be limited to an aggregate amount of 3% (in words: three percent) of the Total Purchase Price ("**General Liability Cap**").

(b) The Seller's aggregate overall liability for claims under or in connection with this Agreement Claims, claims falling under the General Liability Cap and Excluded Claims (except for claims of Purchaser arising as a result of willful deceit (*dol*) or intentional behaviour (*faute intentionnelle*) shall in no event exceed the Total Purchase Price.

**8.8** Time Limitations

(a) Subject to any mandatory time limitations provided for by Luxembourg law, all claims of the Purchaser under or in connection with this Agreement shall be time-barred upon the expiration of eighteen (18) months after the Closing Date, except for

(i) claims to request performance of the transfer of the Shares in accordance with this Agreement as well as claims resulting from a breach of Fundamental Warranties which shall be time-barred on the fifth (5th) anniversary of the Signing Date;

(ii) claims of the Purchaser resulting from fraud or willful misconduct under this Agreement which shall become time-barred in accordance with the rules of statutory law; provided, however, that the Seller is, in accordance with Section 8.9(c), not liable for the acts or omissions of third parties engaged by the Seller (including but not limited to legal and other advisors);

(iii) Tax Indemnity Claims resulting under Section 9 of this Agreement which shall become time-barred in accordance with Section 9.8.

(b) The applicable limitation period can, with respect to a specific claim of the Purchaser, only be suspended by means of bringing legal action.

**8.9** No other Remedies

(a) The remedies that the Purchaser may have against the Seller for any breach of its obligations set forth under or in connection with this Agreement are solely governed by this Agreement, and the remedies of Purchaser provided for by this Agreement shall be the exclusive remedies available to Purchaser, any Affiliates of Purchaser or the Companies under and/or in connection with this Agreement. Any rights of the Purchaser not explicitly contained in this Agreement or arising out of breach of contract, breach of pre-contractual obligations, frustration of contract or tort are hereby waived. The foregoing applies, in particular, to any rights of the Purchaser to withdraw from this

Agreement or to require the winding up of the transactions contemplated under this Agreement.

(b)  This Section 8.9 as well as any other limitations and exclusions of liability pursuant to this Agreement shall not apply to any rights and remedies for willful deceit (*dol*) by the Seller or the Seller's own willful misconduct (*faute intentionnelle*) in which case statutory law shall apply.

(c)  Any rights of the Purchaser arising out of Seller's fraud or willful misconduct shall not be affected thereby; provided, however, that any liability of the Seller for and any right to rescind this Agreement based on fraud or willful misconduct (*faute intentionnelle*) by third parties engaged by Seller's shall be excluded.

(d)  The Seller's liability for the behavior, actions, omissions or knowledge of persons assisting, advising or acting on behalf of the Seller (or, in each case, any Affiliate of any Seller) in connection with the performance of its obligations or generally in connection with the Transaction (including the preparation of documents forming part of the VDR Content and information provided orally or in writing in expert sessions, Q&A-processes or otherwise), irrespective of any degree of fault shall be excluded to the fullest extent legally permissible.

8.10  Reimbursement and Excess Recoveries

(a)  Any payments actually made by the Seller to discharge a liability under or in connection with this Agreement which is or becomes excluded, limited or reduced under this Section 8 shall be refunded by the Purchaser to the Seller immediately upon the event triggering such exclusion, limitation or reduction of liability becoming known. The preceding sentence shall apply *mutatis mutandis* to any other remediation measures actually undertaken by the Seller with respect to which liability is or becomes excluded, limited or reduced under this Section 8, in which case the Purchaser shall compensate the Seller for such remediation measures in cash. The Purchaser undertakes to inform the Seller without undue delay about any event which may trigger an exclusion, limitation or reduction of liability under this Section 8.

(b)  Without limiting the generality of Section 8.10(a), if the Purchaser recovers from a third party for Losses for which it (or the relevant Group Company) was already compensated in whole or in part by the Seller under or in connection with this Agreement, the Purchaser undertakes to pay to the Seller the amount of such excess recovery within ten (10) Business Days of its receipt.

9  TAXES

9.1  Tax Indemnity

(a)  Subject to Closing having occurred, the Seller shall indemnify the Purchaser from any Tax imposed on and payable by the Company and relating to any Tax assessment period or portion thereof ending on the day before the Effective Date or any taxable period ending on the applicable statute of limitation prior to the Effective Date ("Tax Indemnification Claim"). In case of a tax assessment period and/or a business/ fiscal year starting prior to and ending on or after the Effective Date, the Tax Indemnification Claim shall refer to

an amount equal to any Tax that would have been assessed if the respective tax assessment period and business/fiscal year had ceased on the day before Effective Date.

(b)    The Tax Indemnification Claim shall become due and payable on the later of (i) ten (10) Business Days following written notice by the Purchaser (which shall include a copy of the relevant Tax assessment), and (ii) three (3) Business Days before the respective Tax is due and payable to the competent Tax Authority.

(c)    To the extent the Seller has indemnified the Purchaser with respect to any Tax and such Tax is subsequently reduced, the difference shall be reimbursed by the Purchaser to the Seller, including all interests received thereon.

9.2   Exclusion of Tax Indemnity

The Seller shall not be liable for any Tax Indemnification Claim, if and to the extent:

(a)    the relevant Tax has been paid or otherwise settled (including, but not limited to, by way of set-off) prior to the Effective Date;

(b)    the relevant Tax could have been avoided by offsetting Tax losses by way of a carry-back if and to the extent such losses have originated from any Tax assessment period or portion thereof ending prior to the Effective Date; any actual offsetting of such losses against income which is attributable to a taxable period on or after the Effective Date is disregarded for the purpose of determining the existence of such offsetting opportunity;

(c)    the matter to which the respective Tax relates has been taken into account in the Financial Statements 2020 as a Tax liability or Tax provision, even if part of other liabilities, accruals or provisions;

(d)    the respective Tax or the facts and circumstances from which such Tax results gives rise to a Tax benefit, irrespective of whether the Tax benefit relates to the same type of Tax (e.g., the lengthening of any amortization or depreciation periods, higher depreciation allowances, increase of tax loss carry forwards, step-up in the Tax basis of assets, non-recognition of liabilities or provisions) of the Purchaser, the Company or any Affiliate of the Purchaser ("**Tax Benefit**"). The amount of the Tax Benefit to be deducted from the Tax Indemnification Claim is the aggregate of (i) the face value of the Tax Benefit which is realized in any period prior to and including the date on which the respective Tax Indemnification Claim becomes due and payable and (ii) the net present value of the Tax Benefit which is allocable to any period after such date. The net present value of the Tax Benefit shall be calculated on a lump-sum basis by applying (i) the Tax rate that is anticipated to apply at the time when the Tax Benefit is expected to be realized and (ii) a discount rate of 1 percent (1.0 %) per annum over the anticipated period in which the Tax Benefit is expected to be realized and, by ignoring all other tax attributes of the Company;

(e)    the respective Tax results from changes in tax legislation including the official decrees and guidance of the Tax authorities and jurisdiction of upper Tax courts which become effective or are published after the Effective Date;

23

(f)  the amount of the respective Tax has been recovered or could have been reasonably recovered by the Purchaser or the Company from a Third Party including any current insurance policy (assuming that scope of existing insurance coverage is not subsequently narrowed down) or future insurance policy, including any insurance entered into in connection with the conclusion of this Agreement;

(g)  the respective Tax results from or is increased by (i) entering into this Agreement and/or by the consummation of any of the Transaction or (ii) by any transaction or action or (including but not limited to the change in the exercise of any Tax election right, the approval or implementation of any reorganization measure or the sale of any asset, omission to file a necessary notification, change in accounting and transfer pricing policies and termination of any tax consolidation scheme) taken or omitted to take by the Purchaser, the Company or any Affiliate of the Purchaser after the Closing, which has a retroactive effect on a Tax assessment period ending prior to the Effective Date or portions thereof, unless such transaction or action is required by mandatory law or taken or omitted to take with the written consent of the Seller;

(h)  the respective Tax results from or is increased by any change in the accounting and taxation principles or practices of the Company (including methods of submitting Tax returns) for Tax assessment periods ending prior to the Effective Date or portions thereof introduced after the Closing Date, which has a retroactive effect on a Tax assessment period ending prior to the Effective Date or portions thereof, unless such change is required by mandatory law or taken with the written consent of the Seller;

(i)  the Purchaser has failed to comply with any of its obligations set forth in Section 9.4 and 9.5, unless the Purchaser proves that the respective Tax is not caused or increased by such non-compliance; or

(j)  this Agreement does provide that such Tax shall be borne by the Purchaser.

9.3  Tax Refunds and Overstated Tax Provisions.

(a)  Subject to Closing having occurred, the Purchaser shall pay to the Seller an amount equal to any repayment of any Tax, received in cash or by way of set-off or otherwise (plus any interest thereon) received by the Company on or after the Effective Date for Taxes relating to any Tax assessment period or portion thereof ending prior to the Effective Date ("Tax Refund"). The Purchaser shall notify the Seller in writing and without undue delay of any relevant decision by any Tax Authority resulting in a Tax Refund. Any amount payable to the Seller pursuant to this Section 9.3(a) shall be due and payable within five (5) Business Days after the end of each quarter of the calendar year in which a relevant Tax Refund has been received by the Company.

(b)  The Purchaser shall pay to the Seller an amount equal to any Tax liability or Tax accrual included, even if part of other liabilities, accruals and provisions, in the Financial Statements 2020 to the extent that they exceed the actual Tax charge and has therefore been or can be dissolved in the relevant commercial balance sheet of the Company pursuant to the applicable accounting principles ("Overstated Tax Provision(s)"), except to the extent that such liability or provision for Taxes has been set off against any Tax Indemnification Claim. The Purchaser shall notify the Seller in writing and without undue delay of any relevant decision by the Tax Authority or the reason for dissolving the

liability/provision resulting in a claim of the Seller under this Section 9.3(b). Any amount payable to the Seller pursuant to this Section 9.3(b) shall be due and payable within five Business Days after the dissolution of the liability/provision has to be effected in accordance with applicable accounting standards.

(c) The Purchaser shall, and shall procure that the Company will, deliver to the Seller within six (6) months following the end of each calendar year a written statement which confirms that the Purchaser has complied fully with its notification obligations set forth in Sections 9.3(a) and Section 9.3(b) ("**Annual Tax Statement**"). The Seller is entitled to appoint a certified accounting firm (i), at its own expense, to have the statement received from the Purchaser reviewed or (ii), at the expense of the Purchaser and provided that the relevant Annual Tax Statement is not provided to the Seller within twelve (12) months after the end of the respective calendar year, to collect the data by own investigation.

9.4 Tax Matters after the Closing Date

(a) After the Closing Date, the Purchaser shall, and shall procure that the Company shall, prepare and file when due all Tax Returns required to be filed by or on behalf of the Company, provided, however, that any Tax Return (i) relating to a Tax assessment period ending prior to or on the Effective Date or portions thereof or (ii) or which could have any impact on the corporate tax position of the Seller ("**Relevant Tax Return**") will be subject to the review and consent of the Seller to the extent they relate to a period prior to the Effective Date or they could have any impact on the corporate tax position of the Seller. The Relevant Tax Returns to be filed after the Closing Date shall be prepared consistent with the policies, procedures, practices and election rights adopted in the financial statements of the relevant Tax period as well as the Tax returns for previous Tax periods of the Company unless required by a change in law or administrative rules. The Purchaser shall procure that any Relevant Tax Return to be reviewed by the Seller will be furnished to the Seller no later than 30 (thirty) Business Days prior to the due date of such Relevant Tax Return, and shall be filed in accordance with Seller's instructions to the extent they comply with mandatory law.

(b) The Purchaser shall notify the Seller of all Tax assessments and announcements of Tax audits, Tax audit's requests or any other facts or circumstances which are reasonably likely to give rise to a Tax Indemnification Claim or which could have any impact on the corporate tax position of the Seller ("**Relevant Tax Matters**"). The Purchaser's notice shall be given within ten (10) Business Days after the Company has received the relevant information or earlier, if required because of the urgency of the relevant matter. Each notification shall be in writing and copies of any documents related thereto shall be attached to such correspondence. The Purchaser shall, and shall procure that the Company shall, permit the Seller to participate at its request and at its expense, in all Relevant Tax Matters.

(c) With respect to any Relevant Tax Matter, after the Closing Date the Purchaser shall procure that (i) the Seller and the Seller's advisors are granted the right to participate in meetings and correspondence with the relevant Tax Authorities, including in connection with any Tax audits, (ii) all written questions or information requests by the Tax Authorities, including Tax auditors, are forwarded to the Seller as soon as reasonably practical for evaluation and comments, (iii) such comments are duly incorporated by the

relevant Company in its statement to the Tax Authority as far as such comments comply with mandatory law, (iv) no Tax return of the Company is amended without the Seller's written consent, unless such amendment is required by mandatory law; and (v) no written communication is submitted to any Tax Authority or Tax court without the Seller's written consent. The Purchaser shall procure (i) that the Tax Authorities conducting the Tax audit shall be asked to raise their questions and information requests in writing and (ii) that the Seller are informed of the ongoing process of the Tax audits. The Purchaser shall not (and shall ensure that the Company will not) settle, concede or give its consent to the findings of any Tax audit relating to any Relevant Tax Matter without the prior written consent of the Seller.

(d) After the Closing Date, the Purchaser shall procure that, upon the request of the Seller and at the Seller's expense, objections are filed and legal proceedings are instituted or maintained and conducted against any Tax assessments or other decisions of the Tax Authorities with respect to Relevant Tax Matters (herein collectively "**Tax Litigation**") in accordance with the Seller's directions. The Seller shall have the right to lead any Tax Litigation and the Purchaser shall cooperate and follow the Seller's instructions and shall cause the Company or its respective successor to cooperate and follow the Seller's instructions in each phase of such Tax Litigation. The Purchaser shall provide, or procure that the Company provides all documentation and information reasonably requested by the Seller as soon as reasonably practicable after the receipt of such request. The Purchaser shall not settle, and shall ensure that the Company will not settle, any Tax Litigation without prior written consent of the Seller.

9.5 Cooperation on Tax Matters

(a) The Parties shall fully cooperate, and shall cause their representatives to fully cooperate, with each other in connection with all Tax matters relating to any period prior to and including the Closing Date, including the preparation and filing of any Tax Return. Cooperation between the Purchaser and the Seller shall also include (but shall not be limited to) (i) the providing and making available by one Party to the other Party of all books, records and information, and (ii) the full assistance of all officers and employees of the Seller and the Seller's Affiliates, and the Company, to the extent necessary or useful in connection with any Tax matter relating to any period prior to and including the Closing Date. When exercising its rights under Sections 9.4 and Section 9.5, Parties shall act in good faith and take into account the other Party's reasonable interests.

(b) The Purchaser agrees to cause the Company to give the Seller reasonable notice prior to discarding or destroying any books and records relating to Relevant Tax Matters and, if the Seller so requests, to allow the Seller to take possession of such books and records to be otherwise destroyed or discarded.

9.6 Reverse Tax Indemnity

(a) Subject to Closing having occurred, the Purchaser shall indemnify the Seller from any Tax imposed on and payable by the Seller as and insofar caused by a breach of Purchaser's obligation under Section 9.4 or Section 9.5.

(b) Any claim of the Seller according to Section 9.6(a) shall become due and payable on the later of (i) ten (10) Business Days following written notice by the Purchaser (which shall

26

include a copy of the relevant Tax assessment), and (ii) three (3) Business Days before the respective Tax is due and payable to the competent Tax Authority.

9.7   Purchase Price Adjustment

Any payments made by the Seller or the Purchaser in accordance with this Section 9, shall constitute an adjustment of the Total Purchase Price.

9.8   Limitation

All claims under this Section 9 shall be time-barred at the earlier of (i) six (6) months after the unappealable assessment of the respective Tax or (ii) five (5) years after the Closing Date, provided, however, that the Seller's claims under Section 9.3 shall not be time barred any earlier than six (6) months after the Purchaser's notification pursuant to Section 9.3(a) or (b).

10.   WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller in the form of an independent guarantee that the statements contained in Section 10.1 through Section 10.3 ("**Purchaser's Warranties**") are true and correct as of the Signing Date and, except for Sections 10.1(d) and 10.1(e), as of the Closing Date

10.1   Authorization of the Purchaser

(a)   The Purchaser has been duly established and is validly existing as a limited liability company (*Società a responsabilità limitata*) organized under the laws of Italy.

(b)   This Agreement constitutes legal, valid, and, subject to its terms and conditions, binding obligations of the Purchaser. The execution of this Agreement and of each ancillary agreement to this Agreement as well as the performance by the Purchaser of its obligations hereunder and thereunder and the consummation of the transactions have been duly and validly authorized by all necessary corporate actions and corporate bodies on the part of the Purchaser.

(c)   No insolvency proceedings are pending in relation to the Purchaser and there are no circumstances which would require to file for insolvency of the Purchaser under any applicable laws.

(d)   The execution and performance of this Agreement by the Purchaser require no approval or consent by any Governmental Authority or other Third Party and do not violate any applicable law or decision by any court or Governmental Authority binding on the Purchaser.

(e)   The Purchaser is not aware of any facts or circumstances which could give rise to any claim resulting from a Relevant Breach due to the incorrectness of any Seller's Warranty or breach of any covenant or other obligation under or in connection with this Agreement.

10.2   Financial Capability

(a)   As of the Closing Date, the Purchaser will have sufficient immediately available funds or binding equity and debt financing commitments ("**Financing Commitments**") which are

only subject to customary conditions to enable it to make all payments required to be made by it under this Agreement.

(b) The Purchaser will make use of the Financing Commitments solely for the payment of the Total Purchase Price and the other obligations under or in connection with this Agreement.

(c) The Purchaser will not amend or terminate the Financing Commitments or waive any rights thereunder until all obligations of the Purchaser under or in connection with this Agreement have been fulfilled. The Purchaser shall procure that any conditions for the payouts under the Financing Commitments will be fulfilled at least three (3) Business Days prior to the Closing Date.

10.3 Purchaser's Intentions and Experiences

(a) As of the Signing Date and as of the Closing Date, the Purchaser is purchasing the Shares for investment on its own account.

(b) The Purchaser (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

11. COVENANTS OF THE PURCHASER

11.1 Access to Information

Without limiting any additional rights of the Seller under Sections 8.2 or 8.5, the Purchaser shall procure that:

(a) the Company preserves for the applicable, corresponding claims survival period set forth in this Agreement all documents, records and correspondence, accounts and other information of the Company (in whatever form held) existing prior to the Closing which are or are reasonably likely to be relevant to any actual or potential claims based on a Relevant Breach or indemnities by the Seller contained in this Agreement ("Relevant Information");

(b) the Company, upon request, provides the Seller and its Representatives with access to the Relevant Information and, in the event of physical access, allow the Seller to take copies of the Relevant Information, during normal business hours and on reasonable notice; and

(c) the Company, upon request, provides the Seller with all information relating to the period from (and including) 1 January 2021 and the Closing Date reasonably required for purposes of preparing the group financial statements as well as the year-end closing of Maillis Group for the fiscal year 2021, including (i) uploading to HFM the financials in all monthly forms, (ii) performing data reconciliation in HFM, BW and identifying intercompany mismatches, (iii) providing standard information about restructuring & non-recurring expenses along with IFRS16, loans and factoring data, (iv) preparing the year end disclosures within the deadlines set out by the Maillis Group auditors together with the checklist according to standard templates and (v) responding to ad hoc requests

in connection with the processing of the afore-mentioned data, in each case in line with past practice.

11.2   Cooperation

The Parties shall cooperate with each other in connection with the closing of the transactions contemplated by this Agreement. The Purchaser shall procure that all documents are executed and delivered and all other statements and all other acts are made that are necessary or expedient for this purpose to the extent this is not intolerable for the Purchaser.

11.3   Shareholder Resolution of TAM S.r.l.

The Purchaser shall cause the Company to hold a shareholders' meeting of TAM S.r.l. and resolve the acceptance of the resignation of Luc Modest Van Damme as director of TAM S.r.l. and approval of all the actions taken by such resigning directors in their capacity, and fully release them from any personal responsibility for the activity carried out in same capacity, waiving any responsibility action *vis-à-vis* such directors pursuant to Article 2393 of the Italian Civil Code and pursuant to applicable Laws.

11.4   Indemnification of Beneficiaries

(a)   The Purchaser shall indemnify and hold harmless the Seller, the Affiliates or assignees of the Seller as well as its respective officers and employees, managing directors and board members (each a "**Beneficiary**") from and against any and all losses, liabilities (whether present or future, actual or contingent), damages and reasonable costs and expenses (including taxes, reasonable legal fees, expenses and disbursements) arising out of or in connection with

(i)   the conduct of the Business for which any Beneficiary is held liable by a Group Company or for which liability against any Beneficiary is asserted by a Group Company, in each case in its capacity as (i) current and former direct or indirect shareholder of a Group Company, or (ii) current and former director, officer, board member, advisor, agent or employee of a Group Company, in each case unless and to the extent such liability is based on willful deceit or willful misconduct by the relevant Beneficiary;

(ii)   any claims brought against any Beneficiary by a Group Company arising out of, or in connection with, (i) any financing agreements, and/or (ii) any other debt or financial liabilities or obligations of any of the Group Companies;

in each case unless and except to the extent the Purchaser has an enforceable right to claim damages or indemnification from the Seller in respect of such losses, liabilities or damages under the terms of this Agreement (herein collectively the "**Seller's Indemnification Claims**" and each a "**Seller's Indemnification Claim**").

(b)   A Seller's Indemnification Claim shall be time-barred twelve (12) months after the Seller has been notified in writing of the respective claim or liability both stating the amount of the respective claim or liability and the underlying facts (in reasonably sufficient detail) giving rise to a Seller's Indemnification Claim.

12. LIABILITY OF THE PURCHASER

In the event (i) of any breach or non-fulfilment by the Purchaser of any of the Purchaser's Warranties, (ii) the Purchaser breaches any of the covenants set out in 11 or (iii) the Purchaser breaches any other obligations resulting from or in connection with this Agreement, the rights of the Seller shall be determined in accordance with statutory law unless expressly provided otherwise in this Agreement.

13. MISCELLANEOUS

13.1 Defined Terms

In this Agreement, the following terms shall have the meanings specified in this section:

| Definitions | Meaning |
|---|---|
| Affiliate | any affiliate(s) (entreprises filiales) within the meaning of article 1711-1 of the Luxembourg law on commercial companies dated 10 August 1915, as amended. |
| Accounting Principles | shall mean the generally accepted accounting principles set forth in the Code and in Legislative Decree No. 127/91, those established by the Italian Accountants' Organization (Principi Contabili Predisposti dai Consigli Nazionali dei Dottori Commercialisti e degli Esperti Contabili), those established and/or revised by the OIC (Organismo Italiano di Contabilità) and, in absence of equivalent Italian principles, by the accounting principles issued by the IASB – International Accounting Standards Board. |
| Business Days | shall mean any days other than Saturdays, Sundays and public holidays in the Grand Duchy of Luxembourg. |
| Effective Date | shall mean 1 January 2021, 0:00 hours CET |
| EUR or Euro | shall mean Euro or Euros (or any of its replacement as official currency in the Grand Duchy of Luxembourg, at the applicable conversion rate from time to time). |
| Governmental Authority | shall mean any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or similar authority or instrumentality (domestic or foreign). |
| Intellectual Property Rights | means any patents, trademarks, business names, designs and design rights and the benefit of all applications and licenses to use such rights. |
| Maillis Group | means (individually and collectively) Maillis International S.A. and its Subsidiaries from time to time, but excluding the Group Companies |

| Schedules | All schedules referred to in this Agreement. |
|---|---|
| Subsidiary | when used with respect to a specified person, means any entity directly or indirectly controlled by such person. |
| Tax or Taxes | shall mean any tax levy, impost, duty, other charge or social security contributions or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same |
| Third Party | shall mean any person who or which is neither a Party to this Agreement nor an Affiliate of a Party to this Agreement. |
| VAT | shall mean value added tax, including any similar tax, which may be imposed in place thereof from time to time. |

13.2   Other Defined Terms

### A

Additional 2021 Bonus and BoD Fees.........7
Agreement.................................................5
Annual Tax Statement ..............................25

### B

Base Purchase Price..................................6
Beneficiary..............................................29
Business..................................................5
Business Employees To Be Transferred .....11

### C

Cash Flow Gross-Up Amount......................6
Claim Notice...........................................17
Closing....................................................8
Closing Actions........................................9
Closing Conditions....................................9
Closing Date............................................8
Closing Protocol......................................10
Company..................................................5

### D

Deductible Amount..................................20
Due Diligence...........................................5

### E

Excluded Claims......................................20

### F

Fairly Disclosed......................................18
Financial Statements 2020.......................14
Financing Commitments ..........................27
Fundamental Warranties..........................21

### G

General Liability Cap...............................21
Group Companies .....................................5
Group Company ........................................5

### I

Included 2021 Bonus and BoD Fees...........7
Included Cash Flow...................................6
Inofyta SPA .............................................5

### K

Key Employees........................................14

### L

Long Stop Date ......................................11
Losses ...................................................17

### M

Maillis Holdings.......................................9
Maillis International SPA ...........................5
Marflex SPA .............................................5

31

Material Intellectual Property Rights ......... 15

**N**

Normalized Cash Flow ............................. 6

**O**

Other Group Companies ........................... 5
Overstated Tax Provision(s) ..................... 24

**P**

Parties ................................................ 5
Party ................................................. 5
PPA .................................................. 12
PPA Beneficiary ................................... 12
PPA Gross Amount ................................ 12
Purchaser ............................................ 5
Purchaser's Warranties .......................... 27

**R**

Relevant Breach .................................. 17
Relevant Information ............................ 28
Relevant Tax Matters ........................... 25
Relevant Tax Return ............................. 25
Relevant Withholding Tax ..................... 12

Restitution In Kind .............................. 17

**S**

Scheduled Closing Date ......................... 8
Seller ............................................... 5
Seller's Account ................................... 7
Seller's Indemnification Claim ............... 29
Seller's Indemnification Claims .............. 29
Seller's Knowledge ............................. 13
Seller's Warranties ............................. 13
Shares ............................................... 6
Signing Date ...................................... 5

**T**

Tax Benefit ........................................ 23
Tax Indemnification Claim ..................... 22
Tax Litigation .................................... 26
Tax Refund ........................................ 24
Third Party Claim ............................... 19
Total Purchase Price ............................. 6
Transaction ....................................... 5

**V**

Vendor Loan ....................................... 7
Vendor Loan Amount ............................ 7

**13.3 Notices**

All notices, requests and other communications hereunder shall be made in the English language and shall be delivered

(a) if made prior or at to Closing, in writing or in written form (email sufficient) and

(b) if made after Closing, in writing by registered letter

(c) to the persons at the address set forth below, or such other addresses as may be designated by the respective Party to the other Party in the same manner:

To the Seller:

Spyridon Gaitanos
19, rue Klengillier, L-8239 Mamer
Grand Duchy of Luxembourg
Email: spyros.gaitanos@maillis.lu

and

Luc van Damme

1, Gruuss Stross, L-9991 Weiswampach
Email: luc.vandamme@maillis.lu

with a copy to:

Renzenbrink & Partner
Dr. Ulf Renzenbrink / Dr. Andreas Stoll
Valentinskamp 70 (EMPORIO)
20355 Hamburg
Germany
Fax: +49 40 350171010
Email: renzenbrink@renzenbrink-partner.de / stoll@renzenbrink-partner.de

To the Purchaser:

Guido Sazbon
C.so Italia 22
20122 Milano
Italy
Email: guido.sazbon@spadapartners.it

13.4.  Public Disclosure, confidentiality

(a)   Neither Party shall make any press release or similar public announcement with respect to this Agreement except as expressly agreed upon with the other Parties.

(b)   Each Party shall keep confidential and not disclose to any Third Party the contents of this Agreement and any confidential information regarding the other Parties disclosed to it in connection with this Agreement or its implementation, except as expressly agreed upon with the other Party and except as may be required in order to comply with the requirements of any applicable laws or the rules and regulations of any stock exchange upon which any securities of the relevant Party or any of its parent companies are listed. If and to the extent any announcement, press release or disclosure of information regarding the subject matter of this Agreement is to be made under applicable mandatory laws or any applicable stock exchange regulations, the Party concerned shall, to the extent permissible under applicable laws or stock exchange regulations, not disclose any such information without first consulting with the other Parties and limit the disclosure to the minimum extent. The Purchaser shall, however, be allowed to disclose this Agreement and its contents to any Third Party holding a beneficial interest in it, to its advisors and banks providing financing for the transactions contemplated hereby.

13.5   Costs and Expenses

(a)   All transfer taxes (including real estate transfer taxes), taxes on financial transactions (*tassa sulle transazioni finanziarie*, s.c. *Tobin Tax*), stamp duties (e.g., *imposta di bollo*), costs and fees (including notarial costs and fees), registration duties or other charges in connection with any regulatory requirements (including merger control proceedings) and other charges and costs payable in connection with the execution of this Agreement and

33

the implementation of the transactions contemplated hereby shall be borne by Purchaser.

(b)   Each Party shall pay its own expenses, including the costs of its advisors, incurred in connection with this Agreement.

13.6   Entire Agreement; Amendments and Waivers

(a)   This Agreement (including all Schedules hereto) contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes and replaces all oral and written declarations of intention made by the Parties in connection with the contractual negotiations.

(b)   Any provision of this Agreement (including this Section 13.6) may be amended or waived only if such amendment or waiver is (i) by written instrument executed by all Parties and explicitly refers to this Agreement or (ii) by notarized deed, if required by law.

13.7   No Assignments; No Set-Off and No Third Party Rights

(a)   Except as expressly set forth in this Agreement, Purchaser may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Seller, provided that the assignment of rights under this Agreement to Purchaser's lenders as security for the acquisition financing provided to Purchaser in connection with this Agreement shall be permitted.

(b)   No Party, except as provided otherwise in this Agreement, shall be entitled (i) to set-off (any rights and claims it may have under this Agreement against any rights or claims any other Party may have under this Agreement or (ii) to refuse to perform any obligation it may have under this Agreement on the grounds that it has a right of retention unless the rights or claims of the relevant Party claiming a right of set-off or retention have been acknowledged in writing by the relevant other Party/Parties or have been confirmed by final decision of a arbitral tribunal in accordance with the principles set forth in Section 13.8(b), in no event, the Purchaser shall be entitled to set-off any claims against, or to exercise any rights of retention with respect to the Purchaser's obligations to make any payments on the Scheduled Closing Date or the Closing Date, as applicable.

(c)   This Agreement shall not grant any rights to, and is not intended to operate for the benefit of, third parties unless otherwise explicitly provided for herein. Wherever under this Agreement any party other than the Purchaser is to be indemnified by the Seller, such other party, in particular the Companies, shall not be entitled to bring any claims for indemnification against the Seller.

13.8   Governing Law; Jurisdiction; Service of Process

(a)   This Agreement shall be governed by, and construed in accordance with, the laws of the Grand Duchy of Luxembourg (excluding conflict of laws rules and the CISG) while the transfer of the shares and the Transfer Deed shall be governed by the laws of Italy.

(b)   All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. No award or procedural

order made in the arbitration shall be published. The place of the arbitration shall be Frankfurt am Main, Germany. The language of the arbitral proceedings shall be English. In the event that mandatory applicable law requires any matter arising from or in connection with this Agreement or its consummation to be decided upon by a court of law, the competent courts in and for Frankfurt am Main, Germany shall have exclusive jurisdiction.

13.9   Interpretation

(a)   The headings of the sections and subsections in this Agreement are for convenience purposes only and shall not affect the interpretation of any of the provisions hereof.

(b)   Terms defined in the singular have a comparable meaning when used in the plural, and *vice versa*.

(c)   For the purpose of any disclosure thresholds or the like in any representations and warranties contained in this Agreement, any reference to EUR shall include the equivalent in any foreign currency at the official Euro foreign exchange rates of the European Central Bank on the Signing Date.

(d)   Words such as "hereof", "herein" or "hereunder" refer (unless otherwise required by the context) to this Agreement as a whole and not to a specific provision of this Agreement. The term "including" shall mean "including, without limitation".

(e)   The terms "including" and "in particular" shall always mean "including, without limitation" and "in particular, without limitation", respectively.

(f)   The Schedules to this Agreement are an integral part of this Agreement and any reference to this Agreement includes this Agreement and the Schedules as a whole. The disclosure of any matter in this Agreement (including any Schedule thereto) shall be deemed to be a disclosure for all purposes of this Agreement. The fact that a matter has been disclosed in a Schedule shall not be used to construe the extent of the required disclosure (including any standard of materiality) pursuant to the relevant representation or other provision of this Agreement.

13.10   Severability

Should any provision of this Agreement, or any provision incorporated into this Agreement in the future, be or become invalid or unenforceable, the validity or enforceability of the other provisions of this Agreement shall not be affected thereby. The invalid or unenforceable provision shall be deemed to be substituted by a suitable and equitable provision which, to the extent legally permissible, comes as close as possible to the intent and purpose of the invalid or unenforceable provision. The same shall apply: (i) if the Parties have, unintentionally, failed to address a certain matter in this Agreement; in this case a suitable and equitable provision shall be deemed to have been agreed upon which comes as close as possible to what the Parties, in the light of the intent and purpose of this Agreement, would have agreed upon if they had considered the matter; or (ii) if any provision of this Agreement is invalid because of the scope of any time period or performance stipulated herein; in this case a legally permissible time period or performance shall be deemed to have been agreed which comes as close as possible to the stipulated time period or performance.



EUROPACK S.A.

Name: Spyridon Gaitanos

Position: Director

Name:

Position:

Thaleia AcquiCo S.r.l.

Name:

Position:

**EUROPACK S.A.**

_____                    _____

Name:                                              Name:

Position:                                          Position:


**Thaleia AcquiCo S.r.l.**

_____

Name:        GUIDO  SAZBON

Position:    SOLE DIRECTOR

37

**Project Thaleia**

**Schedule (A)**

**Other Group Companies**

**Schedule (A) – Other Group Companies**

| No. | Company Name | Commercial Register | Registration Number | Percentage | Comments |
|---|---|---|---|---|---|
| 1. | **M.J. Maillis España** | [●] | [●] | 100% | To be held as of the Closing Date |
| 2. | **Tam S.r.l.** | Milan, Italy | 09178450152 | 71% | n/a |
| 3. | **Combi Packaging Systems Limited Liability Company** | The Corporation Trust Company , Delaware (USA) | Tax ID 34-1893967<br><br>D-U-N-S ® Number: 097626741 | 50% | n/a |

\* \* \*

Project Thaleia

Schedule 2.1(b)

Sample Calculation Purchase Price
Adjustment Cash Generation

| | values in 000 € | Cash Flow Statement (FC 2021) | |
|---|---|---|---|
| A | **Operating EBITDA** | **16,227** | |
| | Restructuring Expense | 0 | |
| | Net Non.Recurring | -35 | |
| B | **Extraordinary costs** | **-35** | |
| | FX Differences (+/-) | -42 | |
| | - Non Cash Items Add Back | 673 | |
| | Provisions Included in Operating EBITDA | 636 | |
| | Mng fees | -1,046 | |
| C | **Adjustments to Ebitda** | **221** | |
| | Inventories | -1,777 | |
| | Trade Receivables IC | 24 | |
| | Trade Receivables Non IC | -1,183 | |
| | Trade Payables IC | 185 | |
| | Trade Payables Non IC | 3,349 | |
| D | **Trade Working Capital** | **598** | |
| | Other Receivables IC | 2,277 | |
| | Other Receivables Non IC | 0 | |
| | Other Payables IC | | |
| | Other Payables Non IC | -205 | |
| | Other Taxes | 134 | |
| | FX in WC | | |
| E | **Other Woca Elements** | **2,205** | |
| F | **Total Working Capital** | **2,804** | |
| G | **Taxes Paid** | **-1,664** | |
| H | **Interest** | **-434** | |
| I | **Cash Flow from Operation ( A+B+C+F+G+H)** | **17,118** | |
| | Acquisitions / Disposals of Affiliates | 0 | |
| | CAPEX | -539 | |
| | Proceeds from sales of Assets | 5 | |
| | Interest received IC | 73 | |
| | Interest received Non IC | 0 | |
| | Dividends received | | |
| J | **Cash Flow from Investing** | **-461** | |
| | Changes in Equity | 0 | |
| | Loans IC | | |
| | Loans Non IC | -3,537 | *Note: included in leakage or added below* |
| | Dividends paid | -2,277 | *Note: included in leakage* |
| K | **Cash Flow from Financing** | **-5,814** | |
| | **Cash Generated ( I+J+K)** | **10,843** | |
| | | | |
| | Plus: Debt repayment deducted in Equity Value | 2,619 | |
| | **Normalized Cash Generated** | **13,462** | |
| | Less: Cash Generation already included in Equity Value | -9,000 | |
| | **Purchase Price Adjustment for additional cash generation** | **4,462** | |

FC21_CF_LE

Project Thaleia

Schedule 2.1(c)

Sample Calculation 2021 Bonus and BoD
Fees

| No | Items | Included 2021 Bonus and BoD Fees (a) | Actual 2021 Bonus and BoD Fees (b) | Additional 2021 Bonus and BoD Fees (c)=(a)-(b) |
|---|---|---|---|---|
| 1 | Annual Bonus Payment for year 2021 - Luc van Damme | 150,000.00 € | | |
| 2 | Maillis Group - BoD & BD service agreement - Michael Maillis - Annual fees a | 658,000.00 € | | |
| 3 | Maillis Group - BoD - H.I.G. monitoring fees incl. expenses | 500,000.00 € | | |
| 4 | Maillis Group - BoD fees - Wolf-Dieter Baumann | 95,000.00 € | | |
| 5 | Maillis Group - BoD and other fees - Adorma | 113,000.00 € | | |
| | **Total** | **1,516,000.00 €** | - | - |

If (c) is a negative amount, such amount will be deducted from the Base Purchase Price

If (c) is a positive amount, such amount will be added to the Base Purchase Price

Project Thaleia

Schedule 3.3(a)(x)

Closing Protocol

Date: [●] 2022

---

**CLOSING PROTOCOL**

relating to

**PROJECT THALEIA**

---

This Closing Protocol ("**Closing Protocol**") is entered into by and among

(1)   **EUROPACK S.A.**, a stock corporation (*société anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 2, rue de Bitbourg, L - 1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B 68393 ("**Seller**"); and

(2)   **Thaleia AcquiCo S.r.l.**, a limited liability company (*Società a responsabilità limitata*) organized under the laws of Italy and registered with the Registry of Enterprises of Milano Monza Brianza Lodi under no. 12134760961 ("**Purchaser**").

The Seller and the Purchaser are collectively referred to as the "**Parties**", and each individually a "**Party**".

### Preamble

(A)   On |●] 2021, the Parties entered into a share purchase agreement regarding the sale and purchase of shares in **SIAT – Società Internazionale Applicazioni Tecniche S.p.A.** (the "**SPA**").

(B)   Except as expressly provided otherwise in this Closing Protocol, the terms used in this Closing Protocol shall have the same meaning ascribed to them in the SPA and shall be construed and interpreted as set out in the SPA. Any references herein to "**SPA Section(s)**" means those sections of the SPA. Any references herein to "**SPA Schedule(s)**" means those Schedules to the SPA. Any other references herein to Sections or Schedules are those referred to in this Closing Protocol.

(C)   With this Closing Protocol the Parties intend to confirm to each other the due fulfilment or waiver of the Closing Conditions according to SPA Section 3.2, and that the Closing Actions according to SPA Section 3.3 were duly performed or waived, and that Closing has occurred.

**NOW IT IS AGREED** as follows:

1.   **Subject Matter**

This Closing Protocol describes the actions taken in connection with the consummation of the transactions contemplated by the SPA at the Closing Date. The legal significance of this Closing Protocol is strictly limited to serve as evidence that the Closing Conditions were fulfilled or effectively waived and that the Closing Actions were taken in accordance with SPA Sections 3.3(a)(i) through [3.3(a)(ix)] or effectively waived. The execution of this Closing Protocol shall not limit or prejudice the rights of the Parties arising under or in connection with the SPA or under applicable law.

2.   **Closing Date**

The Parties agree that the Closing Date within the meaning of SPA Section 3.1 shall be today.

3.   **Closing Conditions**

The Parties hereby confirm, unconditionally and irrevocably, that the Closing Conditions pursuant to SPA Section 3.2(b) have been fulfilled as follows:

2

a) The Transfer of all shares in M.J. Maillis España S.A. from Maillis Holdings S.à r.l. to the Company (by way of a sale and transfer from Maillis Holdings to the Company at a purchase price of EUR 1.00) has taken place;

b) the Purchaser has confirmed (in its free discretion) to the Seller in writing that the Purchaser has obtained, directly or indirectly, sufficient funds or binding equity and debt financing commitments to pay the Total Purchase Price; and

c) closing of the Marflex SPA has occurred.

4.   **Closing Actions**

The Parties hereby confirm, unconditionally and irrevocably, that as of today, the following Closing Actions pursuant to SPA Section 3.3 have taken place by concurrent performance in the following sequence:

a) The Seller has passed a resolution on and procured that the Company effects a cash distribution of the amount of the non-operating cash at hand of the Company to the extent legally permissible;

b) the Purchaser has paid the Total Purchase Price to the Seller;

c) the Seller has transferred to Purchaser the Shares and, to this effect, delivered to Purchaser the share certificates of the Shares, duly endorsed for transfer to Purchaser with authentication of a notary public selected by the Parties pursuant to section 2355 paragraph 3 of the Italian Civil Code;

d) the Seller has caused the transfer of the Shares to be duly recorded in the share ledger of the Company;

e) [the Seller has caused Luc Modest Van Damme, Spyridon Gaitanos, Stefano Nanni Costa and/or Fabricio Redaelli to resign from their office as directors of the Company and, in the case of Luc Modest Van Damme, of TAM S.r.l. by delivering letters of resignation and whereby each of them has acknowledged and agreed not to have any claim against the Company and, where applicable, TAM S.r.l., except the compensation accrued until the resignation date;]

f) [the Seller has caused Luc Modest Van Damme, Spyridon Gaitanos, Stefano Nanni Costa and/or Fabricio Redaelli to resign from their office as directors of the Company and, in the case of Luc Modest Van Damme, of TAM S.r.l. by delivering letters of resignation and whereby each of them has acknowledged and agreed not to have any claim against the Company and, where applicable, TAM S.r.l., except the compensation accrued until the resignation date;]

g) [the Seller has caused Luc Modest Van Damme and/or Spyridon Gaitanosto to resign from their office at M.J. Maillis España S.A. by delivering letters of resignation and whereby each of them has acknowledged and agreed not to have any claim against the Company, except the compensation accrued until the resignation date;]

h) [the Seller has used its best efforts to cause the external auditor of the Company to resign from its office by delivering a letter of resignation whereby he has acknowledged and agreed not to have any claim against the Company, except the compensation accrued until the resignation date;] and

i) the Purchaser held a shareholders' meeting of the Company and resolved the acceptance of the resignations of the resigning officers as directors of the Company and approval of all the actions taken by such resigning directors in their capacity, and fully released them from any personal responsibility for the activity carried out in same capacity, waiving any responsibility action vis-à-vis such directors pursuant to Article 2393 of the Italian Civil Code and pursuant to applicable Laws.

5. **Closing Confirmation**

The Parties hereby confirm to each other that the Closing Actions pursuant to SPA Sections 3.3(a)(i) through [3.3(a)(ix)] have been performed (to the extent not waived) and have been fully completed.

As a matter of precaution, the Parties hereby waive the Closing Conditions which have not yet been fulfilled, and the performance of all Closing Actions which have not yet been performed as Closing Actions.

6. **Share Transfers**

The Parties hereby confirm, unconditionally and irrevocably, that the *in rem* transfers of the Shares (SPA Section 3.3(a)(iii)) have become effective.

7. **Interpretation and Miscellaneous**

In this Closing Protocol the headings are inserted for convenience purposes only and shall not affect the interpretation of this Closing Protocol; where a term has been inserted in quotation marks and/or italics it alone (and not the English term to which it relates) shall be authoritative for the purpose of the interpretation of the relevant English term in this Closing Protocol.

SPA Section 13 shall apply accordingly to this Closing Protocol.

\*\*\*

*signature page follows*

SIGNATURE PAGE CLOSING PROTOCOL PROJECT THALEIA

Date [●] 2022

**EUROPACK S.A.**

_____
by Spyridon Gaitanos

**Thaleia AcquiCo S.r.l.**

_____
by [●]

5

**Project Thaleia**

**Schedule 4(a)**

**Employees To Be Transferred**

**<u>Schedule 4(a) – Employees To Be Transferred</u>**

| Entity | HC | First Name | Surname | comments |
|---|---|---|---|---|
| UK | 1 | Matthew | Phillips M | Remains |
| UK | 1 | Richard | Garlick R | Remains |
| UK | 1 | Sam | George S | Remains |
| UK | 1 | Joanne | Green J | Remains |
| UK | 1 | Jordan | Green-Duffus J | Remains |
| UK | 1 | Janet | Hilton J | Remains |
| UK | 1 | Anthony | King A | Remains |
| UK | 1 | Gary | Lloyd G | Remains |
| UK | 1 | Jospeh | Lukow J | Remains |
| UK | 1 | Thomas | Mellor T | Remains |
| UK | 1 | Garry | Parker G | Remains -in pension from Q3/2022 |
| UK | 1 | Angela | Wain A | Remains |
| UK | 1 | Andrew | Wilkinson A | Remains |
| GER | 1 | Dennis | Flunkert | Remains |
| GER | 1 | Harald | Gross | Remains |
| GER | 1 | Bernd | Mazur | Remains |
| GER | 1 | Susanne | Meiswinkel | Remains |
| GER | 1 | Olaf | Schilling | Remains |
| GER | 1 | Frank | Schulz | Remains |
| GER | 1 | Bernd | Trömmler | Remains |
| GER | 1 | Christian | Haas | Remains |
| GER | 1 | Dennis | Herhalt | Remains |
| GER | 1 | Helge | Ott | Remains |
| SPA | 1 | Felker | Laurent | Remains |
| SPA | 1 | Boutin | Claire | Remains |
| SPA | 1 | CAÑIZARES MUÑIZ | JAIRO | Remains |
| SPA | 1 | BELTRAN PUBILL | ALBERT | Remains |
| SPA | 1 | Fernandez Marquez | Antonio | Remains |
| SPA | 1 | Geffriaud | Dominique | Remains |
| SPA | 1 | GIRONES SANGÜESA | EVA | Remains |
| SPA | 1 | SILVA VEGA | ALEJANDRO | Remains |
| SPA | 1 | LOPEZ MARIN | FERNANDO | Remains |

TOTAL        32

\* \* \*

**Project Thaleia**

**Schedule 5.1(a)**

**PPA and PPA Beneficiary**

**Schedule 5.1(a) – PPA and PPA Beneficiary**

| No. | Date | Parties | Description | Name of Beneficiary | Remarks |
|---|---|---|---|---|---|
| 1. | 30/04/2019 | Gianantonio Bottarini and HIG Luxembourg Holdings 46 Sarl | PPA concerning sale of Maillis Group | Gianantonio Bottarini | |
| 2. | 21/01/2021 | Gianantonio Bottarini and HIG Luxembourg Holdings 46 Sarl | PPA concerning sale of SIAT SpA | Gianantonio Bottarini | |
| 3. | 30/04/2019 | Gian Luca Alchieri – HIG Luxembourg Holdings 46 Sarl | PPA concerning sale of Maillis Group | Gian Luca Alchieri | |
| 4. | 21/01/2021 | Gian Luca Alchieri – HIG Luxembourg Holdings 46 Sarl | PPA concerning sale of SIAT SpA | Gian Luca Alchieri | |
| 5. | 30/4/2019 | HIG Luxembourg Holdings 46 Sarl / Konstantinos Marinakis | PPA concerning sale of Maillis Group | Konstantinos Marinakis | |
| 6. | 1/2/2021 | HIG Luxembourg Holdings 46 Sarl / Konstantinos Marinakis | PPA concerning sale of SIAT SpA | Konstantinos Marinakis | |

* * *

Project Thaleia

Schedule 6.4(b)

Management Reports

# M.J.MAILLIS GROUP

## - Actual (IFRS16) 2021

### Period October

### Group PL Overview

**Year 2021 - Siat Spa**
**Month: October**
**values in th €**

| | Prior Month | | | October Mtd | | | | | | | October Ytd | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep A21 | vs PM | | A20 | A21 | B21 | vs A20 | | vs B21 | | A20 | A21 | B21 | vs A20 | | vs B21 | |
| | | abs | % | | | | Δ abs | Δ % | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % |
| _Sales | 6.234 | 190 | 3,0% | 5.370 | 6.424 | 5.634 | 1.054 | 19,6% | 790 | 14,0% | 52.849 | 59.749 | 51.521 | 6.900 | 13,1% | 8.228 | 16,0% |
| _Cos of Sales | 4.129 | -9 | -0,2% | 3.448 | 4.120 | 3.613 | 672 | 19,5% | 508 | 14,1% | 36.207 | 37.703 | 32.953 | 1.496 | 4,1% | 4.751 | 14,4% |
| Gross Profit 1 | 2.105 | 199 | 9,4% | 1.922 | 2.304 | 2.021 | 382 | 19,9% | 283 | 14,0% | 16.642 | 22.045 | 18.568 | 5.403 | 32,5% | 3.478 | 18,7% |
| % on sales Dom | 39,0% | -3,8pp | | 39,0% | 35,3% | | -3,7pp | | 35,3pp | | 29,4% | 39,6% | | 10,2pp | | 39,6pp | |
| % on sales Exp | 32,4% | 3,6pp | | 34,7% | 36,0% | 36,4% | 1,2pp | | -0,4pp | | 33,7% | 36,0% | 36,6% | 2,3pp | | -0,6pp | |
| % on sales Intra Group | 71,9% | 5,2pp | | 36,3% | 77,1% | | 40,8pp | | 77,1pp | | 11,5% | 91,3% | | 79,8pp | | 91,3pp | |
| % on sales | 33,8% | 2,1pp | | 35,8% | 35,9% | 35,9% | 0,1pp | | 0,0pp | | 31,5% | 36,9% | 36,0% | 5,4pp | | 0,9pp | |
| Transportation Expense | 97 | 54 | 55,7% | 112 | 150 | 121 | 38 | 34,3% | 29 | 24,0% | 1.142 | 1.230 | 1.143 | 88 | 7,7% | 87 | 7,6% |
| % on sales | 1,6% | 0,8pp | | 2,1% | 2,3% | 2,2% | 0,3pp | | 0,2pp | | 2,2% | 2,1% | 2,2% | -0,1pp | | -0,2pp | |
| Gross Profit 2 | 2.008 | 145 | 7,2% | 1.810 | 2.153 | 1.900 | 344 | 19,0% | 253 | 13,3% | 15.500 | 20.816 | 17.424 | 5.315 | 34,3% | 3.391 | 19,5% |
| % on sales | 32,2% | 1,3pp | | 33,7% | 33,5% | 33,7% | -0,2pp | | -0,2pp | | 29,3% | 34,8% | 33,8% | 5,5pp | | 1,0pp | |
| Other Op.Income | 0 | 15 | na | 14 | 15 | 13 | 1 | 10,0% | 2 | 16,1% | 260 | 119 | 133 | -142 | -54,5% | -15 | -11,0% |
| - Total Manpower Cost | 494 | 6 | 1,2% | 375 | 500 | 466 | 125 | 33,2% | 34 | 7,2% | 3.780 | 4.341 | 4.241 | 561 | 14,9% | 100 | 2,4% |
| - Total Travelling Cost | 7 | 3 | 41,3% | 7 | 10 | 18 | 2 | 28,9% | -8 | -47,0% | 78 | 80 | 168 | 1 | 1,7% | -88 | -52,4% |
| - Total Rents & Utilities | 14 | 5 | 35,6% | 20 | 19 | 25 | -1 | -3,9% | -6 | -22,6% | 227 | 184 | 243 | -43 | -18,8% | -58 | -24,1% |
| - Total Selling Expenses | -10 | 1 | -7,0% | 19 | -9 | 24 | -28 | -149,0% | -34 | -137,4% | 181 | 396 | 365 | 215 | 119,1% | 31 | 8,6% |
| - Total 3rd Party & Other Exp. | 111 | 10 | 9,2% | 51 | 122 | 83 | 70 | 137,6% | 39 | 46,5% | 879 | 876 | 825 | -3 | -0,4% | 52 | 6,2% |
| - Expenses IC | 102 | -7 | -6,6% | 146 | 95 | 120 | -51 | -35,0% | -25 | -21,1% | 1.525 | 1.016 | 1.202 | -508 | -33,3% | -186 | -15,5% |
| Operating Expenses | 717 | 18 | 2,5% | 618 | 735 | 736 | 117 | 19,0% | -1 | -0,1% | 6.670 | 6.894 | 7.043 | 224 | 3,4% | -149 | -2,1% |
| % on sales | 11,5% | -0,1pp | | 11,5% | 11,4% | 13,1% | -0,1pp | | -1,6pp | | 12,6% | 11,5% | 13,7% | -1,1pp | | -2,1pp | |
| Operating E.B.I.T.D.A | 1.291 | 142 | 11,0% | 1.206 | 1.433 | 1.177 | 228 | 18,9% | 256 | 21,8% | 9.091 | 14.040 | 10.515 | 4.949 | 54,4% | 3.526 | 33,5% |
| % on sales | 20,7% | 1,6pp | 7,7% | 22,5% | 22,3% | 20,9% | -0,1pp | | 1,4pp | | 17,2% | 23,5% | 20,4% | 6,3pp | | 3,1pp | |
| FX Differences (+/-) | -2 | 8 | -372,0% | -9 | 6 | | 15 | -161,3% | 6 | na | -81 | -36 | | 45 | -55,2% | -36 | na |
| Restructuring Expense | 0 | 0 | na | 0 | 0 | | 0 | na | 0 | na | 16 | 0 | | -16 | -100,9% | 0 | na |
| NR Operating Expense | 0 | 1 | 303,1% | 44 | 1 | 0 | -42 | -97,1% | 1 | na | 185 | 90 | 142 | -95 | -51,2% | -51 | -36,4% |
| NR Operating Income | 0 | 1 | na | 0 | 1 | | 1 | 275,5% | 1 | na | 39 | 58 | | 19 | 48,0% | 58 | na |
| Net NR Expenses | 2 | -8 | -334,1% | 53 | -6 | 0 | -58 | -110,7% | -6 | na | 242 | 68 | 142 | -174 | -71,9% | -73 | -51,8% |
| Management Fees | 94 | 3 | 3,0% | 79 | 96 | 85 | 17 | 21,6% | 12 | 14,0% | 755 | 894 | 773 | 140 | 18,5% | 121 | 15,7% |
| Mark Up | 33 | 0 | 0,0% | 32 | 33 | 32 | 0 | 1,5% | 0 | 1,5% | 364 | 322 | 322 | -43 | -11,7% | 0 | 0,0% |
| E.B.I.T.D.A. | 1.162 | 148 | 12,7% | 1.042 | 1.310 | 1.060 | 268 | 25,7% | 250 | 23,5% | 7.730 | 12.756 | 9.278 | 5.027 | 65,0% | 3.478 | 37,5% |
| % on sales | 18,6% | 1,7pp | | 19,4% | 20,4% | 18,8% | 1,0pp | | 1,6pp | | 14,6% | 21,3% | 18,0% | 6,7pp | | 3,3pp | |
| Depreciation | 176 | 1 | 0,6% | 174 | 177 | 165 | 3 | 1,9% | 12 | 7,5% | 1.755 | 1.761 | 1.678 | 6 | 0,3% | 83 | 4,9% |
| E.B.I.T | 986 | 147 | 14,9% | 868 | 1.133 | 896 | 265 | 30,5% | 237 | 26,5% | 5.975 | 10.996 | 7.600 | 5.021 | 84,0% | 3.395 | 44,7% |
| % on sales | 15,8% | 1,8pp | | 16,2% | 17,6% | 15,9% | 1,5pp | | 1,7pp | | 11,3% | 18,4% | 14,8% | 7,1pp | | 3,7pp | |
| F.I.& FX in Financing (+/-) | | 0 | na | | | | 0 | na | 0 | na | | | | 0 | na | 0 | na |
| Interest Income | 0 | 0 | -99,2% | 8 | 0 | 8 | -8 | -100,0% | -8 | -100,0% | 56 | 73 | 83 | 17 | 30,1% | -10 | -11,5% |
| Interest Expense | 26 | 25 | 95,5% | 49 | 51 | 37 | 2 | 3,8% | 13 | 36,2% | 414 | 376 | 416 | -38 | -9,2% | -40 | -9,6% |
| Other Financial Expenses | | 0 | na | | | | 0 | na | 0 | na | | | | 0 | na | 0 | na |
| - Net Financial Expenses | 26 | 25 | 95,9% | 40 | 51 | 29 | 10 | 25,0% | 22 | 75,3% | 358 | 303 | 333 | -55 | -15,3% | -31 | -9,2% |
| E.B.T. | 961 | 122 | 12,7% | 828 | 1.082 | 867 | 255 | 30,8% | 216 | 24,9% | 5.617 | 10.693 | 7.267 | 5.076 | 90,4% | 3.426 | 47,1% |
| % on sales | 15,4% | 1,4pp | | 15,4% | 16,8% | 15,4% | 1,4pp | | 1,5pp | | 10,6% | 17,9% | 14,1% | 7,3pp | | 3,8pp | |
| Extraordinary Loss/ Income | | 0 | na | | | | 0 | na | 0 | na | | | | 0 | na | 0 | na |
| Income and Other Taxes | 244 | 29 | 12,0% | 177 | 274 | 216 | 96 | 54,3% | 57 | 26,5% | 1.277 | 2.529 | 1.816 | 1.253 | 98,1% | 713 | 39,3% |
| Minority Interest | | 0 | na | | | | 0 | na | 0 | na | | | | 0 | na | 0 | na |
| E.A.T. | 716 | 92 | 12,9% | 650 | 809 | 651 | 158 | 24,3% | 158 | 24,3% | 4.341 | 8.163 | 5.451 | 3.823 | 88,1% | 2.713 | 49,8% |
| % on sales | 11,5% | 1,1pp | | 12,1% | 12,6% | 11,5% | 0,5pp | | 1,0pp | | 8,2% | 13,7% | 10,6% | 5,4pp | | 3,1pp | |



# IFRS Balance Sheet Overview

# Legal Entities

# Period: Oct 2021

Design: Group MIS and Planning

**Year 2021**
**Month: Oct**
**- IFRS BS**
**- Siat Spa**
**values in th €**

| | PM | vs PM | | Oct A20 | Oct A21 | Oct B21 | vs A20 | | Dec A20 | Oct A21 | Dec B21 | vs Dec A20 | vs Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | | | 0 | 0 | 0 | | | 0 | 0 | 0 | | |
| **Assets** | Sep A21 | Δ abs | | Oct A20 | Oct A21 | Oct B21 | Δ abs | | Dec A20 | Oct A21 | Dec B21 | Δ abs | Δ abs |
| - Intangibles | 10.874 | -35 | | 11.340 | 10.839 | 10.854 | -501 | | 11.038 | 10.839 | 11.179 | -198 | -340 |
| - Tangibles | 6.069 | -63 | | 6.551 | 6.005 | 5.530 | -546 | | 6.502 | 6.005 | 5.370 | -497 | 635 |
| - Other Assets | 5.910 | | | 5.910 | 5.910 | 5.910 | | | 5.910 | 5.910 | 5.910 | | |
| - Inventory | 9.654 | -153 | | 8.184 | 9.501 | 7.868 | 1.317 | | 6.541 | 9.501 | 7.155 | 2.960 | 2.345 |
| - Trade Receivables | 10.509 | 1.130 | | 10.355 | 11.639 | 10.423 | 1.284 | | 10.545 | 11.639 | 11.622 | 1.094 | 17 |
| - Other Receivables | 459 | 153 | | 11.422 | 612 | 267 | -10.809 | | 2.732 | 612 | 121 | -2.120 | 491 |
| - Deferred Tax | 1.013 | | | 1.150 | 1.013 | 1.102 | -137 | | 1.102 | 1.013 | 1.102 | -90 | -90 |
| - Cash | 17.346 | 396 | | 6.391 | 17.742 | 19.359 | 11.351 | | 10.027 | 17.742 | 21.156 | 7.714 | -3.414 |
| **- Total Assets** | **61.834** | **1.428** | | **61.303** | **63.262** | **61.313** | **1.959** | | **54.398** | **63.262** | **63.617** | **8.864** | **-355** |
| | | | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | | | |
| - Share Capital and Share Premium | 10.810 | | | 10.810 | 10.810 | 10.810 | | | 10.810 | 10.810 | 10.810 | | |
| - Currency Translation reserve | | 0 | | | | | 0 | | | | | 0 | 0 |
| - Reserves | 9.165 | 0 | | 18.558 | 9.165 | 9.165 | -9.393 | | 9.165 | 9.165 | 9.165 | 0 | 0 |
| - Retained Profits / Losses | 12.421 | 809 | | 5.508 | 13.230 | 12.794 | 7.722 | | 7.343 | 13.230 | 14.815 | 5.886 | -1.586 |
| - Minority Interest | | 0 | | | | | | | | | | 0 | 0 |
| **- Equity & Reserves** | **32.396** | **809** | | **34.876** | **33.205** | **32.769** | **-1.671** | | **27.318** | **33.205** | **34.791** | **5.886** | **-1.586** |
| | | | | | | | | | | | | | |
| - *Loans IC* | | | | | | 2.376 | | | | | 3.294 | | -3.294 |
| - *Loans Non IC* | 4.421 | -47 | | 7.276 | 4.374 | 6.369 | -2.901 | | 7.127 | 4.374 | 6.225 | -2.753 | -1.850 |
| **- Loans** | **4.421** | **-47** | | **7.276** | **4.374** | **8.746** | **-2.901** | | **7.127** | **4.374** | **9.518** | **-2.753** | **-5.144** |
| - Interest Payable | | | | | | | | | | | | | |
| - Provisions | 2.438 | -7 | | 2.492 | 2.431 | 2.450 | -61 | | 2.430 | 2.431 | 2.454 | 1 | -23 |
| - Other Liabilities | | | | | | | | | | | | | |
| - Tax Liabilities and Deferred Tax | 4.913 | 302 | | 3.775 | 5.214 | 4.112 | 1.440 | | 3.644 | 5.214 | 3.656 | 1.570 | 1.558 |
| - Trade Payables | 13.940 | -273 | | 9.834 | 13.667 | 10.328 | 3.833 | | 10.730 | 13.667 | 10.493 | 2.937 | 3.174 |
| - Other Payables | 3.726 | 644 | | 3.051 | 4.370 | 2.908 | 1.319 | | 3.148 | 4.370 | 2.705 | 1.222 | 1.665 |
| **- Total Liabilities** | **29.437** | **619** | | **26.427** | **30.057** | **28.544** | **3.629** | | **27.079** | **30.057** | **28.826** | **2.978** | **1.231** |
| **- Total Equity and Liabilities** | **61.834** | **1.428** | | **61.303** | **63.262** | **61.313** | **1.959** | | **54.398** | **63.262** | **63.617** | **8.864** | **-355** |

| Trade WoCap values | PM | vs PM | | Oct A20 | Oct A21 | Oct B21 | vs A20 | | Dec A20 | Oct A21 | Dec B21 | vs Dec A20 | vs Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| _Inventory | 10.947 | -153 | | 9.436 | 10.794 | 9.170 | 1.358 | | 7.843 | 10.794 | 8.458 | 2.951 | 2.336 |
| _Trade Receivables Non IC | 9.876 | 664 | | 10.159 | 10.541 | 10.227 | 382 | | 10.095 | 10.541 | 11.411 | 445 | -871 |
| _Trade Receivables IC | 12 | 12 | | 25 | 24 | 15 | 0 | | 45 | 24 | 31 | -21 | -7 |
| **_Total Trade Receivables** | **9.889** | **676** | | **10.183** | **10.565** | **10.243** | **381** | | **10.141** | **10.565** | **11.442** | **424** | **-878** |
| _Trade Payables Non IC | 12.403 | -30 | | 9.061 | 12.373 | 9.651 | 3.312 | | 9.818 | 12.373 | 9.651 | 2.555 | 2.723 |
| _Trade Payables IC | 1.173 | -222 | | 697 | 951 | 607 | 255 | | 870 | 951 | 772 | 81 | 179 |
| **_Total Trade Payables** | **13.576** | **-252** | | **9.758** | **13.324** | **10.258** | **3.566** | | **10.688** | **13.324** | **10.423** | **2.636** | **2.901** |
| **_Trade Working Capital Gross** | **7.259** | **775** | | **9.861** | **8.034** | **9.155** | **-1.827** | | **7.295** | **8.034** | **9.477** | **739** | **-1.443** |
| % on sales | 10,5% | 0,9 pp | | 14,9% | 11,5% | 14,8% | -3,4 pp | | 11,6% | 11,5% | 15,4% | -0,1 pp | -3,9 pp |
| **_Trade Working Capital Non IC** | **8.420** | **541** | | **10.533** | **8.961** | **9.747** | **-1.572** | | **8.120** | **8.961** | **10.218** | **841** | **-1.257** |
| % on sales | 12,2% | 0,6 pp | | 16,7% | 12,8% | 15,8% | -3,9 pp | | 13,4% | 12,8% | 16,6% | -0,6 pp | -3,7 pp |

| Trade WoCap Days | PM | vs PM | | Oct A20 | Oct A21 | Oct B21 | vs A20 | | Dec A20 | Oct A21 | Dec B21 | vs Dec A20 | vs Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DII | 90D | -3D | | 73D | 87D | 83D | 14D | | 66D | 87D | 77D | 21D | 10D |
| DSO Non IC | 52D | 2D | | 58D | 54D | 60D | -4D | | 60D | 54D | 67D | -6D | -13D |
| DSO IC | 27D | 30D | | 3D | 57D | 617D | 54D | | 6D | 57D | 0D | 51D | 57D |
| **DSO All** | **52D** | **2D** | | **55D** | **54D** | **60D** | **-1D** | | **58D** | **54D** | **67D** | **-4D** | **-13D** |
| DPO All | 112D | -4D | | 76D | 108D | 93D | 32D | | 90D | 108D | 95D | 18D | 13D |

| Trade WoCap Days | PM | vs PM | Oct A20 | Oct A21 | Oct B21 | vs A20 | Dec A20 | Oct A21 | Dec B21 | vs Dec A20 | vs Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LTM REV NON IC | 68.771 | 1.063 | 63.081 | 69.834 | 61.750 | 6.752 | 60.524 | 69.834 | 61.706 | 9.310 | 8.128 |
| LTM REV IC | 162 | -8 | 3.111 | 154 | 9 | -2.957 | 2.564 | 154 | 0 | -2.410 | 154 |
| LTM REV GROSS | **68.933** | **1.054** | **66.193** | **69.988** | **61.759** | **3.795** | **63.088** | **69.988** | **61.706** | **6.900** | **8.282** |
| LTM COS GROSS | 43.801 | 672 | 46.513 | 44.474 | 39.723 | -2.039 | 42.977 | 44.474 | 39.604 | 1.496 | 4.869 |

**Project Thaleia**

**Schedule 6.5(b)**

**Collective Bargaining Agreements, Workers' Council and Pension Commitments**

**Schedule 6.5(b) – Collective Bargaining Agreements, Workers' Council and Pension Commitments**

| No. | Type | Expiry Date | Description | Remarks |
|---|---|---|---|---|
| 1. | National Labour Contract for Metallurgic companies<br><br>(*Contratto Collettivo Nazionale di Lavoro (CCNL) settore metal-meccanico per le lavoratrici e i lavoratori addetti all'industria metalmeccanica privata e alla installazione di impianti*) | 30/06/2024 | Contract negotiated at national level and applicable to all the companies belonging to the Metallurgic sector | n/a |
| 2. | Second level agreement on labour contract<br><br>(*Verbale di accordo sindacale*) | 31/12/2017 | To rule different aspects such as: union meetings, training, bonus, calendar etc. | Contract expired but still operating even without formal renewal |
| 3. | Worker's council | 3 years from elections (last elections on Jan 2021) | 4 workers act as worker's representatives during meetings with the company | All 4 workers belong to Union "FIM-CISL" |

\* \* \*

**Project Thaleia**

**Schedule 6.5(c)**

**Pending Employment-related Litigation**

**Schedule 6.5(c) – Pending Employment-related Litigation**

| No. | Parties | File Number | Description |
|---|---|---|---|
| 1. | SIAT; [●] | None | The employee claims to have been injured on the Company premises of SIAT (falling down stairs) in 2018. She has requested compensation for physical and psychological damages. The formal communication and negotiation regarding the termination of the employment and a settlement agreement is currently ongoing between the respective lawyers. |

\* \* \*

8

Execution Version

# Share Purchase Agreement

relating to

# Project Euthymia



KENZENBRINK
& PARTNER

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| 1. | SALE AND TRANSFER OF THE SHARES | 6 |
| 1.1 | Status of the Company | 6 |
| 1.2 | Sale and Purchase of the Shares | 6 |
| 2. | PURCHASE PRICE | 6 |
| 2.1 | Purchase Price | 6 |
| 2.2 | Mode of Payment; Seller's Account | 6 |
| 2.3 | Default Interest; Calculation of Interest | 7 |
| 2.4 | No Set-off/Retention; Treatment of Payments | 7 |
| 2.5 | VAT | 7 |
| 3. | CLOSING; CLOSING CONDITION; CLEARANCES | 7 |
| 3.1 | Closing; Scheduled Closing Date; Closing Date | 7 |
| 3.2 | Condition to Closing | 8 |
| 3.3 | Closing Actions | 8 |
| 3.4 | Termination Right | 9 |
| 4. | TRANSFER OF EMPLOYEES | 9 |
| 5. | PROFIT PARTICIPATION AGREEMENTS | 10 |
| 5.1 | Definitions | 10 |
| 5.2 | Profit Participation Agreement | 10 |
| 6. | WARRANTIES OF THE SELLER | 11 |
| 6.1 | General Provisions on Seller's Warranties | 11 |
| 6.2 | Enforceability and Capacity | 11 |
| 6.3 | Status of the Company, the Shares | 11 |
| 6.4 | No other Warranties | 12 |
| 7. | COVENANTS OF THE SELLER | 12 |
| 8. | LIABILITY OF THE SELLER | 13 |
| 8.1 | Relevant Breaches; Losses | 13 |
| 8.2 | Notice Obligation | 13 |
| 8.3 | Exclusions of Seller's Liability | 14 |
| 8.4 | No Double Dip | 15 |
| 8.5 | Third Party Claims | 15 |
| 8.6 | De Minimis; Deductible | 16 |
| 8.7 | Cap | 17 |
| 8.8 | Time Limitations | 17 |
| 8.9 | No other Remedies | 17 |
| 8.10 | Reimbursement and Excess Recoveries | 18 |
| 9. | WARRANTIES OF THE PURCHASER | 18 |

9.1    Authorization of the Purchaser .............................................................................................18

9.2    Purchaser's Intentions and Experiences ................................................................................19

10.    COVENANTS OF THE PURCHASER .......................................................................................19

10.1   Access to Information ..........................................................................................................19

10.2   Compliance with Law 4557/2018 .......................................................................................20

10.3   Cooperation .......................................................................................................................20

10.4   Indemnification of Beneficiaries .........................................................................................20

11.    LIABILITY OF THE PURCHASER .............................................................................................21

12.    MISCELLANEOUS .................................................................................................................21

12.1   Defined Terms ....................................................................................................................21

12.2   Other Defined Terms ..........................................................................................................22

12.3   Notices ................................................................................................................................23

12.4   Public Disclosure, confidentiality .......................................................................................24

12.5   Costs and Expenses ............................................................................................................24

12.6   Entire Agreement; Amendments and Waivers ....................................................................24

12.7   No Assignments; No Set-Off and No Third Party Rights ......................................................24

12.8   Governing Law; Jurisdiction; Service of Process .................................................................25

12.9   Interpretation .....................................................................................................................25

12.10  Severability .........................................................................................................................26

LIST OF SCHEDULES

| | |
|---|---|
| Schedule 3.3(a)(v) | Closing Protocol |
| Schedule 4(a) | Employees To Be Transferred |
| Schedule 5.1(a) | PPA and PPA Beneficiary |

This SHARE PURCHASE AGREEMENT ("Agreement") is entered into on 20 December 2021 ("Signing Date") by and among

(1)   Maillis International S.A., a stock corporation (société anonyme) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 2, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (Registre de Commerce et de Sociétés) under B 212166 ("Seller"), and

(2)   Tribus Holdings 9 S.à r.l., a limited liability company (Société à responsabilité limitée) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, incorporated by notarial deed of the notary Danielle Kolbach, Junglinster, Grand Duchy of Luxembourg dated 26 November 2021 ("Purchaser").

The Seller and the Purchaser are collectively referred to as the "Parties", and each individually a "Party".

RECITALS

(A)   The Seller is the sole shareholder of M.J. MAILLIS SINGLE MEMBER S.A.- INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES, a Greek société anonyme organized under the laws of Greece with its seat in the Municipality of Oinofyta, Viotia, registered with the General Commercial Registry (G.E.M.I) under Registration No.295301000 and with the Greek tax authorities (Tax Authority DOY of Thiva) with tax identification number 094051915 ("Company").

(B)   The Company is active in the field of manufacturing of metal straps ("Business").

(C)   The Seller intends to sell and transfer all shares in the Company to the Purchaser and the Purchaser intends to purchase and acquire such participations in the Company from the Seller, in each case in accordance with the terms and conditions of this Agreement ("Transaction"). The Transaction forms part of a combined effort under which it is planned to sell Maillis Group as a whole in various portions under separate purchase agreements to different purchasers. In such context, on or about hereof, (i) Maillis Holdings S.à r.l. will enter into a purchase agreement regarding the sale of its shares in Marflex M.J. Maillis Poland sp. z o.o. ("Marflex SPA"), (ii) EUROPACK S.A. will enter into a purchase agreement regarding the sale of its shares in SIAT – Società Internazionale Applicazioni Tecniche S.p.A. ("SIAT SPA") and (iii) H.I.G. Lux 46 Holdings S.à r.l. will enter into a purchase agreement regarding the sale of its shares in Maillis International S.A. ("Maillis International SPA"). It is intended to consummate the transactions under the Marflex SPA, SIAT SPA, this Agreement and the Maillis International SPA in this specific order in a short sequence, if practically possible on the same day.

(D)   The Parties confirm that this Agreement is entered into following (i) completion of a comprehensive internal due diligence investigation of the Company, its business operations and the Business by the Purchaser together with its representatives ("Due Diligence") and (ii) a discussion and negotiation of all provisions contained in this Agreement.

5

1.    SALE AND TRANSFER OF THE SHARES

1.1    Status of the Company

(a)    The Seller is the sole shareholder of the Company.

(b)    The Company's issued and fully paid-in share capital amounts to EUR 2,039,919.30 and is divided into 6,799,731 common registered shares with a nominal value of EUR 0.30 per share ("Shares").

1.2    Sale and Purchase of the Shares

(a)    The Seller hereby agrees, subject to the terms of this Agreement, to sell and, with effect as from Closing, to transfer to the Purchaser the full, exclusive and undisputed ownership and possession and holding to the Shares, representing 100% of the paid-in share capital of the Company and equal voting rights, which are currently incorporated in the share certificate No. 6 (incorporating 6,799,731 common registered shares with serial numbers: 0,000,001-6,799,731) ("Seller's Share Certificate"), free and clear of any Encumbrances and together with all rights, obligations and interests attached and accruing thereto, and to further deliver to the Purchaser the Seller's Share Certificate to the Purchaser. The Purchaser hereby accepts such sale.

(b)    The Shares are sold with all rights and obligations pertaining thereto, including the rights to any profits not yet distributed or resolved to be distributed on or prior to the Effective Date.

2    PURCHASE PRICE

2.1    Purchase Price

(a)    The aggregate purchase price for the Shares shall be a fixed amount of EUR 1 (in words: Euro one) ("Purchase Price").

(b)    At the Scheduled Closing Date, the Purchaser shall pay to the Seller in the Seller's Account in accordance with Section 2.2 an amount equal to the Purchase Price.

2.2    Mode of Payment; Seller's Account

(a)    The relevant amounts payable to the Seller under this Agreement shall be paid by the Purchaser by irrevocable wire transfer to a bank account to be notified by the Seller to the Purchaser ("Seller's Account") free of charges.

(b)    The Purchase Price has been finally determined by the Parties and shall not be subject to any further adjustment.

(c)    Payments to be made under this Agreement by the Seller shall be made into an account held by the Purchaser to be notified by the Purchaser to the Seller in accordance with Section 12.3.

(d)    Any and all payments to the Seller under this Agreement shall be deemed to have been made upon the later of (i) the irrevocable and unconditional crediting of the amount

6

payable (without deduction of any costs or charges, other than those of the recipient's bank) to the Seller's Account pursuant to Section 2.2(a) and (ii) the value date as of which such amount has been credited to such account.

2.3    Default Interest; Calculation of Interest

(a)    In the event of a delayed payment by any Party in respect of any payment under or in connection with this Agreement when due and regardless of whether or not the statutory requirements of default are met, such Party shall be liable for default interest of eight percent (8 %) p.a. as from (and including) the respective due date until (but excluding) the day of actual receipt of the respective payment in the relevant account. The foregoing shall not affect the rights of the relevant other Party to claim additional damages.

(b)    Interest under this Agreement shall be calculated on the basis of the actual/360 method.

2.4    No Set-off/Retention; Treatment of Payments

(a)    The Purchaser shall not have any right of set-off or retention right with respect to its payment obligations pursuant to this Section 2.

(b)    The Parties agree that any indemnity, compensation, damage or similar payment made under this Agreement (other than the payment of the Purchase Price) shall be treated by the Parties as an adjustment of the Purchase Price, i.e., an increase or a reduction of the Purchase Price, respectively, and, to the extent permitted by applicable law, shall be treated by the Parties as such also for tax purposes. For the avoidance of doubt the foregoing shall not affect the definition of Purchase Price nor, consequently, the overall cap pursuant to Section 8.7.

2.5    VAT

The Parties agree that the sale of the Shares is not subject to VAT. The Seller shall refrain from exercising an option for VAT with respect to the Shares or any action under this Agreement. Should any sales and assignments or other supplies or services set forth in this Agreement, contrary to the Parties' assessment, attract VAT which is payable by the Seller for reasons other than for a waiver of a VAT exemption by the Seller, then the respective Purchase Price or other payment amount shall be increased by the amount of such VAT and be payable upon issuance of an invoice to the Purchaser in compliance with applicable VAT laws.

3.    CLOSING; CLOSING CONDITION; CLEARANCES

3.1    Closing; Scheduled Closing Date; Closing Date

The closing of the Transaction ("**Closing**") pursuant to Section 3.3(a) shall take place at 10 a.m. CET on the Scheduled Closing Date unless the Seller and the Purchaser agree on another time of Closing in writing. "**Scheduled Closing Date**" shall be the Business Day which is the day on which the Closing Condition has been fulfilled or waived, with the proviso that the failure to perform any Closing Actions (other than 3.3(a)(i) and (ii) below) within three Business Days after the Scheduled Closing Date does not result in a default for purposes of this Agreement. "**Closing Date**" shall be the day on which all of the Closing Actions as set out in Section 3.3 below have been taken or duly waived (other than 3.3(a)(i) and (ii) below).

3.2    Condition to Closing

(a)    The Parties mutually agree that the consummation of the Closing does not require clearance by any antitrust or other regulatory authorities.

(b)    The obligations of the Purchaser and the Seller to consummate the Closing are subject to the condition precedent ("Closing Condition") that closing of the Marflex SPA and the SIAT SPA has occurred.

(c)    The Seller and the Purchaser may waive the Closing Condition by way of a joint written agreement.

3.3    Closing Actions

(a)    On the Scheduled Closing Date, the Parties shall take, or cause to be taken the following actions (the "Closing Actions") by concurrent performance in the following sequence.

(i)    The Purchaser shall pay the Purchase Price to the Seller.

(ii)    The Seller and the Purchaser shall execute a transfer deed relating to the Shares and the Seller and/or the Purchaser shall forthwith procure that the transfer is promptly notified to the Company so that an entry reflecting the transfer is made in the Company's shares and shareholders' books as per applicable Greek law.

(iii)    The Seller shall hand over resignation letters by Messieurs Luc van Damme and Spyridon Gaitanos regarding their resignation from the board of directors of the Company with immediate effect as of the Scheduled Closing Date.

(iv)    The Seller shall cause the Company to pass a shareholder's resolution as to the full discharge of the members of the board of directors of the Company for the time period up to and including the Closing Date;

(v)    The Parties shall execute a closing protocol confirming the due fulfilment or waiver of the Closing Condition and the due performance or waiver, as the case may be, of the Closing Actions set forth under Section 3.3(a)(i) through Section 3.3(a)(iv) ("Closing Protocol"), essentially in the form of the draft attached hereto as Schedule 3.3(a)(v).

(b)    The Seller and the Purchaser may waive one or more of the Closing Actions (other than 3.3(a)(i) and (ii) above) by way of a joint agreement in text form (email sufficient). Such waiver shall solely have the effect that the Closing is performed despite non-performance of such Closing Action. Unless expressly agreed otherwise, the waiver shall leave the right of the waiving Party to demand performance of the relevant Closing Action as well as any rights to claim damages in connection with the facts or circumstances which resulted in the waiver remains unaffected.

(c)    The relevant Parties shall procure and ensure that all entries provided under applicable law are made in the Company's shares and shareholders' books and the relevant Parties or the Company (as may be applicable) shall make any declarations (including towards any commercial register) and adopt any shareholders' resolution as may be necessary or appropriate such that the Closing Actions (including any changes in the offices set forth

8

therein) are legally effected and registered with the respective commercial or central registers (as applicable) as soon as reasonably possible after the Closing Date.

3.4   Termination Right

(a)   The Seller shall be entitled to terminate this Agreement if

(i)   the Closing Condition set forth in Section 3.2(b) has not been fulfilled within nine (9) months after the Signing Date ("Long Stop Date") or;

(ii)   not all the Closing Actions to be performed by the Purchaser have been performed by the Purchaser or waived (other than 3.3(a)(i) and (ii) above) by the Seller within fifteen (15) Business Days following the Scheduled Closing Date

(b)   The Purchaser shall be entitled to terminate this Agreement if

(i)   the Closing Condition set forth in Section 3.2(b) has not been fulfilled by the Long Stop Date, or

(ii)   any of the Closing Actions to be performed by the Seller have not been performed by the Seller or waived by the Purchaser within fifteen (15) Business Days following the Scheduled Closing Date.

(c)   In the event of a termination in accordance with Section 3.4(a) or 3.4(b), none of the Parties shall have any obligation or incur a liability towards the other Party provided, however, that the provisions contained in Section 12 of this Agreement shall survive and remain unaffected by the termination of this Agreement and both the Seller and the Purchaser shall do and complete without undue delay any and all actions and formalities required for reverting the transfer of the Shares.

4.   TRANSFER OF EMPLOYEES

(a)   The Seller and the Purchaser agree and acknowledge that the employment relationships of the employees of Maillis Group entities listed in **Schedule 4(a)** (collectively the "Business Employees To Be Transferred") form part of the Business and shall be offered to transfer, at the Purchaser's election, either to the Company or to the Purchaser within six (6) months after the Closing Date. As soon as reasonable following the date hereof, the Seller and the respective Maillis Group entity shall approach the Business Employees To Be Transferred and inform each of them about the potential transfer of their employment relationships to the Company or the Purchaser, as the case may be.

(b)   No later than fifteen (15) Business Days after the date hereof, the Seller shall cause the Company (if applicable), the respective Maillis Group Company and the Purchaser (if applicable) to offer to each Business Employee To Be Transferred to enter into a tripartite agreement according to which the Company or the Purchaser, as the case may be, shall assume, subject to the occurrence of Closing, the employment relationship of the respective Business Employee To Be Transferred at essentially the same conditions as those which apply for his/her employment with the respective Maillis Group Company and crediting his/her length of service with the respective Maillis Group Company and its predecessors, if any.

7

(e)    The provisions of this Section 4 shall be for the sole benefit of the Parties and nothing herein, expressed or implied, is intended to or shall be construed to confer on or give to any person other than the Parties any legal or equitable or other rights or remedies with respect to the matters provided for in this Section 4.

5.    **PROFIT PARTICIPATION AGREEMENTS**

5.1    Definitions

(a)    "PPA" shall mean the respective profit participation agreement relating to the Seller entered into between the Seller, the shareholders of the Seller and the respective PPA Beneficiary as set-out in **Schedule 5.1(a)**.

(b)    "PPA Beneficiary" shall mean the respective individual as set-out in Schedule 5.1(a).

5.2    Profit Participation Agreement

(a)    Eight (8) Business Days prior to the Scheduled Closing Date, the Seller shall provide to the Purchaser and the Company a conservative good faith estimate of the gross amount of the entitlement of each respective PPA Beneficiary pursuant to the respective PPA ("**PPA Gross Amount**").

(b)    After notification of the PPA Gross Amount pursuant to Section 5.2(a), the Seller shall procure that the payroll department of the Company shall provide for each participant of the PPA without undue delay, but no later than five (5) Business Days prior to the Scheduled Closing Date, to the Seller and the Purchaser a conservative good faith estimate of the amount of relevant withholding Tax/social security contributions (or of any other payment owed by the Company in connection or based upon any PPA payment) payable in connection with entitlement of each respective PPA Beneficiary pursuant to the respective PPA (such reported amount the "**Relevant Withholding Tax**").

(c)    The Purchaser undertakes to pay the Relevant Withholding Tax to the Company without undue delay after Closing.

(d)    As soon as reasonably possible after the Closing, the Seller shall provide the final amount of the PPA Gross Amount to the Purchaser and the Company; as soon as possible thereafter but not later than ten (10) Business Days after the notification by the Seller, the Purchaser shall procure that the Company provides final amounts of the Relevant Withholding Tax and the underlying calculation of the Relevant Withholding Tax. If and to the extent the final amount of the Relevant Withholding Tax is higher than the estimated amount as notified pursuant to Section 5.2(d), the Seller shall pay the difference to the Company's bank account as notified by the Company to the Seller. If and to the extent the final amount of the Relevant Withholding Tax is lower than the estimated amount as notified pursuant to Section 5.2(d), the Purchaser shall procure that the Company shall pay the difference to the Seller' Account.

(e)    The Purchaser shall procure that the Company shall pay the respective Relevant Withholding Tax (as adjusted under (it above) to the respective competent Tax Authority in accordance with applicable Law.

6. **WARRANTIES OF THE SELLER**

6.1 General Provisions on Seller's Warranties

(a) The Seller hereby represents and warrants to the Purchaser in the form of an independent guarantee and exclusively in accordance with the limitations, exclusions and other conditions of this Agreement that the statements contained in Section 6.2 and 6.3 (collectively "**Seller's Warranties**") are true and correct as of the Signing Date and/or as of any other date explicitly referred to in the specific Seller's Warranty.

(b) The Seller's Warranties are given on the basis that they should be regarded as a risk allocation between the Parties; the Purchaser acknowledges and agrees that the Seller, its advisors, the management and other employees of the Company have not independently examined or verified the underlying facts, matters, circumstances and statements made in such Seller's Warranties and the schedules pertaining thereto and that this shall neither be construed or interpreted as fraud nor indirect intent due to insufficient or inadequate inquires by the Seller and that nothing in this Agreement shall imply a duty of the Seller (including its advisors and directors and employees of the Company) to make specific or other enquiries or researches of whatever nature.

(c) "**Seller's Knowledge**" shall mean the actual knowledge of the Seller as of the Signing Date. Any liability for negligent ignorance due to insufficient inquiries, deemed knowledge, knowledge 'on file' of which the Seller did not have positive knowledge or any other imputation of knowledge to the Seller shall be excluded and none of these circumstances results in Seller's Knowledge.

(d) Any attribution of knowledge to the Seller and any responsibility of the Seller for a Third Party's fault or knowledge 'on file' shall be excluded.

(e) If any disclosure of events or documents made in this Agreement (i) is below any materiality threshold provided for in relation to such disclosure requirement, or (ii) contains additional information, this shall neither be deemed to constitute a basis for a Relevant Breach nor otherwise affect the respective materiality thresholds (or their interpretation) or increase the scope of any indemnification.

6.2 Enforceability and Capacity

On the Signing Date and on the Closing Date, this Agreement constitutes the legal, valid and binding obligation of the Seller, enforceable under the laws of the Grand Duchy of Luxembourg against the Seller in accordance with its terms, except to the extent that the enforceability thereof may be limited by bankruptcy or insolvency laws. The Seller has the absolute and unrestricted right, power, authority and capacity to execute this Agreement. Except for any Clearances, the Seller has the full power and authority to enter into this Agreement and to perform its obligations hereunder and to consummate this Agreement and the Transaction.

6.3 Status of the Company, the Shares

(a) On the Signing Date and on the Closing Date, the Company is duly incorporated and validly existing under the laws of Greece and the Seller is the sole and unrestricted owner of the Shares as set forth in Section 1.1. On the Signing Date and the Closing Date, the

11

Shares have been duly authorized and validly issued. On the Signing Date and on the Closing Date, the Shares are fully paid up and all contributions have been made in compliance with applicable law and have not been repaid or returned, in whole or in part and are no obligations to make further contributions in respect of the Shares.

(b) No insolvency or similar proceedings have been, or, to the Seller's Knowledge, have been threatened to be, opened or applied for regarding the assets of the Company and the assets of the Seller and there are, to the Seller's Knowledge, no circumstances which would require the opening of or application for such proceedings.

(c) There is no lawsuit, investigation or proceeding pending or threatened in writing against the Seller before any court, arbitrator or Governmental Authority which in any manner challenges or seeks to prevent, alter or materially delay the transactions contemplated under this Agreement.

6.4 No other Warranties

(a) The Seller makes no express or implied representations or warranties in addition to the Seller's Warranties contained in Sections 6.2 and 6.3 and assumes no disclosure obligations in respect of the Company and its business. The Purchaser confirms that its decision to acquire the Shares is based on its own comprehensive due diligence exercise in respect of the Company and its business conducted by the Purchaser.

(b) The Purchaser acknowledges specifically that the Seller does not make any representation or warranty with respect to:

(i) any kind of budget, outlook, estimate or other forecast (including the underlying documentation) regarding future cash flows, financial condition and results of operation of the Company and the future prospects of the business of the Company;

(ii) other information and documents with respect to the Shares, the Company and its business and the Due Diligence Material which have not been made subject of the Seller's Warranties.

7. COVENANTS OF THE SELLER

In the period commencing on the Signing Date and ending on (but excluding) the Closing Date, the Seller shall take all legally permissible and reasonable steps within its power in order to ensure that, during such period, the Company will continue to conduct the business in the ordinary course consistent with past practice and will take none of the following actions without the Purchaser's prior approval (not to be unreasonably conditioned, withheld or delayed and be deemed granted if and to the extent no objection from or on behalf of the Purchaser is received in written form (email sufficient) by the Seller within three (3) Business Days following receipt by the Purchaser of the request for consent):

(a) any dissolution or liquidation of the Company;

(b) any acquisition or disposal of shares in other companies, businesses or other fixed assets outside the ordinary course of business (in each case unless included in the budget of the Company;

12

(c)     any change of the articles of association of the Company;

(d)     payments or other benefits or promises to managing directors or employees made with a view to the sale and transfer of the Shares.

8.      **LIABILITY OF THE SELLER**

8.1     Relevant Breaches; Losses

(a)     In the event of any incorrectness of any of the Seller's Warranties ("**Relevant Breach**") and subject to this Section 8, the Seller shall put the Purchaser or, at the election of the Seller, the Company, in the position the Purchaser had been in had the Relevant Breach not occurred ("**Restitution in Kind**"). If the Seller (i) has not provided Restitution in Kind within two (2) months following receipt of the Claim Notice, (ii) Restitution in Kind is impossible or (iii) the Seller has declared his definite unwillingness to provide Restitution in Kind in writing, the Purchaser may demand the Seller to pay the amount of the Losses incurred.

(b)     "**Losses**" shall mean all liabilities, reasonable costs and expenses and other damages, excluding, however, (i) any indirect damages to the extent not reasonably foreseeable, (ii) lost profits to the extent not reasonably foreseeable and any lost profits at the level of the Purchaser, (iii) any consequential damages to the extent not reasonably foreseeable, (iv) any potential or actual reductions in value of the Shares, the Company or the Business beyond the actual damages incurred, (v) any frustrated expenses, (vi) damages/losses of goodwill or due to lost opportunities, and (vii) any incidental or internal costs and expenses incurred by the Company or the Purchaser, and (viii) any damages based on the allegation that the Purchase Price or any portion thereof have been calculated or determined based on incorrect assumptions. In calculating any Losses, no valuation methodology using multiples of earnings or similar shall be applied. Any Losses shall be computed net of any present or future advantages and benefits (including avoided losses, Tax benefits and savings as well as increases in the value of any asset owned by the Company) related to the relevant matter. All Losses shall be calculated on a Euro-for-Euro basis.

(c)     Any payments made by the Seller with respect to Relevant Breaches pursuant to this Agreement shall be treated by the Parties as adjustments of the Purchase Price. In no event shall the Seller owe any gross-up for Taxes falling due in connection with any compensation for Losses.

8.2     Notice Obligation

(a)     In the event that the Purchaser or, after the Closing Date, the Company becomes aware of facts that could potentially constitute a Relevant Breach, the Purchaser shall without undue delay, however at but in no event later than within a period of 15 (fifteen) Business Days after the relevant person becoming aware of the relevant circumstances, notify the Seller thereof ("**Claim Notice**"). The Claim Notice shall set out in reasonable detail the potential Relevant Breach and, to the extent possible, the estimated amount of Losses (to be) incurred in connection therewith.

13

(b)     Following the Closing, the Purchaser shall procure that the Seller is provided with all required or requested information and assistance, including access to all records, documents, information and relevant management members and employees or other knowledgeable persons, which the Seller requires or reasonably requests in order to determine the extent, if any, to which the claim is justified.

8.3     Exclusions of Seller's Liability

In no event shall the Seller be liable for any Relevant Breach if and to the extent

(a)     the matters to which the Relevant Breach relates are reflected as a write off, value adjustment, liability or provision, including general adjustments or provisions made for the relevant risk category, in the Financial Statements 2020;

(b)     the Purchaser, any Affiliate of the Purchaser and/or, after the Closing, the Company have participated in causing such Loss, including a failure to mitigate damages;

(c)     the Purchaser had actual knowledge of the facts or circumstances underlying the Relevant Breach as of the Signing Date. The Purchaser shall be deemed to have actual knowledge of all facts and circumstances

    (i)     contained in this Agreement and all Schedules thereto;

    (ii)    any information disclosed to the Purchaser, its representatives and/or professional advisors by or on behalf of the Seller in writing or in written form (email sufficient)in connection with the transactions contemplated under this Agreement, including without limitation (i) any facts and circumstances identified in the Financial Fact Book prepared by Ernst & Young dated 24 June 2021 or in the Tax Fact Book prepared by Ernst & Young dated 25 June 2021, and (ii) answers in writing or in written form (email sufficient) given by or on behalf of the Seller or its professional advisors in connection with the question and answer process until and including 30 November 2021;

    (iii)   any information Fairly Disclosed in the documents contained in the virtual data room operated by Intralinks accessible to the Purchaser, its representatives and professional advisors until 30 November 2021, a complete set of which will be contained on two (2) USB-sticks, one of which was handed over to each Party for purposes of providing evidence. "Fairly Disclosed" shall mean disclosed in a manner that an experienced purchaser applying the customary duty of care of a prudent businessman and having received professional advice could reasonably detect the relevance of the matter.

(d)     the claim resulting from the Relevant Breach results from, or is increased by, the passing of, or any change in any law, statute, ordinance, rule, regulation, common law rule or administrative practice of any government, governmental department, agency or regulatory body after the Signing Date;

(e)     the Purchaser or the Company, or any successor to all or parts of their business has received or has a respective claim for repayment, reimbursement or indemnification against a third party (other than any of the Group Entities), including under any insurance

44

policy (but except for any W&I Insurance policy) in force until the Closing Date, or would have had such claim if the insurance coverage in force immediately prior to the Closing Date had been maintained after the Closing Date; or

(f) the Purchaser failed to fully comply with the procedures set forth in Sections 8.2 and 8.5 with regard to a Relevant Breach, except to the extent that such failure does neither cause an increase of the claim resulting from the Relevant Breach nor otherwise prejudices the Seller.

## 8.4 No Double Dip

(a) The Parties agree that where one and the same set of facts qualifies under more than one provision entitling the Purchaser to a claim or remedy under this Agreement, there shall be only one claim or remedy. In particular, the foregoing shall apply if one and the same set of facts or circumstances qualifies as a breach or non-fulfilment of more than one of the Seller's Warranties.

(b) Furthermore, rights of the Purchaser resulting from the breach of breaches of Seller's Warranties shall be excluded if and to the extent this Agreement provides for a more specific Seller's Warranty relating to the relevant set of facts. In such cases, solely the more specific Seller's Warranty shall apply and any rights of the Purchaser shall exclusively be determined on basis of the more specific Seller's Warranty and the limitations and exclusions applicable to such specific Seller's Warranty.

## 8.5 Third Party Claims

In the event that (i) an order of any Governmental Authority is issued, announced to be issued, threatened to be issued or imminent to be issued against the Purchaser or the Company or (ii) the Purchaser or the Company are sued, threatened to be sued or imminent to be sued by a third party, including any Governmental Authority, in each case in a manner which may, taking into account the liability limitations of the Seller under this Section 8, give rise to a Relevant Breach ("Third Party Claim"), the Purchaser shall give Seller notice of such Third Party Claim without undue delay but in any case no later than within ten (10) Business Days after the Purchaser or the Company have learned of such Third Party Claim, and the following principles shall apply:

(a) The Purchaser shall procure that the Seller is provided with all materials, information and assistance relevant in relation to the Third Party Claim and are given reasonable opportunity to comment or discuss with the Purchaser any measures which the Seller proposes to take or to omit in connection with such Third Party Claim. In particular, the Seller shall be given an opportunity to comment on, participate in, and review any reports, audits or other measures and shall receive copies of all relevant orders of any governmental authority without undue delay but in any event at least ten (10) Business Days prior to the expiry of any relevant objection period.

(b) No admission of liability shall be made by or on behalf of the Purchaser or the Company, and the Third Party Claim shall not be compromised, disposed of or settled, without the prior written consent of the Seller, such consent not to be unreasonably delayed or withheld.

15

(c)     The Seller shall further be entitled, at his own discretion, to take such action (or cause the Purchaser or the Company to take such action) as the Seller deems reasonably necessary to avoid, dispute, deny, defend, appeal, resist, compromise or contest such Third Party Claim (including making counter-claims or other claims against third parties) in the name and on behalf of the Purchaser or the Company, provided that the Third Party Claim shall not be compromised, disposed or settled without the prior written consent of the Purchaser, such consent not to be unreasonably delayed or withheld. The Purchaser shall give, and shall procure that the Company give, subject to them being reimbursed all reasonable and evidenced costs and out of pocket expenses, all such information and assistance as described above, including (i) reasonable access to premises and personnel during normal business hours and without causing substantial disruption of the business operations and (ii) the right to examine and copy or photograph any assets, accounts, documents and records for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any Third Party Claim or liability as the Seller or its professional advisors may reasonably request; the Purchaser shall fully cooperate, and cause the Company to fully cooperate with the Seller in the defense of any Third Party Claim.

(d)     The foregoing shall include, in particular, the Seller's right to select counsel to the Purchaser or the Company, to direct any negotiations with the relevant Third Party and to take all decisions regarding the commencement, conduct or termination of any litigation or arbitration proceedings.

(e)     The Purchaser shall, for such purpose, promptly deliver to the Seller and its representatives copies of all correspondence relating to the Third Party Claim; in all other respects, Section 10.1 below shall apply. The costs incurred by the Purchaser or the Company in the defense of the Third Party Claim shall be borne by the Seller only to the extent that such costs are included in the damages recoverable by the Purchaser pursuant to this Section 8; the Seller shall bear its costs incurred in connection with the defense.

(f)     No action by the Seller or its representatives in connection with the defense of any Third Party Claim shall be construed as an acknowledgement (whether express or implied) of the Purchaser's claim under this Agreement or of any underlying facts related to such claim.

8.6    De Minimis, Deductible

(a)     Except for Excluded Claims, the Seller shall only be liable for Losses

    (i)     if the Losses resulting from an individual Relevant Breach exceed an amount of EUR 200,000.00 (in words: Euro two hundred thousand) in each case and

    (ii)    if the aggregate amount of Losses resulting from Relevant Breaches which are not excluded or deducted pursuant to Section 8.6(a)(i) exceeds an amount of EUR 500,000.00 (in words: Euro five hundred thousand) ("Deductible Amount"), whereas only the amount exceeding the Deductible Amount shall be recoverable.

(b)     "Excluded Claims" shall mean the following claims of the Purchaser

36

(i) specific performance claims for transfer of title to the Shares or (ii) are claims for Breaches of the Seller's Warranties set forth in Sections 6.2 and 6.3 ((i) and (ii) the "Fundamental Warranties");

(ii) resulting from an intentional breach of a Seller's Warranty or fraud.

## 8.7 Cap

The Seller's aggregate overall liability for claims under or in connection with this Agreement including Excluded Claims (except for claims of Purchaser arising as a result of willful deceit (*dol*) or intentional behaviour (*faute intentionnelle*) shall in no event exceed an amount of EUR 500,000.00.

## 8.8 Time Limitations

(a) Subject to any mandatory time limitations provided for by Luxembourg law, all claims of the Purchaser under or in connection with this Agreement shall be time-barred upon the expiration of eighteen (18) months after the Closing Date, except for

(i) claims to request performance of the transfer of the Shares in accordance with this Agreement as well as claims resulting from a breach of Fundamental Warranties which shall be time-barred on the fifth (5th) anniversary of the Signing Date; and

(ii) claims of the Purchaser resulting from fraud or willful misconduct under this Agreement which shall become time-barred in accordance with the rules of statutory law; provided, however, that the Seller is, in accordance with Section 8.9(c), not liable for the acts or omissions of third parties engaged by the Seller (including but not limited to legal and other advisors).

(b) The applicable limitation period can, with respect to a specific claim of the Purchaser, only be suspended by means of bringing legal action.

## 8.9 No other Remedies

(a) The remedies that the Purchaser may have against the Seller for any breach of its obligations set forth under or in connection with this Agreement are solely governed by this Agreement, and the remedies of Purchaser provided for by this Agreement shall be the exclusive remedies available to Purchaser, any Affiliates of Purchaser or the Companies under and/or in connection with this Agreement. Any rights of the Purchaser not explicitly contained in this Agreement or arising out of breach of contract, breach of pre-contractual obligations, frustration of contract or tort are hereby waived. The foregoing applies, in particular, to any rights of the Purchaser to withdraw from this Agreement or to require the winding up of the transactions contemplated under this Agreement.

(b) This Section 8.9 as well as any other limitations and exclusions of liability pursuant to this Agreement shall not apply to any rights and remedies for willful deceit (*dol*) by the Seller or the Seller's own willful misconduct (*faute intentionnelle*) in which case statutory law shall apply.

17

(c)     Any rights of the Purchaser arising out of Seller's fraud or willful misconduct shall not be affected thereby; provided, however, that any liability of the Seller for and any right to rescind this Agreement based on fraud or willful misconduct (*faute intentionnelle*) by third parties engaged by the Seller shall be excluded.

(d)     The Seller's liability for the behavior, actions, omissions or knowledge of persons assisting, advising or acting on behalf of the Seller (or, in each case, any Affiliate of any Seller) in connection with the performance of its obligations or generally in connection with the Transaction (including the preparation of documents forming part of the VDR Content and information provided orally or in writing in expert sessions, Q&A-processes or otherwise), irrespective of any degree of fault shall be excluded to the fullest extent legally permissible.

8.10    Reimbursement and Excess Recoveries

(a)     Any payments actually made by the Seller to discharge a liability under or in connection with this Agreement which is or becomes excluded, limited or reduced under this Section 8 shall be refunded by the Purchaser to the Seller immediately upon the event triggering such exclusion, limitation or reduction of liability becoming known. The preceding sentence shall apply *mutatis mutandis* to any other remediation measures actually undertaken by the Seller with respect to which liability is or becomes excluded, limited or reduced under this Section 8, in which case the Purchaser shall compensate the Seller for such remediation measures in cash. The Purchaser undertakes to inform the Seller without undue delay about any event which may trigger an exclusion, limitation or reduction of liability under this Section 8.

(b)     Without limiting the generality of Section 8.10(a), if the Purchaser recovers from a third party for Losses for which it (or the Company) was already compensated in whole or in part by the Seller under or in connection with this Agreement, the Purchaser undertakes to pay to the Seller the amount of such excess recovery within ten (10) Business Days of its receipt.

9.      WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller in the form of an independent guarantee that the statements contained in Sections 9.1 and 9.2 ("**Purchaser's Warranties**") are true and correct as of the Signing Date and, except for Sections 9.1(d) and 9.1(e), as of the Closing Date.

9.1     Authorization of the Purchaser

(a)     The Purchaser has been duly established and is validly existing as a limited liability company (*Société à responsabilité limitée*) under the laws of the Grand Duchy of Luxembourg.

(b)     This Agreement constitutes legal, valid, and, subject to its terms and conditions, binding obligations of the Purchaser. The execution of this Agreement and of each ancillary agreement to this Agreement as well as the performance by the Purchaser of obligations hereunder and thereunder and the consummation of the transactions have been duly

and validly authorized by all necessary corporate actions and corporate bodies on the part of the Purchaser.

(c)   No insolvency proceedings are pending in relation to the Purchaser and there are no circumstances which would require to file for insolvency of the Purchaser under any applicable laws.

(d)   The execution and performance of this Agreement by the Purchaser require no approval or consent by any Governmental Authority or other Third Party and do not violate any applicable law or decision by any court or Governmental Authority binding on the Purchaser.

(e)   The Purchaser is aware of any facts or circumstances which could give rise to any claim resulting from a Relevant Breach due to the incorrectness of any Seller's Warranty or breach of any covenant or other obligation under or in connection with this Agreement.

9.2   Purchaser's Intentions and Experiences

(a)   As of the Signing Date and as of the Closing Date, the Purchaser is purchasing the Shares for investment on its own account.

(b)   The Purchaser (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

10.   COVENANTS OF THE PURCHASER

10.1   Access to Information

Without limiting any additional rights of the Seller under Sections 8.2 or 8.5, the Purchaser shall procure that

(a)   the Company preserves for the applicable, corresponding claims survival period set forth in this Agreement all documents, records and correspondence, accounts and other information of the Company (in whatever form held) existing prior to the Closing which are or are reasonably likely to be relevant to any actual or potential claims based on a Relevant Breach or indemnities by the Seller contained in this Agreement ("Relevant Information");

(b)   the Company, upon request, provides the Seller and its Representatives with access to the Relevant Information and, in the event of physical access, allow the Seller to take copies of the Relevant Information, during normal business hours and on reasonable notice; and

(c)   the Company, upon request, provides the Seller with all information relating to the period from (and including) 1 January 2021 and the Closing Date reasonably required for purposes of preparing the group financial statements as well as the year-end closing of Mallis Group for the fiscal year 2021, including (i) uploading to HFM the financials in all monthly forms, (ii) performing data reconciliation in HFM, BW and identifying intercompany mismatches, (iii) providing standard information about restructuring &

non-recurring expenses along with IFRS16, loans and factoring data, (iv) preparing the year end disclosures within the deadlines set out by the Maillis Group auditors together with the checklist according to standard templates and (v) responding to ad hoc requests in connection with the processing of the afore-mentioned data, in each case in line with past practice.

10.2   Compliance with Law 4557/2018

The Purchaser hereby agrees and undertakes to take all necessary actions in order for the Company to comply with Law 4557/2018 on Prevention and Suppression of Money Laundering and Terrorist Financing (implementation of Directive 2015/849/EU, specifically to cause the Company to declare, as soon as possible after Closing and in any case within the deadlines provided in the relevant legislation, the details of the new ultimate beneficial owners (natural persons) of the Company (unless one of the exemptions set out in the law applies in respect of the Purchaser) to the Central Registry kept by the secretary of general of information systems of the Ministry of Economy.

10.3   Cooperation

The Parties shall cooperate with each other in connection with the closing of the transactions contemplated by this Agreement. The Purchaser shall procure that all documents are executed and delivered and all other statements and all other acts are made that are necessary or expedient for this purpose to the extent this is not intolerable for the Purchaser.

10.4   Indemnification of Beneficiaries

(a)   The Purchaser shall indemnify and hold harmless the Seller, the Affiliates or assignees of the Seller as well as its respective officers and employees, managing directors and board members (each a "**Beneficiary**") from and against any and all losses, liabilities (whether present or future, actual or contingent), damages and reasonable costs and expenses (including taxes, reasonable legal fees, expenses and disbursements) arising out of or in connection with

(i)   the conduct of the Business for which any Beneficiary is held liable by a Group Company or for which liability against any Beneficiary is asserted by a Group Company, in each case in its capacity as (i) current and former direct or indirect shareholder of a Group Company, or (ii) current and former director, officer, board member, advisor, agent or employee of a Group Company, in each case unless and to the extent such liability is based on willful deceit or willful misconduct by the relevant Beneficiary;

(ii)   any claims brought against any Beneficiary by a Group Company arising out of, or in connection with, (i) any financing agreements, and/or (ii) any other debt or financial liabilities or obligations of any of the Group Companies;

in each case unless and except to the extent the Purchaser has an enforceable right to claim damages or indemnification from the Seller in respect of such losses, liabilities or damages under the terms of this Agreement (herein collectively the "**Seller's Indemnification Claims**" and each a "**Seller's Indemnification Claim**")

20

(b) A Seller's Indemnification Claim shall be time-barred twelve (12) months after the Seller has been notified in writing of the respective claim or liability both stating the amount of the respective claim or liability and the underlying facts (in reasonably sufficient detail) giving rise to a Seller's Indemnification Claim.

11. **LIABILITY OF THE PURCHASER**

In the event (i) of any breach or non-fulfilment by the Purchaser of any of the Purchaser's Warranties, (ii) the Purchaser breaches any of the covenants set out in 10 or (iii) the Purchaser breaches any other obligations resulting from or in connection with this Agreement, the rights of the Seller shall be determined in accordance with statutory law unless expressly provided otherwise in this Agreement.

12. **MISCELLANEOUS**

12.1 Defined Terms

In this Agreement, the following terms shall have the meanings specified in this section:

| Definitions | Meaning |
|---|---|
| Affiliate | any affiliate(s) (*entreprises filiales*) within the meaning of article 1711-1 of the Luxembourg law on commercial companies dated 10 August 1915, as amended. |
| Business Days | shall mean any days other than Saturdays, Sundays and public holidays in the Grand Duchy of Luxembourg. |
| Effective Date | shall mean 1 January 2021, 0:00 hours EET |
| Encumbrance | means any charge or claim or defect of full title or restriction of any kind to the title, including without limitation, pledge, mortgage, right of first refusal, option, retention of title, lien or security interest. |
| EUR or Euro | shall mean Euro or Euros (or any of its replacement as official currency in the Grand Duchy of Luxembourg, at the applicable conversion rate from time to time). |
| Governmental Authority | shall mean any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or similar authority or instrumentality (domestic or foreign). |
| Intellectual Property Rights | means any patents, trademarks, business names, designs and design rights and the benefit of all applications and licenses to use such rights. |
| Maillis Group | means (individually and collectively) Maillis International S.A. and its Subsidiaries from time to time, but excluding the Company |

21

| Schedules | All schedules referred to in this Agreement. |
|---|---|
| Subsidiary | when used with respect to a specified person, means any entity directly or indirectly controlled by such person. |
| Tax or Taxes | shall mean any tax levy, impost, duty, other charge or social security contributions or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same |
| Third Party | shall mean any person who or which is neither a Party to this Agreement nor an Affiliate of a Party to this Agreement. |
| VAT | shall mean value added tax, including any similar tax, which may be imposed in place thereof from time to time. |

12.2   Other Defined Terms

**A**

Agreement ................................................. 5

**B**

Beneficiary ............................................... 20
Business .................................................. 5
Business Employees To Be Transferred ....... 9

**C**

Claim Notice ............................................ 13
Closing ................................................... 7
Closing Actions ....................................... 8
Closing Condition ..................................... 8
Closing Date ........................................... 7
Closing Protocol ...................................... 8
Company ................................................. 5

**D**

Deductible Amount ................................... 16
Due Diligence .......................................... 5

**E**

Excluded Claims ...................................... 16

**F**

Fairly Disclosed ...................................... 14
Fundamental Warranties ........................... 16

**L**

Long Stop Date ........................................ 9
Losses .................................................... 13

**M**

Maillis International SPA ........................... 5
Marflex SPA ............................................ 5

**P**

Parties .................................................... 5
Party ...................................................... 5
PPA ........................................................ 10
PPA Beneficiary ....................................... 10
PPA Gross Amount ................................... 10
Purchaser ............................................... 5
Purchaser's Warranties ............................ 18

**R**

Relevant Breach ...................................... 13
Relevant Information ................................ 19
Relevant Withholding Tax .......................... 10
Restitution in Kind ................................... 13

**S**

Scheduled Closing Date ............................ 7
Seller ..................................................... 5
Seller's Account ...................................... 6

Seller's Indemnification Claim ...................20
Seller's Indemnification Claims...............20
Seller's Knowledge. .....................................11
Seller's Share Certificate...........................6
Seller's Warranties ......................................11
Shares..............................................................6
SIAT SPA ..........................................................5

Signing Date ...................................................5

T

Third Party Claim............................................15
Transaction......................................................5

12.3   Notices

All notices, requests and other communications hereunder shall be made in the English language and shall be delivered

(a)   If made prior or at to Closing, in writing or in written form (email sufficient) and

(b)   If made after Closing, in writing by registered letter

(c)   to the persons at the address set forth below, or such other addresses as may be designated by the respective Party to the other Party in the same manner:

To the Seller:

Spyridon Gaitanos
19, rue Klengliller, L-8239 Mamer
Grand Duchy of Luxembourg
Email: spyros.gaitanos@maillis.lu

and

Luc van Damme
1, Gruuss Stross, L-9991 Weiswampach
Grand Duchy of Luxembourg
Email: luc.vandamme@maillis.lu

with a copy to:

Renzenbrink & Partner
Dr. Ulf Renzenbrink / Dr. Andreas Stoll
Valentinskamp 70 (EMPORIO)
20355 Hamburg
Germany
Fax: +49 40 350171010
Email: renzenbrink@renzenbrink-partner.de / stoll@renzenbrink-partner.de

To the Purchaser:

Tribus Holdings 9 S.à r.l.
Valery Beuken
15, boulevard F.W. Raiffeisen, L-2411 Luxembourg

Grand Duchy of Luxembourg

Email: valery.beuken@alterdomus.com

12.4 Public Disclosure, confidentiality

(a) Neither Party shall make any press release or similar public announcement with respect to this Agreement except as expressly agreed upon with the other Parties.

(b) Each Party shall keep confidential and not disclose to any Third Party the contents of this Agreement and any confidential information regarding the other Parties disclosed to it in connection with this Agreement or its implementation, except as expressly agreed upon with the other Party and except as may be required in order to comply with the requirements of any applicable laws or the rules and regulations of any stock exchange upon which any securities of the relevant Party or any of its parent companies are listed. If and to the extent any announcement, press release or disclosure of information regarding the subject matter of this Agreement is to be made under applicable mandatory laws or any applicable stock exchange regulations, the Party concerned shall, to the extent permissible under applicable laws or stock exchange regulations, not disclose any such information without first consulting with the other Parties and limit the disclosure to the minimum extent. The Purchaser shall, however, be allowed to disclose this Agreement and its contents to any Third Party holding a beneficial interest in it, to its advisors and banks providing financing for the transactions contemplated hereby.

12.5 Costs and Expenses

(a) All transfer taxes (including real estate transfer taxes), stamp duties, fees (including notarial fees), registration duties or other charges in connection with any regulatory requirements (including merger control proceedings) and other charges and costs payable in connection with the execution of this Agreement and the implementation of the transactions contemplated hereby shall be borne by Purchaser.

(b) Each Party shall pay its own expenses, including the costs of its advisors, incurred in connection with this Agreement.

12.6 Entire Agreement; Amendments and Waivers

(a) This Agreement (including all Schedules hereto) contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes and replaces all oral and written declarations of intention made by the Parties in connection with the contractual negotiations.

(b) Any provision of this Agreement (including this Section 12.6) may be amended or waived only if such amendment or waiver is (i) by written instrument executed by all Parties and explicitly refers to this Agreement or (ii) by notarized deed, if required by law.

12.7 No Assignments; No Set-Off and No Third Party Rights

(a) Except as expressly set forth in this Agreement, Purchaser may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Seller, provided that the assignment of rights under this Agreement to

24

Purchaser's lenders as security for the acquisition financing provided to Purchaser in connection with this Agreement shall be permitted.

(b)     No Party, except as provided otherwise in this Agreement, shall be entitled (i) to set-off (any rights and claims it may have under this Agreement against any rights or claims any other Party may have under this Agreement or (ii) to refuse to perform any obligation it may have under this Agreement on the grounds that it has a right of retention unless the rights or claims of the relevant Party claiming a right of set-off or retention have been acknowledged in writing by the relevant other Party/Parties or have been confirmed by final decision of a arbitral tribunal in accordance with the principles set forth in Section 12.8(b). In no event, the Purchaser shall be entitled to set-off any claims against, or to exercise any rights of retention with respect to the Purchaser's obligations to make any payments on the Scheduled Closing Date or the Closing Date, as applicable.

(c)     This Agreement shall not grant any rights to, and is not intended to operate for the benefit of, third parties unless otherwise explicitly provided for herein. Wherever under this Agreement any party other than the Purchaser is to be indemnified by the Seller, such other party, in particular the Companies, shall not be entitled to bring any claims for indemnification against the Seller.

12.8   Governing Law; Jurisdiction; Service of Process

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the Grand Duchy of Luxembourg (excluding conflict of laws rules and the CISG) while the transfer of the shares and the Transfer Deed shall be governed by the laws of Greece.

(b)     All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. No award or procedural order made in the arbitration shall be published. The place of the arbitration shall be Frankfurt am Main, Germany. The language of the arbitral proceedings shall be English. In the event that mandatory applicable law requires any matter arising from or in connection with this Agreement or its consummation to be decided upon by a court of law, the competent courts in and for Frankfurt am Main, Germany, shall have exclusive jurisdiction.

12.9   Interpretation

(a)     The headings of the sections and subsections in this Agreement are for convenience purposes only and shall not affect the interpretation of any of the provisions hereof.

(b)     Terms defined in the singular have a comparable meaning when used in the plural, and *vice versa.*

(c)     For the purpose of any disclosure thresholds or the like in any representations and warranties contained in this Agreement, any reference to EUR shall include the equivalent in any foreign currency at the official Euro foreign exchange rates of the European Central Bank on the Signing Date.

25

(d)   Words such as "hereof", "herein" or "hereunder" refer (unless otherwise required by the context) to this Agreement as a whole and not to a specific provision of this Agreement. The term "including" shall mean "including, without limitation".

(e)   The terms "including" and "in particular" shall always mean "including, without limitation" and "in particular, without limitation", respectively.

(f)   The Schedules to this Agreement are an integral part of this Agreement and any reference to this Agreement includes this Agreement and the Schedules as a whole. The disclosure of any matter in this Agreement (including any Schedule thereto) shall be deemed to be a disclosure for all purposes of this Agreement. The fact that a matter has been disclosed in a Schedule shall not be used to construe the extent of the required disclosure (including any standard of materiality) pursuant to the relevant representation or other provision of this Agreement.

15.10  Severability

Should any provision of this Agreement, or any provision incorporated into this Agreement in the future, be or become invalid or unenforceable, the validity or enforceability of the other provisions of this Agreement shall not be affected thereby. The invalid or unenforceable provision shall be deemed to be substituted by a suitable and equitable provision which, to the extent legally permissible, comes as close as possible to the intent and purpose of the invalid or unenforceable provision. The same shall apply: (i) if the Parties have, unintentionally, failed to address a certain matter in this Agreement; in this case a suitable and equitable provision shall be deemed to have been agreed upon which comes as close as possible to what the Parties, in the light of the intent and purpose of this Agreement, would have agreed upon if they had considered the matter; or (ii) if any provision of this Agreement is invalid because of the scope of any time period or performance stipulated herein; in this case a legally permissible time period or performance shall be deemed to have been agreed which comes as close as possible to the stipulated time period or performance.

*[Signature Page to Follow]*

Maillis International S.A.


Name:  Luc van Damme

Position:  Director

Name:    Spyridon Gaitanos

Position:   Director


Tribus Holdings 9 S.à r.l.


_____

Name:

Position:

_____

Name:

Position:

**Maillis International S.A.**

Name: _____            Name: _____

Position: _____        Position: _____


**Tribus Holdings 9 S.à r.l.**

Name: **Daphné Chanteloup**               Name: **Valéry Beuken**

Position: **A Manager**                   Position: **B Manager**

27

Project Euthymia

Schedule 3.3(a)(v)

Closing Protocol

Date: |●| 2022

---

## CLOSING PROTOCOL

relating to

## PROJECT EUTHYMIA

---

This Closing Protocol ("**Closing Protocol**") is entered into by and among

(1)    **Maillis International S.A** a stock corporation (*société anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 2, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B 212166 ("**Seller**"); and

(2)    **Tribus Holdings 9 S.à r.l.**, a limited liability company (*Société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, incorporated by notarial deed of the notary Danielle Kolbach, Junglinster, Grand Duchy of Luxembourg dated 26 November 2021 ("**Purchaser**").

The Seller and the Purchaser are collectively referred to as the "**Parties**", and each individually a "**Party**".

## Preamble

(A)    On [●] 2021, the Parties entered into a share purchase agreement regarding the sale and purchase of shares in **M.J. MAILLIS SINGLE MEMBER S.A.- INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES** (the "**SPA**").

(B)    Except as expressly provided otherwise in this Closing Protocol, the terms used in this Closing Protocol shall have the same meaning ascribed to them in the SPA and shall be construed and interpreted as set out in the SPA. Any references herein to "**SPA Section(s)**" means those sections of the SPA. Any references herein to "**SPA Schedule(s)**" means those Schedules to the SPA. Any other references herein to Sections or Schedules are those referred to in this Closing Protocol.

(C)    With this Closing Protocol the Parties intend to confirm to each other the due fulfilment or waiver of the Closing Conditions according to SPA Section 3.2, and that the Closing Actions according to SPA Section 3.3 were duly performed or waived, and that Closing has occurred.

**NOW IT IS AGREED** as follows:

1.    **Subject Matter**

This Closing Protocol describes the actions taken in connection with the consummation of the transactions contemplated by the SPA at the Closing Date. The legal significance of this Closing Protocol is strictly limited to serve as evidence that the Closing Conditions were fulfilled or effectively waived and that the Closing Actions were taken in accordance with SPA Sections 3.3(a)(i) through [3.3(a)(iv)] or effectively waived. The execution of this Closing Protocol shall not limit or prejudice the rights of the Parties arising under or in connection with the SPA or under applicable law.

2.    **Closing Date**

The Parties agree that the Closing Date within the meaning of SPA Section 3.1 shall be today.

3.    **Closing Conditions**

The Parties hereby confirm, unconditionally and irrevocably, that the Closing Conditions pursuant to SPA Section 3.2(b) have been fulfilled as follows:

The closing of the Marflex SPA and the SIAT SPA have occurred.

4.   **Closing Actions**

The Parties hereby confirm, unconditionally and irrevocably, that as of today, the following Closing Actions pursuant to SPA Section 3.3 have taken place by concurrent performance in the following sequence:

a)   The Purchaser has paid the Purchase Price to the Seller;

b)   the Seller and the Purchaser have executed a transfer deed relating to the Shares;

c)   the Seller has handed over resignation letters by Messieurs Luc van Damme and Spyridon Gaitanos regarding their resignation from the board of directors of the Company with immediate effect as of the Scheduled Closing Date; and

d)   the Seller has passed a resolution as to the full discharge of the members of the board of directors of the Company for the time period up to and including the Closing Date.

5.   **Closing Confirmation**

The Parties hereby confirm to each other that the Closing Actions pursuant to SPA Sections 3.3(a)(i) through [3.3(a)(iv)] have been performed (to the extent not waived) and have been fully completed.

As a matter of precaution, the Parties hereby waive the Closing Conditions which have not yet been fulfilled, and the performance of all Closing Actions which have not yet been performed as Closing Actions.

6.   **Share Transfers**

The Parties hereby confirm, unconditionally and irrevocably, that the *in rem* transfers of the Shares (SPA Section 3.3(a)(ii)) have become effective.

7.   **Interpretation and Miscellaneous**

In this Closing Protocol the headings are inserted for convenience purposes only and shall not affect the interpretation of this Closing Protocol; where a term has been inserted in quotation marks and/or italics it alone (and not the English term to which it relates) shall be authoritative for the purpose of the interpretation of the relevant English term in this Closing Protocol.

SPA Section 12 shall apply accordingly to this Closing Protocol.

***

*signature page follows*

3

SIGNATURE PAGE CLOSING PROTOCOL PROJECT EUTHYMIA

Date [●] 2022

**MAILLIS INTERNAIONTAL S.A.**

_____
by Luc van Damme / Spyridon Gaitanos

**Thaleia AcquiCo S.r.l.**

_____
by [●]

4

**Project Euthymia**

**Schedule 4(a)**

**Employees To Be Transferred**

**Schedule 4(a) – Employees To Be Transferred**

| No. | Maillis Entity | Employee Name | Remarks |
|-----|----------------|---------------|---------|
| 1. | M.J. Maillis UK | Morgan Tony | *Sales* |
| 2. | M.J. Maillis UK | Kirk Sandra | *Sales / Customer service* |
| 3. | M.J. Maillis UK | Molson Julie | *Customer service* |
| 4. | M.J. Maillis Espana SA | Bermejo Jose Antonio | *Sales* |
| 5. | M.J. Maillis Espana SA | Guerra Christina | *Customer service* |

* * *

**Project Euthymia**

**Schedule 5.1(a)**

**PPA and PPA Beneficiary**

**Schedule 5.1(a) – PPA and PPA Beneficiary**

| No. | Date | Parties | Description | Name of Beneficiary | Remarks |
|---|---|---|---|---|---|
| 1. | **30/04/2019** | • H.I.G. Luxembourg Holdings 46 S.à.r.l.<br><br>• Maria Glynou | PPA concerning sale of Maillis Group | *Maria Glynou* | |
| 2. | **30/04/2019** | • H.I.G. Luxembourg Holdings 46 S.à.r.l.<br><br>• Aris Mitsias | PPA concerning sale of Maillis Group | *Aris Mitsias* | |
| 3. | **30/04/2019** | • H.I.G. Luxembourg Holdings 46 S.à.r.l.<br><br>• Vasileios Boursinos | PPA concerning sale of Maillis Group | *Vasileios Boursinos* | |
| 4. | **21/01/2021** | • H.I.G. Luxembourg Holdings 46 S.à.r.l.<br><br>• Maria Glynou | PPA concerning sale of MJ Maillis SA | *Maria Glynou* | |
| 5. | **21/01/2021** | • H.I.G. Luxembourg Holdings 46 S.à.r.l.<br><br>• Aris Mitsias | PPA concerning sale of MJ Maillis SA | *Aris Mitsias* | |

| No. | Date | Parties | Description | Name of Beneficiary | Remarks |
|---|---|---|---|---|---|
| 6. | 21/01/2021 | • H.I.G. Luxembourg Holdings 46 S.à.r.l.<br><br>• Vasileios Boursinos | PPA concerning sale of MJ Maillis SA | *Vasileios Boursinos* | |

\* \* \*

9

Execution Version

# Share Purchase Agreement

relating to

# Project Flip (Remaining Structure)



**TABLE OF CONTENTS**

**PAGE**

| | | |
|---|---|---|
| 1. | SALE AND TRANSFER OF THE SHARES .................................................................. | 6 |
| 1.1 | Status of the Company.............................................................................................. | 6 |
| 1.2 | Sale and Purchase of the Shares .............................................................................. | 6 |
| 2. | PURCHASE PRICE ................................................................................................... | 6 |
| 2.1 | Purchase Price............................................................................................................ | 6 |
| 2.2 | Mode of Payment; Seller's Account ......................................................................... | 6 |
| 2.3 | Default Interest; Calculation of Interest ................................................................. | 7 |
| 2.4 | No Set-off/Retention; Treatment of Payments ..................................................... | 7 |
| 2.5 | VAT ............................................................................................................................. | 7 |
| 3. | CLOSING; CLOSING CONDITIONS; CLEARANCES.................................................... | 7 |
| 3.1 | Closing; Scheduled Closing Date; Closing Date...................................................... | 7 |
| 3.2 | Conditions to Closing................................................................................................ | 7 |
| 3.3 | Closing Actions.......................................................................................................... | 8 |
| 3.4 | Termination Right ..................................................................................................... | 9 |
| 4. | WARRANTIES OF THE SELLER ............................................................................... | 9 |
| 4.1 | General Provisions on Seller's Warranties.............................................................. | 9 |
| 4.2 | Enforceability and Capacity.....................................................................................10 |
| 4.3 | Status of the Group Companies...............................................................................10 |
| 4.4 | No other Warranties .................................................................................................11 |
| 5. | COVENANTS OF THE SELLER..................................................................................11 |
| 6. | LIABILITY OF THE SELLER ......................................................................................12 |
| 6.1 | Relevant Breaches; Losses.......................................................................................12 |
| 6.2 | Notice Obligation......................................................................................................12 |
| 6.3 | Exclusions of Seller's Liability .................................................................................13 |
| 6.4 | No Double Dip ...........................................................................................................13 |
| 6.5 | Third Party Claims.....................................................................................................14 |
| 6.6 | Cap ..............................................................................................................................15 |
| 6.7 | Time Limitations........................................................................................................15 |
| 6.8 | No other Remedies ...................................................................................................16 |
| 6.9 | Reimbursement and Excess Recoveries .................................................................16 |
| 7. | WARRANTIES OF THE PURCHASER .......................................................................17 |
| 7.1 | Authorization of the Purchaser...............................................................................17 |
| 7.2 | Purchaser's Intentions and Experiences ................................................................17 |
| 8. | COVENANTS OF THE PURCHASER ........................................................................17 |
| 8.1 | Access to Information ...............................................................................................17 |
| 8.2 | Cooperation ..............................................................................................................18 |

| 8.3 | Indemnification of Beneficiaries | 18 |
|---|---|---|
| 9. | LIABILITY OF THE PURCHASER | 19 |
| 10. | MISCELLANEOUS | 19 |
| 10.1 | Defined Terms | 19 |
| 10.2 | Other Defined Terms | 20 |
| 10.3 | Notices | 21 |
| 10.4 | Public Disclosure, confidentiality | 22 |
| 10.5 | Costs and Expenses | 22 |
| 10.6 | Entire Agreement; Amendments and Waivers | 22 |
| 10.7 | No Assignments; No Set-Off and No Third Party Rights | 22 |
| 10.8 | Governing Law; Jurisdiction; Service of Process | 23 |
| 10.9 | Interpretation | 23 |
| 10.10 | Severability | 24 |

## LIST OF SCHEDULES

Schedule (D)                    Other Group Companies

Schedule 3.3(a)(viii)           Closing Protocol

4

This **SHARE PURCHASE AGREEMENT** ("**Agreement"**) is entered into on 20 December 2021 ("**Signing Date**") by and among

(1)   **H.I.G. Lux. 46 Holdings S.à r.l.,** a limited liability company (*société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B185603 ("**Seller**"); and

(2)   **Tribus Holdings 10 S.à r.l.,** a limited liability company (*Société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, incorporated by notarial deed of the notary Danielle Kolbach, Junglinster, Grand Duchy of Luxembourg dated 26 November 2021 ("**Purchaser**").

The Seller and the Purchaser are collectively referred to as the "**Parties**", and each individually a "**Party**".

## RECITALS

(A)   The Seller is the sole shareholder of Maillis International S.A., a stock corporation (*société anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 2, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B 212166  ("**Company**").

(B)   The Company is active in the holding and managing participations ("**Business**").

(C)   The Seller intends to sell and transfer all shares in the Company to the Purchaser and the Purchaser intends to purchase and acquire such participations in the Company from the Seller, in each case in accordance with the terms and conditions of this Agreement ("**Transaction**"). The Transaction forms part of a combined effort under which it is planned to sell Maillis Group as a whole in various portions under separate purchase agreements to different purchasers. In such context, on or about hereof, (i) Maillis Holdings S.à r.l. will enter into a purchase agreement regarding the sale of its shares in Marflex M.J. Maillis Poland sp. z o.o. ("**Marflex SPA**"), (ii) EUROPACK S.A. will enter into a purchase agreement regarding the sale of its shares in SIAT – Società Internazionale Applicazioni Tecniche S.p.A. ("**SIAT SPA**") and (iii) Maillis International S.A. will enter into a purchase agreement regarding the sale of its shares in M.J. MAILLIS SINGLE MEMBER S.A.- INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES ("**Inofyta SPA**"). It is intended to consummate the transactions under the Marflex SPA, SIAT SPA, Inofyta SPA and this Agreement in this specific order in a short sequence, if practically possible on the same day.

(D)   Following the completion of the aforesaid transactions, the Company will hold, directly or indirectly, the companies listed in **Schedule (D)** (such companies the "**Other Group Companies**" and together with the Company the "**Group Companies**", each a "**Group Company**").

5

(E)     The Parties confirm that this Agreement is entered into following (i) completion of a comprehensive internal due diligence investigation of the Group Companies, their business operations and the Business by the Purchaser together with its representatives ("**Due Diligence**") and (ii) a discussion and negotiation of all provisions contained in this Agreement.

## 1.     SALE AND TRANSFER OF THE SHARES

1.1     Status of the Company

(a)     The Seller is the sole shareholder of the Company.

(b)     The Company's share capital amounts to EUR 2,526,000 and is divided into 2,526,000 shares with a nominal value of EUR 1.00 per share ("**Shares**").

1.2     Sale and Purchase of the Shares

(a)     The Seller hereby sells the Shares subject to the terms of this Agreement to the Purchaser. The Purchaser hereby accepts such sale.

(b)     The Shares are sold with all rights and obligations pertaining thereto, including the rights to any profits not yet distributed or resolved to be distributed on or prior to the Effective Date, except for Permitted Leakage.

## 2.     PURCHASE PRICE

2.1     Purchase Price

(a)     The aggregate purchase price for the Shares shall be a fixed amount of EUR 1.00 (in words: Euro one) ("**Purchase Price**").

(b)     At the Scheduled Closing Date, the Purchaser shall pay to the Seller in the Seller's Account in accordance with Section 2.2 an amount equal to the Purchase Price.

2.2     Mode of Payment; Seller's Account

(a)     The relevant amounts payable to the Seller under this Agreement shall be paid by the Purchaser by irrevocable wire transfer a bank account to be notified by the Seller to the Purchaser ("**Seller's Account**") free of charges.

(b)     The Purchase Price has been finally determined by the Parties and shall not be subject to any further adjustment.

(c)     Payments to be made under this Agreement by the Seller shall be made into an account held by the Purchaser to be notified by the Purchaser to the Seller in accordance with Section 10.3.

(d)     Any and all payments to the Seller under this Agreement shall be deemed to have been made upon the later of (i) the irrevocable and unconditional crediting of the amount payable (without deduction of any costs or charges, other than those of the recipient's bank) to the Seller's Account pursuant to Section 2.2(a) and (ii) the value date as of which such amount has been credited to such account.

2.3 Default Interest; Calculation of Interest

(a) In the event of a delayed payment by any Party in respect of any payment under or in connection with this Agreement when due and regardless of whether or not the statutory requirements of default are met, such Party shall be liable for default interest of eight percent (8%) p.a. as from (and including) the respective due date until (but excluding) the day of actual receipt of the respective payment in the relevant account. The foregoing shall not affect the rights of the relevant other Party to claim additional damages.

(b) Interest under this Agreement shall be calculated on the basis of the actual/360 method.

2.4 No Set-off/Retention; Treatment of Payments

(a) The Purchaser shall not have any right of set-off or retention right with respect to its payment obligations pursuant to this Section 2.

(b) The Parties agree that any indemnity, compensation, damage or similar payment made under this Agreement (other than the payment of the Purchase Price) shall be treated by the Parties as an adjustment of the Purchase Price, i.e., an increase or a reduction of the Purchase Price, respectively, and, to the extent permitted by applicable law, shall be treated by the Parties as such also for Tax purposes. For the avoidance of doubt the foregoing shall not affect the definition of Purchase Price nor, consequently, the cap pursuant to Section 6.6.

2.5 VAT

The Parties agree that the sale of the Shares is not subject to VAT. The Seller shall refrain from exercising an option for VAT with respect to the Shares or any action under this Agreement. Should any sales and assignments or other supplies or services set forth in this Agreement, contrary to the Parties' assessment, attract VAT which is payable by the Seller for reasons other than for a waiver of a VAT exemption by the Seller, then the respective Purchase Price or other payment amount shall be increased by the amount of such VAT and be payable upon issuance of an invoice to the Purchaser in compliance with applicable VAT laws.

3. **CLOSING; CLOSING CONDITIONS; CLEARANCES**

3.1 Closing; Scheduled Closing Date; Closing Date

The closing of the Transaction ("**Closing**") pursuant to Section 3.3(a) shall take place at 10 a.m. CET on the Scheduled Closing Date unless the Seller and the Purchaser agree on another time of Closing in writing. "**Scheduled Closing Date**" shall be the Business Day which is the day on which the last of the Closing Conditions has been fulfilled or waived, with the proviso that the failure to perform any Closing Actions (other than 3.3 (a) (i), (ii) and (iii) below) within three Business Days after the Scheduled Closing Date does not result in a default for purposes of this Agreement. "**Closing Date**" shall be the day on which all of the Closing Actions as set out in Section 3.3 below have been taken or duly waived (other than 3.3 (a) (i), (ii) and (iii) below).

3.2 Conditions to Closing

(a) The Parties mutually agree that the consummation of the Closing does not require clearance by any antitrust or other regulatory authorities.

7

(b)     The obligations of the Purchaser and the Seller to consummate the Closing are subject to the following conditions precedent ("**Closing Conditions**") that

    (i)     closing of the Marflex SPA, the SIAT SPA and the Inofyta SPA have occurred; and

    (ii)    the proceeds generated under the Marflex SPA, the SIAT SPA and the Inofyta SPA have been upstreamed and distributed to H.I.G. Lux 46 Holdings S.à r.l.

3.3     Closing Actions

(a)     On the Scheduled Closing Date, the Parties shall take, or cause to be taken the following actions (the "**Closing Actions**") by concurrent performance in the following sequence:

    (i)     The Purchaser shall pay the Purchase Price to the Seller.

    (ii)    The Seller and the Purchaser shall execute a transfer deed relating to the Shares.

    (iii)   The shareholders' register of the Company shall be amended to reflect the transfer of the Shares from the Seller to the Purchase. For such purposes, the Seller and the Purchaser hereby instruct any director of the Company to do so on their behalf.

    (iv)    The Seller shall hand over resignation letters by Messieurs Luc van Damme, Spyridon Gaitanos, Michael Maillis, Wolfgang Biedermann, Wolf-Dieter Baumann, Christian Kraul von Renner and Adorma Limited regarding their resignation from the board of directors of the Company (and in case of Mr. van Damme any other offices held at other Group Companies) with immediate effect as of the Scheduled Closing Date.

    (v)     The Seller shall pass a resolution as to the full discharge of the members of the board of directors of the Company for the time period up to and including the Closing Date.

    (vi)    If and to the extent requested by the Purchaser, the Seller shall take reasonable efforts to cause any other directors and officers of the Group Companies to resign from office with immediate effect as of the Scheduled Closing Date.

    (vii)   The Seller shall provide reasonable evidence of the termination of (i) of the existing Professional Service Agreement between Maillis International S.A. and H.I.G Capital LLC, (ii) the existing Business Development Services Agreement between Maillis International S.A. and DIVERSFIELD LIMITED CYPRUS Co., (iii) the board of directors agreement (terms and conditions of appointment) between Maillis International S.A. and Mr. Michael Maillis, (iv) the existing BoD service agreement between Maillis International S.A.  and Adorma Limited, and (v) the existing BoD service agreement between Maillis International S.A. and Wolf-Dieter Baumann, all with effect as of no later than the Closing Date.

    (viii)  The Parties shall execute a closing protocol confirming the due fulfilment or waiver of the Closing Conditions and the due performance or waiver, as the case may be, of the Closing Actions set forth under Section 3.3(a)(i) through Section 3.3(a)(v) ("**Closing Protocol**"), essentially in the form of the draft attached hereto as **Schedule 3.3(a)(viii)**.

8

(b) The Seller and the Purchaser may waive one or more of the Closing Actions (other than 3.3 (a) (i), (ii) and (iii) above) by way of a joint agreement in text form (email sufficient). Such waiver shall solely have the effect that the Closing is performed despite non-performance of such Closing Action. Unless expressly agreed otherwise, the waiver shall leave the right of the waiving Party to demand performance of the relevant Closing Action as well as any rights to claim damages in connection with the facts or circumstances which resulted in the waiver remains unaffected.

(c) The relevant Parties shall procure and ensure that all entries provided under applicable law are made in the Company's shares and shareholders' books and the relevant Parties or the Company (as may be applicable) shall make any declarations (including towards any commercial register) and adopt any shareholders' resolution as may be necessary or appropriate such that the Closing Actions (including any changes in the offices set forth therein) are legally effected and registered with the respective commercial or central registers (as applicable) as soon as reasonably possible after the Closing Date.

3.4 Termination Right

(a) The Seller shall be entitled to terminate this Agreement if

(i) the Closing Conditions set forth in Section 3.2(b) have not been fulfilled within nine (9) months after the Signing Date ("**Long Stop Date**"), or

(ii) any of the Closing Actions to be performed by the Purchaser have not been performed by the Purchaser or waived by the Seller within fifteen (15) Business Days following the Scheduled Closing Date.

(b) The Purchaser shall be entitled to terminate this Agreement if

(i) the Closing Conditions set forth in Section 3.2(b) have not been fulfilled by the Long Stop Date, or

(ii) any of the Closing Actions to be performed by the Seller have not been performed by the Seller or waived by the Purchaser within fifteen (15) Business Days following the Scheduled Closing Date.

(c) In the event of a termination in accordance with Section 3.4(a) or 3.4(b), none of the Parties shall have any obligation or incur a liability towards the other Party provided, however, that the provisions contained in Section 10 of this Agreement shall survive and remain unaffected by the termination of this Agreement and both the Seller and the Purchaser shall do and complete without undue delay any and all actions and formalities required for reverting the transfer of the Shares.

4. **WARRANTIES OF THE SELLER**

4.1 General Provisions on Seller's Warranties

(a) The Seller hereby represents and warrants to the Purchaser in the form of an independent guarantee and exclusively in accordance with the limitations, exclusions and other conditions of this Agreement that the statements contained in Sections 4.2 and 4.3

(collectively "**Seller's Warranties**") are true and correct as of the Signing Date and/or as of any other date explicitly referred to in the specific Seller's Warranty.

(b) The Seller's Warranties are given on the basis that they should be regarded as a risk allocation between the Parties; the Purchaser acknowledges and agrees that the Seller, its advisors, the management and other employees of the Group Companies have not independently examined or verified the underlying facts, matters, circumstances and statements made in such Seller's Warranties and the schedules pertaining thereto and that this shall neither be construed or interpreted as fraud nor indirect intent due to insufficient or inadequate inquires by the Seller and that nothing in this Agreement shall imply a duty of the Seller (including its advisors and directors and employees of the Group Companies) to make specific or other enquiries or researches of whatever nature.

(c) "**Seller's Knowledge**" shall mean the actual knowledge of the Seller as of the Signing Date. Any liability for negligent ignorance due to insufficient inquiries, deemed knowledge, knowledge 'on file' of which the Seller did not have positive knowledge or any other imputation of knowledge to the Seller shall be excluded and none of these circumstances results in Seller's Knowledge.

(d) Any attribution of knowledge to the Seller and any responsibility of the Seller for a Third Party's fault or knowledge 'on file' shall be excluded.

(e) if any disclosure of events or documents made in this Agreement (i) is below any materiality threshold provided for in relation to such disclosure requirement, or (ii) contains additional information, this shall neither be deemed to constitute a basis for a Relevant Breach nor otherwise affect the respective materiality thresholds (or their interpretation) or increase the scope of any indemnification.

4.2 Enforceability and Capacity

On the Signing Date and on the Closing Date, this Agreement constitutes the legal, valid and binding obligation of the Seller, enforceable under the laws of the Grand Duchy of Luxembourg against the Seller in accordance with its terms, except to the extent that the enforceability thereof may be limited by bankruptcy or insolvency laws. The Seller has the absolute and unrestricted right, power, authority and capacity to execute this Agreement. Except for any Clearances, the Seller has the full power and authority to enter into this Agreement and to perform its obligations hereunder and to consummate this Agreement and the Transaction.

4.3 Status of the Group Companies

(a) On the Signing Date and on the Closing Date, the Company is duly incorporated and validly existing under the laws of its country of incorporation, the Seller is the sole and unrestricted owner of the Shares as set forth in Section 1.1 and the Company is the owner of the participations in the other Group Companies as set forth in Schedule (A). On the Signing Date and the Closing Date, the Shares and the participations of the Company in the other Group Companies as set forth in Schedule (A) have been duly authorized and validly issued. On the Signing Date and on the Closing Date, the Shares and the participations are fully paid up and all contributions have been made in compliance with applicable law and have not been repaid or returned, in whole or in part and are no

obligations to make further contributions in respect of the Shares and the participations of the Company in the other Group Companies as set forth in Schedule (A).

(b) No insolvency or similar proceedings have been, or, to the Seller's Knowledge, have been threatened to be, opened or applied for regarding the assets of any Group Company and the assets of the Seller and there are, to the Seller's Knowledge, no circumstances which would require the opening of or application for such proceedings.

(c) There is no lawsuit, investigation or proceeding pending or threatened in writing against the Seller before any court, arbitrator or Governmental Authority which in any manner challenges or seeks to prevent, alter or materially delay the transactions contemplated under this Agreement.

4.4 No other Warranties

(a) The Seller makes no express or implied representations or warranties in addition to the Seller's Warranties contained in Sections 4.2 and 4.3 and assumes no disclosure obligations in respect of the Group Companies and their businesses. The Purchaser confirms that its decision to acquire the Shares is based on a comprehensive due diligence exercise in respect of the Group Companies and their businesses conducted by the Purchaser.

(b) The Purchaser acknowledges specifically that the Seller does not make any representation or warranty with respect to:

(i) any kind of budget, outlook, estimate or other forecast (including the underlying documentation) regarding future cash flows, financial condition and results of operation of the Group Companies and the future prospects of the business of the Group Companies;

(ii) other information and documents with respect to the Shares, the Group Companies and their businesses and the Due Diligence Material which have not been made subject of the Seller's Warranties.

5. COVENANTS OF THE SELLER

In the period commencing on the Signing Date and ending on (but excluding) the Closing Date, the Seller shall take all legally permissible and reasonable steps within its power in order to ensure that, during such period, the Company will continue to conduct the business in the ordinary course consistent with past practice and will take none of the following actions without the Purchaser's prior approval (not to be unreasonably conditioned, withheld or delayed and be deemed granted if and to the extent no objection from or on behalf of the Purchaser is received in written form (email sufficient) by the Seller within three (3) Business Days following receipt by the Purchaser of the request for consent):

(a) any dissolution or liquidation of the Company;

(b) any acquisition or disposal of shares in other companies, businesses or other fixed assets outside the ordinary course of business (in each case unless included in the budget of the Company;

11

(c)    any change of the articles of association of the Company;

(d)    payments or other benefits or promises to managing directors or employees made with a view to the sale and transfer of the Shares.

## 6.    LIABILITY OF THE SELLER

6.1    Relevant Breaches; Losses

(a)    In the event of any incorrectness of any of the Seller's Warranties ("**Relevant Breach**") and subject to this Section 6, the Seller shall put the Purchaser or, at the election of the Seller, the relevant Group Company, in the position the Purchaser had been in had the Relevant Breach not occurred ("**Restitution in Kind**"). If the Seller (i) has not provided Restitution in Kind within two (2) months following receipt of the Claim Notice, (ii) Restitution in Kind is impossible or (iii) the Seller has declared his definite unwillingness to provide Restitution in Kind in writing, the Purchaser may demand the Seller to pay the amount of the Losses incurred.

(b)    "**Losses**" shall mean all liabilities, reasonable costs and expenses and other damages, excluding, however, (i) any indirect damages to the extent not reasonably foreseeable, (ii) lost profits to the extent not reasonably foreseeable and any lost profits at the level of the Purchaser, (iii) any consequential damages to the extent not reasonably foreseeable, (iv) any potential or actual reductions in value of the Shares, any Group Company or the Business beyond the actual damages incurred, (v) any frustrated expenses, (vi) damages/losses of goodwill or due to lost opportunities, and (vii) any incidental or internal costs and expenses incurred by any Group Company or the Purchaser, and (viii) any damages based on the allegation that the Purchase Price or any portion thereof have been calculated or determined based on incorrect assumptions. In calculating any Losses, no valuation methodology using multiples of earnings or similar shall be applied. Any Losses shall be computed net of any present or future advantages and benefits (including avoided losses, Tax benefits and savings as well as increases in the value of any asset owned by the Company) related to the relevant matter. All Losses shall be calculated on a Euro-for-Euro basis.

(c)    Any payments made by the Seller with respect to Relevant Breaches pursuant to this Agreement shall be treated by the Parties as adjustments of the Purchase Price. In no event shall the Seller owe any gross-up for Taxes falling due in connection with any compensation for Losses.

6.2    Notice Obligation

(a)    In the event that the Purchaser or, after the Closing Date, any Group Company becomes aware of facts that could potentially constitute a Relevant Breach, the Purchaser shall without undue delay, however at but in no event later than within a period of 15 (fifteen) Business Days after the relevant person becoming aware of the relevant circumstances, notify the Seller thereof ("**Claim Notice**"). The Claim Notice shall set out in reasonable detail the potential Relevant Breach and, to the extent possible, the estimated amount of Losses (to be) incurred in connection therewith.

12

(b) Following the Closing, the Purchaser shall procure that the Seller is provided with all required or requested information and assistance, including access to all records, documents, information and relevant management members and employees or other knowledgeable persons, which the Seller requires or reasonably requests in order to determine the extent, if any, to which the claim is justified.

6.3 Exclusions of Seller's Liability

In no event shall the Seller be liable for any Relevant Breach if and to the extent

(a) the matters to which the Relevant Breach relates are reflected as a write-off, value adjustment, liability or provision, including general adjustments or provisions made for the relevant risk category, in the Financial Statements 2020;

(b) the Purchaser, any Affiliate of the Purchaser and/or, after the Closing, the Company have participated in causing such Loss, including a failure to mitigate damages;

(c) the Purchaser had actual knowledge of the facts or circumstances underlying the Relevant Breach as of the Signing Date. The Purchaser shall be deemed to have actual knowledge of all facts and circumstances

(i) contained in this Agreement and all Schedules thereto;

(ii) any information disclosed to the Purchaser, its representatives and/or professional advisors by or on behalf of the Seller in writing or in written form (email sufficient)in connection with the transactions contemplated under this Agreement.;

(d) the claim resulting from the Relevant Breach results from, or is increased by, the passing of, or any change in any law, statute, ordinance, rule, regulation, common law rule or administrative practice of any government, governmental department, agency or regulatory body after the Signing Date;

(e) The Purchaser or any Group Company, or any successor to all or parts of their business has received or has a respective claim for repayment, reimbursement or indemnification against a third party (other than any of the Group Entities), including under any insurance policy (but except for any W&I insurance policy) in force until the Closing Date, or would have had such claim if the insurance coverage in force immediately prior to the Closing Date had been maintained after the Closing Date; or

(f) the Purchaser failed to fully comply with the procedures set forth in Sections 6.2 and 6.5 with regard to a Relevant Breach, except to the extent that such failure does neither cause an increase of the claim resulting from the Relevant Breach nor otherwise prejudices the Seller.

6.4 No Double Dip

(a) The Parties agree that where one and the same set of facts qualifies under more than one provision entitling the Purchaser to a claim or remedy under this Agreement, there shall be only one claim or remedy. In particular, the foregoing shall apply if one and the same

13

set of facts or circumstances qualifies as a breach or non-fulfilment of more than one of the Seller's Warranties.

(b) Furthermore, rights of the Purchaser resulting from the breach of breaches of Seller's Warranties shall be excluded if and to the extent this Agreement provides for a more specific Seller's Warranty relating to the relevant set of facts. In such cases, solely the more specific Seller's Warranty shall apply and any rights of the Purchaser shall exclusively be determined on basis of the more specific Seller's Warranty and the limitations and exclusions applicable to such specific Seller's Warranty.

6.5 Third Party Claims

In the event that (i) an order of any Governmental Authority is issued, announced to be issued, threatened to be issued or imminent to be issued against the Purchaser or any Group Company or (ii) the Purchaser or any of the Group Companies are sued, threatened to be sued or imminent to be sued by a third party, including any Governmental Authority, in each case in a manner which may, taking into account the liability limitations of the Seller under this Section 6, give rise to a Relevant Breach ("**Third Party Claim**"), the Purchaser shall give Seller notice of such Third Party Claim without undue delay but in any case no later than within ten (10) Business Days after the Purchaser or any relevant Group Company have learned of such Third Party Claim, and the following principles shall apply:

(a) The Purchaser shall procure that the Seller is provided with all materials, information and assistance relevant in relation to the Third Party Claim and are given reasonable opportunity to comment or discuss with the Purchaser any measures which the Seller proposes to take or to omit in connection with such Third Party Claim. In particular, the Seller shall be given an opportunity to comment on, participate in, and review any reports, audits or other measures and shall receive copies of all relevant orders of any governmental authority without undue delay but in any event at least ten (10) Business Days prior to the expiry of any relevant objection period.

(b) No admission of liability shall be made by or on behalf of the Purchaser or any relevant Group Company, and the Third Party Claim shall not be compromised, disposed of or settled, without the prior written consent of the Seller, such consent not to be unreasonably delayed or withheld.

(c) The Seller shall further be entitled, at its own discretion, to take such action (or cause the Purchaser or any relevant Group Company to take such action) as the Seller deems reasonably necessary to avoid, dispute, deny, defend, appeal, resist, compromise or contest such Third Party Claim (including making counter-claims or other claims against third parties) in the name and on behalf of the Purchaser or the Group Companies concerned, provided that the Third Party Claim shall not be compromised, disposed or settled without the prior written consent of the Purchaser, such consent not to be unreasonably delayed or withheld. The Purchaser shall give, and shall procure that the relevant Group Companies give, subject to them being reimbursed all reasonable and evidenced costs and out of pocket expenses, all such information and assistance as described above, including (i) reasonable access to premises and personnel during normal business hours and without causing substantial disruption of the business operations and (ii) the right to examine and copy or photograph any assets, accounts,

14

documents and records for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any Third Party Claim or liability as the Seller or its professional advisors may reasonably request; the Purchaser shall fully cooperate, and cause each Group Company to fully cooperate with the Seller in the defense of any Third Party Claim.

(d)     The foregoing shall include, in particular, the Seller's right to select counsel to the Purchaser or the relevant Group Company, to direct any negotiations with the relevant Third Party and to take all decisions regarding the commencement, conduct or termination of any litigation or arbitration proceedings.

(e)     The Purchaser shall, for such purpose, promptly deliver to the Seller and its representatives copies of all correspondence relating to the Third Party Claim; in all other respects, Section 8.1 below shall apply. The costs incurred by the Purchaser or the Company in the defense of the Third Party Claim shall be borne by the Seller only to the extent that such costs are included in the damages recoverable by the Purchaser pursuant to this Section 6; the Seller shall bear its costs incurred in connection with the defense.

(f)     No action by the Seller or its representatives in connection with the defense of any Third Party Claim shall be construed as an acknowledgement (whether express or implied) of the Purchaser's claim under this Agreement or of any underlying facts related to such claim.

6.6     Cap

The Seller's aggregate overall liability for claims under or in connection with this Agreement (except for claims of Purchaser arising as a result of willful deceit or intentional behaviour) shall in no event exceed an amount of EUR 1.00.

6.7     Time Limitations

(a)     Subject to any mandatory time limitations provided for by Luxembourg law, all claims of the Purchaser under or in connection with this Agreement shall be time-barred upon the expiration of eighteen (18) months after the Closing Date, except for

(i)     claims to request performance of the transfer of the Shares in accordance with this Agreement as well as claims resulting from a breach of Fundamental Warranties which shall be time-barred on the fifth (5th) anniversary of the Signing Date; and

(ii)    claims of the Purchaser resulting from fraud or willful misconduct under this Agreement which shall become time-barred in accordance with the rules of statutory law; provided, however, that the Seller is, in accordance with Section 6.8(c), not liable for the acts or omissions of third parties engaged by the Seller (including but not limited to legal and other advisors).

(b)     The applicable limitation period can, with respect to a specific claim of the Purchaser, only be suspended by means of bringing legal action.

15

6.8   No other Remedies

(a)   The remedies that the Purchaser may have against the Seller for any breach of its obligations set forth under or in connection with this Agreement are solely governed by this Agreement, and the remedies of Purchaser provided for by this Agreement shall be the exclusive remedies available to Purchaser, any Affiliates of Purchaser or the Companies under and/or in connection with this Agreement. Any rights of the Purchaser not explicitly contained in this Agreement or arising out of breach of contract, breach of pre-contractual obligations, frustration of contract or tort are hereby waived. The foregoing applies, in particular, to any rights of the Purchaser to withdraw from this Agreement or to require the winding up of the transactions contemplated under this Agreement.

(b)   This Section 6.8 as well as any other limitations and exclusions of liability pursuant to this Agreement shall not apply to any rights and remedies for willful deceit (*dol*) by the Seller or the Seller's own willful misconduct (*faute intentionnelle*) in which case statutory law shall apply.

(c)   Any rights of the Purchaser arising out of Seller's fraud or willful misconduct shall not be affected thereby; provided, however, that any liability of the Seller for and any right to rescind this Agreement based on fraud or willful misconduct (*faute intentionnelle*) by third parties engaged by the Seller shall be excluded.

(d)   The Seller's liability for the behavior, actions, omissions or knowledge of persons assisting, advising or acting on behalf of the Seller (or, in each case, any Affiliate of any Seller) in connection with the performance of its obligations or generally in connection with the Transaction (including the preparation of documents forming part of the VDR Content and information provided orally or in writing in expert sessions, Q&A-processes or otherwise), irrespective of any degree of fault shall be excluded to the fullest extent legally permissible.

6.9   Reimbursement and Excess Recoveries

(a)   Any payments actually made by the Seller to discharge a liability under or in connection with this Agreement which is or becomes excluded, limited or reduced under this Section 6 shall be refunded by the Purchaser to the Seller immediately upon the event triggering such exclusion, limitation or reduction of liability becoming known. The preceding sentence shall apply *mutatis mutandis* to any other remediation measures actually undertaken by the Seller with respect to which liability is or becomes excluded, limited or reduced under this Section 6, in which case the Purchaser shall compensate the Seller for such remediation measures in cash. The Purchaser undertakes to inform the Seller without undue delay about any event which may trigger an exclusion, limitation or reduction of liability under this Section 6.

(b)   Without limiting the generality of Section 6.9(a), if the Purchaser recovers from a third party for Losses for which it (or the relevant Group Company) was already compensated in whole or in part by the Seller under or in connection with this Agreement, the Purchaser undertakes to pay to the Seller the amount of such excess recovery within ten (10) Business Days of its receipt.

16

7.   **WARRANTIES OF THE PURCHASER**

The Purchaser hereby represents and warrants to the Seller in the form of an independent guarantee that the statements contained in Sections 7.1 and 7.2 ("**Purchaser's Warranties**") are true and correct as of the Signing Date and, except for Sections 7.1(d) and 7.1(e), as of the Closing Date.

7.1   Authorization of the Purchaser

(a)   The Purchaser has been duly established and is validly existing as a limited liability company (*Société à responsabilité limitée*) under the laws of the Grand Duchy of Luxembourg.

(b)   This Agreement constitutes legal, valid, and, subject to its terms and conditions, binding obligations of the Purchaser. The execution of this Agreement and of each ancillary agreement to this Agreement as well as the performance by the Purchaser of its obligations hereunder and thereunder and the consummation of the transactions have been duly and validly authorized by all necessary corporate actions and corporate bodies on the part of the Purchaser.

(c)   No insolvency proceedings are pending in relation to the Purchaser and there are no circumstances which would require to file for insolvency of the Purchaser under any applicable laws.

(d)   The execution and performance of this Agreement by the Purchaser require no approval or consent by any Governmental Authority or other Third Party and do not violate any applicable law or decision by any court or Governmental Authority binding on the Purchaser.

(e)   The Purchaser is not aware of any facts or circumstances which could give rise to any claim resulting from a Relevant Breach due to the incorrectness of any Seller's Warranty or breach of any covenant or other obligation under or in connection with this Agreement.

7.2   Purchaser's Intentions and Experiences

(a)   As of the Signing Date and as of the Closing Date, the Purchaser is purchasing the Shares for investment on its own account.

(b)   The Purchaser (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

8.   **COVENANTS OF THE PURCHASER**

8.1   Access to Information

Without limiting any additional rights of the Seller under Sections 6.2 or 6.5, the Purchaser shall procure that

17

(a)   the Company preserves for the applicable, corresponding claims survival period set forth in this Agreement all documents, records and correspondence, accounts and other information of the Company (in whatever form held) existing prior to the Closing which are or are reasonably likely to be relevant to any actual or potential claims based on a Relevant Breach or indemnities by the Seller contained in this Agreement ("**Relevant Information**");

(b)   the Company, upon request, provides the Seller and its Representatives with access to the Relevant Information and, in the event of physical access, allow the Seller to take copies of the Relevant Information, during normal business hours and on reasonable notice; and

(c)   the Company, upon request, provides the Seller with all information relating to the period from (and including) 1 January 2021 and the Closing Date reasonably required for purposes of preparing the group financial statements as well as the year-end closing of Maillis Group for the fiscal year 2021, including (i) uploading to HFM the financials in all monthly forms, (ii) performing data reconciliation in HFM, BW and identifying intercompany mismatches, (iii) providing standard information about restructuring & non-recurring expenses along with IFRS16, loans and factoring data, (iv) preparing the year end disclosures within the deadlines set out by the Maillis Group auditors together with the checklist according to standard templates and (v) responding to ad hoc requests in connection with the processing of the afore-mentioned data, in each case in line with past practice.

8.2   Cooperation

The Parties shall cooperate with each other in connection with the closing of the transactions contemplated by this Agreement. The Purchaser shall procure that all documents are executed and delivered and all other statements and all other acts are made that are necessary or expedient for this purpose to the extent this is not intolerable for the Purchaser.

8.3   Indemnification of Beneficiaries

(a)   The Purchaser shall indemnify and hold harmless the Seller, the Affiliates or assignees of the Seller as well as its respective officers and employees, managing directors and board members (each a "**Beneficiary**") from and against any and all losses, liabilities (whether present or future, actual or contingent), damages and reasonable costs and expenses (including taxes, reasonable legal fees, expenses and disbursements) arising out of or in connection with

(i)   the conduct of the Business for which any Beneficiary is held liable by a Group Company or for which liability against any Beneficiary is asserted by a Group Company, in each case in its capacity as (i) current and former direct or indirect shareholder of a Group Company, or (ii) current and former director, officer, board member, advisor, agent or employee of a Group Company, in each case unless and to the extent such liability is based on willful deceit or willful misconduct by the relevant Beneficiary;

18

(ii)     any claims brought against any Beneficiary by a Group Company arising out of, or in connection with, (i) any financing agreements, and/or (ii) any other debt or financial liabilities or obligations of any of the Group Companies;

in each case unless and except to the extent the Purchaser has an enforceable right to claim damages or indemnification from the Seller in respect of such losses, liabilities or damages under the terms of this Agreement (herein collectively the "**Seller's Indemnification Claims**" and each a "**Seller's Indemnification Claim**").

(b)     A Seller's Indemnification Claim shall be time-barred twelve (12) months after the Seller has been notified in writing of the respective claim or liability both stating the amount of the respective claim or liability and the underlying facts (in reasonably sufficient detail) giving rise to a Seller's Indemnification Claim.

## 9.   LIABILITY OF THE PURCHASER

In the event (i) of any breach or non-fulfilment by the Purchaser of any of the Purchaser's Warranties, (ii) the Purchaser breaches any of the covenants set out in 8 or (iii) the Purchaser breaches any other obligations resulting from or in connection with this Agreement, the rights of the Seller shall be determined in accordance with statutory law unless expressly provided otherwise in this Agreement.

## 10.   MISCELLANEOUS

10.1   Defined Terms

In this Agreement, the following terms shall have the meanings specified in this section:

| Definitions | Meaning |
|---|---|
| Affiliate | any affiliate(s) (*entreprises filiales*) within the meaning of article 1711-1 of the Luxembourg law on commercial companies dated 10 August 1915, as amended. |
| Business Days | shall mean any days other than Saturdays, Sundays and public holidays in the Grand Duchy of Luxembourg. |
| Effective Date | shall mean 1 January 2021, 0:00 hours CET |
| EUR or Euro | shall mean Euro or Euros (or any of its replacement as official currency in the Grand Duchy of Luxembourg, at the applicable conversion rate from time to time). |
| Governmental Authority | shall mean any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or similar authority or instrumentality (domestic or foreign). |
| Intellectual Property Rights | means any patents, trademarks, business names, designs and design rights and the benefit of all applications and licenses to use such rights. |

19

| Maillis Group | means (individually and collectively) Maillis International S.A. and its Subsidiaries from time to time, but excluding the Group Companies. |
|---|---|
| Schedules | All schedules referred to in this Agreement. |
| Subsidiary | when used with respect to a specified person, means any entity directly or indirectly controlled by such person. |
| Tax or Taxes | shall mean any tax levy, impost, duty, other charge or social security contributions or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same. |
| Third Party | shall mean any person who or which is neither a Party to this Agreement nor an Affiliate of a Party to this Agreement. |
| VAT | shall mean value added tax, including any similar tax, which may be imposed in place thereof from time to time. |

## 10.2   Other Defined Terms

### A

Agreement ...................................................5

### B

Base Purchase Price ...................................6
Beneficiary ............................................. 18
Business....................................................5

### C

Claim Notice ............................................ 12
Closing ......................................................7
Closing Actions..........................................8
Closing Conditions .....................................8
Closing Date .............................................7
Closing Protocol ........................................8
Company ...................................................5

### D

Due Diligence ...........................................6

### G

Group Companies.......................................5
Group Company..........................................5

### I

Inofyta SPA ................................................ 5

### L

Long Stop Date .......................................... 9
Losses .....................................................12

### M

Marflex SPA ............................................... 5

### O

Other Group Companies............................. 5

### P

Parties ...................................................... 5
Party ........................................................ 5
Purchaser.................................................. 5
Purchaser's Warranties............................16

### R

Relevant Breach.......................................12
Relevant Information ...............................18
Restitution in Kind ...................................12

**S**

**Scheduled Closing Date** .............................7
**Seller**...............................................................5
**Seller's Account** ........................................6
**Seller's Indemnification Claim** ................. 19
**Seller's Indemnification Claims**............... 19
**Seller's Knowledge** .................................. 10
**Seller's Warranties** ......................................9

**Shares** ...................................................... 6
**SIAT SPA** .................................................. 5
**Signing Date** ............................................ 5

**T**

**Third Party Claim**......................................14
**Transaction** ............................................... 5

10.3   Notices

All notices, requests and other communications hereunder shall be made in the English language and shall be delivered

(a)   if made prior or at to Closing, in writing or in written form (email sufficient) and

(b)   if made after Closing, in writing by registered letter

(c)   to the persons at the address set forth below, or such other addresses as may be designated by the respective Party to the other Party in the same manner:

To the Seller:

H.I.G. Lux. 46 Holdings S.à r.l.
Philipp Leclercq
15, boulevard F.W. Raiffeisen, L-2411 Luxembourg
Grand Duchy of Luxembourg
Email: philippe.leclercq@alterdomus.com

with a copy to:

Renzenbrink & Partner
Dr. Ulf Renzenbrink / Dr. Andreas Stoll
Valentinskamp 70 (EMPORIO)
20355 Hamburg
Germany
Fax: +49 40 350171010
Email: renzenbrink@renzenbrink-partner.de / stoll@renzenbrink-partner.de

To the Purchaser:

Tribus Holdings 10 S.à r.l.
Valéry Beuken
15, boulevard F.W. Raiffeisen, L-2411 Luxembourg
Grand Duchy of Luxembourg
Email: valery.beuken@alterdomus.com

10.4 Public Disclosure, confidentiality

(a)    Neither Party shall make any press release or similar public announcement with respect to this Agreement except as expressly agreed upon with the other Parties.

(b)    Each Party shall keep confidential and not disclose to any Third Party the contents of this Agreement and any confidential information regarding the other Parties disclosed to it in connection with this Agreement or its implementation, except as expressly agreed upon with the other Party and except as may be required in order to comply with the requirements of any applicable laws or the rules and regulations of any stock exchange upon which any securities of the relevant Party or any of its parent companies are listed. If and to the extent any announcement, press release or disclosure of information regarding the subject matter of this Agreement is to be made under applicable mandatory laws or any applicable stock exchange regulations, the Party concerned shall, to the extent permissible under applicable laws or stock exchange regulations, not disclose any such information without first consulting with the other Parties and limit the disclosure to the minimum extent. The Purchaser shall, however, be allowed to disclose this Agreement and its contents to any Third Party holding a beneficial interest in it, to its advisors and banks providing financing for the transactions contemplated hereby.

10.5 Costs and Expenses

(a)    All transfer taxes (including real estate transfer taxes), stamp duties, fees (including notarial fees), registration duties or other charges in connection with any regulatory requirements (including merger control proceedings) and other charges and costs payable in connection with the execution of this Agreement and the implementation of the transactions contemplated hereby shall be borne by Purchaser.

(b)    Each Party shall pay its own expenses, including the costs of its advisors, incurred in connection with this Agreement.

10.6 Entire Agreement; Amendments and Waivers

(a)    This Agreement (including all Schedules hereto) contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes and replaces all oral and written declarations of intention made by the Parties in connection with the contractual negotiations.

(b)    Any provision of this Agreement (including this Section 10.6) may be amended or waived only if such amendment or waiver is (i) by written instrument executed by all Parties and explicitly refers to this Agreement or (ii) by notarized deed, if required by law.

10.7 No Assignments; No Set-Off and No Third Party Rights

(a)    Except as expressly set forth in this Agreement, Purchaser may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Seller, provided that the assignment of rights under this Agreement to Purchaser's lenders as security for the acquisition financing provided to Purchaser in connection with this Agreement shall be permitted.

(b) No Party, except as provided otherwise in this Agreement, shall be entitled (i) to set-off (any rights and claims it may have under this Agreement against any rights or claims any other Party may have under this Agreement or (ii) to refuse to perform any obligation it may have under this Agreement on the grounds that it has a right of retention unless the rights or claims of the relevant Party claiming a right of set-off or retention have been acknowledged in writing by the relevant other Party/Parties or have been confirmed by final decision of a arbitral tribunal in accordance with the principles set forth in Section 10.8(b). In no event, the Purchaser shall be entitled to set-off any claims against, or to exercise any rights of retention with respect to the Purchaser's obligations to make any payments on the Scheduled Closing Date or the Closing Date, as applicable.

(c) This Agreement shall not grant any rights to, and is not intended to operate for the benefit of, third parties unless otherwise explicitly provided for herein. Wherever under this Agreement any party other than the Purchaser is to be indemnified by the Seller, such other party, in particular the Companies, shall not be entitled to bring any claims for indemnification against the Seller.

10.8 Governing Law; Jurisdiction; Service of Process

(a) This Agreement shall be governed by, and construed in accordance with, the laws of the Grand Duchy of Luxembourg (excluding conflict of laws rules and the CISG).

(b) All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. No award or procedural order made in the arbitration shall be published. The place of the arbitration shall be Frankfurt am Main, Germany. The language of the arbitral proceedings shall be English. In the event that mandatory applicable law requires any matter arising from or in connection with this Agreement or its consummation to be decided upon by a court of law, the competent courts in and for Frankfurt am Main, Germany, shall have exclusive jurisdiction.

10.9 Interpretation

(a) The headings of the sections and subsections in this Agreement are for convenience purposes only and shall not affect the interpretation of any of the provisions hereof.

(b) Terms defined in the singular have a comparable meaning when used in the plural, and *vice versa*.

(c) For the purpose of any disclosure thresholds or the like in any representations and warranties contained in this Agreement, any reference to EUR shall include the equivalent in any foreign currency at the official Euro foreign exchange rates of the European Central Bank on the Signing Date.

(d) Words such as "hereof", "herein" or "hereunder" refer (unless otherwise required by the context) to this Agreement as a whole and not to a specific provision of this Agreement. The term "including" shall mean "including, without limitation".

23

(e)   The terms "including" and "in particular" shall always mean "including, without limitation" and "in particular, without limitation", respectively.

(f)   The Schedules to this Agreement are an integral part of this Agreement and any reference to this Agreement includes this Agreement and the Schedules as a whole. The disclosure of any matter in this Agreement (including any Schedule thereto) shall be deemed to be a disclosure for all purposes of this Agreement. The fact that a matter has been disclosed in a Schedule shall not be used to construe the extent of the required disclosure (including any standard of materiality) pursuant to the relevant representation or other provision of this Agreement.

10.10   Severability

Should any provision of this Agreement, or any provision incorporated into this Agreement in the future, be or become invalid or unenforceable, the validity or enforceability of the other provisions of this Agreement shall not be affected thereby. The invalid or unenforceable provision shall be deemed to be substituted by a suitable and equitable provision which, to the extent legally permissible, comes as close as possible to the intent and purpose of the invalid or unenforceable provision. The same shall apply: (i) if the Parties have, unintentionally, failed to address a certain matter in this Agreement; in this case a suitable and equitable provision shall be deemed to have been agreed upon which comes as close as possible to what the Parties, in the light of the intent and purpose of this Agreement, would have agreed upon if they had considered the matter; or (ii) if any provision of this Agreement is invalid because of the scope of any time period or performance stipulated herein; in this case a legally permissible time period or performance shall be deemed to have been agreed which comes as close as possible to the stipulated time period or performance.

[*Signature Page to follow*]

24

**H.I.G. Lux. 46 Holdings S.à r.l.**

Name:   Daphné Chanteloup

Position:   A Manager

Name:   Valéry Beuken

Position:   B Manager

**Tribus Holdings 10 S.à r.l.**

Name:   Daphné Chanteloup

Position:   A Manager

Name:   Valéry Beuken

Position:   B Manager

25

Project Flip

Schedule (D)

Other Group Companies

<u>Schedule (D) – Other Group Companies</u>

| No. | Company Name | Commercial Register | Registration Number | Percentage | Comments |
|---|---|---|---|---|---|
| 1. | Maillis Holding S.à r.l. | Luxembourg Trade and Companies Register | B 212128 | 100% | Held directly |
| 2. | EUROPACK S.A. | Luxembourg Trade and Companies Register | B 68393 | 100% | Held indirectly via Maillis Holding S.à r.l. |
| 3. | Maillis Sander GmbH | Wuppertal, Germany | HRB 10361 | 100% | Held indirectly via Maillis Holding S.à r.l. |
| 4. | M.J. Maillis U.K. Ltd. | Companies House for England and Wales | 03246586 | 100% | Held indirectly via Maillis Holding S.à r.l. and EUROPACK S.A. |
| 5. | MJ Maillis Turkey | Trade Register Office of İstanbul (*Ticaret Sicil Memurluğu*) | 957390-0 | 100% | Held indirectly via Maillis Holding S.à r.l. and EUROPACK S.A. |

* * *

Project Flip

Schedule 3.3(a)(viii)

Closing Protocol

Date: [●] 2022

_____

CLOSING PROTOCOL

relating to

PROJECT FLIP

_____

This Closing Protocol ("**Closing Protocol**") is entered into by and among

(1)  **H.I.G. Lux. 46 Holdings S.à r.l.**, a limited liability company (*société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et de Sociétés*) under B185603 ("**Seller**"); and

(2)  **Tribus Holdings 10 S.à r.l.**, a limited liability company (*Société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, incorporated by notarial deed of the notary Danielle Kolbach, Junglinster, Grand Duchy of Luxembourg dated 26 November 2021 ("**Purchaser**").

The Seller and the Purchaser are collectively referred to as the "**Parties**", and each individually a "**Party**".

## Preamble

(A)  On [●] 2021, the Parties entered into a share purchase agreement regarding the sale and purchase of shares in **Maillis International S.A.** (the "**SPA**").

(B)  Except as expressly provided otherwise in this Closing Protocol, the terms used in this Closing Protocol shall have the same meaning ascribed to them in the SPA and shall be construed and interpreted as set out in the SPA. Any references herein to "**SPA Section(s)**" means those sections of the SPA. Any references herein to "**SPA Schedule(s)**" means those Schedules to the SPA. Any other references herein to Sections or Schedules are those referred to in this Closing Protocol.

(C)  With this Closing Protocol the Parties intend to confirm to each other the due fulfilment or waiver of the Closing Conditions according to SPA Section 3.2, and that the Closing Actions according to SPA Section 3.3 were duly performed or waived, and that Closing has occurred.

**NOW IT IS AGREED** as follows:

1.  **Subject Matter**

This Closing Protocol describes the actions taken in connection with the consummation of the transactions contemplated by the SPA at the Closing Date. The legal significance of this Closing Protocol is strictly limited to serve as evidence that the Closing Conditions were fulfilled or effectively waived and that the Closing Actions were taken in accordance with SPA Sections 3.3(a)(i) through [3.3(a)(vii)] or effectively waived. The execution of this Closing Protocol shall not limit or prejudice the rights of the Parties arising under or in connection with the SPA or under applicable law.

2.  **Closing Date**

The Parties agree that the Closing Date within the meaning of SPA Section 3.1 shall be today.

2

3.  **Closing Conditions**

The Parties hereby confirm, unconditionally and irrevocably, that the Closing Conditions pursuant to SPA Section 3.2(b) have been fulfilled as follows:

a) The closing of the Marflex SPA, the SIAT SPA and the Inofyta SPA have occurred; and

b) the proceeds generated under the Marflex SPA, the SIAT SPA and the Inofyta SPA have been upstreamed and distributed to H.I.G. Lux 46 Holdings S.à r.l.

4.  **Closing Actions**

The Parties hereby confirm, unconditionally and irrevocably, that as of today, the following Closing Actions pursuant to SPA Section 3.3 have taken place by concurrent performance in the following sequence:

a) The Purchaser has paid the Purchase Price to the Seller;

b) the Seller and the Purchaser have executed a transfer deed relating to the Shares;

c) the shareholders' register of the Company has been amended to reflect the transfer of the Shares from the Seller to the Purchaser;

d) the Seller has handed over resignation letters by Messieurs Luc van Damme, Spyridon Gaitanos, Michael Maillis, Wolfgang Biedermann, Wolf-Dieter Baumann, Christian Kraul von Renner and Adorma Limited regarding their resignation from the board of directors of the Company (and in case of Mr. van Damme any other offices held at other Group Companies) with immediate effect as of the Scheduled Closing Date;

e) the Seller has passed a resolution as to the full discharge of the members of the board of directors of the Company for the time period up to and including the Closing Date.

f) [the Seller has taken reasonable efforts to cause any other directors and officers of the Group Companies to resign from office with immediate effect as of the Scheduled Closing Date;] and

g) the Seller has provided reasonable evidence of the termination of (i) of the existing Professional Service Agreement between Maillis International S.A. and H.I.G Capital LLC, (ii) the existing Business Development Services Agreement between Maillis International S.A. and DIVERSFIELD LIMITED CYPRUS Co., (iii) the board of directors agreement (terms and conditions of appointment) between Maillis International S.A. and Mr. Michael Maillis, (iv) the existing BoD service agreement between Maillis International S.A. and Adorma Limited, and (v) the existing BoD service agreement between Maillis International S.A. and Wolf-Dieter Baumann, all with effect as of no later than the Closing Date.

5.  **Closing Confirmation**

The Parties hereby confirm to each other that the Closing Actions pursuant to SPA Sections 3.3(a)(i) through [3.3(a)(vii)] have been performed (to the extent not waived) and have been fully completed.

As a matter of precaution, the Parties hereby waive the Closing Conditions which have not yet been fulfilled, and the performance of all Closing Actions which have not yet been performed as Closing Actions.

6.    **Share Transfers**

The Parties hereby confirm, unconditionally and irrevocably, that the *in rem* transfers of the Shares (SPA Section 3.3(a)(ii)) have become effective.

7.    **Interpretation and Miscellaneous**

In this Closing Protocol the headings are inserted for convenience purposes only and shall not affect the interpretation of this Closing Protocol; where a term has been inserted in quotation marks and/or italics it alone (and not the English term to which it relates) shall be authoritative for the purpose of the interpretation of the relevant English term in this Closing Protocol.

SPA Section 10 shall apply accordingly to this Closing Protocol.

**\* \* \***

*signature page follows*

4

SIGNATURE PAGE CLOSING PROTOCOL PROJECT FLIP

Date [●] 2022

H.I.G. Lux. 46 Holdings S.à r.l.                    Tribus Holdings 10 S.à r.l.


_____          _____
by [●]                                                      by [●]

5

10

# OMITTED DUE TO CONFIDENTIALITY

11

# OMITTED DUE TO CONFIDENTIALITY

12

# OMITTED DUE TO CONFIDENTIALITY

13

 **MAILLIS**

Confidential

**Business unit Report**
**P&L Summary**
**B2021**

## Detailed P&L Excluding Gaderoth & MSS

| values in 000 € | A18* | A19* | F20 | B21 | A19* vs A18* | | F20 vs A19* | | B21 vs F20 | | LTM Oct A20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Δ abs | Δ % | Δ abs | Δ % | Δ abs | Δ % | |
| _Sales | 210,926 | 198,472 | 167,507 | 178,881 | -12,455 | -5.9% | -30,965 | -15.6% | 11,375 | 6.8% | 168,425 |
| _Cos of Sales | 165,063 | 150,155 | 122,211 | 129,699 | -14,908 | -9.0% | -27,944 | -18.6% | 7,489 | 6.1% | 124,444 |
| **Gross Profit 1** | **45,864** | **48,316** | **45,296** | **49,182** | **2,453** | **5.3%** | **-3,020** | **-6.3%** | **3,886** | **8.6%** | **43,980** |
| % on sales | 21.7% | 24.3% | 27.0% | 27.5% | 2.6pp | | 2.7pp | | 0.5pp | | 26.1% |
| **Transportation Expense** | **10,935** | **10,464** | 10,134 | 10,442 | -472 | -4.3% | -329 | -3.1% | 308 | 3.0% | 10,155 |
| % on sales | 5.2% | 5.3% | 6.0% | 5.8% | 0.1pp | | 0.8pp | | -0.2pp | | 6.0% |
| **Gross Profit 2** | **34,928** | **37,853** | **35,162** | **38,740** | **2,925** | **8.4%** | **-2,691** | **-7.1%** | **3,578** | **10.2%** | **33,826** |
| % on sales | 16.6% | 19.1% | 21.0% | 21.7% | 2.5pp | | 1.9pp | | 0.7pp | | 20.1% |
| Other Op.Income | 430 | 445 | 335 | 365 | 16 | 3.6% | -110 | -24.7% | 30 | 8.9% | 414 |
| | | | | | | | | | | | |
| - Total Manpower Cost | 20,720 | 15,942 | 14,064 | 13,971 | -4,778 | -23.1% | -1,878 | -11.8% | -94 | -0.7% | 13,671 |
| - Total Travelling Cost | 1,398 | 881 | 879 | 986 | -517 | -37.0% | -2 | -0.3% | 107 | 12.2% | 516 |
| - Total Rents & Utilities | 2,007 | 1,987 | 1,504 | 1,200 | -21 | -1.0% | -482 | -24.3% | -304 | -20.2% | 1,559 |
| - Total Selling Expenses | 2,798 | 549 | 368 | 538 | -2,249 | -80.4% | -181 | -32.9% | 170 | 46.1% | 442 |
| - Total 3rd Party & Other Exp. | 2,612 | 5,645 | 4,228 | 4,284 | 3,033 | 116.1% | -1,417 | -25.1% | 56 | 1.3% | 3,835 |
| - Expenses IC | 0 | 0 | 0 | 0 | 0 | -100.0% | 0 | na | 0 | na | 0 |
| **Operating Expenses** | **29,535** | **25,003** | **21,044** | **20,978** | **-4,532** | **-15.3%** | **-3,960** | **-15.8%** | **-65** | **-0.3%** | **20,023** |
| % on sales | 14.0% | 12.6% | 12.6% | 11.7% | -1.4pp | | 0.0pp | | -0.8pp | | 11.9% |
| **Operating E.B.I.T.D.A** | **5,823** | **13,295** | **14,453** | **18,127** | **7,472** | **128.3%** | **1,158** | **8.7%** | **3,674** | **25.4%** | **14,217** |
| % on sales | 2.8% | 6.7% | 8.6% | 10.1% | 3.9pp | | 1.9pp | | 1.5pp | | 8.4% |

*Y18 & Y19 inlcude Gaderoth & MSS Data

Conso_PL_Summary

 **MAILLIS**

**Business unit Report**
**Maillis Group**
**B2021**
values in 000 €

*Confidential*

## Inofita BU

| | A18 est | A19 est | F20 | B21 | A19 est vs A18 | | F20 vs A19 | | B21 vs F20 | | LTM Oct A20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Δ abs | Δ % | Δ abs | Δ % | Δ abs | Δ % | |
| _Sales | 41,623 | 40,201 | 34,006 | 39,582 | -1,422 | -3.4% | -6,195 | -15.4% | 5,576 | 16.4% | 34,654 |
| _Cos of Sales | 35,037 | 32,320 | 27,778 | 31,333 | -2,716 | -7.8% | -4,543 | -14.1% | 3,556 | 12.8% | 28,610 |
| Gross Profit 1 | 6,587 | 7,881 | 6,228 | 8,249 | 1,294 | 19.7% | -1,652 | -21.0% | 2,020 | 32.4% | 6,045 |
| % on sales | 15.8% | 19.6% | 18.3% | 20.8% | 3.8pp | | -1.3pp | | 2.5pp | | 17.4% |
| Transportation Expenses | 3,517 | 3,464 | 3,169 | 3,741 | -53 | -1.5% | -295 | -8.5% | 572 | 18.1% | 3,023 |
| % on sales | 8.5% | 8.6% | 9.3% | 9.5% | 0.2pp | | 0.7pp | | 0.1pp | | 8.7% |
| Gross Profit 2 | 3,069 | 4,417 | 3,060 | 4,508 | 1,348 | 43.9% | -1,357 | -30.7% | 1,448 | 47.3% | 3,022 |
| % on sales | 7.4% | 11.0% | 9.0% | 11.4% | 3.6pp | | -2.0pp | | 2.4pp | | 8.7% |
| Other Op.Income | 0 | 34 | 38 | 0 | 34 | 0.0% | 4 | 10.3% | -38 | -100.0% | 136 |
| Operating Expenses | 3,929 | 3,725 | 3,273 | 3,319 | -204 | -5.2% | -452 | -12.1% | 46 | 1.4% | 3,394 |
| % on sales | 9.4% | 9.3% | 9.6% | 8.4% | -0.2pp | | 0.4pp | | -1.2pp | | 9.8% |
| Operating E.B.I.T.D.A | -860 | 726 | -176 | 1,189 | 1,586 | -184.4% | -902 | -124.2% | 1,364 | -777.1% | -236 |
| % on sales | -2.1% | 1.8% | -0.5% | 3.0% | 3.9pp | | -2.3pp | | 3.5pp | | -0.7% |

## Marflex BU

| | A18 est | A19 est | F20 | B21 | A19 est vs A18 | | F20 vs A19 | | B21 vs F20 | | LTM Oct A20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Δ abs | Δ % | Δ abs | Δ % | Δ abs | Δ % | |
| _Sales | 83,747 | 78,575 | 76,052 | 78,379 | -5,172 | -6.2% | -2,523 | -3.2% | 2,327 | 3.1% | 76,574 |
| _Cos of Sales | 66,103 | 60,941 | 58,038 | 59,893 | -5,162 | -7.8% | -2,903 | -4.8% | 1,855 | 3.2% | 59,238 |
| Gross Profit 1 | 17,644 | 17,634 | 18,014 | 18,487 | -10 | -0.1% | 380 | 2.2% | 473 | 2.6% | 17,336 |
| % on sales | 21.1% | 22.4% | 23.7% | 23.6% | 1.4pp | | 1.2pp | | -0.1pp | | 22.6% |
| Transportation Expenses | 5,425 | 5,415 | 5,640 | 5,340 | -10 | -0.2% | 225 | 4.2% | -300 | -5.3% | 5,552 |
| % on sales | 6.5% | 6.9% | 7.4% | 6.8% | 0.4pp | | 0.5pp | | -0.6pp | | 7.3% |
| Gross Profit 2 | 12,219 | 12,219 | 12,373 | 13,146 | 0 | 0.0% | 155 | 1.3% | 773 | 6.2% | 11,784 |
| % on sales | 14.6% | 15.6% | 16.3% | 16.8% | 1.0pp | | 0.7pp | | 0.5pp | | 15.4% |
| Other Op.Income | 31 | 31 | 45 | 0 | 0 | 0.0% | 14 | 45.9% | -45 | -100.0% | 48 |
| Operating Expenses | 8,068 | 7,563 | 6,479 | 6,684 | -505 | -6.3% | -1,084 | -14.3% | 205 | 3.2% | 6,652 |
| % on sales | 9.6% | 9.6% | 8.5% | 8.5% | 0.0pp | | -1.1pp | | 0.0pp | | 8.7% |
| Operating E.B.I.T.D.A | 4,182 | 4,687 | 5,940 | 6,463 | 505 | 12.1% | 1,253 | 26.7% | 523 | 8.8% | 5,180 |
| % on sales | 5.0% | 6.0% | 7.8% | 8.2% | 1.0pp | | 1.8pp | | 0.4pp | | 6.8% |

## Siat BU

| | A18 est | A19 est | F20 | B21 | A19 est vs A18 | | F20 vs A19 | | B21 vs F20 | | LTM Oct A20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Δ abs | Δ % | Δ abs | Δ % | Δ abs | Δ % | |
| _Sales | 67,197 | 62,458 | 57,303 | 60,920 | -4,739 | -7.1% | -5,155 | -8.3% | 3,617 | 6.3% | 57,188 |
| _Cos of Sales | 49,203 | 42,941 | 36,692 | 38,697 | -6,262 | -12.7% | -6,249 | -14.6% | 2,006 | 5.5% | 37,140 |
| Gross Profit 1 | 17,994 | 19,517 | 20,612 | 22,223 | 1,524 | 8.5% | 1,094 | 5.6% | 1,611 | 7.8% | 20,048 |
| % on sales | 26.8% | 31.2% | 36.0% | 36.5% | 4.5pp | | 4.7pp | | 0.5pp | | 35.1% |
| Transportation Expenses | 1,146 | 1,133 | 1,330 | 1,361 | -13 | -1.1% | 197 | 17.4% | 31 | 2.3% | 1,585 |
| % on sales | 1.7% | 1.8% | 2.3% | 2.2% | 0.1pp | | 0.5pp | | -0.1pp | | 2.8% |
| Gross Profit 2 | 16,848 | 18,384 | 19,282 | 20,862 | 1,536 | 9.1% | 897 | 4.9% | 1,580 | 8.2% | 18,464 |
| % on sales | 25.1% | 29.4% | 33.6% | 34.2% | 4.4pp | | 4.2pp | | 0.6pp | | 32.3% |
| Other Op.Income | 16 | 16 | 4 | 0 | 0 | 0.0% | -12 | -72.0% | -4 | -100.0% | 4 |
| Operating Expenses | 8,248 | 7,925 | 8,221 | 8,657 | -323 | -3.9% | 296 | 3.7% | 436 | 5.3% | 7,643 |
| % on sales | 12.3% | 12.7% | 14.3% | 14.2% | 0.4pp | | 1.7pp | | -0.1pp | | 13.4% |
| Operating E.B.I.T.D.A | 8,616 | 10,475 | 11,065 | 12,205 | 1,859 | 21.6% | 590 | 5.6% | 1,140 | 10.3% | 10,825 |
| % on sales | 12.8% | 16.8% | 19.3% | 20.0% | 3.9pp | | 2.5pp | | 0.7pp | | 18.9% |

BU_Pnl

**Excl.Gad&MSS**
**B2021**
values in 000 €   **Sales excluding Gaderoth & MSS**

| Volumes | A19 | F20 | B21 | F20 VS A19 Δ abs | B21 VS F20 Δ abs |
|---|---|---|---|---|---|
| Metal straps (tns) | 42,250 | 36,848 | 43,099 | -5,402 | 6,252 |
| Stretch film (tns) | 35,245 | 41,304 | 41,988 | 6,059 | 684 |
| Pet Strap (tns) | 8,213 | 8,286 | 9,000 | 73 | 714 |
| PP Strap (tns) | 3,404 | 3,391 | 3,500 | -13 | 109 |

| ASP / Tn | A19 | F20 | B21 | F20 VS A19 Δ abs | B21 VS F20 Δ abs |
|---|---|---|---|---|---|
| Metal straps (tns) | 923 | 881 | 881 | -42 | 0 |
| Stretch film (tns) | 1,545 | 1,338 | 1,352 | -208 | -15 |
| Pet Strap (tns) | 1,523 | 1,434 | 1,389 | -89 | 45 |
| PP Strap (tns) | 2,185 | 2,054 | 2,055 | -131 | -1 |

| Gross Margin / Tn | A19 | F20 | B21 | F20 VS A19 Δ abs | B21 VS F20 Δ abs |
|---|---|---|---|---|---|
| Metal straps (tns) | 178 | 165 | 188 | -13 | -22 |
| Stretch film (tns) | 319 | 290 | 313 | -29 | -23 |
| Pet Strap (tns) | 423 | 431 | 429 | 8 | 3 |
| PP Strap (tns) | 533 | 568 | 581 | 35 | -13 |

| Sales | A19 | F20 | B21 | F20 VS A19 | B21 VS F20 |
|---|---|---|---|---|---|
| Metal straps | 39,014 | 32,468 | 37,957 | -6,546 | -5,490 |
| Seals Inofita | 823 | 573 | 720 | -250 | -147 |
| By Products/scrap Inofita | 1,250 | 933 | 905 | -317 | 28 |
| Stretch film | 54,467 | 55,253 | 56,787 | 787 | -1,533 |
| Pet Strap | 12,504 | 11,880 | 12,498 | -624 | -618 |
| PP Strap | 7,436 | 6,964 | 7,193 | -472 | -229 |
| Other Consumables | 2,688 | 1,815 | 1,902 | -873 | -87 |
| By Products/scrap Marflex | 207 | 62 | 0 | -145 | 62 |
| F/A Machines | 292 | 0 | 0 | -292 | 0 |
| S/A Machines | 26,239 | 24,575 | 26,750 | -1,664 | -2,175 |
| Tape Flexo | 1,501 | 490 | 500 | -1,010 | -10 |
| Trd machines | 381 | 380 | 400 | -2 | -20 |
| Machines | 28,413 | 25,445 | 27,650 | -2,968 | -2,205 |
| Tools | 8,410 | 7,567 | 7,900 | -843 | -333 |
| Other M&T | 7,127 | 6,464 | 6,620 | -663 | -156 |
| Spare Parts | 13,982 | 13,430 | 14,250 | -552 | -820 |
| Services | 4,528 | 4,398 | 4,500 | -130 | -102 |
| Service & Spares | 18,510 | 17,828 | 18,750 | -682 | -922 |
| Edgeboards | 1,695 | 216 | 0 | -1,479 | 216 |
| Special Bands | 636 | 36 | 0 | -599 | 36 |
| Total | 183,180 | 167,505 | 178,881 | -15,674 | -11,376 |
| | 21840.34 | | | | |

| Gross Profit | A19 | F20 | B21 | F20 VS A19 | B21 VS F20 |
|---|---|---|---|---|---|
| Metal straps | 7,519 | 6,092 | 8,090 | -1,427 | -1,999 |
| Seals Inofita | 269 | 131 | 158 | -138 | -27 |
| By Products/scrap Inofita | 93 | 10 | 0 | -83 | 10 |
| Stretch film | 11,233 | 11,971 | 13,135 | 738 | -1,164 |
| Pet Strap | 3,478 | 3,573 | 3,857 | 95 | -284 |
| PP Strap | 1,813 | 1,925 | 2,032 | 111 | -107 |
| Other Consumables | 623 | 394 | 442 | -229 | -48 |
| By Products/scrap Marflex | 207 | 62 | -980 | -145 | 1,042 |
| F/A Machines | 36 | 0 | 0 | -36 | 0 |
| S/A Machines | 5,518 | 6,300 | 7,194 | 782 | -894 |
| Tape Flexo | 167 | 84 | 88 | -83 | -4 |
| Trd machines | 130 | 164 | 173 | 33 | -9 |
| Machines | 5,852 | 6,548 | 7,455 | 696 | -907 |
| Tools | 3,039 | 2,891 | 2,920 | -148 | -29 |
| Other M&T | 2,698 | 2,530 | 2,714 | -168 | -184 |
| Spare Parts | 7,346 | 7,661 | 8,088 | 315 | -426 |
| Services | 872 | 1,257 | 1,270 | 385 | -13 |
| Service & Spares | 8,218 | 8,919 | 9,358 | 700 | -439 |
| Edgeboards | 314 | 64 | 0 | -249 | 64 |
| Special Bands | 146 | 5 | 0 | -141 | 5 |
| Adjustments | 360 | 180 | 0 | -180 | 180 |
| Aff 99 | 0 | 0 | 0 | 0 | 0 |
| Total | 45,862 | 45,296 | 49,182 | -566 | -4,066 |

| Gpm% | A19 | F20 | B21 | F20 VS A19 Δ abs | B21 VS F20 Δ abs |
|---|---|---|---|---|---|
| Metal straps | 19.3% | 18.8% | 21.3% | n/a | -2.6pp |
| Seals Inofita | 32.7% | 22.9% | 22.0% | n/a | 0.9pp |
| By Products/scrap Inofita | 7.4% | 1.1% | 0.0% | n/a | 1.1pp |
| Stretch film | 20.6% | 21.7% | 23.1% | n/a | -1.5pp |
| Pet Strap | 27.8% | 30.1% | 30.9% | n/a | -0.8pp |
| PP Strap | 24.4% | 27.6% | 28.3% | n/a | -0.6pp |
| Other Consumables | 23.2% | 21.7% | 23.2% | n/a | -1.5pp |
| By Products/scrap Marflex | 100.0% | 100.0% | n/a | n/a | n/a |
| F/A Machines | 12.3% | n/a | n/a | n/a | n/a |
| S/A Machines | 21.0% | 25.6% | 26.9% | n/a | -1.3pp |
| Tape Flexo | 11.1% | 17.2% | 17.6% | n/a | -0.4pp |
| Trd machines | 34.2% | 43.2% | 43.2% | n/a | 0.0pp |
| Machines | 20.6% | 25.7% | 27.0% | n/a | -1.2pp |
| Tools | 36.1% | 38.2% | 37.0% | n/a | 1.2pp |
| Other M&T | 37.9% | 39.1% | 41.0% | n/a | -1.9pp |
| Spare Parts | 52.5% | 57.0% | 56.8% | n/a | 0.3pp |
| Services | 19.3% | 28.6% | 28.2% | n/a | 0.4pp |
| Service & Spares | 44.4% | 50.0% | 49.9% | n/a | 0.1pp |
| Edgeboards | 18.5% | 29.8% | n/a | n/a | n/a |
| Special Bands | 23.0% | 13.5% | n/a | n/a | n/a |
| Total | 25.0% | 27.0% | 27.5% | n/a | -0.5pp |

Prepared by Elena Thoma

**Year 2021**
values in th €

**NET DEBT * Historical data include Gaderoth & MSS**

| | Dec A18 | Dec A19 | Oct A20 | Jan B21 | Feb B21 | Mar B21 | Apr B21 | May B21 | Jun B21 | Jul B21 | Aug B21 | Sep B21 | Oct B21 | Nov B21 | Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **- Loans Non IC** | | | | | | | | | | | | | | | |
| - Non current bank loans | 0 | | 200 | 523 | 512 | 500 | 489 | 478 | 466 | 455 | 443 | 432 | 421 | 409 | 398 |
| - Non current finance lease liabilities | 3,674 | 2,409 | 2,064 | 1,877 | 1,789 | 1,700 | 1,612 | 1,523 | 1,435 | 1,346 | 1,257 | 1,168 | 1,079 | 989 | 903 |
| - Non current finance lease liabilities IFRS16 | 6,680 | 5,759 | 5,146 | 4,438 | 4,342 | 4,244 | 4,159 | 4,075 | 3,980 | 3,896 | 3,811 | 3,716 | 3,632 | 3,548 | 3,404 |
| - Current loans from banks | 3,501 | 3,502 | 3,069 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 | 2,136 |
| - Current finance lease liabilities | 1,328 | 1,380 | 1,497 | 1,412 | 1,329 | 1,246 | 1,163 | 1,080 | 996 | 997 | 999 | 1,000 | 1,001 | 1,002 | 1,000 |
| - Current finance lease liabilities IFRS16 | 2,117 | 1,678 | 1,540 | 1,719 | 1,693 | 1,665 | 1,637 | 1,609 | 1,582 | 1,556 | 1,529 | 1,505 | 1,480 | 1,456 | 1,480 |
| - Bank overdrafts | | | 1,792 | 3,000 | 3,111 | 2,993 | 2,853 | 2,374 | 2,500 | 2,838 | 2,152 | 2,000 | 2,272 | 2,687 | 1,955 |
| **- Loans Non IC Total** | **17,301** | **14,728** | **15,308** | **15,104** | **14,912** | **14,486** | **14,050** | **13,276** | **13,096** | **13,224** | **12,329** | **11,957** | **12,020** | **12,228** | **11,276** |
| **- Loans IC** | **0** | **0** | **0** | **0** | | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **- Loans Total** | **17,301** | **14,728** | **15,308** | **15,104** | **14,912** | **14,486** | **14,050** | **13,276** | **13,096** | **13,224** | **12,329** | **11,957** | **12,020** | **12,228** | **11,276** |
| **Pension Obligations** | | | | | | | | | | | | | | | |
| - MJM Greece | 3,438 | 2,846 | 2,714 | 2,739 | 2,743 | 2,746 | 2,750 | 2,754 | 2,758 | 2,762 | 2,766 | 2,769 | 2,773 | 2,777 | 2,781 |
| - Siat Spa | 2,995 | 2,801 | 2,695 | 2,709 | 2,715 | 2,721 | 2,727 | 2,733 | 2,739 | 2,745 | 2,751 | 2,757 | 2,763 | 2,769 | 2,775 |
| - MJM Poland | 81 | 109 | 100 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 |
| - MJM UK | 8,470 | 8,624 | 8,197 | 8,072 | 8,012 | 7,952 | 7,892 | 7,832 | 7,773 | 7,713 | 7,653 | 7,593 | 7,533 | 7,473 | 7,413 |
| - Maillis Sander Gmbh | | - | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 |
| - MJM Austria | 30 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - Sander | 973 | 1,038 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - Gaderoth | 748 | 911 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - MJM France | 41 | 74 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Pension Obligations Total** | **16,776** | **16,403** | **14,744** | **14,663** | **14,613** | **14,563** | **14,513** | **14,463** | **14,412** | **14,362** | **14,312** | **14,262** | **14,212** | **14,162** | **14,112** |
| **Total Debt** | **34,077** | **31,130** | **30,052** | **29,767** | **29,524** | **29,048** | **28,563** | **27,738** | **27,508** | **27,587** | **26,641** | **26,219** | **26,232** | **26,390** | **25,388** |
| **Total Cash** | **12,591** | **10,920** | **21,719** | **24,083** | **25,166** | **25,086** | **25,108** | **26,566** | **26,904** | **28,602** | **32,179** | **33,214** | **32,956** | **32,730** | **33,128** |
| **Net Debt** | **21,486** | **20,210** | **8,333** | **5,684** | **4,358** | **3,962** | **3,454** | **1,173** | **604** | **-1,016** | **-5,538** | **-6,994** | **-6,723** | **-6,341** | **-7,739** |
| **Factoring** | | | | | | | | | | | | | | | |
| M.J.Maillis Poland | 2,377 | 1,690 | 2,545 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maillis S.A | 376 | 328 | 264 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| Siat Conso | 454 | 547 | 778 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **3,207** | **2,565** | **3,587** | **150** | **150** | **150** | **150** | **150** | **150** | **150** | **150** | **150** | **150** | **150** | **150** |
| **Trade Finance (BG, L/C)** | | | | | | | | | | | | | | | |
| M.J.Maillis Poland | 2,000 | 2,000 | | | | | | | | | | | | | |
| Maillis S.A | | | 2,100 | | | | | | | | | | | | |
| Siat Conso | | 78 | 91 | | | | | | | | | | | | |
| **Total** | **2,000** | **2,078** | **2,191** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

14



# BoD October 20th 2021

20.10.2021

# BoD October 20 2021 – Teams

## Agenda

1. End-year financial forecast
2. Budget 2022
3. Analysis of the Exit Process result
4. New exit plan and relevant actions



# September YTD Financials – Outlook 2021

**Forecast 2021**

values in 000 €

**Consolidated PnL**

| | | | | 9+3 Estimation | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | A20 | 9Months Actual | 3M Forecast | F21 9+3 ( 9MA+3MB21) | F21 V2 | B21 | F21 V2 vs A20 | | F21 V2 vs B21 | | LTM |
| | | | | | | | Δ abs | Δ % | Δ abs | Δ % | |
| _Sales | 169,622 | 185,478 | 45,586 | 231,064 | 231,763 | 181,498 | 62,141 | 36.6% | 50,265 | 27.7% | 229,269 |
| _Cos of Sales | 123,661 | 138,082 | 33,131 | 171,213 | 172,154 | 131,444 | 48,494 | 39.2% | 40,711 | 31.0% | 170,095 |
| Gross Profit 1 | 45,961 | 47,396 | 12,456 | 59,852 | 59,608 | 50,055 | 13,647 | 29.7% | 9,554 | 19.1% | 59,174 |
| % on sales | 27.1% | 25.6% | 27.3% | 25.9% | 25.7% | 27.6% | -1.4pp | | -1.9pp | | 25.8% |
| Transportation Expense | 10,236 | 9,577 | 2,550 | 12,127 | 12,140 | 10,479 | 1,904 | 18.6% | 1,661 | 15.8% | 12,094 |
| % on sales | 6.0% | 5.2% | 5.6% | 5.2% | 5.2% | 5.8% | -0.8pp | | -0.5pp | | 5.3% |
| Gross Profit 2 | 35,726 | 37,819 | 9,906 | 47,724 | 47,468 | 39,575 | 11,743 | 32.9% | 7,893 | 19.9% | 47,080 |
| % on sales | 21.1% | 20.4% | 21.7% | 20.7% | 20.5% | 21.8% | -0.6pp | | -1.3pp | | 20.5% |
| Other Op.Income | 428 | 466 | 90 | 556 | 597 | 365 | 169 | 39.5% | 232 | 63.6% | 665 |
| Operating Expenses | 20,485 | 15,681 | 5,132 | 20,814 | 20,393 | 20,855 | -91 | -0.4% | -461 | -2.2% | 20,701 |
| % on sales | 12.1% | 8.5% | 11.3% | 9.0% | 8.8% | 11.5% | -3.3pp | | -2.7pp | | 9.0% |
| Operating E.B.I.T.D.A | 15,669 | 22,603 | 4,863 | 27,467 | 27,672 | 19,085 | 12,003 | 76.6% | 8,586 | 45.0% | 27,044 |
| % on sales | 9.2% | 12.2% | 10.7% | 11.9% | 11.9% | 10.5% | 2.7pp | | 1.4pp | | 11.8% |
| **SUM BU Op.EBITDA** | 17,532 | 23,710 | 5,256 | 28,966 | 29,036 | 20,654 | 11,434 | 65.2% | 8,312 | 40.2% | 28,611 |



# September YTD and 2021 Outlook - Inofyta

**Forecast 2021**

values in 000 €

**Business Unit PnL**

| Inofita BU | Inofita 9+3 Estimation | | | | | | | | | | LTM Sept A21 | EXIT BUSINESS PLAN | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A20 | 9Months Actual | 3M Forecast | F21 9+3 (9MA+3MB21) | F21 V2 | B21 | F21 V2 vs A20 | | F21 V2 vs B21 | | | A20 | BP21 | BP22 | BP23 | BP24 | BP25 |
| | | | | | | | Δ abs | Δ % | Δ abs | Δ % | | | | | | | |
| Steel Volumes (tns) | 37,594 | 38,281 | 11,146 | 49,426 | 49,426 | 43,099 | 11,832 | 31.5% | 6,327 | 14.7% | 47,970 | 37,594 | 46,993 | 48,215 | 49,998 | 51,747 | 53,454 |
| _Sales | 35,015 | 52,249 | 10,233 | 62,482 | 62,482 | 39,582 | 27,467 | 78.4% | 22,900 | 57.9% | 61,394 | 35,015 | 58,929 | 46,365 | 48,082 | 49,770 | 51,422 |
| _Cos of Sales | 28,576 | 40,969 | 8,080 | 49,049 | 49,436 | 31,333 | 20,860 | 73.0% | 18,102 | 57.8% | 48,358 | 28,576 | 49,346 | 36,320 | 37,378 | 38,595 | 39,875 |
| Gross Profit 1 | 6,440 | 11,280 | 2,153 | 13,433 | 13,046 | 8,249 | 6,607 | 102.6% | 4,798 | 58.2% | 13,036 | 6,440 | 9,583 | 10,045 | 10,703 | 11,175 | 11,547 |
| % on sales | 18.4% | 21.6% | 21.0% | 21.5% | 20.9% | 20.8% | 2.5pp | | 0.0pp | | 21.2% | 18.4% | 16.3% | 21.7% | 22.3% | 22.5% | 22.5% |
| Transportation Expenses | 3,219 | 3,964 | 967 | 4,932 | 4,932 | 3,741 | 1,712 | 53.2% | 1,191 | 31.8% | 4,757 | 3,219 | 4,737 | 4,161 | 4,315 | 4,435 | 4,581 |
| % on sales | 9.2% | 7.6% | 9.5% | 7.9% | 7.9% | 9.5% | -1.3pp | | -1.6pp | | 7.7% | 9.2% | 8.0% | 9.0% | 9.0% | 8.9% | 8.9% |
| Gross Profit 2 | 3,220 | 7,316 | 1,186 | 8,501 | 8,115 | 4,508 | 4,894 | 152.0% | 3,607 | 80.0% | 8,279 | 3,220 | 4,846 | 5,884 | 6,389 | 6,740 | 6,966 |
| % on sales | 9.2% | 14.0% | 11.6% | 13.6% | 13.0% | 11.4% | 3.8pp | | 1.6pp | | 13.5% | 9.2% | 8.2% | 12.7% | 13.3% | 13.5% | 13.5% |
| Other Op.Income | 50 | 33 | 0 | 33 | 33 | 0 | -17 | -34.6% | 33 | na | 46 | 50 | | | | | |
| Operating Expenses | 3,242 | 2,500 | 799 | 3,299 | 3,299 | 3,319 | 56 | 1.7% | -20 | -0.6% | 3,225 | 3,242 | 3,354 | 3,550 | 3,575 | 3,610 | 3,582 |
| % on sales | 9.3% | 4.8% | 7.8% | 5.3% | 5.3% | 8.4% | -4.0pp | | -3.1pp | | 5.3% | 9.3% | 5.7% | 7.7% | 7.4% | 7.3% | 7.0% |
| Operating E.B.I.T.D.A | 28 | 4,849 | 387 | 5,236 | 4,849 | 1,189 | 4,821 | 17095.3% | 3,660 | 307.9% | 5,100 | 28 | 1,492 | 2,334 | 2,813 | 3,130 | 3,384 |
| % on sales | 0.1% | 9.3% | 3.8% | 8.4% | 7.8% | 3.0% | 7.7pp | | 4.8pp | | 8.3% | 0.1% | 2.5% | 5.0% | 5.9% | 6.3% | 6.6% |



4 | 19.10.2021

# September YTD and 2021 Outlook - Marflex

| Forecast 2021 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **values in 000 €** | | | | | | | | | | | | | | | | | |
| **Business Unit PnL** | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Marflex BU** | **Marflex 9+3 Estimation** | | | | | | | | | | | **EXIT BUSINESS PLAN** | | | | | |
| | A20 | 9Months Actual | 3M Forecast | F21 9+3 ( 9MA+3MB21) | F21 V2 | B21 | F21 V2 vs A20 | | F21 V2 vs B21 | | LTM Sept A21 | A20 | BP21 | BP22 | BP23 | BP24 | BP25 |
| | | | | | | | Δ abs | Δ % | Δ abs | Δ % | | | | | | | |
| Stretch Volumes ( tns) | 41,611 | 30,224 | 10,292 | 40,515 | 40,515 | 41,988 | -1,095 | -2.6% | -1,473 | -3.5% | 40,745 | 41,611 | 41,690 | 45,421 | 48,178 | 52,331 | 57,335 |
| Strap Volumes( tns) | 11,931 | 10,891 | 2,991 | 13,882 | 13,882 | 12,500 | 1,952 | 16.4% | 1,382 | 11.1% | 14,081 | 11,931 | 12,879 | 12,845 | 13,051 | 13,270 | 13,506 |
| | | | | | | | | | | | | | | | | | |
| **_Sales** | **76,561** | **78,464** | **19,096** | **97,561** | **97,561** | **78,379** | 21,000 | 27.4% | 19,181 | 24.5% | **97,179** | **76,561** | **82,222** | **83,297** | **87,642** | **94,200** | **102,142** |
| _Cos of Sales | 58,388 | 63,172 | 14,589 | 77,762 | 77,762 | 59,893 | 19,374 | 33.2% | 17,869 | 29.8% | 77,553 | 58,388 | 63,307 | 63,106 | 66,197 | 70,439 | 75,975 |
| **Gross Profit 1** | **18,173** | **15,292** | **4,507** | **19,799** | **19,799** | **18,487** | 1,626 | 8.9% | 1,312 | 7.1% | **19,626** | **18,173** | **18,915** | **20,191** | **21,445** | **23,761** | **26,167** |
| % on sales | **23.7%** | **19.5%** | **23.6%** | **20.3%** | **20.3%** | **23.6%** | -3.4pp | | -3.3pp | | **20.2%** | **23.7%** | **23.0%** | **24.2%** | **24.5%** | **25.2%** | **25.6%** |
| Transportation Expenses | 5,807 | 4,520 | 1,225 | 5,745 | 5,745 | 5,340 | -62 | -1.1% | 405 | 7.6% | 6,016 | 5,807 | 5,507 | 5,639 | 5,926 | 6,254 | 6,730 |
| % on sales | **7.6%** | **5.8%** | **6.4%** | **5.9%** | **5.9%** | **6.8%** | -1.7pp | | -0.9pp | | **6.2%** | **7.6%** | **6.7%** | **6.8%** | **6.8%** | **6.6%** | **6.6%** |
| **Gross Profit 2** | **12,366** | **10,772** | **3,282** | **14,054** | **14,054** | **13,146** | 1,688 | 13.6% | 908 | 6.9% | **13,610** | **12,366** | **13,408** | **14,552** | **15,519** | **17,508** | **19,437** |
| % on sales | **16.2%** | **13.7%** | **17.2%** | **14.4%** | **14.4%** | **16.8%** | -1.7pp | | -2.4pp | | **14.0%** | **16.2%** | **16.3%** | **17.5%** | **17.7%** | **18.6%** | **19.0%** |
| Other Op.Income | 78 | 38 | 0 | 38 | 38 | 0 | -40 | -51.1% | 38 | na | 71 | 78 | 22 | | | | |
| Operating Expenses | 6,552 | 5,159 | 1,651 | 6,810 | 6,810 | 6,684 | 258 | 3.9% | 126 | 1.9% | 6,867 | 6,552 | 6,925 | 7,080 | 7,321 | 7,572 | 7,831 |
| % on sales | **8.6%** | **6.6%** | **8.6%** | **7.0%** | **7.0%** | **8.5%** | -1.6pp | | -1.5pp | | **7.1%** | **8.6%** | **8.4%** | **8.5%** | **8.4%** | **8.0%** | **7.7%** |
| **Operating E.B.I.T.D.A** | **5,893** | **5,651** | **1,631** | **7,282** | **7,282** | **6,463** | 1,390 | 23.6% | 819 | 12.7% | **6,815** | **5,893** | **6,505** | **7,472** | **8,198** | **9,936** | **11,606** |
| % on sales | **7.7%** | **7.2%** | **8.5%** | **7.5%** | **7.5%** | **8.2%** | -0.2pp | | -0.8pp | | **7.0%** | **7.7%** | **7.9%** | **9.0%** | **9.4%** | **10.5%** | **11.4%** |



# September YTD and 2021 Outlook – Siat

# 5 Year EXIT Business Plan

| Forecast 2021 | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| values in 000 € | | | | | | | | | | | | | | | |
| **Business Unit PnL** | | | | | | | | | | | | | | | |

| **Siat BU** | | | | Siat 9+3 Estimation | | | | | | | | | EXIT BUSINESS PLAN | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **A20** | **9Months Actual** | **3M Forecast** | **F21 9+3 ( 9MA+3MB21)** | **F21 V2** | **B21** | **F21 V2 vs A20** | | **F21 V2 vs B21** | | **LTM Sept A21** | **A20** | **BP21** | **BP22** | **BP23** | **BP24** | **BP25** |
| | | | | | | | Δ abs | Δ % | Δ abs | Δ % | | | | | | | |
| _Sales | **57,872** | **54,772** | **16,257** | **71,029** | **71,720** | **63,537** | 13,848 | 23.9% | 8,183 | 12.9% | **70,672** | 57,872 | 67,985 | 74,269 | 79,175 | 84,435 | 90,151 |
| _Cos of Sales | 36,925 | 34,107 | 10,461 | 44,568 | 44,957 | 40,442 | 8,032 | 21.8% | 4,515 | 11.2% | 44,334 | 36,925 | 42,689 | 46,593 | 49,573 | 52,684 | 56,143 |
| **Gross Profit 1** | **20,947** | **20,666** | **5,796** | **26,461** | **26,763** | **23,095** | 5,816 | 27.8% | 3,668 | 15.9% | **26,338** | 20,947 | 25,296 | 27,675 | 29,602 | 31,750 | 34,007 |
| % on sales | **36.2%** | **37.7%** | **35.6%** | **37.3%** | **37.3%** | **36.3%** | 1.1pp | | 1.0pp | | **37.3%** | 36.2% | 37.2% | 37.3% | 37.4% | 37.6% | 37.7% |
| Transportation Expenses | 1,215 | 1,093 | 357 | 1,450 | 1,463 | 1,398 | 248 | 20.4% | 65 | 4.6% | 1,321 | 1,215 | 1,496 | 1,634 | 1,742 | 1,858 | 1,983 |
| % on sales | **2.1%** | **2.0%** | **2.2%** | **2.0%** | **2.0%** | **2.2%** | -0.1pp | | -0.2pp | | **1.9%** | 2.1% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| **Gross Profit 2** | 19,732 | 19,573 | 5,438 | 25,011 | 25,300 | 21,697 | 5,568 | 28.2% | 3,603 | 16.6% | 25,016 | 19,732 | 23,800 | 26,041 | 27,860 | 29,893 | 32,024 |
| % on sales | **34.1%** | **35.7%** | **33.5%** | **35.2%** | **35.3%** | **34.1%** | 1.2pp | | 1.1pp | | **35.4%** | 34.1% | 35.0% | 35.1% | 35.2% | 35.4% | 35.5% |
| Other Op.Income | 7 | 0 | 0 | 0 | | 0 | -7 | -100.0% | 0 | na | 2 | 7 | | | | | |
| Operating Expenses | 8,128 | 6,363 | 2,200 | 8,563 | 8,395 | 8,695 | 267 | 3.3% | -300 | -3.4% | 8,322 | 8,128 | 8,474 | 9,074 | 9,427 | 9,802 | 10,255 |
| % on sales | **14.0%** | **11.6%** | **13.5%** | **12.1%** | **11.7%** | **13.7%** | -2.3pp | | -2.0pp | | **11.8%** | 14.0% | 12.5% | 12.2% | 11.9% | 11.6% | 11.4% |
| **Operating E.B.I.T.D.A** | 11,611 | 13,209 | 3,239 | 16,448 | 16,905 | 13,002 | 5,294 | 45.6% | 3,903 | 30.0% | 16,696 | 11,611 | 15,326 | 16,967 | 18,433 | 20,091 | 21,769 |
| % on sales | **20.1%** | **24.1%** | **19.9%** | **23.2%** | **23.6%** | **20.5%** | 3.5pp | | 3.1pp | | **23.6%** | 20.1% | 22.5% | 22.8% | 23.3% | 23.8% | 24.1% |
| Combi EBITDA contribution (50 | 1,782 | | | | 2,789 | | | | | | | 1,782 | 2,235 | 2,811 | 3,183 | 3,760 | 4,387 |
| **Adjusted operating EBITDA** | **13,393** | | | | **19,694** | | | | | | | 13,393 | 17,561 | 19,778 | 21,617 | 23,851 | 26,156 |



# September YTD and 2021 Outlook – Siat

## 5 Year UPDATED EXIT Business Plan

**Forecast 2021**

values in 000 €

**Business Unit PnL**

| Siat BU | Siat 9+3 Estimation | | | | | | | | | | | UPDATED EXIT BUSINESS PLAN | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A20 | 9Months Actual | 3M Forecast | F21 9+3 (9MA+3MB21) | F21 V2 | B21 | F21 V2 vs A20 Δ abs | Δ % | F21 V2 vs B21 Δ abs | Δ % | LTM Sept A21 | A20 | BP21 | BP22 | BP23 | BP24 | BP25 | BP26 |
| _Sales | 57,872 | 54,772 | 16,257 | 71,029 | 71,720 | 63,537 | 13,848 | 23.9% | 8,183 | 12.9% | 70,672 | 57,872 | 71,720 | 73,519 | 78,261 | 83,750 | 89,124 | 94,064 |
| _Cos of Sales | 36,925 | 34,107 | 10,461 | 44,568 | 44,957 | 40,442 | 8,032 | 21.8% | 4,515 | 11.2% | 44,334 | 36,925 | 44,957 | 45,942 | 48,803 | 52,147 | 55,337 | 58,349 |
| **Gross Profit 1** | **20,947** | **20,666** | **5,796** | **26,461** | **26,763** | **23,095** | **5,816** | **27.8%** | **3,668** | **15.9%** | **26,338** | **20,947** | **26,763** | **27,577** | **29,457** | **31,602** | **33,787** | **35,715** |
| % on sales | 36.2% | 37.7% | 35.6% | 37.3% | 37.3% | 36.3% | 1.1pp | | 1.0pp | | 37.3% | 36.2% | 37.3% | 37.5% | 37.6% | 37.7% | 37.9% | 38.0% |
| Transportation Expenses | 1,215 | 1,093 | 357 | 1,450 | 1,463 | 1,398 | 248 | 20.4% | 65 | 4.6% | 1,321 | 1,215 | 1,463 | 1,390 | 1,517 | 1,624 | 1,728 | 1,824 |
| % on sales | 2.1% | 2.0% | 2.2% | 2.0% | 2.0% | 2.2% | -0.1pp | | -0.2pp | | 1.9% | 2.1% | 2.0% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% |
| **Gross Profit 2** | **19,732** | **19,573** | **5,438** | **25,011** | **25,300** | **21,697** | **5,568** | **28.2%** | **3,603** | **16.6%** | **25,016** | **19,732** | **25,300** | **26,187** | **27,940** | **29,979** | **32,059** | **33,891** |
| % on sales | 34.1% | 35.7% | 33.5% | 35.2% | 35.3% | 34.1% | 1.2pp | | 1.1pp | | 35.4% | 34.1% | 35.3% | 35.6% | 35.7% | 35.8% | 36.0% | 36.0% |
| Other Op.Income | 7 | 0 | 0 | 0 | 0 | 0 | -7 | -100.0% | 0 | na | 2 | 7 | | | | | | |
| Operating Expenses | 8,128 | 6,363 | 2,200 | 8,563 | 8,395 | 8,695 | 267 | 3.3% | -300 | -3.4% | 8,322 | 8,128 | 8,395 | 8,854 | 9,316 | 9,686 | 10,123 | 10,407 |
| % on sales | 14.0% | 11.6% | 13.5% | 12.1% | 11.7% | 13.7% | -2.3pp | | -2.0pp | | 11.8% | 14.0% | 11.7% | 12.0% | 11.9% | 11.6% | 11.4% | 11.1% |
| **Operating E.B.I.T.D.A** | **11,611** | **13,209** | **3,239** | **16,448** | **16,905** | **13,002** | **5,294** | **45.6%** | **3,903** | **30.0%** | **16,696** | **11,611** | **16,905** | **17,334** | **18,624** | **20,292** | **21,936** | **23,484** |
| % on sales | 20.1% | 24.1% | 19.9% | 23.2% | 23.6% | 20.5% | 3.5pp | | 3.1pp | | 23.6% | 20.1% | 23.6% | 23.6% | 23.8% | 24.2% | 24.6% | 25.0% |
| Combi EBITDA contribution (50 | 1,782 | | | | 2,789 | | | | | | | 1,782 | 2,789 | 2,811 | 3,183 | 3,760 | 4,387 | 5,045 |
| **Adjusted operating EBITDA** | **13,393** | | | | **19,694** | | | | | | | **13,393** | **19,694** | **20,145** | **21,807** | **24,052** | **26,323** | **28,529** |



7 | 19.10.2021

# September YTD Financials – Outlook 2021

**Year 2021**
values in 000 €

**NET DEBT * Historical data include Gaderoth & MSS**

| | Dec A18 | Dec A19 | Dec A20 | Jan A21 | Feb A21 | Mar A21 | Apr A21 | May A21 | Jun A21 | Jul A21 | Aug A21 | Sep A21 | Q4 2021 | Dec F21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **- Loans Non IC** | | | | | | | | | | | | | | |
| - Non current bank loans | 0 | | 719 | 723 | 713 | 675 | 673 | 669 | 654 | 1,638 | 1,630 | 1,610 | | 1,610 |
| - Non current finance lease liabilities | 3,674 | 2,409 | 1,896 | 1,789 | 1,699 | 1,609 | 1,519 | 1,430 | 1,338 | 1,253 | 1,163 | 1,076 | | 1,076 |
| - Non current finance lease liabilities IFRS16 | 6,680 | 5,759 | 4,653 | 4,537 | 4,463 | 4,674 | 4,672 | 4,567 | 4,577 | 4,447 | 4,348 | 4,213 | | 4,213 |
| - Current loans from banks | 3,501 | 3,502 | 2,787 | 2,784 | 2,640 | 2,636 | 2,639 | 146 | 143 | 140 | 142 | 355 | | 355 |
| - Current finance lease liabilities | 1,328 | 1,380 | 1,349 | 1,251 | 1,164 | 1,082 | 995 | 991 | 991 | 990 | 992 | 989 | | 989 |
| - Current finance lease liabilities IFRS16 | 2,117 | 1,678 | 1,531 | 1,639 | 1,660 | 1,699 | 1,724 | 1,704 | 1,676 | 1,647 | 1,619 | 1,584 | | 1,584 |
| - Bank overdrafts | | | 3,072 | 3,085 | 2,879 | 1,773 | 2,481 | 3,299 | 3,949 | 4,177 | 4,333 | 5,830 | | 5,830 |
| **- Loans Non IC Total** | 17,301 | 14,728 | 16,007 | 15,809 | 15,218 | 14,148 | 14,703 | 12,806 | 13,328 | 14,292 | 14,226 | 15,656 | 0 | 15,656 |
| **- Loans IC** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **- Loans Total** | 17,301 | 14,728 | 16,007 | 15,809 | 15,218 | 14,148 | 14,703 | 12,806 | 13,328 | 14,292 | 14,226 | 15,656 | 0 | 15,656 |
| **Pension Obligations** | | | | | | | | | | | | | | |
| - MJM Greece | 3,438 | 2,846 | 2,777 | 2,788 | 2,800 | 2,811 | 2,823 | 2,824 | 2,782 | 2,794 | 2,805 | 2,817 | | 2,817 |
| - Siat Spa | 2,995 | 2,801 | 2,611 | 2,602 | 2,617 | 2,596 | 2,596 | 2,606 | 2,616 | 2,628 | 2,643 | 2,660 | | 2,660 |
| - MJM Poland | 81 | 109 | 106 | 107 | 107 | 104 | 106 | 108 | 107 | 106 | 107 | 105 | | 105 |
| - Gaderoth | 748 | 911 | 0 | | | | | | | | | | | |
| - Sander | 973 | 1,038 | 0 | | | | | | | | | | | |
| - MJM UK | 8,470 | 8,624 | 9,105 | 9,206 | 9,291 | 9,434 | 9,198 | 9,232 | 9,197 | 9,211 | 9,075 | 8,999 | | 8,999 |
| - MJM France | 41 | 74 | 0 | | | | | | | | | | | |
| - MJM Austria | 30 | 0 | 0 | | | | | | | | | | | |
| - Maillis Sander Gmbh | | 0 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | | 1,157 |
| **Pension Obligations Total** | 16,776 | 16,403 | 15,757 | 15,862 | 15,973 | 16,103 | 15,880 | 15,928 | 15,860 | 15,897 | 15,788 | 15,739 | 0 | 15,739 |
| **Total Debt** | 34,077 | 31,130 | 31,764 | 31,670 | 31,190 | 30,251 | 30,583 | 28,733 | 29,188 | 30,189 | 30,014 | 31,395 | 0 | 31,395 |
| **Total Cash** | 12,591 | 10,920 | 24,953 | 24,654 | 23,740 | 25,732 | 26,620 | 22,781 | 25,065 | 25,540 | 26,100 | 27,742 | 11,217 | 38,959 |
| **Net Debt** | 21,486 | 20,210 | 6,811 | 7,017 | 7,450 | 4,519 | 3,964 | 5,952 | 4,123 | 4,650 | 3,914 | 3,653 | -11,217 | -7,564 |

| | |
|---|---|
| **Q4 EBITDA** | 5,069 |
| **Q4 Wcap movement** | 478 |
| **Q4 GE Real Estate** | 5,670 |
| **Q4 CASH GENERATION** | 11,217 |



8 | 19.10.2021

15

| | |
|---|---|
| **From:** | Christian Kraul-von Renner <ckraulvonrenner@higcapital.com> |
| **Sent:** | 03 November 2021 10:12 |
| **To:** | Michael Maillis |
| **Subject:** | Aw: |

Michael,

Thanks for your email. Please be ensured that also we want to absolutely avoid any negotiations with you as a long trusted partner. However, it is important to understand the context of a "Flip" transaction, i.e. selling and buying between Funds. These transactions are under specific compliance scrutiny and **any** transaction between Funds requires the consent of the respective Funds' external Advisory Boards ("ABs"). These ABs are made up of LP representatives and they act in the sole interest of the Fund they represent, so in the case of the Fund I AB, Seller's interests and in the case of Fund III AB, Buyer's interests. This transaction is therefore **not at the discretion** of H.I.G.'s Investment Committee, hence us. These compliance mechanisms have to exist, as the investors' universe between Funds is not identical.  So for any "Flip" to work, we need to strike a fair balance. This fair balance has to be backed-up by objective market evidence. As a result, it is simply impossible for Fund III, the potential Buyer, to pay a price above the highest offer received in a competitive sale process. We have no discretion around these procedures.

The Marflex transaction is totally independent of a Flip, so we should decide independently as well. We believe that there is a window of opportunity to get the proposed deal approved by Fund I's AB right now because of potential tax changes expected in the US in the next year. So a quick sale this year would avoid potential taxation risks for Fund I investors.

In summary, there is a window now, at the terms we have proposed which we believe we can deliver before the end of the year. This would also avoid that SIAT management feels to be left in limbo. Konstantinos has stated several times that he would hate this as he wants to move on.

Best,

Case 1:22-cv-23619-RKA   Document 5-5   Entered on FLSD Docket 11/04/2022   Page 252 of 298

Christian

---

**From:** Michael Maillis <michael@maillis.com>
**Sent:** Dienstag, 2. November 2021 15:28
**To:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
**Subject:**

Christian,

Thank you for your prompt response delivering to me some necessary clarifications I requested in order to understand the "Option 3" scenario that you proposed in the recent BOD.
I believe now, with the help of an external expert, I will understand your option 3 and comment as the Seller.
My intention is to come to a fair agreement, both for the "Sellers" and the "Buyer", avoiding negotiations between partners. Further my approach will be in a positive sense, in order not to risk the Flip option, which I believe we all prefer.

I believe that as soon as we have Marflex's outcome, I will be ready with my response to you.

Best,

Michael

2

16

**From:** **Dorotheos Samoladas** dsamoladas@sarantitis.com
**Subject:** Fwd: BoD Meeting
**Date:** 16 November 2021 - 2:59 PM
**To:** Luc Luc Van Damme luc.vandamme@maillis.com, MICHAEL MAILLIS mmaillis1@me.com

FYI

---------- Forwarded message ---------
From: **Dorotheos Samoladas** <dsamoladas@sarantitis.com>
Date: Tue, Nov 16, 2021 at 2:58 PM
Subject: Re: BoD Meeting
To: Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>

Christian,
See my comments below with green letters.

Best
Dorotheos

Dorotheos Samoladas
Managing Partner

**SARANTITIS**
9 Anagnostopoulou str.
Athens 106 73
Tel. +30-210-3670400
Fax +30-210-3621595
www.sarantitis.com

On Mon, Nov 15, 2021 at 8:17 PM Christian Kraul-von Renner <ckraulvonrenner@higcapital.com> wrote:
> Ok. I'll call you.
> Best
>
> Am 15.11.2021 um 17:34 schrieb Dorotheos Samoladas <DSamoladas@sarantitis.com>:
>
> Christian,
> I did not have the time yet to go through your email. I am of course happy to discuss.
> 2pm CET, tomorrow, is ok with me.
>
> Best
> Dorotheos
>
>
> On Mon, Nov 15, 2021 at 2:50 PM Christian Kraul-von Renner <ckraulvonrenner@higcapital.com> wrote:
>
>> Hi Dorotheos,
>>
>> No problem – here it is also very busy. Many thanks for your email. Please see below for my thoughts. I suggest we speak over phone in next days as we should finalize our decision rather soon. When would you be available – tmrw 2pm cet?
>>
>> Best,
>>
>> Christian
>>
>> **From:** Dorotheos Samoladas <dsamoladas@sarantitis.com>
>> **Sent:** Sonntag, 14. November 2021 15:32
>> **To:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
>> **Subject:** Re: BoD Meeting

Hi Christian.

Due to being very busy recently, I did not have the time to look into the matter and revert to you earlier. I have now gone through the Option 3 proposal and the recent correspondence and my view is the following:

## I. EV Multiple

I still believe that a 8.5x EV multiple is indeed quite aggressive for a company like SIAT. We have discussed in the past and I had heard from you and WB that SIAT should have a multiple in the area of 10x. The argument that the bidding process gave us the market's current appraisal regarding SIAT, is not strong in this case, as there was a serious flaw in the process (lack of adequate financial history combined with poor advise on the potential impact of such weak point, resulting in not doing the extra mile that was needed to support our figures), which [a] discouraged strong players from bidding, while [b] allowed Greenbridge to negotiate surprisingly harder than its initial indicative offer.

Nevertheless, as my position is that we should implement the flip transaction as good partners do, I would be ok with this low EV multiple. It obviously transfers considerable value to the new fund, but this is, in principle, something understandable in order to make the transaction appealing to the new investors. In addition, I would like to avoid Option 2.

As discussed, we all were looking for a higher exit multiple in the process, but as a matter of fact, it did not work out. Christian, the 8.5x is acceptable for me, under the circumstances. What I am stressing is that we did not really see what potential buyers might offer and this creates a sense of "loss". MM (and not only) is disappointed by the way that the process was handled. If the process had no flaws, the outcome would be accepted as the real value of the companies, whatever the value would be.

## II. EV and Purchase Price

**A.** Financial Performance Figures used to calculate the EV. Although I see the latter point, what really strikes me, at this point in time, is the fact that the proposal follows the Locked Box structure of the failed (regarding SIAT and Inofyta) bidding process of the 1st half of 2021 (which of course, was taking into account 2020 year end figures). Using the Locked Box figures at this point in time, where we are very close to 2021 year end, does not look right. Moreover, a transaction of the nature of the pertained flip deal (a deal between HIG funds, where everything should be at arm's length) makes this look even stranger. The new fund was not part of the bidding process and so, nobody is committed to apply the now obsolete 2020 figures. I understand that the 2020 Locked Box concept would now work (again) in favor of the Buyer but, [a] I think we are losing the balance of how much additional value should be left for the Buyer, while [b] net debt calculation becomes questionable, when we now have actual 2021 figures, which we should apply [c] we also have to see what the "Leakages" are (to beneficiaries outside the scope of the flip), which will not be an issue with 2021 figures. So, since closing of the flip transaction will take place at the end of 2021 or beginning of 2022, the 2020 Locked Box concept should not apply.

It seems there is misunderstanding here as you indicate that the transaction proposal assumes the Seller does not receive any value for 2021. This is wrong. For SIAT we added ~€9m as free cash flow proxi for 2021 – see also the source from EY below which even assumes that a COMBI dividend is paid in 2021. Furthermore it is rather normal to have lock box transactions with an effective date 31/12/2020 even if signing falls in Q4. We just sold a company two weeks ago with the same approach. As you know, a lock box transaction is a seller friendly structure as it provides certainty around the numbers. In the process we decided against completion accounts due to the increased complexity and to reduce transaction costs. Also, whether we use lock-box Dec '20 or completion accounts or any other lock-box date should not really matter in the final value as seller is compensated for the cash flow in 2021 (which is the case in our proposal). A lock box transaction with 31/12/21 as effective date, however, does not work as we would have to wait by end of January to have the numbers, update the EY work to have the same basis of the figures, etc. This would bring us to March. Please see attached an email to Michael with regards to the timing.

I know that there is an amount in respect of 2021 cash. Again we would have to see the period this interest amount covers, the Leakage figure etc. . The point here is to do what is most straightforward, without formulas and approximations. Luc can give us the year end actual numbers by the end January as you say. We can have the flip transaction documentation signed before and closing/payment of the flip price, subject to finalizing 2021 figures.

<image001.png>

**B.** UK Pension Liability.

Deducting €17M for the UK pension liability, is charging our proceeds with the most expensive option there is, in the UK pension matter, which we have in the past and recently (following WB's instructions) explored and rejected due to its high cost. As you know, all current (total) deficit figures of the two schemes are in the area of €10M, according to the schemes' actuary and also, the Pensions Protection Fund (PPF), while, with the improved investment strategy applied by our new trustees, the deficit is expected to decrease further. It is noted that, in our case, the exposure of Maillis International is limited to its guarantee for the (now reduced) amount of €3.3M and that it could be validly argued that this is the only amount that should be deducted for a Maillis International purchase price determination. Notwithstanding the previous, I fully understand

[i] that a buyer would push it further to deduct a higher amount and [ii] that HIG needs to be on the safe side as regards the UK pension supervising authorities. However, the latter cannot go to the extent of charging against the purchase price, an exorbitant amount that would be appealing to an insurer, to take up the liability. No seller would accept such an extreme buyer position, almost doubling the current schemes' deficit amount.

We are all well aware that UK pension is a complex and difficult matter to deal with. At the end, this is not an issue that ends at Maillis International but at the UBO, which is H.I.G.. You are aware that we have had a case with the PPF which we certainly do not want to repeat again. The UK pension topic has also been scrutinized by our external Advisory Boards (see email attached) and it has been agreed that the insurance value would need to be applied. Deducting from the flip transaction price, an amount equal to the pension schemes' deficit, or equal to the buy-out cost has nothing to do with HIG's position in respect of the Pensions' Regulator. It is only related with the flip price. Moreover, asking your current stakeholders to pay €7M more as "additional protection" in view of HIG's behavior in another investment, does not seem justifiable. Leaving behind €10M for the UK deficit is the only reasonable and fair arrangement.

### III. Distribution Amounts

Referring to your correspondence with Michael and Luc (MM forwarded it to me) I am confused about *transaction expenses*.

A. First of all, I cannot see how HW would be entitled to a success fee for...not getting the deal done. I would see this only in case the flip transaction would be a free choice of the seller, while HW would have worked for the bidding process and despite good available options, HIG would decide the flip transaction for its own reasons. In our case, where the flip transaction is a "way out" of the impasse caused by the poor result of the process, no success fee should apply, regarding SIAT and Inofyta (assuming that Marflex sale will be successful and of course, HW will be paid for such a successful sale).

So, I see the table you circulated with €1.8M of Exit Fees and it is difficult to understand how this figure would go to over €4M. In Option 3 we have assumed €2.6m which is exactly 50% of the total fees HW would earn if a transaction is made at the assumed EVs (€209.9m). Thus, in a Sterling deal, we all would have paid €2.6m more. The HW EL is unfortunately not 100% clear regarding an internal sale. Every M&A advisor wants to be covered from exactly this scenario and therefore every EL (like the HW one) includes a provision regarding "Equitable consideration". We only know the final amount until we have discussed with HW, which we cannot do now. Thus, we have assumed the midway, ie €2.6m, which we assumed to be fair and a likely negotiation outcome. Also this point has been discussed with our ABs. It is indeed justifiable to get paid when a job is done, but the HW's EL should provide for cases where things do not go well, as in this case. Another point is the €1M for EY, the advisor who is responsible for the financial history weakness that had the negative impact on the process. Should they be paid €1M for this quality of services?

B. In addition, in your email of 1.11.2021, I see two "*Transaction Expenses - HIG 46*" charged against the sale proceeds, both in respect of WULFTEC (€4.7M) and now in respect of the flip transaction (€4.4M). What are the *Transaction Expenses - HIG 46* that are being charged? I had in mind that HIG 46 owed only repayment of loans.

At every H.I.G portfolio company, there is a transaction fee of H.I.G. (2.1% of EV) due when there is an exit. The advisory agreement has been concluded in 2014 between H.I.G 46 and H.I.G Capital. I assumed you have been aware / we discussed that matter before (eg at the Wulftec deal). Christian, the only fee payable to HIG that is known to me, is the €500K management fee paid annually, by Maillis Greece, to HIG. A 2.1% transaction fee on the EV, paid to the "owner" of the investment, effectively changes the stakeholders' participation in HIG 46. I do not recall this being mentioned in the past and, to be honest, I never scrutinized the distribution in respect of WULFTEC, because of my trust to HIG. If I am mistaken and there had been any communication of such an agreement in the past, please forward it to me. As the total cost is €9.1M, this is something that must be clarified.

C. Moreover, in the below table that you circulated about the total proceeds, I see the figure €221M for WULFTEC. I remember that the sale price was $259M, which (with the then applicable exchange rate) was around €227M. What reduced the WULFTEC sale proceeds, mentioned below? I used the rate from Dec 2018 which was 1.1396 and thus it is 221€m assuming an EV of $252m. The EqV was $259m. Was this the exchange rate for the €133M that were remitted to Europack?

Recapping my position, I support the flip transaction with the proposed EV multiple, but based on 2021 figures, while all amounts deducted from the proceeds should also be actual or very close to the actual amounts and clear to all of us (in the latter spirit, we could agree on an escrow mechanism for the part of the proceeds estimated to cover the various expenses, the balance of which would be distributed to the investors depending on the actual payments). Please let me refer again to the email attached. We do have internal controls from the ABs safeguarding there is a fair and arms' length balance. Keep in mind that HIG Fund I owns +80% of the economic value and thus has a strong interest in getting the numbers right. Escrow mechanism seems complex and would not lead to a clean cut in which the AB of our Fund I has a strong interest in.

I note that there is no negotiation here, as in [I] I accept your EV multiple, [II] is necessary adjustments to the deal and [III] is merely "due diligence" questions.

Christian,

I am confident that we can make this transaction in a manner that will affirm our excellent cooperation and friendship of the last 10 years and I will work to this end, as we all should. I am always available to discuss and find the best way to move forward. 100% agree!!! Please also note we as H.I.G like to facilitate the Option 3 as we believe it is the best solution for everybody currently on the table. Because financing of the deal will be not easy due to missing history at SIAT, our Fund 1 is prepared to offer a vendor loan in the amount of €16m. This will **not** affect you or other participants but solely our Fund I receives €16m less cash but a loan instead.

Best

Dorotheos

21.10.2021

If Option 3 is executed, we have generated an EV of €436 and €334m of cash proceeds for H.I.G 46.

**Proceeds to Maillis Shareholder (in EURm)**

**Proposed Transaction**

| | |
|---|---|
| EV for SIAT | 157.5 |
| EV for MMS | 6.4 |
| EV for RS | 0.0 |
| EV for MPS | 46.0 |
| **Total EV** | **209.9** |
| | |
| Cash proceeds - Flip SIAT/MMS/RS | 150.0 |
| Cash proceeds - Sale of MPS | 41.7 |
| **Total proceeds to H.I.G. 46** | **191.7** |

**Recap - Wulftec deal**

| | |
|---|---|
| EV for Wulftec | 221.1 |
| Proceeds to H.I.G. 46 | 133.0 |

**Recap - MSS deal**

| | |
|---|---|
| EV for MSS | 5.2 |
| Proceeds to H.I.G. 46 | 10.0 |

**Total achievement**

| | |
|---|---|
| Combined EVs | 436.2 |
| Proceeds to H.I.G. 46 | 334.7 |

On Fri, Oct 29, 2021 at 6:13 PM Dorotheos Samoladas <dsamoladas@sarantitis.com> wrote:

Thanks Christian, noted. I agree that this should be finalised in the spitit of good partnership. I will revert on Monday.

Have a nice weekend

Dorotheos

Sent from my iPhone

On 29 Oct 2021, at 3:57 PM, Christian Kraul-von Renner <ckraulvonrenner@higcapital.com> wrote:

Dorotheos,

Thanks for the open chat. As discussed option 3 is just an option which can be considered by us as shareholders now. We don't want to negotiate with you.

With regards to the multiple, pls keep in mind that the €18.5m includes €2.8m from COMBI which SIAT however, does no control. If we take this out, the EBITDA is €15.7m on €157.5m EV or 10.0x, thus one is paying 10x for a business with 10% better cash conversion coming from a potential Combi dividend.

Best,

Christian

**From:** Christian Kraul-von Renner
**Sent:** Donnerstag, 21. Oktober 2021 13:16
**To:** Michael Maillis <michael@maillis.com>; Dorotheos Samoladas (dsamoladas@sarantitis.com) <dsamoladas@sarantitis.com>; Baumann, Wolf-Dieter (wolf_dieterbaumann@me.com) <wolf_dieterbaumann@me.com>; Luc Van Damme <luc.vandamme@maillis.lu>
**Cc:** 'Wolfgang Biedermann (WBiedermann@higcapital.com)' <WBiedermann@higcapital.com>; 'Fritz Simons' <FSimons@higcapital.com>
**Subject:** BoD Meeting

Gents,

see attached for discussion later.

Best,

Christian

17

**From:** **Dorotheos Samoladas** dsamoladas@sarantitis.com  📎
**Subject:** Fwd: FW: RE: BoD 21.10.2021 - Questions on Presentation of Exit Options
**Date:** 7 December 2021 - 1:18 PM
**To:** MICHAEL MAILLIS  mmaillis1@me.com

FYI

**From:** Luc Van Damme
**Sent:** Monday, December 6, 2021 12:01
**To:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
**Subject:** RE: RE: BoD 21.10.2021 - Questions on Presentation of Exit Options

Christian,

Michael already forwarded me this asking for my remarks, which I shared with Dorotheos, not with Michael.

I completely disagree with the numbers. They are diminishing what we have achieved with Maillis.

In the end the Net Debt at or around December 15th will be a Cash Positive number of more than €15 Mio, taking out Marflex (where the best possible outcome will be targeted with Teufelberger) and taking out the IFRS debt because the EV of Siat is also not considering it; but taking into the calculation the Dividend from Combi and the net proceeds of the German building. Actually, if you take the Net Debt status as presented in the BoD and adjust for these items you will find exactly this. So, with € 15+ Mio on the Bank Account in excess of the accounting valuation of all Debt(-like) items there should be more excess Cash than what might be needed for any future expenses not included in the Net Debt schedule. Why don't we use the Net Debt schedule? We all know it, it contains actually very few items that are in addition very easy to confirm at any given date. It calculates Actual Debt and Actual Cash, so very neutral for both Funds and probably in line with an expected "post-closing" final settlement as we have done with Wulftec.

With respect to the points below, … even if am really not willing to enter into back and forth calculation discussions …

- The Net Debt numbers as presented in the BoD are adjusted for Tax. I used YTD Actual Cash so obviously that includes all actual Cash Tax expenses. For Q4 I am indeed using EBITDA as a forecast of Cash Flow and that is a number before tax, but regardless, it is what I think will be generated. In any case the forecast of Siat (and I double checked it with them) is to pay only € 794K additional tax this year. The YTD cash position actually already includes actual Cash Tax outflow of € 870K in Siat. However, it might be correct that we will incur a tax outflow in the future on current income and that a Buyer would look to deduct this … but also for 2022 one will have Tax Cash outflow only in 2023 etc. etc. … so as long as we pay and plan as per the rules in Italy there should not be a deduction.

- "Luc assumed the Q4 EBITDA for Marflex as cash inflow in his figures. This is to be negotiated with Teufelberger and is not part of the Flip deal". This is not at all what is planned because the Transaction with Teufelberger is being prepared on Closing Accounts so automatically the Cash/Debt position that will be used in the Equity Value Bridge with Teufelberger will include Cash Flow up to the date of the Closing Accounts, no negotiation should be required in this respect.

- "Approx. €1m positive cash flow has been assumed by Luc for Inofita by adding Q4 EBITDA and WCAP. No buyer would be prepared to pay a forecast cash flow for that business. By the way, October cash flow of Inofita was -€0.6, while Option 3 assumed Inofita will be cash flow break even after Sep.!" …. I am really asking myself which date is finally being used for the Flip???  The November Cash will offset the negative October Cash-Flow and December will indeed be positive. At least that is my forecast and why is my Forecast not being seen as credible???

- The last point … is new, agree? After you adjust for the comments I made above … even if you only would consider € 1.0 Mio of my comments as valid … this "package" becomes € 5.2 …. Why is the "package" not reversed in sign as indeed the Flip is being prepared with no downside for Fund 3?

Christian, you know my overall view, but I do not intend to argue against my employer. Neither do I want to create a negative situation that will stick into my mind in the coming years, instead of enjoying the achievement of nearly multiplying by 5 the EBITDA since I took over as CEO. Really I do not want this, believe me.

Thanks, Luc.





**Luc Van Damme**
Chief Executive Officer

Maillis International S.A.
2, rue de Bitbourg L-1273 Luxembourg
Mob. +352 621 981 860
luc.vandamme@maillis.com
www.maillis.com

---

**From:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
**Sent:** Monday, December 6, 2021 10:45
**To:** Luc Van Damme <luc.vandamme@maillis.lu>
**Subject:** FW: RE: BoD 21.10.2021 - Questions on Presentation of Exit Options

Luc,

As discussed Wolfgang and Michael have been talking with regards to the option 3. Michael has been struggling to understand the numbers from the BoD deck including your approach to reconcile (email attached) and the net debt assumed in the option 3. As we all know, the numbers cannot be compared by exact Euro cents but only high level and thus we provided further explanation for Michael as per below.

Let me know if you like to further discuss. Happy to jump on a call.

Christian

###########

In any case, addressing your broader question, it is my understanding that there have been already several email-exchanges in this regard and the numbers are transparently on the table. You should refer to Luc's email who provided the reconciliation in addition to Christian's input and estimated a delta of -€9.8m (see email attached). This delta can be explained as per the table and comments below. The main difference is that Luc has assumed the full year **not tax adjusted** cash flow for S/M/I.

| Delta as per Luc's email | | (9.8) |
|---|---|---|
| 1 | FY Tax effect SIAT | 3.2 |
| 2 | Marflex Q4 EBITDA | 1.6 |
| 3 | Inofita Q4 EBITDA/CF | 1.0 |
| 4 | Package discount | 4.2 |
| | **Delta** | **0.2** |

1. As per my email below, net Cash Flow has to be adjusted for taxes, resulting in a difference of €2.7m YTD Oct and €3.2m for the whole FY 2021
2. Luc assumed the Q4 EBITDA for Marflex as cash inflow in his figures. This is to be negotiated with Teufelberger and is not part of the Flip deal. Thus it needs to be corrected. But of course we will negotiate hard with Teufelberger in H.I.G.'s own interest!
3. Approx. €1m positive cash flow has been assumed by Luc for Inofita by adding Q4 EBITDA and WCAP. No buyer would be prepared to pay a forecast cash flow for that business. By the way, October cash flow of Inofita was -€0.6, while Option 3 assumed Inofita will be cash flow break even after Sep.!
4. As you can see from the BoD overview and the Net Debt Summary Fritz has send: If you add the Final Purchase Price

you arrive to €154.2m (167.2m SIAT PP + 3.8m Inofita - 1.3m YTD Aug CF Inofita - 15.5m HS). Our Advisory Boards discussed and agreed a minor package discount for taking on all the legacy agendas of €4.2m arriving at a clean cut payment of €150.0m for S/I/RS as proposed in Option 3. Again, we are happy for you to take over the remaining business as previously discussed.

####################

From previous email

- YTD October net cash-flow of SIAT is €7.7m. However, SIAT redeemed external bank debt of €2.6m and, thus the adjusted net cash flow was **€10.3m**
- However, SIAT has not yet paid its full income taxes (about 30%) on YTD earnings of €14million equivalent to €3.5m. As per October reporting, only €0.9million were paid so far, leaving €2.7m still to be paid. Therefore, the tax adjusted net YTD October cash flow is €7.6m (see table below)
- Annualizing these €7.6m for the past 10 months to the full year will lead to €9.1m net cash flow for SIAT, equivalent to the amount Christian was adding in his Locked Box calculation.

18

| | |
|---|---|
| **From:** | Luc Van Damme <luc.vandamme@maillis.lu> |
| **Sent:** | 09 December 2021 17:48 |
| **To:** | Michael Maillis; CKVR |
| **Cc:** | Dorotheos Samoladas (dsamoladas@sarantitis.com) |
| **Subject:** | RE: Net Debt Reconciliation |

Michael,

Please allow me to step in here and comment:

The numbers assumed in Option 3 are based on the Company's figure and has been reviewed and summarized in comprehensive EY Due Diligence Reports. Some numbers in these report were also new to me, but that's ok as I am not a M&A professional. Based on that reports and buyer's due diligence we received offers. Based on that offers, H.I.G has proposed Option 3 in the last BoD meeting. I do understand now the complexity of comparing the figures from our company reporting to the numbers assumed in the received bids and thus H.I.G.'s option 3. However, indeed the reconciliation as send by Christian shows that the numbers do tie with our company reporting even if a few line items seem conservative from my end (e.g., UK pension). The exercise that was done even revealed that the Option 3 was short by ~€4.4m due to a better cash flow generation at SIAT which will be added to the €150m. In addition, Sellers receive the free cash flow of SIAT until Closing. Based on this, I am fine to proceed as a shareholder.

Thanks,
Luc



**Luc Van Damme**
Chief Executive Officer

Maillis International S.A.
2, rue de Bitbourg L-1273 Luxembourg
Mob. +352 621 981 860
luc.vandamme@maillis.com
www.maillis.com

---

**From:** Michael Maillis <michael@maillis.com>
**Sent:** Thursday, December 9, 2021 10:42
**To:** CKVR <ckraulvonrenner@higcapital.com>
**Cc:** Luc Van Damme <luc.vandamme@maillis.lu>; Dorotheos Samoladas (dsamoladas@sarantitis.com) <dsamoladas@sarantitis.com>
**Subject:** RE: Net Debt Reconciliation

Christian,

I really don't understand being at the end of 2021 and having clear and reliable Company figures you still insist in the creative locked box logic and for explanation you elaborate not understandable intransparent and confusing bridges. Sorry but to me the only reason I see, is an attempt to transfer disproportional value to the new Fund.

As I mentioned yesterday to Wolfgang and in order to facilitate the preferred to you Flip Option, I am prepared to accept the very aggressive EV valuation you proposed in October, although I know that this already transfers €20M-€30M to the new Fund because of the low multiplier.

I explained further that in that case I will not accept (and this is not negotiable) any creative calculation of the Equity valuation other than the one based on the Net Debt calculation forecasted by Luc (not by you or by me) and adjusted with the IFRS Siat's Net Debt. This is my position.

Best,
Michael

---

**From:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
**Sent:** Τετάρτη, 8 Δεκεμβρίου 2021 7:27 μμ
**To:** Michael Maillis <michael@maillis.com>; Dorotheos Samoladas (dsamoladas@sarantitis.com) <dsamoladas@sarantitis.com>
**Cc:** Luc Van Damme <luc.vandamme@maillis.lu>
**Subject:** Net Debt Reconciliation

Dear both,

Over past days we have worked with Luc and invested time and resources to provide a reconciliation between the net debt as assumed in Option 3 (-€13.9m, delta between €163.9 EV and €150.0m Purchase Price) and the net debt as presented in last BoD (-€3.6m) plus expected cash-in until end of 2021.

The high level message is that the numbers **do reconcile** assuming an additional gross-up mechanism for the actual realized SIAT cash flow.

In the course of the analysis with Luc we have seen that the assumption of the SIAT cash flow generation of €9.0m for 2021 assumed in Option 3 was too conservative. We propose to remedy this by including an additional gross up mechanism that entitles the Sellers to benefit from any additional SIAT free cash flow until closing in excess to what was assumed in Option 3. In concrete terms, SIAT is currently expected to generate €13.4m adjusted cash flow in 2021 and thus, the PP of €150.0m would increase by +€4.4m (13.4m – 9.0m). As Closing will only occur in Q1 this number will even get bigger.

Adding the €4.4m to the €150.0m offer as presented in Option 3, the implied net debt is reduced to -€9.5m (€163.9-154.4m). This leaves a difference of €5.9m to the net debt as presented in the last BoD (-€3.6m) which can be well reconciled. Only a smaller amount of €1.9m is left  that relates to seasonal working capital swings. Please see attached for the full details of the analysis (first tab "Bridge" in excel or PDF overview) and below for a summary:

| | |
|---|---|
| **Net debt as per September BoD** | **€ (3.6) m** |
| Plus: Removal of Marflex net debt | € 7.2  m |
| Plus: Removal of IFRS debt | € 5.8  m |
| Less: UK pension valuation delta | € (8.0) m |
| Plus: Future cash inflows not yet included in BoD net debt | € 10.4 m |
| Less: Future cash outflows not yet included in BoD net debt | € (8.1) m |
| Less: Other debt-like items not considered in BoD net debt | € (7.1) m |
| Less: Package discount in Option 3 offer | € (4.2) m |
| **Net debt adjusted as per BoD** | **€(7.6) m** |
| **Net debt adjusted – Option 3** | **€ (9.5) m** |
| **Delta** | **€ 1.9 m** |

Overall this means, that even if we'd wait until financial data is available for 31 December 2021 and apply the same structural methodology with regards to net debt and debt-like items as assumed in Option 3, the purchase price would still come out at ~€154m.

It is well understood that such a bridge was required to provide transparency to everybody, and we sincerely hope this is achieved.

I am happy to jump on a call at any time tomorrow, if you have further questions.

Christian

Christian Kraul-von Renner
Managing Director
H.I.G. European Capital Partners GmbH
Warburgstrasse 50
20354 Hamburg
Phone:     +49 40 413 306 174
Fax:         +49 40 413 306 200
Mobile:     +49 173 382 69 86
ckraulvonrenner@higcapital.com
www.higcapital.com

Gesellschaft mit beschränkter Haftung mit Sitz in Hamburg
Amtsgericht Hamburg HRB 102745
Geschäftsführer: Wolfgang Biedermann, Holger Kleingarn, Klaas Reineke, Christian Kraul-von Renner, Florian Kawohl

19

| **From:** | Christian Kraul-von Renner <ckraulvonrenner@higcapital.com> |
| **Sent:** | 26 April 2022 16:25 |
| **To:** | Michael Maillis |
| **Subject:** | RE: Distribution |

Michael,

Sorry for the late respond. I had Fritz taken a look at this. See below

- Pls note that the version from the calc we have found on our server assumed a distribution of 196.3m vs 196.1. Key takes however does not differ, ie
- The €27.865m distribution already assumed the higher CF generation at SIAT (154.5m forecast vs 151.3+3.0 actual)
- Key difference is Marflex 40.2m old vs 34.3+0.8+3.5 = 38.6 → delta of 1.6m
- The 1.5m was a purely mistake in the old calculation → delta of 1.5m
- This leads to 193.0m actual vs 196.3m planned distribution

Hope that helps,
Christian

| Proceeds in EUR (m) | Distribution | Actual | Distribution in 2023 |
|---|---|---|---|
| Existing Cash at H.I.G. 46 | 15-Apr-22 | 0.1 | - |
| Cash PP Marflex at Closing (incl IC PP) | 15-Apr-22 | 34.3 | - |
| Cash PP SIAT at Closing | 15-Apr-22 | 151.3 | - |
| Cash PP from Share Capital Reduction | 10-Jul-22 | 3.0 | - |
| Marflex Vendor Loan | Mid-2023 | - | 0.8 |
| Marflex Earn Out | Mid-2023 | - | 3.5 |
| Plus: Additional Cash from Maillis International | | - | - |
| **Total proceeds to H.I.G. 46** | | **188.6** | **4.3** |
| Less: H.I.G. Fees (50% of fees applied for Flip transaction) | | (2.6) | - |
| Less: Holdback Marflex SPA Indemnity | | (1.0) | - |
| Less: Other costs and holdback for H.I.G. 46 running costs | | (0.5) | - |
| Less: PPAs | | (6.2) | (0.3) |
| **Total proceeds to H.I.G. 46 shareholders** | | **178.2** | **4.0** |
| **Dailane - Proceeds** | | | |
| Proceeds from fiduciary agreement for shares in Maillis Management S.C.S. | 14.93% | 26.601 | 0.603 |
| Proceeds from Transaction Bonus | | 0.500 | - |
| **Total** | | **27.101** | **0.603** |

**From:** Michael Maillis <mmaillis1@me.com>
**Sent:** Dienstag, 19. April 2022 10:33
**To:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
**Subject:** Distribution

Christian,

Sorry for any confusion, I am referring to the below email of December 9th that Dorotheos had forwarded to me after conveying to you my question.

I see that the difference is 27.9M plus 14.925% on the increased SIAT cash generation (in total about 28.4M) and approx. 26.6M that I now get.

Thank you
Michael

From: **Dorotheos Samoladas** <dsamoladas@sarantitis.com>
Date: Thu, Dec 9, 2021 at 10:28 AM
Subject: Fwd: Net Debt Reconciliation
To: MICHAEL MAILLIS <mmaillis1@me.com>

Sent from my iPhone

Begin forwarded message:

**From:** Christian Kraul-von Renner <ckraulvonrenner@higcapital.com>
**Date:** 9 December 2021 - 10:10:04 AM EET
**To:** Dorotheos Samoladas <dsamoladas@sarantitis.com>
**Subject: RE: Net Debt Reconciliation**

Good morning Dorotheos,

See below. 196.1m is composed of 154.4 Flip and 41.7 Marflex. For your reference below you find the old bridge send to Michael/you

| | |
|---|---|
| Distribution to HIG 46 | 196.1 |
| (Transaction expenses - H.I.G. 46) | (2,7) |
| Proceeds to option/PPA holder | (6,7) |
| Distribution to HIG 46 shareholders | 186,8 |
| MM share 14.925% | 27.9 |
| MM compensation | 1.1 |
| MM total | ~29m |

**Old Bridge**

| | |
|---|---|
| Distribution to HIG 46 | 191,702,359 |
| Transaction expenses - H.I.G. 46 | (4,407,900) |
| Proceeds to option/PPA holder | (6,536,497) |
| Distribution to HIG 46 shareholders | 180,785,585 |

2

Please note that WB was very firm about our fees as we have done the entire work and our monitoring fee of 500k is below Michael's annual compensation. Anyhow WB finally agreed to this compromise.

Shall we then speak at 14.30 CET?

Best,

Christian

20

| | |
|---|---|
| **From:** | Wolfgang Biedermann <WBiedermann@higcapital.com> |
| **Sent:** | 17 December 2021 13:03 |
| **To:** | Michael Maillis |
| **Subject:** | RE: Fwd: |

Michael,

I truly feel that this is a commercially fair outcome.

I also sincerely hope that the overall result of our very successful business relationship will be a strong pillar for a lifelong trusted friendship!

All the very best to you and your family

Wolfgang

Wolfgang Biedermann

Executive Managing Director

H.I.G. European Capital Partners GmbH

Warburgstr. 50

D-20354 Hamburg

Tel.: +49 40 4133 06 100

Mobil: +49 172 427 94 93

wbiedermann@higcapital.com

---

**From:** Michael Maillis <mmaillis1@me.com>
**Sent:** Freitag, 17. Dezember 2021 13:39
**To:** Wolfgang Biedermann <WBiedermann@higcapital.com>
**Subject:** Fwd:

Wolfgang,

As already explained, at this point I cannot do much but submit to the terms of H.I.G. I will therefore vote in favor of the flip, accepting the additional €500K you offered.

Sincerely

Michael

Begin forwarded message:

**From:** Michael Maillis <mmaillis1@me.com>
**Subject: Re:**
**Date:** 16 December 2021 - 10:00:28 AM EET
**To:** Wolfgang Biedermann <WBiedermann@higcapital.com>

1

Wolfgang,

You remember in our telephone calls in August we discussed few times about the fair Group value.Back then, we fully agreed  about an approximate range.

Having this in mind and facing the flip option and Christian's valuation proposal and being far away from the figures discussed, I felt a real disappointment. I am sure you would feel the same way being in my position.

As I feel really uncomfortable in the today situation and after lot of thinking I would be prepared to approve the flip. From  your side, I would expect you to stick to your last week offer to distribute to me an additional 1,4m (the €0.9M come from a small improvement of the purchase price, to bridge the unfair locked box figures. So they are my share already, as H.I.G. 1 Fund too will take its share).

Expecting your confirmation.

Best,
Michael
Sent from my iPad

On 15 Dec 2021, at 10:49 AM, Wolfgang Biedermann <WBiedermann@higcapital.com> wrote:

Dear Michael,

As agreed, we wanted to finalize our discussions on the flip this week.

To summarize the situation, in my Dec. 1, 2021 mail I had made you the offer to increase your share in the sale proceeds of Maillis over and above your pro-rata share in the €150 million by €1.4 million to settle on all concerns you had raised regarding valuation and structure. Post our BoD discussion last Thursday, I am more convinced than ever that this was and remains a fair offer:

1. As I mentioned before, there is no room for me to discuss H.I.G. management fees in whatever form. We have invested enormous time and resources to achieve this outcome and the fees we were allowed to charge as part of the deal with the Greek banks simply didn't reflect that work. For that reason, our fee agreements were entered into on Luxco level at the time we did the deal. ALL our investors WITHOUT exception are paying these fees. Christian apparently has made an unfortunate link between our fees and open invoices/compensation Dorotheos would get as part of the flip but this has nothing to do with Dorotheos or anybody else not sharing in our fees.
2. Your argument around pensions holding a sizeable upside for us was clearly proven wrong by the figures Luc had to present during our call and which to me, frankly were total news! I trust you can now agree that pensions are not a value pocket for us but a liability which potentially might extend until 2034!
3. Luc checked the cash flow figures and confirmed that the systematic approach we are using is correct. Updating the cash flow figures for the most recent very good company performance, he calculated that the net debt position actually improved by €4.4 million compared to Christian's previous calculations and therefore the original purchase price of €150m has now improved by approx. €4.4m plus an estimated approx. €2.5m of Q1 of 2022 SIAT cash flow assuming the Transaction closes end of March 2022. In total these improvements amount to approx. €6.9m of which your ˜15% share will be approx. €1.0m.
4. The €150m purchase price did not yet consider a cash-out from an increased 2021 bonus to Luc, the 2021 bonus you are entitled to (approx. €300k) and any ongoing BoD/H.I.G. monitoring fees in 2022 until exit. Luc, Dorotheos and Christian are working on a simple schedule in the SPA to ensure a clean cut off for all BoD members so that these outstanding obligations can be paid before Closing. With regards to Luc's 2021 bonus I would propose we pay him an amount of €500k for the great achievements he delivered. I assume you support this. Altogether, these payments will actually reduce the net cash purchase price by over €1 million.

In summary, doing the proper math, you are factually entitled to less than an additional €0.9m ((˜€6.9m - ˜€1m)*15%). However, I am willing to stick to my previous offer of €1.4m, i.e. to pay an additional €0.5 million over the €0.9 million to finally settle any open issues on the transaction.

Michael, I trust with this we can and will bring our partnership to a mutually beneficial end.

Best,

Wolfgang

Wolfgang Biedermann
Executive Managing Director
H.I.G. European Capital Partners GmbH
Warburgstr. 50
D-20354 Hamburg
Tel.: +49 40 4133 06 100
Mobil: +49 172 427 94 93
wbiedermann@higcapital.com

21

**Maillis International S.A.**
*Société anonyme*
Registered office: 2, rue de Bitbourg
L-1273 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg: B212166
(the "**Company**")

---

**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS OF THE COMPANY HELD ON THE 16TH DECEMBER 2021 BY CONFERENCE CALL INITIATED IN LUXEMBOURG**

---

**PRESENT OR REPRESENTED:**

- **Mr. Luc van Damme**, class A 1 director, attending by conference call initiated from Luxembourg;
- **Mr. Spyridon Gaitanos**, class A 2 director, attending by conference call initiated from Luxembourg;
- **Mr. Michael Maillis**, class B director, attending by conference call initiated from Luxembourg;
- **Mr. Wolfgang Biedermann**, class B director, [attending by conference call initiated from Luxembourg;
- **Mr. Wolf-Dieter Baumann**, class B director, attending by conference call initiated from Luxembourg;
- **Mr. Christian Kraul von Renner**, class B director, attending by conference call initiated from Luxembourg; and
- **Adorma Limited**, class B director attending by conference call initiated from Luxembourg as represented by Mr. Dorotheos Samoladas

each, a "**Director**" and together, the "**Board of Directors**".

The meeting is opened at 10.00 a.m (CET) by Mr Michael Maillis, chairman of the Board (the "**Chairman**") and Mr. Dorotheos Samoladas acting as secretary of the meeting kept the minutes thereof (the "**Secretary**").

The virus COVID-19 has recently spread and disrupted activity in continental Europe, including the Grand Duchy of Luxembourg. Luxembourg's Government as well as the Government of its neighbor countries, including Belgium, France and Germany, have issued guidelines, recommendations pursuant to which home-office shall be encouraged.

The Board of Directors was therefore required to participate to the present meeting by conference call initiated from Luxembourg.

The meeting agrees that:

- all the participants can effectively and continuously hear and understand each other and be heard by one another;

- the members of the Board of Directors present or represented at the meeting constitute a quorum and declare having waived the convening notice requirements and having sufficient knowledge of the agenda prior to the meeting;

- the present meeting is duly constituted can therefore validly deliberate on the following agenda:

**AGENDA**

1) Approval and, to the extent necessary, ratification of the entry into, execution and performance of a Luxembourg law governed share purchase agreement to be entered into on or around the date hereof by and between the Company as seller and Tribus Holdings 9 S.à r.l. as purchaser;

2) Approval and, to the extent necessary, ratification of the transfer of the shares in the Company from its sole shareholder, H.I.G. Luxembourg 46 Holdings S.à r.l., to Tribus Holdings 10 S.à r.l.;

3) Approval, and to the extent necessary, ratification of the entry into, execution and performance of any agreements and/or documents necessary and/or useful for the purpose of the aforementioned items and as contemplated in the present minutes;

4) Delegation of powers; and

5) Miscellaneous.

**DISCUSSION**

The Board of Directors is reminded that the sole shareholder of the Company is H.I.G. Luxembourg 46 Holdings S.à r.l., a *société à responsabilité limitée* incorporated and existing under the laws of the Grand Duchy of Luxembourg with its registered office at 15, Boulevard F.W. Raiffeisen, L-2411 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register under B185603 (the "**Sole Shareholder**").

The Board of Directors is further reminded that the Company is the sole shareholder of (i) Maillis Holdings S.à r.l., a *société à responsabilité limitée*, incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 2 rue de Bitbourg, L 1273 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register under number B 212128 ("**Maillis Holdings**") and (ii) M.J. MAILLIS SINGLE MEMBER S.A. - INDUSTRIAL PACKAGING SYSTEMS & TECHNOLOGIES, a Greek *société anonyme* organized under the laws of Greece with its seat in the Municipality of Oinofyta, Viotia, registered with the General Commercial Registry (G.E.M.I) under Registration No.295301000 and with the Greek tax authorities (Tax Authority DOY of Thiva) with tax identification number 094051915 ("**M.J. MAILLIS**"). In turn, Maillis Holdings is the sole shareholder of Europack S.A., a *société anonyme*, incorporated and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 2, rue de Bitbourg, L 1273 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register under number B 68393 ("**Europack**").

The Board of Directors notes that it is intended to sell the group to which the Company belongs as a whole in various portions under separate purchase agreements to different purchasers. In such context, on or about hereof, (i) Maillis Holdings will enter into a purchase agreement regarding the sale of its shares in Marflex M.J. Maillis Poland sp. Z o.o., (ii) Europack will enter into a purchase agreement regarding the sale of its shares in SIAT – Società Internazionale Applicazioni Tecniche S.p.A. and (iii) the Sole Shareholder will enter into a purchase agreement regarding the sale of its shares in the Company (the "**Maillis Group Transfer**").

The Board of Directors further notes that, as part of the Maillis Group Transfer, the Company shall enter into a Luxembourg law governed share purchase agreement to be made by and between the Company as seller and Tribus Holdings 9 S.à r.l. as purchaser (the "**SPA**"), whereby the Company shall transfer to Tribus Holdings 9 S.à r.l. all the 6,799,731 common registered shares in M.J. MAILLIS having a nominal value of EUR 0.30 each for the purchase price of EUR 1.00 (the "**M.J. MAILLIS Transfer**").

The Board of Directors finally notes that, in the context of the Maillis Group Transfer, the Sole Shareholder will transfer 2,526,000 shares having a nominal value of EUR 1 each in the Company to Tribus Holdings 10 S.à r.l. (the "**Change of Control**").

Entry into various other ancillary documents relating to the above (including without limitation any letters or notices to be delivered under the Documents (as such term is defined below)) may be required as well as any other agreements, documents, certificates, instruments, proxies, notices, letters, shareholder(s)' resolutions and registers as may be required in connection with or as contemplated by the Transactions and/or the Documents (each as defined below) (the "**Ancillary Documents**").

The SPA and the Ancillary Documents, as well as any documents or agreements listed therein or in relation thereto are hereinafter collectively referred to as the "**Documents**" (and each a "**Document**") and the transactions contemplated under the M.J. MAILLIS Transfer, the Change of Control, as well as any documents or agreements in relation thereto, are hereinafter collectively referred to as the "**Transactions**".

Each Director declares having carefully reviewed and contemplated the Transactions described in the agenda and in the present declarations and having carefully reviewed and contemplated the Transactions and the Documents and the transactions referred to therein.

To each Director's knowledge, the latest versions of the Documents as well as all necessary information in connection with the Transactions have been sent to or are known by the Board of Directors and the Board of Directors has carefully considered such information and such Documents and is familiar with their content.

Each Director confirms that he has no conflicting interest in the matters referred to in the present resolutions.

The Board of Director is of the opinion that the matters referred to in the present resolutions are in compliance with the Company's articles of association and the applicable legal provisions and would not result in any breach of any restriction imposed by law, the articles of association or any agreement to which the Company is a party or by which the Company is bound.

The Board of  Directors further establishes that the matters referred to in the present resolutions would materially benefit the Company, would be for the purpose of carrying on its business and would be in the best corporate interest of the Company.

**THEREFORE**, after due and careful consideration, the Board of Directors unanimously passes the following resolutions:

### FIRST RESOLUTION

The Board of Directors resolves to approve and, to the extent necessary and applicable, ratify the entering into, execution and performance of the Transactions by the Company and the entering into, execution and performance of each of the Documents by the Company as well as any agreements, documents, certificates, instruments, proxies, notices, letters and registers as may be required in connection with or as contemplated by the Transactions and the Documents.

### SECOND RESOLUTION

The Board of Directors resolves to authorize and appoint any of the Directors (each an "**Attorney**"), each acting individually and with full power of substitution, to negotiate, amend, adapt, waive, sign, execute and perform for and on behalf of the Company the Documents as well as the Ancillary Documents, on behalf of the Company as may be required or desirable in connection with or as contemplated by the Documents and/or the Transactions and/or the foregoing resolutions in such forms as the Attorney may approve (the execution of any such documents by an Attorney being conclusive evidence of the approval of the Company to the terms and conditions of the documents) and to do all such acts and things as may be ancillary thereto and/or necessary and/or useful and/or desirable in the opinion of the Attorney in connection with or for the purpose of the entry into, execution, delivery or performance of the Documents and/or the Transactions and/or the foregoing resolutions.

The Board of Directors also resolves that all actions previously taken by an Attorney in connection with the above resolutions are hereby adopted, ratified, confirmed and approved in all respects in the name and on behalf of the Company.

There being no further business, the meeting closes at 10.30 a.m (CET).

*[Remainder of the page intentionally left blank – Signature page follows]*

By: Michael Maillis
Title: Chairman

22

Confidential



# Management Reporting Package
# Preliminary

## December 2021

**P&L : Excluding Gaderoth & MSS Entities**
**BS,CF,TWcap,Net Debt:Historical data of Gaderoth & MSS included**

Cover

| Contents | |
|---|---|

| pg.3 | Conso P&L Summary |
|---|---|
| pg 4 | Conso P&L Detailed |
| pg 5 | BU P&L |
| pg 6 | Other P&L |
| pg 7,8 | BU_Sales |
| pg 9 | Monthly trends |
| pg 10 | Balance sheet |
| pg 11 | TWCAP : Trade Working Capital |
| pg 12 | Cash flow |
| pg 13 | Net Debt |

| Definitions | |
|---|---|

| 1 | A2021 **unaudited Draft results.** |
|---|---|
| 2 | Machine / tools figures consist of : Tools, Machines and Machines Components |
| 3 | Other M&T consists of: Dispensers, Conveyors, Rental Income & Other Machines and Tools |
| 4 | DSO calculation :  Trade Receivables & Notes  / LTM Turnover (Provisions are not deducted |
| 5 | DPO calculation :  Trade Payables / LTM Cost of Sales |
| 6 | DII calculation :  Inventory /  LTM Cost of sales ( Provisions are not deducted) |

| Abbreviations | |
|---|---|

| A20 | Actual 2020 (un audited) | OPEX | Operating Expenses |
|---|---|---|---|
| A21 | Actual 2021 (un audited) | F/A | Fully-Automatic |
| B21 | Budget 2021 | S/A | Semi-Automaitic |
| MTD | Month To Day | TP | Trade Payables |
| YTD | Year to Day | TR | Trrade Receivables |
| € 0.000 | Thousand Euro | ASP | Average Selling Price |
| tn | Tonnes | | |
| QTY | Quantity | | |

INDEX

 **MAILLIS**

Confidential

**Actual 2021**

values in 000 €

## Summary P&L Excluding Gaderoth & MSS

| | Prior Month | | | December Mtd | | | | | | | December Ytd | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
| | | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % |
| _Sales | 24,489 | -3,969 | -16.2% | 13,159 | 20,520 | 13,355 | 7,361 | 55.9% | 7,165 | 53.6% | 169,622 | 254,256 | 181,498 | 84,634 | 49.9% | 72,758 | 40.1% |
| _Cos of Sales | 19,236 | -2,777 | -14.4% | 9,962 | 16,460 | 9,950 | 6,497 | 65.2% | 6,510 | 65.4% | 123,661 | 192,068 | 131,444 | 68,407 | 55.3% | 60,624 | 46.1% |
| Gross Profit 1 | 5,253 | -1,192 | -22.7% | 3,197 | 4,061 | 3,406 | 864 | 27.0% | 655 | 19.2% | 45,961 | 62,188 | 50,055 | 16,227 | 35.3% | 12,134 | 24.2% |
| % on sales | 21.5% | -1.7pp | | 24.3% | 19.8% | 25.5% | -4.5pp | | -5.7pp | | 27.1% | 24.5% | 27.6% | -2.6pp | | -3.1pp | |
| Transportation Expense | 1,155 | -272 | -23.5% | 775 | 883 | 756 | 108 | 13.9% | 127 | 16.9% | 10,236 | 12,654 | 10,479 | 2,418 | 23.6% | 2,174 | 20.7% |
| % on sales | 4.7% | -0.4pp | | 5.9% | 4.3% | 5.7% | -1.6pp | | -1.4pp | | 6.0% | 5.0% | 5.8% | -1.1pp | | -0.8pp | |
| Gross Profit 2 | 4,098 | -920 | -22.5% | 2,422 | 3,178 | 2,650 | 756 | 31.2% | 528 | 19.9% | 35,726 | 49,535 | 39,575 | 13,809 | 38.7% | 9,959 | 25.2% |
| % on sales | 16.7% | -1.2pp | | 18.4% | 15.5% | 19.8% | -2.9pp | | -4.4pp | | 21.1% | 19.5% | 21.8% | -1.6pp | | -2.3pp | |
| Other Op.Income | 67 | 9 | 13.4% | 73 | 76 | 30 | 3 | 4.0% | 46 | 152.9% | 428 | 657 | 365 | 229 | 53.5% | 292 | 79.9% |
| | | | | | | | | | | | | | | | | | |
| Operating Expenses | 1,985 | 65 | 3.3% | 1,673 | 2,050 | 1,674 | 377 | 22.5% | 376 | 22.5% | 20,485 | 21,685 | 20,855 | 1,201 | 5.9% | 830 | 4.0% |
| % on sales | 8.1% | 1.9pp | | 12.7% | 10.0% | 12.5% | -2.7pp | | -2.5pp | | 12.1% | 8.5% | 11.5% | -3.5pp | | -3.0pp | |
| Operating E.B.I.T.D.A | 2,180 | -977 | -44.8% | 822 | 1,203 | 1,006 | 382 | 46.4% | 197 | 19.6% | 15,669 | 28,506 | 19,085 | 12,837 | 81.9% | 9,421 | 49.4% |
| % on sales | 8.9% | -3.0pp | | 6.2% | 5.9% | 7.5% | -0.4pp | | -1.7pp | | 9.2% | 11.2% | 10.5% | 2.0pp | | 0.7pp | |

Conso_PL_Summary

 **MAILLIS**

*Confidential*

**Actual 2021**

values in 000 €

## Detailed P&L Excluding Gaderoth & MSS

| | Prior Month | | | December Mtd | | | | | | | December Ytd | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
| | | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % |
| _Sales | 24,489 | -3,969 | -16.2% | 13,159 | 20,520 | 13,355 | 7,361 | 55.9% | 7,165 | 53.6% | 169,622 | 254,256 | 181,498 | 84,634 | 49.9% | 72,758 | 40.1% |
| _Cos of Sales | 19,236 | -2,777 | -14.4% | 9,962 | 16,460 | 9,950 | 6,497 | 65.2% | 6,510 | 65.4% | 123,661 | 192,068 | 131,444 | 68,407 | 55.3% | 60,624 | 46.1% |
| **Gross Profit 1** | **5,253** | **-1,192** | **-22.7%** | **3,197** | **4,061** | **3,406** | **864** | **27.0%** | **655** | **19.2%** | **45,961** | **62,188** | **50,055** | **16,227** | **35.3%** | **12,134** | **24.2%** |
| % on sales | 21.5% | -1.7pp | | 24.3% | 19.8% | 25.5% | -4.5pp | | -5.7pp | | 27.1% | 24.5% | 27.6% | -2.6pp | | -3.1pp | |
| Transportation Expense | 1,155 | -272 | -23.5% | 775 | 883 | 756 | 108 | 13.9% | 127 | 16.9% | 10,236 | 12,654 | 10,479 | 2,418 | 23.6% | 2,174 | 20.7% |
| % on sales | 4.7% | -0.4pp | | 5.9% | 4.3% | 5.7% | -1.6pp | | -1.4pp | | 6.0% | 5.0% | 5.8% | -1.1pp | | -0.8pp | |
| **Gross Profit 2** | **4,098** | **-920** | **-22.5%** | **2,422** | **3,178** | **2,650** | **756** | **31.2%** | **528** | **19.9%** | **35,726** | **49,535** | **39,575** | **13,809** | **38.7%** | **9,959** | **25.2%** |
| % on sales | 16.7% | -1.2pp | | 18.4% | 15.5% | 19.8% | -2.9pp | | -4.4pp | | 21.1% | 19.5% | 21.8% | -1.6pp | | -2.3pp | |
| Other Op.Income | 67 | 9 | 13.4% | 73 | 76 | 30 | 3 | 4.0% | 46 | 152.9% | 428 | 657 | 365 | 229 | 53.5% | 292 | 79.9% |
| | | | | | | | | | | | | | | | | | |
| - Total Manpower Cost | 1,421 | 170 | 12.0% | 1,165 | 1,591 | 1,122 | 426 | 36.5% | 469 | 41.8% | 14,004 | 14,942 | 14,008 | 938 | 6.7% | 933 | 6.7% |
| - Total Travelling Cost | 57 | 15 | 27.1% | 6 | 73 | 71 | 66 | 1040.0% | 2 | 2.8% | 456 | 514 | 810 | 58 | 12.7% | -297 | -36.6% |
| - Total Rents & Utilities | 127 | -156 | -123.1% | 204 | -29 | 101 | -233 | -114.4% | -130 | -129.1% | 1,531 | 1,202 | 1,194 | -328 | -21.4% | 8 | 0.7% |
| - Total Selling Expenses | -34 | 10 | -28.7% | 20 | -24 | 36 | -45 | -221.1% | -61 | -166.9% | 350 | 521 | 587 | 172 | 49.1% | -66 | -11.2% |
| - Total 3rd Party & Other Exp. | 414 | 26 | 6.3% | 277 | 440 | 344 | 163 | 58.7% | 96 | 27.9% | 4,144 | 4,506 | 4,255 | 361 | 8.7% | 251 | 5.9% |
| **Operating Expenses** | **1,985** | **65** | **3.3%** | **1,673** | **2,050** | **1,674** | **377** | **22.5%** | **376** | **22.5%** | **20,485** | **21,685** | **20,855** | **1,201** | **5.9%** | **830** | **4.0%** |
| % on sales | 8.1% | 1.9pp | | 12.7% | 10.0% | 12.5% | -2.7pp | | -2.5pp | | 12.1% | 8.5% | 11.5% | -3.5pp | | -3.0pp | |
| **Operating E.B.I.T.D.A** | **2,180** | **-977** | **-44.8%** | **822** | **1,203** | **1,006** | **382** | **46.4%** | **197** | **19.6%** | **15,669** | **28,506** | **19,085** | **12,837** | **81.9%** | **9,421** | **49.4%** |
| % on sales | 8.9% | -3.0pp | | 6.2% | 5.9% | 7.5% | -0.4pp | | -1.7pp | | 9.2% | 11.2% | 10.5% | 2.0pp | | 0.7pp | |
| FX Differences (+/-) | 34 | 26 | 75.8% | -41 | 60 | 0 | 101 | -244.2% | 60 | | -766 | 272 | -3 | 1,038 | -135.5% | 275 | |
| Restructuring Expense | 133 | 415 | 312.1% | 404 | 548 | 20 | 144 | 35.7% | 528 | 2640.9% | 2,376 | 2,134 | 240 | -243 | -10.2% | 1,894 | 789.0% |
| NR Operating Expense | 138 | 1,423 | 1028.8% | 2,615 | 1,561 | 184 | -1,054 | -40.3% | 1,377 | 750.3% | 7,824 | 4,488 | 2,096 | -3,336 | -42.6% | 2,391 | 114.1% |
| Bad Debt IC | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| NR Operating Income | 46 | 1,548 | 3382.8% | 1,698 | 1,594 | 0 | -104 | -6.1% | 1,594 | na | 1,836 | 1,695 | 0 | -141 | -7.7% | 1,695 | na |
| **Net NR Expenses** | **192** | **264** | **137.8%** | **1,362** | **456** | **204** | **-907** | **-66.5%** | **252** | **123.9%** | **9,131** | **4,655** | **2,339** | **-4,476** | **-49.0%** | **2,315** | **99.0%** |
| **E.B.I.T.D.A** | **1,988** | **-1,241** | **-62.4%** | **-541** | **748** | **803** | **1,288** | **-238.3%** | **-55** | **-6.9%** | **6,538** | **23,851** | **16,746** | **17,313** | **264.8%** | **7,105** | **42.4%** |
| % on sales | 8.1% | -4.5pp | | -4.1% | 3.6% | 6.0% | 7.8pp | | -2.4pp | | 3.9% | 9.4% | 9.2% | 5.5pp | | 0.2pp | |
| Depreciation | 483 | -31 | -6.5% | 872 | 451 | 463 | -421 | -48.3% | -12 | -2.5% | 6,652 | 6,033 | 5,724 | -619 | -9.3% | 308 | 5.4% |
| **E.B.I.T** | **1,506** | **-1,209** | **-80.3%** | **-1,413** | **296** | **340** | **1,709** | **-121.0%** | **-43** | **-12.8%** | **-113** | **17,819** | **11,022** | **17,932** | **-15801.6%** | **6,797** | **61.7%** |
| % on sales | 6.1% | -4.7pp | | -10.7% | 1.4% | 2.5% | 12.2pp | | -1.1pp | | -0.1% | 7.0% | 6.1% | 7.1pp | | 0.9pp | |
| F.I.& FX in Financing (+/-) | -147 | 316 | -214.5% | -220 | 169 | 1 | 388 | -176.7% | 168 | ####### | -891 | -2,924 | 7 | -2,033 | 228.2% | -2,931 | ###### |
| Interest Income | 0 | 0 | 81.9% | -43 | 0 | 0 | 43 | -99.6% | 0 | ####### | -29 | -10 | 7 | 19 | -66.2% | -17 | ###### |
| Interest Expense | 124 | 71 | 57.2% | 167 | 196 | 102 | 29 | 17.3% | 94 | 91.8% | 1,326 | 1,488 | 1,239 | 162 | 12.2% | 249 | 20.1% |
| Other Financial Expenses | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| - **Net Financial Expenses** | **272** | **-245** | **-90.0%** | **429** | **27** | **101** | **-402** | **-93.7%** | **-74** | **-73.3%** | **2,245** | **4,422** | **1,225** | **2,177** | **96.9%** | **3,197** | **261.1%** |
| Share of Profit Combi | 254 | -309 | -121.3% | 257 | -54 | 135 | -311 | -121.0% | -189 | -140.1% | 1,261 | 1,714 | 1,620 | 452 | 35.9% | 94 | 5.8% |
| **E.B.T.** | **1,488** | **-1,273** | **-85.5%** | **-1,585** | **215** | **373** | **1,800** | **-113.6%** | **-158** | **-42.4%** | **-1,098** | **15,111** | **11,417** | **16,208** | **-1476.8%** | **3,694** | **32.4%** |
| % on sales | 6.1% | -5.0pp | | -12.0% | 1.0% | 2.8% | 13.1pp | | -1.7pp | | -0.6% | 5.9% | 6.3% | 6.6pp | | -0.3pp | |
| Extraordinary Loss/ Income | 38 | -83 | -221.9% | -6 | -46 | -4 | -40 | 729.2% | -42 | 974.6% | -64 | 252 | 75 | 316 | -494.3% | 177 | 236.1% |
| Income and Other Taxes | 435 | -324 | -74.6% | -1,002 | 110 | -21 | 1,113 | -111.0% | 131 | -638.3% | 1,548 | 4,835 | 2,532 | 3,287 | 212.4% | 2,303 | 91.0% |
| Minority Interest | 2 | -16 | -661.8% | 17 | -14 | -15 | -31 | -180.2% | 1 | -8.5% | 51 | 67 | 53 | 16 | 31.1% | 14 | 27.2% |
| **E.A.T.** | **1,014** | **-849** | **-83.8%** | **-594** | **164** | **413** | **758** | **-127.7%** | **-249** | **-60.2%** | **-2,633** | **9,957** | **8,757** | **12,589** | **-478.2%** | **1,199** | **13.7%** |
| % on sales | 4.1% | -3.3pp | | -4.5% | 0.8% | 3.1% | 5.3pp | | -2.3pp | | -1.6% | 3.9% | 4.8% | 5.5pp | | -0.9pp | |

Conso_PL_Detailed



*Confidential*

**Actual 2021**
values in 000 €

## Business Unit P&L

### Inofita BU

| | Nov A21 | vs PM Δ abs | vs PM Δ % | A20 | A21 | B21 | A21 vs A20 Δ abs | A21 vs A20 Δ % | A21 vs B21 Δ abs | A21 vs B21 Δ % | A20 | A21 | B21 | A21 vs A20 Δ abs | A21 vs A20 Δ % | A21 vs B21 Δ abs | A21 vs B21 Δ % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Prior Month** | | | **December Mtd** | | | | | | | **December Ytd** | | | | | | |
| Steel Volumes (tns) | 5,035 | -1,549 | -30.8% | 3,307 | 3,486 | 3,423 | 179 | 5.4% | 63 | 1.8% | 37,594 | 51,534 | 43,099 | 13,939 | 37.1% | 8,434 | 19.6% |
| _Sales | 8,225 | -2,519 | -30.6% | 3,108 | 5,706 | 3,136 | 2,598 | 83.6% | 2,570 | 82.0% | 35,015 | 74,023 | 39,582 | 39,008 | 111.4% | 34,441 | 87.0% |
| _Cos of Sales | 6,912 | -2,108 | -30.5% | 2,622 | 4,804 | 2,521 | 2,183 | 83.3% | 2,283 | 90.6% | 28,576 | 59,120 | 31,333 | 30,545 | 106.9% | 27,787 | 88.7% |
| Gross Profit 1 | 1,313 | -411 | -31.3% | 487 | 902 | 615 | 415 | 85.3% | 287 | 46.7% | 6,440 | 14,903 | 8,249 | 8,463 | 131.4% | 6,654 | 80.7% |
| % on sales | 16.0% | -0.2pp | | 15.7% | 15.8% | 19.6% | 0.1pp | | -3.8pp | | 18.4% | 20.1% | 20.8% | 1.7pp | | -0.7pp | |
| Transportation Expenses | 479 | -127 | -26.6% | 294 | 351 | 297 | 57 | 19.3% | 54 | 18.3% | 3,219 | 5,159 | 3,741 | 1,940 | 60.3% | 1,418 | 37.9% |
| % on sales | 5.8% | 0.3pp | | 9.5% | 6.2% | 9.5% | -3.3pp | | -3.3pp | | 9.2% | 7.0% | 9.5% | -2.2pp | | -2.5pp | |
| Gross Profit 2 | 834 | -284 | -34.0% | 192 | 551 | 318 | 358 | 186.3% | 233 | 73.3% | 3,220 | 9,744 | 4,508 | 6,523 | 202.6% | 5,236 | 116.2% |
| % on sales | 10.1% | -0.5pp | | 6.2% | 9.7% | 10.1% | 3.5pp | | -0.5pp | | 9.2% | 13.2% | 11.4% | 4.0pp | | 1.8pp | |
| Other Op.Income | 3 | 3 | 109.9% | 5 | 6 | 0 | 1 | 14.9% | 6 | na | 50 | 42 | 0 | -8 | -16.6% | 42 | na |
| Operating Expenses | 338 | -26 | -7.8% | 210 | 312 | 266 | 101 | 48.2% | 45 | 17.1% | 3,242 | 3,635 | 3,319 | 393 | 12.1% | 316 | 9.5% |
| % on sales | 4.1% | 1.4pp | | 6.8% | 5.5% | 8.5% | -1.3pp | | -3.0pp | | 9.3% | 4.9% | 8.4% | -4.3pp | | -3.5pp | |
| Operating E.B.I.T.D.A | 499 | -254 | -51.0% | -13 | 244 | 52 | 258 | -1939.7% | 193 | 374.3% | 28 | 6,150 | 1,189 | 6,122 | 21710.6% | 4,962 | 417.4% |
| % on sales | 6.1% | -1.8pp | | -0.4% | 4.3% | 1.6% | 4.7pp | | 2.6pp | | 0.1% | 8.3% | 3.0% | 8.2pp | | 5.3pp | |

### Marflex BU

| | Nov A21 | vs PM Δ abs | vs PM Δ % | A20 | A21 | B21 | A21 vs A20 Δ abs | A21 vs A20 Δ % | A21 vs B21 Δ abs | A21 vs B21 Δ % | A20 | A21 | B21 | A21 vs A20 Δ abs | A21 vs A20 Δ % | A21 vs B21 Δ abs | A21 vs B21 Δ % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Prior Month** | | | **December Mtd** | | | | | | | **December Ytd** | | | | | | |
| Stretch Volumes ( tns) | 3,564 | -564 | -15.8% | 3,063 | 3,000 | 3,072 | -63 | -2.0% | -72 | -2.3% | 41,611 | 40,151 | 41,988 | -1,459 | -3.5% | -1,837 | -4.4% |
| Strap Volumes( tns) | 1,126 | 4 | 0.3% | 917 | 1,129 | 901 | 212 | 23.2% | 228 | 25.3% | 11,931 | 14,225 | 12,500 | 2,294 | 19.2% | 1,725 | 13.8% |
| _Sales | 9,985 | -1,151 | -11.5% | 5,482 | 8,834 | 5,732 | 3,353 | 61.2% | 3,103 | 54.1% | 76,561 | 106,590 | 78,379 | 30,029 | 39.2% | 28,211 | 36.0% |
| _Cos of Sales | 8,255 | -801 | -9.7% | 4,258 | 7,454 | 4,391 | 3,195 | 75.0% | 3,062 | 69.7% | 58,388 | 86,539 | 59,893 | 28,151 | 48.2% | 26,646 | 44.5% |
| Gross Profit 1 | 1,730 | -349 | -20.2% | 1,223 | 1,380 | 1,340 | 157 | 12.9% | 40 | 3.0% | 18,173 | 20,051 | 18,487 | 1,878 | 10.3% | 1,565 | 8.5% |
| % on sales | 17.3% | -1.7pp | | 22.3% | 15.6% | 23.4% | -6.7pp | | -7.8pp | | 23.7% | 18.8% | 23.6% | -4.9pp | | -4.8pp | |
| Transportation Expenses | 555 | -119 | -21.4% | 470 | 436 | 352 | -33 | -7.1% | 84 | 24.0% | 5,807 | 6,032 | 5,340 | 225 | 3.9% | 692 | 13.0% |
| % on sales | 5.6% | -0.6pp | | 8.6% | 4.9% | 6.1% | -3.6pp | | -1.2pp | | 7.6% | 5.7% | 6.8% | -1.9pp | | -1.2pp | |
| Gross Profit 2 | 1,175 | -231 | -19.6% | 754 | 944 | 988 | 190 | 25.3% | -44 | -4.5% | 12,366 | 14,019 | 13,146 | 1,653 | 13.4% | 873 | 6.6% |
| % on sales | 11.8% | -1.1pp | | 13.7% | 10.7% | 17.2% | -3.1pp | | -6.6pp | | 16.2% | 13.2% | 16.8% | -3.0pp | | -3.6pp | |
| Other Op.Income | 17 | 30 | 175.0% | 21 | 47 | 0 | 26 | 127.1% | 47 | na | 78 | 103 | 0 | 25 | 31.9% | 103 | na |
| Operating Expenses | 592 | 17 | 2.8% | 629 | 608 | 549 | -21 | -3.3% | 59 | 10.8% | 6,552 | 6,842 | 6,684 | 290 | 4.4% | 159 | 2.4% |
| % on sales | 5.9% | 1.0pp | | 11.5% | 6.9% | 9.6% | -4.6pp | | -2.7pp | | 8.6% | 6.4% | 8.5% | -2.1pp | | -2.1pp | |
| Operating E.B.I.T.D.A | 600 | -217 | -36.1% | 145 | 383 | 439 | 238 | 163.9% | -56 | -12.8% | 5,893 | 7,280 | 6,463 | 1,387 | 23.5% | 817 | 12.6% |
| % on sales | 6.0% | -1.7pp | | 2.6% | 4.3% | 7.7% | 1.7pp | | -3.3pp | | 7.7% | 6.8% | 8.2% | -0.9pp | | -1.4pp | |

### Siat BU

| | Nov A21 | vs PM Δ abs | vs PM Δ % | A20 | A21 | B21 | A21 vs A20 Δ abs | A21 vs A20 Δ % | A21 vs B21 Δ abs | A21 vs B21 Δ % | A20 | A21 | B21 | A21 vs A20 Δ abs | A21 vs A20 Δ % | A21 vs B21 Δ abs | A21 vs B21 Δ % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Prior Month** | | | **December Mtd** | | | | | | | **December Ytd** | | | | | | |
| _Sales | 6,279 | -299 | -4.8% | 4,569 | 5,980 | 4,488 | 1,411 | 30.9% | 1,492 | 33.3% | 57,872 | 73,643 | 63,537 | 15,771 | 27.3% | 10,106 | 15.9% |
| _Cos of Sales | 4,088 | 132 | 3.2% | 3,101 | 4,220 | 3,056 | 1,119 | 36.1% | 1,164 | 38.1% | 36,925 | 46,632 | 40,442 | 9,707 | 26.3% | 6,190 | 15.3% |
| Gross Profit 1 | 2,192 | -432 | -19.7% | 1,468 | 1,760 | 1,432 | 292 | 19.9% | 328 | 22.9% | 20,947 | 27,011 | 23,095 | 6,064 | 28.9% | 3,916 | 17.0% |
| % on sales | 34.9% | -5.5pp | | 32.1% | 29.4% | 31.9% | -2.7pp | | -2.5pp | | 36.2% | 36.7% | 36.3% | 0.5pp | | 0.3pp | |
| Transportation Expenses | 121 | -26 | -21.2% | 11 | 95 | 107 | 84 | 757.6% | -11 | -10.6% | 1,215 | 1,462 | 1,398 | 247 | 20.4% | 64 | 4.6% |
| % on sales | 1.9% | -0.3pp | | 0.2% | 1.6% | 2.4% | 1.4pp | | -0.8pp | | 2.1% | 2.0% | 2.2% | -0.1pp | | -0.2pp | |
| Gross Profit 2 | 2,071 | -406 | -19.6% | 1,457 | 1,665 | 1,325 | 207 | 14.2% | 339 | 25.6% | 19,732 | 25,549 | 21,697 | 5,816 | 29.5% | 3,852 | 17.8% |
| % on sales | 33.0% | -5.1pp | | 31.9% | 27.8% | 29.5% | -4.1pp | | -1.7pp | | 34.1% | 34.7% | 34.1% | 0.6pp | | 0.5pp | |
| Other Op.Income | 0 | 3 | 0.0% | 2 | 3 | 0 | 1 | 23.4% | 3 | na | 7 | 3 | 0 | -4 | -58.6% | 3 | na |
| Operating Expenses | 737 | -18 | -2.5% | 612 | 718 | 684 | 106 | 17.4% | 34 | 5.0% | 8,128 | 8,573 | 8,695 | 445 | 5.5% | -122 | -1.4% |
| % on sales | 11.7% | 0.3pp | | 13.4% | 12.0% | 15.2% | -1.4pp | | -3.2pp | | 14.0% | 11.6% | 13.7% | -2.4pp | | -2.0pp | |
| Operating E.B.I.T.D.A | 1,334 | -385 | -28.9% | 847 | 949 | 641 | 102 | 12.0% | 308 | 48.0% | 11,611 | 16,978 | 13,002 | 5,367 | 46.2% | 3,976 | 30.6% |
| % on sales | 21.2% | -5.4pp | | 18.5% | 15.9% | 14.3% | -2.7pp | | 1.6pp | | 20.1% | 23.1% | 20.5% | 3.0pp | | 2.6pp | |

BU_Pnl



*Confidential*

**Actual 2021**
values in 000 €

## Business Unit P&L - Other

### HQ

| | Prior Month | | | December Mtd | | | | | | | December Ytd | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
| | | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % |
| _Sales | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| _Cos of Sales | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% |
| Gross Profit 1 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | na | na | na | na | | na | |
| Transportation Expenses | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | na | na | na | na | | na | |
| Gross Profit 2 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% |
| % on sales | na | na | | na | na | na | na | | na | | na | na | na | na | | na | |
| Other Op.Income | 0 | 1 | 0.0% | 6 | 1 | 0 | -5 | -83.7% | 1 | na | 34 | 24 | 0 | -10 | -28.8% | 24 | na |
| Operating Expenses | 273 | 244 | 89.6% | 274 | 517 | 145 | 243 | 88.6% | 372 | 255.9% | 2,112 | 2,406 | 1,780 | 295 | 14.0% | 626 | 35.2% |
| % on sales | na | na | | na | na | na | na | | na | | na | na | na | na | | na | |
| Operating E.B.I.T.D.A | -273 | -243 | 89.2% | -269 | -516 | -145 | -248 | 92.1% | -371 | 255.3% | -2,078 | -2,382 | -1,780 | -304 | 14.6% | -602 | 33.8% |
| % on sales | na | na | | na | na | na | na | | na | | na | na | na | na | | na | |

### Supporting Entities

| | Prior Month | | | December Mtd | | | | | | | December Ytd | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
| | | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % |
| _Sales | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | -1 | 0 | 0 | 1 | -100.0% | 0 | na |
| _Cos of Sales | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% | 3 | 0 | 0 | -3 | -100.0% | 0 | 0.0% |
| Gross Profit 1 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | -4 | 0 | 0 | 4 | -100.0% | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | n/a | na | na | na | | na | |
| Transportation Expenses | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | -100.0% | 0 | na | -5 | 0 | 0 | 5 | -100.0% | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | n/a | na | na | na | | na | |
| Gross Profit 2 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | -100.0% | 0 | 0.0% | 1 | 0 | 0 | -1 | -100.0% | 0 | 0.0% |
| % on sales | na | na | | na | na | na | na | | na | | n/a | na | na | na | | na | |
| Other Op.Income | 47 | -28 | -58.9% | 39 | 19 | 30 | -20 | -50.3% | -11 | -35.5% | 251 | 485 | 365 | 234 | 93.1% | 120 | 32.9% |
| Operating Expenses | 23 | -186 | -824.3% | -73 | -164 | 10 | -91 | 123.7% | -174 | -1689.1% | -111 | -23 | 151 | 88 | -79.1% | -175 | -115.3% |
| % on sales | na | na | | na | na | na | na | | na | | n/a | na | na | na | | na | |
| Operating E.B.I.T.D.A | 24 | 159 | 649.2% | 112 | 183 | 20 | 71 | 63.2% | 164 | 830.5% | 363 | 508 | 214 | 145 | 39.9% | 294 | 137.9% |
| % on sales | na | na | | na | na | na | na | | na | | n/a | na | na | na | | na | |

### Liquidation Entities

| | Prior Month | | | December Mtd | | | | | | | December Ytd | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
| | | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % | | | | Δ abs | Δ % | Δ abs | Δ % |
| _Sales | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 174 | 0 | 0 | -174 | -100.0% | 0 | na |
| _Cos of Sales | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% | 206 | 0 | 0 | -206 | -100.0% | 0 | 0.0% |
| Gross Profit 1 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | -32 | 0 | 0 | 32 | -100.0% | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | -18.4% | na | na | na | | na | |
| Transportation Expenses | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | 0.0% | na | na | na | | na | |
| Gross Profit 2 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | 0.0% | 0 | 0.0% | -32 | 0 | 0 | 32 | -100.0% | 0 | 0.0% |
| % on sales | na | na | | na | na | na | na | | na | | -18.4% | na | na | na | | na | |
| Other Op.Income | 0 | 0 | 0.0% | 1 | 0 | 0 | -1 | -100.0% | 0 | na | 8 | 0 | 0 | -8 | -100.0% | 0 | na |
| Operating Expenses | 0 | 0 | 0.0% | 0 | 0 | 0 | 0 | na | 0 | na | 0 | 0 | 0 | 0 | na | 0 | na |
| % on sales | na | na | | na | na | na | na | | na | | 0.0% | na | na | na | | na | |
| Operating E.B.I.T.D.A | 0 | 0 | 0.0% | 1 | 0 | 0 | -1 | -100.0% | 0 | 0.0% | -24 | 0 | 0 | 24 | -100.0% | 0 | 0.0% |
| % on sales | na | na | | na | na | na | na | | na | | -13.7% | na | na | na | | na | |

Other_Pnl

Confidential

**MAILLIS**

**Actual 2021**
values in 000 €

**Sales Report Excluding Gaderoth & MSS**

|  | **Prior Month** | | | **December Mtd** | | | | | | | **December Ytd** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Volumes** | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
|  |  | Δ abs | Δ % |  |  |  | Δ abs | Δ % | Δ abs | Δ % |  |  |  | Δ abs | Δ % | Δ abs | Δ % |
| Metal straps (tns) | 5,035 | -1,549 | -30.8% | 3,307 | 3,486 | 3,423 | 179 | 5.4% | 63 | 1.8% | 37,594 | 51,534 | 43,099 | 13,939 | 37.1% | 8,434 | 19.6% |
| Stretch film  (tns) | 3,564 | -564 | -15.8% | 3,063 | 3,000 | 3,072 | -63 | -2.0% | -72 | -2.3% | 41,611 | 40,151 | 41,988 | -1,459 | -3.5% | -1,837 | -4.4% |
| Pet Strap (tns) | 816 | 7 | 0.8% | 688 | 822 | 652 | 135 | 19.6% | 170 | 26.1% | 8,512 | 10,285 | 9,000 | 1,773 | 20.8% | 1,285 | 14.3% |
| PP Strap (tns) | 310 | -3 | -1.0% | 229 | 307 | 249 | 78 | 33.9% | 58 | 23.2% | 3,419 | 3,940 | 3,500 | 521 | 15.2% | 440 | 12.6% |

|  | **Prior Month** | | | **December Mtd** | | | | | | | **December Ytd** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
|  |  | Δ abs | Δ % |  |  |  | Δ abs | Δ % | Δ abs | Δ % |  |  |  | Δ abs | Δ % | Δ abs | Δ % |
| Metal straps | 7,839 | -2,409 | -30.7% | 2,964 | 5,430 | 3,004 | 2,466 | 83.2% | 2,426 | 80.7% | 33,268 | 70,705 | 37,957 | 37,437 | 112.5% | 32,747 | 86.3% |
| Seals | 133 | -66 | -49.5% | 78 | 67 | 60 | -11 | -14.2% | 7 | 12.1% | 692 | 995 | 720 | 303 | 43.7% | 275 | 38.2% |
| By Products/scrap / Inofita | 248 | -43 | -17.2% | 50 | 205 | 72 | 155 | 307.6% | 134 | 186.0% | 1,005 | 2,123 | 905 | 1,118 | 111.3% | 1,218 | 134.6% |
| Inofita BU | 8,220 | -2,518 | -30.6% | 3,093 | 5,703 | 3,136 | 2,610 | 84.4% | 2,567 | 81.8% | 34,964 | 73,822 | 39,582 | 38,857 | 111.1% | 34,240 | 86.5% |
| Stretch film | 7,541 | -1,094 | -14.5% | 3,901 | 6,447 | 4,156 | 2,546 | 65.3% | 2,291 | 55.1% | 55,258 | 78,433 | 56,787 | 23,175 | 41.9% | 21,646 | 38.1% |
| Pet Strap | 1,322 | 16 | 1.2% | 950 | 1,338 | 905 | 388 | 40.9% | 432 | 47.8% | 12,035 | 15,465 | 12,498 | 3,429 | 28.5% | 2,967 | 23.7% |
| PP Strap | 851 | 7 | 0.8% | 468 | 858 | 512 | 389 | 83.1% | 346 | 67.6% | 7,030 | 10,106 | 7,193 | 3,076 | 43.8% | 2,914 | 40.5% |
| Other Consumables | 249 | -70 | -28.2% | 139 | 178 | 159 | 39 | 28.1% | 20 | 12.5% | 2,038 | 2,484 | 1,902 | 446 | 21.9% | 582 | 30.6% |
| By Products/scrap Marflex | 10 | -5 | -53.2% | 5 | 5 | 0 | 0 | -9.3% | 5 | ####### | 79 | 102 | 0 | 24 | 30.3% | 102 | ####### |
| Marflex BU | 9,973 | -1,147 | -11.5% | 5,464 | 8,826 | 5,732 | 3,362 | 61.5% | 3,094 | 54.0% | 76,440 | 106,590 | 78,379 | 30,150 | 39.4% | 28,211 | 36.0% |
| S/A Machines | 2,722 | 53 | 2.0% | 2,204 | 2,776 | 2,007 | 572 | 25.9% | 769 | 38.3% | 24,938 | 31,580 | 27,721 | 6,641 | 26.6% | 3,858 | 13.9% |
| Tape Flexo | 122 | 58 | 47.2% | 152 | 180 | 55 | 27 | 18.0% | 125 | 228.0% | 549 | 1,131 | 712 | 582 | 106.2% | 419 | 58.9% |
| Trd machines | 7 | -2 | -27.7% | 38 | 5 | 27 | -33 | -86.1% | -21 | -79.9% | 382 | 271 | 398 | -111 | -29.1% | -126 | -31.8% |
| Machines | 2,852 | 109 | 3.8% | 2,395 | 2,961 | 2,089 | 566 | 23.6% | 872 | 41.8% | 25,869 | 32,982 | 28,831 | 7,112 | 27.5% | 4,151 | 14.4% |
| Tools | 877 | -192 | -21.9% | 499 | 685 | 563 | 186 | 37.2% | 122 | 21.6% | 7,213 | 9,723 | 8,207 | 2,510 | 34.8% | 1,516 | 18.5% |
| Other M&T | 687 | 14 | 2.0% | 438 | 701 | 462 | 262 | 59.9% | 238 | 51.5% | 6,593 | 7,826 | 6,901 | 1,233 | 18.7% | 924 | 13.4% |
| Service & Spares | 1,860 | -229 | -12.3% | 1,241 | 1,630 | 1,374 | 390 | 31.4% | 257 | 18.7% | 18,209 | 23,085 | 19,598 | 4,876 | 26.8% | 3,486 | 17.8% |
| Siat BU | 6,276 | -299 | -4.8% | 4,573 | 5,977 | 4,488 | 1,404 | 30.7% | 1,489 | 33.2% | 57,885 | 73,615 | 63,537 | 15,730 | 27.2% | 10,078 | 15.9% |
| Other | 21 | -6 | -26.7% | 29 | 15 | 0 | -14 | -48.5% | 15 | na | 332 | 229 | 0 | -103 | -31.0% | 229 | 0.0% |
| **Total** | 24,489 | -3,969 | -16.2% | 13,159 | 20,520 | 13,355 | 7,361 | 55.9% | 7,165 | 53.6% | 169,621 | 254,256 | 181,498 | 84,635 | 49.9% | 72,758 | 40.1% |

|  | **Prior Month** | | | **December Mtd** | | | | | | | **December Ytd** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Profit** | Nov A21 | vs PM | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | | A20 | A21 | B21 | A21 vs A20 | | A21 vs B21 | |
|  |  | Δ abs | Δ % |  |  |  | Δ abs | Δ % | Δ abs | Δ % |  |  |  | Δ abs | Δ % | Δ abs | Δ % |
| Metal straps | 1,357 | -429 | -31.7% | 466 | 927 | 602 | 462 | 99.2% | 326 | 54.1% | 6,269 | 14,660 | 8,090 | 8,391 | 133.9% | 6,570 | 81.2% |
| Seals | 48 | -26 | -53.7% | 24 | 22 | 13 | -2 | -7.2% | 9 | 68.5% | 166 | 309 | 158 | 144 | 86.6% | 151 | 95.4% |
| By Products/scrap Inofita | 0 | 0 | 73.0% | 0 | 0 | 0 | 0 | na | 0 | na | 12 | 4 | 0 | -8 | -64.2% | 4 | 0.0% |
| Inofita BU | 1,405 | -455 | -32.4% | 490 | 950 | 615 | 460 | 94.0% | 335 | 54.4% | 6,447 | 14,974 | 8,249 | 8,527 | 132.3% | 6,726 | 81.5% |
| Stretch film | 1,171 | -266 | -22.7% | 702 | 905 | 928 | 203 | 29.0% | -24 | -2.5% | 11,788 | 12,436 | 13,135 | 648 | 5.5% | -699 | -5.3% |
| Pet Strap | 286 | -33 | -11.5% | 326 | 253 | 251 | -73 | -22.4% | 2 | 0.7% | 3,728 | 4,356 | 3,857 | 628 | 16.9% | 499 | 12.9% |
| PP Strap | 198 | 1 | 0.5% | 107 | 199 | 124 | 92 | 86.4% | 76 | 61.4% | 1,919 | 2,675 | 2,032 | 755 | 39.4% | 643 | 31.6% |
| Other Consumables | -30 | 2 | -5.0% | 84 | -29 | 37 | -113 | -134.0% | -66 | -177.7% | 518 | 363 | 442 | -155 | -29.9% | -79 | -17.8% |
| By Products/scrap Marflex | 10 | -5 | -53.2% | 5 | 5 | 0 | 0 | -9.3% | 5 | na | 79 | 102 | -980 | 24 | 30.3% | 1,082 | -110.5% |
| Marflex BU | 1,635 | -302 | -18.4% | 1,224 | 1,333 | 1,340 | 109 | 8.9% | -7 | -0.5% | 18,032 | 19,933 | 18,487 | 1,901 | 10.5% | 1,446 | 7.8% |
| S/A Machines | 563 | 20 | 3.6% | 544 | 583 | 494 | 39 | 7.2% | 89 | 18.1% | 6,529 | 7,920 | 7,395 | 1,391 | 21.3% | 525 | 7.1% |
| Tape Flexo | 28 | 25 | 86.8% | 37 | 53 | 7 | 16 | 42.4% | 46 | 641.1% | 116 | 289 | 141 | 173 | 149.6% | 148 | 104.9% |
| Trd machines | 4 | -2 | -45.2% | 19 | 2 | 12 | -16 | -87.4% | -9 | -79.8% | 154 | 116 | 155 | -38 | -24.7% | -40 | -25.5% |
| Machines | 596 | 43 | 7.2% | 600 | 639 | 513 | 39 | 6.5% | 126 | 24.6% | 6,799 | 8,325 | 7,692 | 1,526 | 22.4% | 633 | 8.2% |
| Tools | 355 | -89 | -24.9% | 160 | 267 | 195 | 107 | 67.0% | 72 | 36.9% | 2,709 | 3,805 | 2,955 | 1,096 | 40.4% | 850 | 28.8% |
| Other M&T | 254 | -89 | -35.1% | 170 | 165 | 121 | -5 | -3.2% | 43 | 35.7% | 2,619 | 2,927 | 2,853 | 308 | 11.8% | 75 | 2.6% |
| Service & Spares | 1,004 | -297 | -29.6% | 557 | 707 | 622 | 149 | 26.8% | 85 | 13.7% | 9,100 | 12,176 | 9,820 | 3,076 | 33.8% | 2,357 | 24.0% |
| Siat BU | 2,209 | -432 | -19.6% | 1,487 | 1,777 | 1,451 | 290 | 19.5% | 327 | 22.5% | 21,227 | 27,233 | 23,319 | 6,007 | 28.3% | 3,914 | 16.8% |
| Other | 4 | -4 | -83.7% | 2 | 1 | 0 | -1 | -57.9% | 1 | na | 81 | 48 | 0 | -33 | -41.2% | 48 | 0.0% |
| Adj |  |  |  | 0 | 0 | 0 | 0 | na | 0 | na | 180 | 0 | 0 |  |  | 0 | 0.0% |
| **Total** | 5,253 | -1,192 | -22.7% | 3,203 | 4,061 | 3,406 | 858 | 26.8% | 655 | 19.2% | 45,967 | 62,188 | 50,055 | 16,221 | 35.3% | 12,133 | 24.2% |

|  | **Prior Month** | | **December Mtd** | | | | | **December Ytd** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gpm%** | Nov A21 | vs PM | A20 | A21 | B21 | A21 vs A20 | A21 vs B21 | A20 | A21 | B21 | A21 vs A20 | A21 vs B21 |
|  |  | Δ abs |  |  |  | Δ abs | Δ abs |  |  |  | Δ abs | Δ abs |
| Metal straps | 17.3% | -0.2pp | 15.7% | 17.1% | 20.0% | 1.4pp | -2.9pp | 18.8% | 20.7% | 21.3% | 1.9pp | -0.6pp |
| Seals | 36.1% | -3.0pp | 30.6% | 33.1% | 22.0% | 2.5pp | 11.1pp | 24.0% | 31.1% | 22.0% | 7.1pp | 9.1pp |
| By Products/scrap Inofita | 0.0% | 0.0pp | 0.0% | 0.0% | 0.0% | 0.0pp | 0.0pp | 1.2% | 0.2% | 0.0% | -1.0pp | 0.2pp |
| Inofita BU | 17.1% | -0.4pp | 15.8% | 16.7% | 19.6% | 0.8pp | -3.0pp | 18.4% | 20.3% | 20.8% | 1.8pp | -0.6pp |
| Stretch film | 15.5% | -1.5pp | 18.0% | 14.0% | 22.3% | -3.9pp | -8.3pp | 21.3% | 15.9% | 23.1% | -5.5pp | -7.3pp |
| Pet Strap | 21.6% | -2.7pp | 34.3% | 18.9% | 27.8% | -15.4pp | -8.9pp | 31.0% | 28.2% | 30.9% | -2.8pp | -2.7pp |
| PP Strap | 23.3% | -0.1pp | 22.8% | 23.2% | 24.1% | 0.4pp | -0.9pp | 27.3% | 26.5% | 28.3% | -0.8pp | -1.8pp |
| Other Consumables | -12.1% | -3.9pp | 60.5% | -16.1% | 23.2% | -76.6pp | -39.3pp | 25.4% | 14.6% | 23.2% | -10.8pp | -8.6pp |
| By Products/scrap Marflex | 100.0% | 0.0pp | 100.0% | 100.0% | n/a | 0.0pp | n/a | 100.0% | 100.0% | n/a | 0.0pp | n/a |
| Marflex BU | 16.4% | -1.3pp | 22.4% | 15.1% | 23.4% | -7.3pp | -8.3pp | 23.6% | 18.7% | 23.6% | -4.9pp | -4.9pp |
| S/A Machines | 20.7% | 0.3pp | 24.7% | 21.0% | 24.6% | -3.7pp | -3.6pp | 26.2% | 25.1% | 26.7% | -1.1pp | -1.6pp |
| Tape Flexo | 23.3% | 6.3pp | 24.5% | 29.5% | 13.1% | 5.1pp | 16.5pp | 21.1% | 25.6% | 19.8% | 4.4pp | 5.7pp |
| Trd machines | 57.6% | -13.9pp | 48.3% | 43.6% | 43.3% | -4.6pp | 0.3pp | 40.2% | 42.7% | 39.1% | 2.5pp | 3.6pp |
| Machines | 20.9% | 0.7pp | 25.1% | 21.6% | 24.5% | -3.5pp | -3.0pp | 26.3% | 25.2% | 26.7% | -1.0pp | -1.4pp |
| Tools | 40.5% | -1.5pp | 32.0% | 38.9% | 34.6% | 7.0pp | 4.3pp | 37.6% | 39.1% | 36.0% | 1.6pp | 3.1pp |
| Other M&T | 37.0% | -13.4pp | 38.9% | 23.5% | 26.3% | -15.3pp | -2.7pp | 39.7% | 37.4% | 41.3% | -2.3pp | -3.9pp |
| Service & Spares | 54.0% | -10.6pp | 44.9% | 43.4% | 45.3% | -1.6pp | -1.9pp | 50.0% | 52.7% | 50.1% | 2.8pp | 2.6pp |
| Siat BU | 35.2% | -5.5pp | 32.5% | 29.7% | 32.3% | -2.8pp | -2.6pp | 36.7% | 37.0% | 36.7% | 0.3pp | 0.3pp |
| Other | 21.5% | -16.7pp | 5.9% | 4.8% | n/a | -1.1pp | n/a | 24.4% | 20.8% | n/a | -3.6pp | n/a |
| **Total** | 21.5% | -1.7pp | 24.3% | 19.8% | 25.5% | -4.5pp | -5.7pp | 27.1% | 24.5% | 27.6% | -2.6pp | -3.1pp |



Confidential

## Monthly Trends Excluding Gaderoth & MSS

### Monthly Turnover



| | Jan_ | Feb_ | Mar_ | Apr_ | May_ | Jun_ | Jul_ | Aug_ | Sep_ | Oct_ | Nov_ | Dec_ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A21 | 14.8 | 16.6 | 21.2 | 21.2 | 21.4 | 23.5 | 24.4 | 17.8 | 24.5 | 23.8 | 24.5 | 20.5 |
| B21 | 13.7 | 14.8 | 16.1 | 15.6 | 16.4 | 16.4 | 16.5 | 10.3 | 16.0 | 16.1 | 16.1 | 13.4 |
| A20 | 14.2 | 15.7 | 16.7 | 13.4 | 12.2 | 14.4 | 14.8 | 9.5 | 14.8 | 15.1 | 15.5 | 13.2 |

### Monthly Gross Profit



| | Jan_ | Feb_ | Mar_ | Apr_ | May_ | Jun_ | Jul_ | Aug_ | Sep_ | Oct_ | Nov_ | Dec_ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A21 | 4.2 | 4.8 | 6.2 | 5.9 | 5.8 | 5.7 | 6.2 | 3.4 | 5.4 | 5.5 | 5.3 | 4.1 |
| B21 | 3.8 | 4.2 | 4.6 | 4.3 | 4.6 | 4.6 | 4.8 | 2.2 | 4.4 | 4.5 | 4.6 | 3.4 |
| A20 | 3.7 | 4.3 | 4.5 | 3.9 | 3.5 | 4.1 | 4.1 | 2.0 | 4.0 | 4.1 | 4.5 | 3.2 |

### Monthly Operating EBITDA



| | Jan_ | Feb_ | Mar_ | Apr_ | May_ | Jun_ | Jul_ | Aug_ | Sep_ | Oct_ | Nov_ | Dec_ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A21 | 1.6 | 1.9 | 3.4 | 3.1 | 3.0 | 2.7 | 3.4 | 1.2 | 2.5 | 2.5 | 2.2 | 1.2 |
| B21 | 1.3 | 1.6 | 1.9 | 1.7 | 1.9 | 1.9 | 2.1 | 0.1 | 1.8 | 1.9 | 1.9 | 1.0 |
| A20 | 0.9 | 1.4 | 1.5 | 1.1 | 1.2 | 1.6 | 1.9 | 0.0 | 1.6 | 1.7 | 2.0 | 0.8 |

### Monthly Gross Margin %



| | Jan_ | Feb_ | Mar_ | Apr_ | May_ | Jun_ | Jul_ | Aug_ | Sep_ | Oct_ | Nov_ | Dec_ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A21 | 28.5% | 28.6% | 29.3% | 27.9% | 27.0% | 24.2% | 25.2% | 18.8% | 21.9% | 23.0% | 21.5% | 19.8% |
| B21 | 27.9% | 28.1% | 28.8% | 27.8% | 27.9% | 28.0% | 28.7% | 21.8% | 27.6% | 28.1% | 28.4% | 25.5% |
| A20 | 26.2% | 27.4% | 26.9% | 28.9% | 28.5% | 28.7% | 27.7% | 21.5% | 27.2% | 27.1% | 28.9% | 17.4% |

**MAILLIS**

Confidential

values in 000 €

## Balance Sheet* Historical data include Gaderoth & M

| | Prior Month | | December End Month | | | | |
|---|---|---|---|---|---|---|---|
| **Assets** | **Nov A21** | **vs PM** | **Dec A20** | **Dec A21** | **Dec B21** | **vs A20** | **vs B21** |
| - Intangibles | 22,678 | 156 | 23,269 | 22,834 | 24,352 | -435 | -1,518 |
| - Tangibles | 50,636 | -4,821 | 57,047 | 45,815 | 53,054 | -11,232 | -7,239 |
| - Other Assets | 9,701 | -16 | 8,379 | 9,685 | 8,938 | 1,306 | 747 |
| - Inventory | 33,332 | -684 | 21,269 | 32,648 | 20,712 | 11,379 | 11,936 |
| - Trade Receivables | 48,022 | -4,881 | 31,249 | 43,142 | 30,824 | 11,893 | 12,317 |
| - Other Receivables | 4,808 | -327 | 3,562 | 4,481 | 797 | 920 | 3,685 |
| - Deferred Tax | 10,234 | 719 | 10,621 | 10,953 | 7,331 | 332 | 3,622 |
| - Cash | 29,547 | 8,853 | 24,953 | 38,400 | 33,582 | 13,447 | 4,818 |
| **- Total Assets** | **208,958** | **-1,001** | **180,348** | **207,957** | **179,589** | **27,609** | **28,368** |
| | | | | | | | |
| **Liabilities** | | | | | | | |
| - Share Capital and Share Premium | 172,526 | 0 | 172,526 | 172,526 | 172,526 | 0 | 0 |
| - Currency Translation reserve | -3,484 | 299 | -5,420 | -3,185 | -4,700 | 2,236 | 1,516 |
| - Reserves | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - Retained Profits / Losses | -60,453 | 1,114 | -70,422 | -59,339 | -61,665 | 11,084 | 2,326 |
| - Minority Interest | 682 | -14 | 626 | 668 | 679 | 42 | -11 |
| **- Equity & Reserves** | **109,271** | **1,400** | **97,309** | **110,670** | **106,839** | **13,362** | **3,831** |
| | | | | | | | |
| - Loans | 15,784 | -1,224 | 16,007 | 14,560 | 11,688 | -1,448 | 2,872 |
| - Interest Payable | 3 | 35 | 0 | 38 | 0 | 38 | 38 |
| - Provisions | 15,877 | -571 | 15,925 | 15,306 | 15,359 | -619 | -53 |
| - Other Liabilities | 771 | 3 | 2,465 | 774 | 2,420 | -1,690 | -1,646 |
| - Tax Liabilities and Deferred Tax | 13,309 | 379 | 12,835 | 13,687 | 6,801 | 853 | 6,886 |
| - Trade Payables | 42,464 | -395 | 27,430 | 42,070 | 25,994 | 14,640 | 16,075 |
| - Other Payables | 11,480 | -628 | 8,377 | 10,852 | 10,487 | 2,475 | 364 |
| **- Total Liabilities** | **99,687** | **-2,401** | **83,039** | **97,287** | **72,750** | **14,248** | **24,537** |
| **- Total Equity and Liabilities** | **208,958** | **-1,001** | **180,348** | **207,957** | **179,589** | **27,609** | **28,368** |

| Trade WoCap values | Nov A21 | vs PM | Dec A20 | Dec A21 | Dec B21 | vs A20 | vs B21 |
|---|---|---|---|---|---|---|---|
| **_Inventory** | 34,925 | -669 | 22,972 | 34,256 | 22,466 | 11,283 | 11,790 |
| **_Total Trade Receivables** | 46,666 | -4,987 | 30,695 | 41,678 | 30,572 | 10,983 | 11,106 |
| **_Total Trade Payables** | 41,169 | 146 | 27,143 | 41,315 | 25,645 | 14,172 | 15,670 |

BS



Confidential

**Actual 2021**

values in €mil

| | Dec A20 | Jan A21 | Feb A21 | Mar A21 | Apr A21 | May A21 | Jun A21 | Jul A21 | Aug A21 | Sep A21 | Oct A21 | Nov A21 | Dec A21 | | Dec A20 | Dec A21 | Dec B21 | Vs Dec A20 | vs Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - Inventory | 23.0 | 23.3 | 25.5 | 26.3 | 28.4 | 31.7 | 32.2 | 33.9 | 32.8 | 33.8 | 33.9 | 34.9 | 34.3 | | 23.0 | 34.3 | 22.5 | 11.3 | 11.8 |
| - Trade Receivables | 30.7 | 30.8 | 34.1 | 38.0 | 41.1 | 42.3 | 43.9 | 47.6 | 44.8 | 45.5 | 46.2 | 46.7 | 41.7 | | 30.7 | 41.7 | 30.6 | 11.0 | 11.1 |
| - Trade Payables | 27.1 | 26.9 | 30.1 | 35.5 | 38.9 | 38.5 | 37.7 | 43.5 | 40.3 | 40.4 | 39.8 | 41.2 | 41.3 | | 27.1 | 41.3 | 25.6 | 14.2 | 15.7 |
| - **Trade Working Capital** | **26.5** | **27.2** | **29.5** | **28.8** | **30.6** | **35.5** | **38.5** | **38.0** | **37.3** | **38.9** | **40.4** | **40.4** | **34.6** | | **26.5** | **34.6** | **27.4** | **8.1** | **7.2** |
| **% on Revenue** | 14.9% | 15.4% | 16.7% | 16.1% | 16.4% | 18.3% | 19.0% | 18.0% | 17.0% | 16.9% | 17.0% | 16.4% | 13.6% | | 14.9% | 13.6% | 15.1% | | |

**Trade Working Capital Days**

| | Dec A20 | Jan A21 | Feb A21 | Mar A21 | Apr A21 | May A21 | Jun A21 | Jul A21 | Aug A21 | Sep A21 | Oct A21 | Nov A21 | Dec A21 | | Dec A20 | Dec A21 | Dec B21 | Vs Dec A20 | vs Dec B21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DII** | 63D | 65D | 71D | 73D | 77D | 82D | 79D | 79D | 73D | 72D | 69D | 68D | 64D | | 63D | 64D | 62D | 1 | 3 |
| **DSO** | 62D | 63D | 70D | 76D | 81D | 79D | 78D | 81D | 73D | 71D | 70D | 68D | 59D | | 62D | 59D | 61D | -3 | -2 |
| **DPO** | 75D | 75D | 84D | 98D | 105D | 99D | 92D | 101D | 90D | 86D | 81D | 80D | 77D | | 75D | 77D | 70D | 3 | 7 |



TWCAP

 **MAILLIS**

Confidential

**Actual 2021**

values in 000 €

## Cash Flow *Historical data include Gaderoth & MSS

| | | Prior Month | | Month to Date | | | | | Year to Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Nov A21 | vs PM Δ abs | Dec A20 | Dec A21 | Dec B21 | vs A20 Δ abs | vs B21 Δ abs | Dec A20 | Dec A21 | Dec B21 | vs A20 Δ abs | vs B21 Δ abs |
| A | Operating EBITDA | 2,180 | -977 | 822 | 1,203 | 1,006 | 382 | 197 | 15,478 | 28,506 | 19,085 | 13,028 | 9,421 |
| | Restructuring Expense | -133 | -253 | -565 | -386 | -20 | 180 | -366 | -2,874 | -1,982 | -240 | 892 | -1,742 |
| | Net Non.Recurring | -105 | -1,449 | -1,141 | -1,554 | -184 | -413 | -1,370 | -6,606 | -1,555 | -2,096 | 5,051 | 542 |
| B | Extraordinary costs | -238 | -1,702 | -1,707 | -1,940 | -204 | -233 | -1,736 | -9,480 | -3,536 | -2,336 | 5,943 | -1,200 |
| | FX Differences (+/-) | -13 | 70 | -1 | 57 | | 59 | 57 | -398 | 179 | | 577 | 179 |
| | - Non Cash Items Add Back | -69 | 1,065 | -522 | 996 | 8 | 1,518 | 988 | -2,650 | 845 | -26 | 3,496 | 871 |
| | Provisions Included in Operating EBITDA | 127 | -727 | 2,320 | -600 | 101 | -2,919 | -701 | 3,365 | 885 | 1,210 | -2,480 | -326 |
| | Mng fees | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | | 0 | 0 |
| C | Adjustments to Ebitda | 45 | 408 | 1,796 | 453 | 109 | -1,343 | 344 | 316 | 1,909 | 1,185 | 1,593 | 724 |
| | Inventories | -1,007 | 1,676 | 1,574 | 669 | 785 | -905 | -116 | 8,864 | -11,534 | 506 | -20,399 | -12,041 |
| | Trade Receivables IC | 0 | 0 | 0 | | | 0 | 0 | | | | 0 | 0 |
| | Trade Receivables Non IC | -460 | 5,444 | 1,961 | 4,985 | 1,427 | 3,024 | 3,558 | 3,131 | -11,464 | -315 | -14,595 | -11,149 |
| | Trade Payables IC | 0 | 3 | 0 | 3 | 0 | 3 | 3 | 0 | 8 | 0 | 8 | 8 |
| | Trade Payables Non IC | 1,396 | -1,253 | 331 | 143 | -161 | -188 | 304 | 2,668 | 14,165 | -1,497 | 11,497 | 15,662 |
| D | Trade Working Capital | -70 | 5,870 | 3,866 | 5,800 | 2,051 | 1,935 | 3,749 | 14,662 | -8,826 | -1,306 | -23,489 | -7,520 |
| | Other Receivables IC | 0 | 0 | 0 | | | 0 | 0 | | | | 0 | 0 |
| | Other Receivables Non IC | -48 | 3 | -806 | -45 | 36 | 761 | -81 | 206 | -570 | 1,364 | -776 | -1,934 |
| | Other Payables IC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | -16 | 0 |
| | Other Payables Non IC | 462 | -1,301 | -1,460 | -838 | -677 | 621 | -161 | -3,218 | -1,981 | 698 | 1,237 | -2,679 |
| | Other Taxes | -313 | 134 | -89 | -179 | 128 | -90 | -308 | 1,757 | 59 | 1,116 | -1,698 | -1,057 |
| | FX in WC | 45 | -32 | -45 | 13 | 0 | 58 | 13 | -394 | 146 | -3 | 540 | 149 |
| E | Other Woca Elements | 146 | -1,196 | -2,400 | -1,049 | -513 | 1,351 | -536 | -1,633 | -2,346 | 3,175 | -713 | -5,521 |
| F | Total  Working Capital | 76 | 4,674 | 1,466 | 4,751 | 1,538 | 3,285 | 3,213 | 13,029 | -11,173 | 1,869 | -24,202 | -13,041 |
| G | Taxes Paid | -933 | 478 | 134 | -455 | 36 | -589 | -491 | -1,474 | -3,882 | -4,540 | -2,408 | 657 |
| H | Interest | -124 | -36 | -167 | -160 | -102 | 6 | -58 | -1,370 | -1,450 | -1,239 | -80 | -211 |
| I | A+B+C+F+G+H) | 1,006 | 2,846 | 2,344 | 3,852 | 2,383 | 1,508 | 1,469 | 16,499 | 10,374 | 14,024 | -6,126 | -3,651 |
| | Acquisitions / Disposals of Affiliates | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | _CAPEX | -34 | -486 | -722 | -519 | -486 | 202 | -34 | -3,027 | -1,910 | -1,998 | 1,117 | 87 |
| | Proceeds from sales of Assets | 15 | 6,592 | 8 | 6,607 | | 6,599 | 6,607 | 1,607 | 7,276 | | 5,669 | 7,276 |
| | Interest received IC | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | | 0 | 0 |
| | Interest received Non IC | 0 | 0 | -43 | 0 | 0 | 43 | 0 | -25 | -10 | 7 | 15 | -17 |
| | Dividends received | 1,100 | -1,100 | 0 | 0 | 0 | 0 | 0 | 1,047 | 1,100 | 1,060 | 53 | 40 |
| J | Cash Flow from Investing | 1,081 | 5,006 | -757 | 6,087 | -486 | 6,844 | 6,573 | -398 | 6,456 | -930 | 6,854 | 7,386 |
| | Changes in Equity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,216 | 0 | 0 | -4,216 | 0 |
| | Loans IC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Loans Non IC | -1,052 | -222 | 550 | -1,273 | -951 | -1,823 | -322 | -335 | -2,702 | -4,377 | -2,367 | 1,675 |
| | Dividends paid | 0 | 0 | -129 | 0 | 0 | 129 | 0 | -5,536 | -25 | 1 | 5,511 | -25 |
| K | Cash Flow from Financing | -1,052 | -222 | 421 | -1,273 | -951 | -1,694 | -322 | -1,655 | -2,727 | -4,376 | -1,072 | 1,649 |
| L | Cash Generated ( I+J+K) | 1,036 | 7,631 | 2,008 | 8,666 | 946 | 6,659 | 7,720 | 14,446 | 14,103 | 8,718 | -343 | 5,385 |
| M | Cash Beginning | 28,760 | 787 | 23,123 | 29,547 | 32,635 | 6,424 | -3,088 | 10,920 | 24,953 | 24,953 | 14,033 | 0 |
| N | FX | -248 | 435 | -182 | 187 | 0 | 368 | -186 | -419 | -660 | -93 | -240 | 567 |
| | Cash End ( L+M+N) | 29,547 | 8,853 | 24,948 | 38,400 | 33,582 | 13,451 | 4,818 | 24,947 | 38,397 | 33,579 | 13,449 | 4,818 |

CF

 **MAILLIS**

<span style="color:red">Confidential</span>

**Year 2021**
values in 000 €

## NET DEBT * Historical data include Gaderoth & MSS

| | Dec A18 | Dec A19 | Dec A20 | Jan A21 | Feb A21 | Mar A21 | Apr A21 | May A21 | Jun A21 | Jul A21 | Aug A21 | Sep A21 | Oct A21 | Nov A21 | Dec A21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **- Loans Non IC** | | | | | | | | | | | | | | | |
| - Non current bank loans | 0 | | 719 | 723 | 713 | 675 | 673 | 669 | 654 | 1,638 | 1,630 | 1,610 | 1,610 | 1,582 | 1,577 |
| - Non current finance lease liabilities | 3,674 | 2,409 | 1,896 | 1,789 | 1,699 | 1,609 | 1,519 | 1,430 | 1,338 | 1,253 | 1,163 | 1,076 | 981 | 865 | 774 |
| - Non current finance lease liabilities IFRS16 | 6,680 | 5,759 | 4,653 | 4,537 | 4,463 | 4,674 | 4,672 | 4,567 | 4,577 | 4,447 | 4,348 | 4,213 | 4,216 | 4,181 | 4,029 |
| - Current loans from banks | 3,501 | 3,502 | 2,787 | 2,784 | 2,640 | 2,636 | 2,639 | 146 | 143 | 140 | 142 | 355 | 1,691 | 1,620 | 421 |
| - Current finance lease liabilities | 1,328 | 1,380 | 1,349 | 1,251 | 1,164 | 1,082 | 995 | 991 | 991 | 990 | 992 | 989 | 985 | 1,020 | 1,014 |
| - Current finance lease liabilities IFRS16 | 2,117 | 1,678 | 1,531 | 1,639 | 1,660 | 1,699 | 1,724 | 1,704 | 1,676 | 1,647 | 1,619 | 1,584 | 1,591 | 1,551 | 1,598 |
| - Bank overdrafts | | | 3,072 | 3,085 | 2,879 | 1,773 | 2,481 | 3,299 | 3,949 | 4,177 | 4,333 | 5,830 | 5,720 | 4,966 | 5,147 |
| **- Loans Non IC Total** | **17,301** | **14,728** | **16,007** | **15,809** | **15,218** | **14,148** | **14,703** | **12,806** | **13,328** | **14,292** | **14,226** | **15,656** | **16,794** | **15,784** | **14,560** |
| **- Loans Total** | **17,301** | **14,728** | **16,007** | **15,809** | **15,218** | **14,148** | **14,703** | **12,806** | **13,328** | **14,292** | **14,226** | **15,656** | **16,794** | **15,784** | **14,560** |
| **Pension Obligations** | | | | | | | | | | | | | | | |
| - MJM Greece | 3,438 | 2,846 | 2,777 | 2,788 | 2,800 | 2,811 | 2,823 | 2,824 | 2,782 | 2,794 | 2,805 | 2,817 | 2,828 | 2,840 | 2,840 |
| - Siat Spa | 2,995 | 2,801 | 2,611 | 2,602 | 2,617 | 2,596 | 2,596 | 2,606 | 2,616 | 2,628 | 2,643 | 2,660 | 2,638 | 2,654 | 2,719 |
| - MJM Poland | 81 | 109 | 106 | 107 | 107 | 104 | 106 | 108 | 107 | 106 | 107 | 105 | 105 | 104 | 98 |
| - Gaderoth | 748 | 911 | 0 | | | | | | | | | | | | |
| - Sander | 973 | 1,038 | 0 | | | | | | | | | | | | |
| - MJM UK | 8,470 | 8,624 | 9,105 | 9,206 | 9,291 | 9,434 | 9,198 | 9,232 | 9,197 | 9,211 | 9,075 | 8,999 | 9,108 | 8,977 | 8,331 |
| - MJM France | 41 | 74 | 0 | | | | | | | | | | | | |
| - MJM Austria | 30 | 0 | 0 | | | | | | | | | | | | |
| - Maillis Sander Gmbh | | 0 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,157 | 1,066 |
| **Pension Obligations Total** | **16,776** | **16,403** | **15,757** | **15,862** | **15,973** | **16,103** | **15,880** | **15,928** | **15,860** | **15,897** | **15,788** | **15,739** | **15,837** | **15,733** | **15,054** |
| **Total Debt** | **34,077** | **31,130** | **31,764** | **31,670** | **31,190** | **30,251** | **30,583** | **28,733** | **29,188** | **30,189** | **30,014** | **31,395** | **32,631** | **31,517** | **29,614** |
| **Total Cash** | **12,591** | **10,920** | **24,953** | **24,654** | **23,740** | **25,732** | **26,620** | **22,781** | **25,065** | **25,540** | **26,100** | **27,742** | **28,760** | **29,547** | **38,400** |
| **Net Debt** | **21,486** | **20,210** | **6,811** | **7,017** | **7,450** | **4,519** | **3,964** | **5,952** | **4,123** | **4,650** | **3,914** | **3,653** | **3,871** | **1,970** | **-8,786** |
| **Factoring** | | | | | | | | | | | | | | | |
| M.J.Maillis Poland | 2,377 | 1,690 | 2,538 | 2,358 | 2,484 | 2,680 | 3,403 | 3,959 | 3,885 | 3,843 | 3,829 | 4,080 | 3,598 | 179 | 4,298 |
| Maillis S.A | 376 | 328 | 333 | 219 | 303 | 260 | 511 | 323 | 474 | 711 | 638 | 534 | 525 | 540 | 218 |
| Siat Conso | 454 | 547 | 295 | 493 | 616 | 736 | 553 | 683 | 235 | 359 | 507 | 512 | 373 | 613 | 780 |
| **Total** | **3,207** | **2,565** | **3,166** | **3,070** | **3,403** | **3,676** | **4,467** | **4,965** | **4,594** | **4,913** | **4,974** | **5,126** | **4,496** | **1,332** | **5,296** |
| **Trade Finance (BG, L/C)** | | | | | | | | | | | | | | | |
| M.J.Maillis Poland | 2,000 | 2,000 | | | | | 470 | 470 | 0 | 1,719 | 2,178 | 1,707 | 367 | 179 | 179 |
| Maillis S.A | | | 2,700 | 2,700 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Siat Conso | | 78 | 107 | 106 | 137 | 97 | 53 | 95 | 85 | 42 | 45 | 38 | 46 | 111 | 130 |
| **Total** | **2,000** | **2,078** | **2,807** | **2,806** | **3,637** | **3,597** | **4,023** | **4,065** | **3,585** | **5,261** | **5,723** | **5,245** | **3,913** | **3,790** | **3,809** |

Net_Debt